UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 10-187 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S RESPONSE TO |
| | ) | DEFENDANTS' MOTION TO LIMIT |
| v. | ) | EXPERT TESTIMONY |
| | ) | |
| | ) | |
| AMINA FARAH ALI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW the United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, Jeffrey S. Paulsen, Assistant United States Attorney, and Steven Ward, Trial Attorney, U.S. Department of Justice, and submits this response to Defendants' Motion To Limit Expert Testimony, filed September 12, 2011. The Motion should be denied because the two proposed witnesses are experts whose testimony is relevant to proving elements of the charged offenses which will be helpful to the jury in understanding the intercepted calls in the government's case.

## BACKGROUND

The Government has retained two experts in this matter – Evan Kohlmann and Matt Bryden. Mr. Kohlmann is a recognized expert in international terrorism, terrorist organizations, and radicalization and recruitment through the internet, having qualified as an expert and testified in approximately 15 trials in federal court. He has also testified as an expert before

military commissions at Guantanamo Bay and in several foreign courts, including courts in the United Kingdom, Denmark, Australia, and Bosnia Herzegovina.  Attached as Exhibit 1 is a copy of Mr. Kohlmann's *curriculum vitae*.

While Mr. Kohlmann authored three expert reports in this case, the government notified the defense that his testimony would be limited to the subjects covered in the Kohlmann's Expert Reports 2 & 3. *See* Exhibits 2 & 3.  That testimony focuses on: 1) Al-Shabaab's media department and its publication of claims of responsibility for actions occurring in its campaign against the Somali government; 2) al-Shabaab's communications responding to al-Qaeda, necessary to identifying the speaker on an intercepted call as an al-Shabaab member; and 3) certain computer images found on the hard drive of defendant Ali's computer, including numerous photos of al-Shabaab leaders and the sources of the images.

Defendants challenge to Mr. Kohlmann's qualifications cavalierly claims:

> Kohlmann's claim to fame is that he surfs the internet
> and other media outlets looking for information on Al-
> Qaida. He says that he has amassed one of the world's
> largest libraries of terrorist multimedia. Based upon
> that, he has apparently been making a lucrative living
> being paid as a consultant and prospective government
> witness by the governments of the United States and
> Great Britain. . . .This counsel cannot see any
> material difference between what Kohlmann did and going
> back and reading Reusse's columns in the Star Tribune
> to become an "expert" on the Minnesota Vikings.

This assertion ignores the numerous cases in which federal courts have rejected this argument and found Mr. Kohlmann was qualified to testify in an expert capacity.  *See, e.g.*, *United States v. Kassir*, 2009 WL 910767 *7 (S.D.N.Y. April 2, 2009); *United States v. Mubayyid*, No. 05-40026 (D. Mass. 2007); *United States v. Sabir*, 2007 WL 1373184 at *11; *United States  v. Chandia*, No. 05-CR-401 (E.D. Va. Apr. 21, 2006); *United States v. Paracha*, 2006 WL 12768, at *20-22; *United States v. Padilla,* 04-60001-CR, (S.D. Fl. March 21, 2007); *United States v. Al Timini*, No. 04-CR-385 (E.D. Va. 2005); *United States v. Benkahla*, 530 F.3d 300, 309 n.2 (4th Cir. 2008);  *United States v. Aref,* 285 Fed. Appx. 784, 792 (2d Cir. 2008);  *United States v. Abu–Jihaad,* 533 F. Supp. 2d 121, 123-24 (D. Conn. 2008), *affd*, 630 F.3d 102 (2d Cir. 2010); *United States v. Sherifi*, No. 5:09-CR-216-FL, Order (E.D.N.C. September 16, 2011) (attached as Exhibit 4); *United States v. Sedaghaty*, Cr. No. 05-60008-HO, Order (attached hereto as Exhibit 5).[1]

The government's other expert, Matt Bryden, has more than 20 years field experience in various capacities in the Horn of Africa.  As evidenced by his *curriculum vitae*, Mr. Bryden's life's work is the study of Somalia and the Somali conflict. *See* Exhibit 6.  His fluency in the Somali language,

---

[1] Even in a case where the Court did not allow Mr. Kohlmann's testimony as an expert: *United States v. Amawi*, 541 F. Supp. 2d 945, 949-50 (N.D. Ohio 2008); the Court nevertheless endorsed his methodology as reliable.

coupled with his extensive travel in country, and interviews with principals in the conflict, have provided him, and will provide the jury, unparalleled insight into the Somali conflict.

For the last four years, Mr. Bryden has been the coordinator of the United Nations Security Council Somalia and Eritrea Monitoring Group (and its predecessor) in charge of preparing a comprehensive report to the United Nations Security Council on the operation of the arms embargo and recommendations for targeted sanctions for violations.

With respect to Matt Bryden, defendants apparently concede his expertise stating only, "the hard part is to discern when he is outside his knowledge base and is now commenting on what he reads in the newspapers and media outlets. . . ." To put it succinctly, no witness the government will call as an expert – either Mr. Kohlmann or Mr. Bryden – will give opinions based solely on the media. Therefore, the motion should be denied.

## ARGUMENT

I.   <u>Evan Kohlmann Is Qualified to Testify as An Expert</u>

    A.   **The Legal Standard**

Federal Rule of Evidence 702 governs the admission of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form

4

of an opinion or otherwise, if (1) the testimony is
based upon sufficient facts or data, (2) the testimony
is the product of reliable principles and methods, and
(3) the witness has applied the principles and methods
reliably to the facts of the case.

Under Fed. R. Evid. 702 the district court must act as
gatekeeper to "ensure that any and all scientific testimony or
evidence admitted is not only relevant, but reliable." *Daubert
v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).
The trial judge "has the gatekeeping responsibility to 'ensur[e]
that an expert's testimony both rests on a reliable foundation
and is relevant to the task at hand.' " *First Union Nat'l Bank
v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005)(citing *Kumho Tire
Co. v. Carmichael*, 526 U.S. 137 (1999)).  The district court's
gatekeeping role under Fed. R. Evid. 702 extends to nonscientific
expert testimony. *Kumho Tire*, 526 U.S. 137, 141 (1999).  In
addition to the factors listed in Fed. R. Evid. 702, such as
experience and education, the district court can and should
consider other factors, such as whether the expert witness's
relevant views have been published or subjected to peer review.
*Daubert*, 509 U.S. at 593-94.

A trial judge has considerable leeway when determining the
reliability of an expert's proposed testimony. *Kumho Tire*, 526
U.S. at 153; *see also Daubert*, 509 U.S. at 594 ("The inquiry
envisioned by Rule 702 is, we emphasize, a flexible one.").
"Lack of certainty is not, for a qualified expert, the same thing

5

as guesswork." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). In addition, Fed. R. Evid. 702 is "construed liberally" when the trial judge is determining the reliability and "admissibility of [proposed expert] testimony based on some 'other specialized knowledge'" that is not scientific knowledge. *United States v. Hankey*, 203 F.3d 1160, 1167-68 (9th Cir. 2000). With some proffers of nonscientific testimony, "reliability depends heavily on the knowledge and experiences of the expert, rather than the methodology or theory behind it." *Id.* at 1169. Peer review may not always be available when a subject is relatively new. *Primiano v. Cook,* 598 F.3d at 565.

In addition to granting the district court leeway with the "ultimate reliability" determination, the district court has "broad latitude when it decides *how* to determine reliability[.]" *Kumho Tire*, 526 U.S. at 142. In other words, the judge has the discretion to decide whether a separate proceeding is necessary to determine the reliability of the witness's qualifications or his methodology. *Id.* at 152. Given the numerous factors and methods available to determine an expert's reliability, the trial judge's decision to admit expert testimony is reviewed for abuse of discretion. Moreover, "[t]he Rules of Evidence have a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix International, Inc*., 128 F.3d 802, 806 (3rd Cir. 1997);

6

*see Daubert*, 509 U.S. at 588.  A district court has broad latitude in deciding how to determine reliability and there is no requirement that the District Court hold a *Daubert* hearing prior to qualifying an expert witness.  *United States v. Solorio-Tafolla*, 324 F.3d 964, 965-66 (8th Cir. 2001).

B.  **Discussion**

Defendants' motion attacks Mr. Kohlmann on the basis of his credentials and his methodology.  They would have the Court believe Mr. Kohlmann has no real-world experience and spends his time in a New York apartment surfing the internet.

Defendant's depiction is inaccurate and ignores both Mr. Kohlmann's substantial experience and the fact that he is recognized as an expert in the field not only in the United States, but overseas as well.  Mr. Kohlmann has been found to be an expert in numerous terrorism cases in approximately fifteen different federal courtrooms.  The Fourth Circuit dispatched a similar complaint about Mr. Kohlmann's qualifications in a single footnote:

> [Defendant] also attacks Kohlmann's qualifications as an expert, but those qualifications were obviously substantial and the district court acted well within its discretion in determining that they were sufficient.

*United States v. Benkahla*, 530 F.3d 300, 309, n.2 (4th Cir. 2008).

As for his qualifications, Mr. Kohlmann graduated *magna cum laude* in 2001 from Georgetown University's School of Foreign Service with an honor's degree in international politics, a concentration in international security studies, and a certificate in Islamic studies.  He later received a law degree from the University of Pennsylvania Law School.  Since graduating from Georgetown, Mr. Kohlmann has devoted his life to the study of international Islamic organizations.  He specializes in Al-Qaida and related terrorist groups, the role of Arab fighters in conflicts in Afghanistan, Bosnia, Chechnya, Kashmir, and Iraq, terrorist fund-raising and recruitment networks, and the use of the internet and other electronic media as recruitment and proselytization tools.

Mr. Kohlmann spent six years as a consultant with the Investigative Project, a counterterrorism "think tank" and policy group.[2]  Mr. Kohlmann worked for The Investigative Project from 1998 until late 2003, first as an intern, and eventually as a full-time senior analyst.  During his tenure there, he gave

_____

[2] The Investigative Project is a counter-terrorism "think tank" and policy group started in 1995 by Steven Emerson, a former CNN journalist.  Since 9-11, Emerson has testified before and briefed Congress dozens of times on terrorist financing and operational networks of Al Qaeda, Hamas, Hezbollah, Islamic Jihad, and other such groups.  Emerson launched The Investigative Project on Terrorism following the broadcast of his documentary film, "Jihad in America," on public television.  The film exposed clandestine operations of militant Islamic terrorist groups on American soil.  For the film, Emerson received numerous awards including the George Polk Award for best television documentary, one of the most prestigious awards in journalism.  He also received the top prize from the Investigative Reporters and Editors Organization (IRE) for best investigative report in both print and television for the documentary.

regular briefings to United States law enforcement agencies, and even delivered presentations to former "Counter-Terrorism Czar," Richard Clarke, at the White House during the Clinton administration.  He has personally interviewed several notorious terrorists and followed terrorist networks on the internet.  He founded Globalterroralert.com in 2004, a clearinghouse of information on international terrorism.  Mr. Kohlmann is a consultant for NBC News/MSNBC on international terrorism.  In addition, he has worked for about five years as a senior investigator for the Nine/Eleven Finding Answers Foundation, a non-profit organization that researches, analyzes and disseminates information about past and current terrorist activities.

Additionally, Mr. Kohlmann has written numerous articles and papers on the topics of his proposed testimony.  His published and peer reviewed works catalog his extensive knowledge concerning international Islamic organizations.  Mr. Kohlmann also authored a book[3] about the foreign mujahideen in Bosnia that has been used as an academic textbook at several universities in the United States and elsewhere, and was cited in the *Final Report of the National Commission on Terrorist Attacks Upon the United States* (also known as "The 9/11 Commission Report").

---

[3] Kohlmann, Evan F., *Al-Qaida's Jihad in Europe: The Afghan-Bosnian Network*, Berg Publishers (Nov. 25, 2004).

Mr. Kohlmann uses a reliable methodology that results in a sound factual basis for his proposed testimony. He gathers his information from identifiable open sources, including original material from terrorist groups such as video recordings, audio recordings, and communiques issued by terrorist organizations, as well as interviews and statements by terrorist leaders, members and supporters. He also consults reliable secondary materials such as reports by other experts in the field and tertiary sources such as textbooks and newspaper articles by reputable authors. Mr. Kohlmann cross-checks such information with other existing information as a way of ensuring that his conclusions are always consistent with the most reliable sources available. Several federal courts have specifically upheld Mr. Kohlmann's methodology as reliable and admitted his expert testimony into evidence.

Defendant argues that Mr. Kohlmann's methodology is unreliable because the majority of his information comes from the Internet. However, the fact is that he is an analyst. He vacuums information from a variety of sources – indeed, much of it can be found in open sources, and much of that is accessible on the internet. Mr. Kohlmann uses his training and experience to draw connections, sort reliable information from unreliable, and form conclusions. This is the essence of what he does.

In *United States v. Paracha*, 2006 WL 12768 (S.D.N.Y. 2006),

10

Mr. Kohlmann's methodology was challenged by the defendant in a case involving material support for Al-Qaida.  In rejecting the challenge, District Judge Stein wrote:

> Paracha challenges the reliability of this methodology, characterizing it as a mere culling from a handful of cases and internet reports information that the user deems reliable.  Although Kohlmann's methodology is not readily subject to testing and permits of no ready calculation of a concrete error rate, it is more reliable than a simple cherry-picking of information from websites and other sources.  The testimony and evidence at the hearing demonstrate that Kohlmann's opinions and conclusions are subjected to various forms of peer review and that the opinions he proposes to offer here regarding al Qaeda's origins, leaders and certain tradecraft are generally accepted within the relevant community.  Kohlmann's methodology, as he describes it, is similar to that employed by experts that have been permitted to testify in other federal courts involving terrorist organizations.  Whatever the general pitfalls of the "vetting process" that is employed by Kohlmann and others in his field, it is a sufficiently reliable methodology to meet the requirements of Fed. R. Evid. 702.

*United States v. Paracha*, 2006 WL 12768, at * 20 (citations omitted); *accord*, *United States v. Sabir*, 2007 WL 1373184, at * 8-9 (S.D.N.Y. 2007).

While Courts have consistently admitted expert testimony from Mr. Kohlmann, none of the reported decisions we found involved al-Shabaab.  Nevertheless, Mr. Kohlmann has demonstrated the necessary level of expertise and experience with this terrorist organization.  The defense recklessly suggests Kohlmann was nothing more than a hired gun with no background on al-

Shabaab before he worked on this case.[4]  Yet, Mr. Kohlmann's interest in al-Shabaab -- another terrorist organization with a global islamist agenda -- predates his work in this matter.  He authored the article *Shabaab al-Mujahedin: Migration and Jihad in the Horn of Africa* in May 2009.  *See* Exhibit 7.  He has since completed collaborating on an article on al-Shabaab and the Somali conflict, which was co-authored with Lorenzo Vidino. Exhibit 8.  Further, he has testified as an expert on al-Shabaab in two cases: *United States v. Kaziu*, 09-CR-660 (E.D.N.Y.) in July 2011; and *Regina v. Mutegombwa*, in the United Kingdom in 2007.  *See* Exhibit 1.

Significantly, defendants attack Kohlmann's expertise to address the background of the Somali conflict and al-Shabaab's role therein.  However, Mr. Kohlmann will not testify about those matters.  His proffered testimony is confined to areas as to which defendants have raised no objection.  This testimony relates generally to the use of the internet and other electronic media as recruitment and proselytization tools; and the identification of jihadist computer images and their sources. This is an area in which, by Mr. Kohlmann's estimate, he has testified about approximately 7 times.

---

[4] Frankly, we are at a loss to account for Defendants' assertion that Kohlmann started working on this investigation on February 2009.

II.  <u>The Testimony of Both Witnesses Will be Helpful to the Jury</u>

    A.  **Legal Standard**

All evidence admitted at trial must be relevant to a material fact and have "probative value." Fed. R. Evid. 402, 403; *Daubert*, 509 U.S. at 597 (requiring that all expert testimony be "relevant to the task at hand"). Expert testimony is relevant and probative when it helps the jury understand other evidence or assists the jury with its fact-finding function. Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591-592 (requiring expert testimony to have a "connection to the pertinent inquiry").

    B.  **Discussion**

Defendants write that the proposed expert testimony is "not necessarily" related to charges in the indictment, without specifying what the offending testimony is. Nothing could be further from the truth. Without the testimony of Mr. Bryden and Mr. Kohlmann, the jury will not fully understand the intercepted calls that are the foundation of this case. Indeed, the course of the Somali conflict is not covered in the Western media in a way that jurors would understand basic (or historical) facts about it when they are discussed or alluded to by the conspirators.

The conspiracy charge requires the government to prove that the defendants acted with knowledge that al-Shabaab was a

designated Foreign Terrorist Organization, or that it had engaged in the terrorist activities that led to designation. *See* Joint Instruction 18. The government must also prove that the defendants intended the funds in this case go to al-Shabaab. *Id*. This, in turn requires the government to prove that the conspirators in Somalia were al-Shabaab members.

Mr. Kohlmann's testimony would be probative of these elements. For instance, Mr. Kohlmann would testify regarding several communiques posted to the official al-Shabaab website. These communiques claim responsibility for certain events in the Somali conflict, each of which are discussed on the intercepted calls. Mr. Kohlmann's testimony as to these claims of responsibility, their source, and their authenticity will assist the jury in understanding the discussions between the conspirators about these events. It will also provide the link between the topic discussed and al-Shabaab, which the jury will not otherwise appreciate.[5]

For example, one call involves Hassan Afgoye, Ali's al-Shabaab point of contact in Somalia, discussing a military engagement against the TFG which took place in March 18, 2009. In the call, Afgoye exults at the successes of his group and boasts that "we captured one of their heavy gun mounted vehicle

_____

[5] He will explain that al-Shabaab has a media department, which operates a website, and that the communiques were posted to the official al-Shabaab website. *See* Exhibit 3 at p.3.

14

[sic]," without mentioning that his group is Al-Shabaab.  Exhibit
9.  Kohlmann's testimony will establish that al-Shabaab claimed
responsibility for that attack by issuing a communique.  Exhibit
10.  From this the jury will understand that when Afgoye said *we*,
he meant al-Shabaab and that defendant Ali also knew that *we*
meant al-Shabaab, helping to prove an element of the charged
offense.  The jury will further understand this shows that Ali
knows al-Shabaab engaged in terrorism, another required element
of the charged offenses.  *See* Joint Instructions 18 & 24.

Mr. Kohlmann would also describe communications between al-
Shabaab and al Qaeda, without which background the jury would
never realize, from the face of the call, that Afgoye had
admitted that he is al-Shabaab and Ali knew it.  In this April
2009 call, Afgoye stated that his group hosted a lecture
presentation entitled, "Here we are at your service, Osama."
Exhibit 11.  Afgoye told Ali, "we simply accepted his calling;
the sheikh had issued a decree."  *Id*.[6]  Mr. Kohlmann will testify
that dating back to 2007 there were communications between the
two organizations, al-Shabaab and al-Qaeda, which reflect al-
Shabaab's aspirations to affiliate or merge with al-Qaeda.  *See*
Exhibit 3 at pp. 14-16.  Mr. Kohlmann will testify that prior to

---

[6] Thereafter, in September 2009, al-Shabaab posted a videotape on its website,
bearing the same name as the April lecture presentation – *Here we are at your
service, Osama!* (Labayk Ya Osama!) – publicly acknowledging the fact that
Shabaab had answered UBL's calling.

this call, on or about March 20, 2009, Osama Bin Laden issued a
video entitled "Fight On, Champions of Somalia," which called for
a response; *see* Exhibit 12; which precipitated a campaign in al-
Shabaab entitled "Labayk Ya Osama," intended to rally support in
Somali for al-Shabaab and its ally, al-Qaeda.  Exhibit 3 at p.16.
Only with the background regarding Bin Laden's message to Shabaab
and the al-Shabaab response, will the jury know that when Afgoye
said *we held a rally* and *we accepted his calling*, he was
referring to al-Shabaab.  The fact that Afgoye did not have to
elaborate on this further, demonstrates likewise, that Ali
understood that *we* referred to al-Shabaab.

Finally, Mr. Kohlmann would testify about images on the hard
drive of defendant Ali's seized computer.  *See* Exhibit 2.  One
such image, from the al Shabaab website depicts a man firing a
shoulder launched rocket, with the name kaataib.net superimposed
over it.  *Id*. at p. 4.  Mr. Kohlmann would identify kaataib.net
as the official website of al-Shabaab, and the utility of such a
website in recruitment and proselytization.  Exhibit 13.  Knowing
that kaataib.net is an al-Shabaab website will allow the jury to
understand that Ali knows that al-Shabaab engaged in terrorism,
an element of the offense(s) charged.  Mr. Kohlmann would also
testify as to the identification of several images of al-Shabaab
leaders, leaders of other opposition militias and other names by
which they are known and are referred to in the calls.  With this

information, the jury will understand that when Ali and Halima
Hassan refer to Abu Mansur, they are discussing Mukhtar Robow, a
prominent al-Shabaab leader.  *See* Exhibit 14.

B.   Matt Bryden

Defendants do not seriously challenge Mr. Bryden's expertise
or methodology.  Their challenge is confined to a veiled
reference to whether Mr. Bryden ever read a newspaper.  *See*
Defendants' Motion at p.5.  In the absence of any challenge to a
specific area of his proffered testimony, we direct the court to
Mr. Bryden's qualifications and publications as evidenced by his
*curriculum vitae* and the summary of testimony in our Rule
16(g)(1) disclosure, dated August 3, 2011.  *See* Exhibit 15.  We
anticipate Mr. Bryden would testify regarding:

> Background on Somalia and the Somali conflict which has
> raged since 1991;
>
> Details about the designated Foreign Terrorist
> Organization al-Shabaab, including, but not limited to,
> its objectives, its leaders, its relationship to al
> Qaeda, its rise to prominence in the Somali conflict,
> and its designation as a foreign terrorist organization
> by the United States;
>
> Al-Shabaab leaders mentioned in the calls, including,
> Mukhtar Robow, aka Abu Mansur; Aden Hashi Ayrow; Fuad
> Mohamed Khalifa, aka Fuad Shongale; Ahmed Abdi Aw
> Mohamed, aka Abu Zubeyr, aka Godane; and Ma'allin
> Burhan;
>
> Identifying an al-Shabaab official named Hassan Mohamed
> Ali, aka Hassan Afgoye, aka Abu Ayman, at one time a
> financial representative for al-Shabaab, who, in
> February 2009, was appointed the al-Shabaab
> administrative governor of the region of Bay and Bakol,

17

which is discussed in several calls;

Common ways to refer to al-Shabaab:  That al-Shabaab is
an Arabic term which means "the Youth;" that the Arabic
term al-Shabaab is in common use by Somalis to refer to
the terrorist organization and that the Somali word for
youth – dhalinyaro – is also in common use to refer to
al-Shabaab.  For certain calls he will give his opinion
that the speakers mean al-Shabaab when they refer to
"the Youth;"

Military engagements involving al-Shabaab and suicide
bombings for which al-Shabaab claimed responsibility,
each of which are mentioned in the calls; and

Leaders of other militias who are not part of al-
Shabaab, but who are each mentioned in the intercepted
calls, including, but not limited to Hassan Dahir
Aweys, Hassan Al-Turki, Isse Kamboni, Ibrahim Shukri,
Mohamed Dulyaden, and others.

These are areas which are traditionally within the scope of
expert testimony offered in federal courts. *See, e.g., United
States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996)(an expert
may assist a jury in understanding the jargon and code words used
by drug dealers); *United States v. Lowe,* 9 F.3d 43, 47 (8th Cir.
1993)(same); *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir.
1994) (organized crime case noting "[a]side from the probability
that the depiction of organized crime in  movies and television
is misleading, the fact remains that the operational methods of
organized  crime families are still beyond the knowledge of the
average citizen."); *United States v. Pungitore*, 910 F.2d 1084,
1148-1149  (3d Cir. 1990); *United States v. Angiulo*, 897 F.2d
1169, 1187-1190 (1st Cir. 1990); *United  States v. Daly*, 842 F.2d

18

1380, 1388 (2d Cir. 1988).

In a material support to terrorism case, the Fourth Circuit directly endorsed expert testimony on the structure and leaders of a terrorist organization. *United States v. Hammoud*, 381 F.3d 316, 337-38 (4th Cir.2004), *vacated on other grounds by* 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005), *relevant portions reinstated by* 405 F.3d 1034 (4th Cir.2005).  As the Fourth Circuit explained, the expert "testified regarding the structure of Hizballah and identified its leaders. [He] also explained the significance of Hammoud's contact with those leaders ... [a]nd discussed the nature of Hizballah's funding activities with specific reference to Hammoud's activities. This testimony was critical in helping the jury understand the issues before it." *Id.* at 337-38.

In this regard, the proposed testimony of both Mr. Kohlmann and Mr. Bryden should be permitted.

19

**CONCLUSION**

For the reasons set forth above, the United States respectfully requests that the Court deny without a hearing Defendants challenge, and permit the proposed expert testimony in the instant case.

Respectfully submitted,

B. TODD JONES
United States Attorney


s/Jeffrey S. Paulsen



BY: JEFFREY S. PAULSEN
Assistant U.S. Attorney
Attorney ID No. 144332


*s/Steven Ward*

BY: STEVEN WARD
Trial Attorney
U.S. Department of Justice
National Security Division

21