UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 10-187(1) (MJD/FLN)

| | |
|---|---|
| UNITED STATES OF AMERICA, | POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING |
| Plaintiff, | |
| v. | |
| AMINA ALI, | |
| Defendant. | |

## INTRODUCTION

The probation officer has calculated a guideline range of Level 40/Category VI = 360 months-life. This guideline range results from a base offense level of 26, a two-level specific offense characteristic for providing material support with the intent to commit or assist in the commission of a violent act, U.S.S.G. § 2M5.3(b)(1)(E), and a 12-level enhancement for commission of an offense that involved, or is intended to promote, a federal crime of terrorism, U.S.S.G. § 3A1.4. The defendant has objected to the recommended specific offense characteristic and terrorism enhancement. For the reasons set forth below, her objections should be overruled.

While the government's position is that the Probation Officer has correctly calculated the guideline range, the government will not necessarily be seeking a sentence within that range. The defendant has indicated in correspondence to the Probation Officer that she will be moving for a downward departure and/or variance on several grounds. Her sentencing memorandum is due May 1. The government wishes to

consider the defendant's grounds for a departure or a variance before making its sentencing recommendation to the Court.

## FACTS

### Background on Somalia

Somalia gained its independence from Italy and Britain in 1960 and for the first nine years of its existence was a viable democracy. T. Bryden 26.[1] In 1969, Army General Siad Barre seized power in a coup and ruled Somalia as a dictatorship until he was driven from power in 1991. Thereafter, the insurgents who had deposed Barre turned upon each other and Somalia was plunged into a persistent and chaotic civil war. T. Bryden 27. As a consequence, since 1991, Somalia has not had a properly functioning central government able to exercise authority over all Somalia.

Several efforts to form a central government and stabilize Somalia have occurred in the intervening period. These included the October 2004 formation of the Transitional Federal Government (TFG), which was headed by Abdullahi Yusuf, the President of the northern Somali region of Puntland. T. Bryden 29. Initially, Yusuf's government did not sit in Somalia because of the security situation in country, but by 2006 it was installed in the city of Baidoa in the Somali region of Bay.

In the vacuum created by the TFG's inability to administer the country, the Islamic Courts Union (ICU), which purported to administer Islamic law, gained support of

---

[1] The citation is to the transcript of the government's expert on Somalia and al-Shabaab, Matthew Bryden. Mr. Bryden's testimony was transcribed separately from the rest of the trial testimony in two separate volumes, each of which begins with page 1. To avoid confusion, the second volume will be designated "T. Bryden II."

2

business communities and the populace in Mogadishu because they were effective in establishing law and order. T. Bryden 31. The ICU gained control of Mogadishu in June 2006 and began to expand its control into the southern reaches of Somalia. In December 2006, Ethiopian troops entered Somalia, routed the ICU, driving it underground and installing the TFG in the capital city of Mogadishu. T. Bryden 34-35.

Subsequent to the Ethiopian incursion, the ICU was scattered, eventually reforming in the neighboring country of Eritrea as the Alliance for the Reliberation of Somalia (ARS). Portions of ARS favored negotiation with the TFG. Additional talks in Djibouti lead to the resignation of TFG President Abdullahi Yusuf, the formation of a new government headed by Sharif Ahmed, and the withdrawal of the Ethiopian troops from Somalia in January 2009. T. Bryden 35. In conjunction with the withdrawal of Ethiopian troops, peacekeeping troops from Uganda and Burundi, as part of the African Union Mission to Somalia, entered Somalia, operating under a United Nations mandate. T. Bryden 21.

Al-Shabaab, a violent Islamist militia which originated as the military wing of the ICU, rejected the results of the Djibouti talks, treated the Sharif Ahmed administration as apostates, and fought to overthrow that government, just as it had previously fought to overthrow the Abdullahi Yusuf government. T. Bryden 35-36, 38.

Throughout the time period relevant to the indictment, al-Shabaab sought to impose its rule by violence, including guerrilla warfare, suicide bombings, targeted assassinations, mortars, and various other tactics intended to intimidate the Somalia population. T. Bryden 41, 43-49.

On February 26, 2008, U.S. Secretary of State Condoleeza Rice, in consultation with the Secretary of the Treasury and the Attorney General, designated al-Shabaab a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, as amended (8 U.S.C. § 1182(a)(3)(B)). Gov't Ex. 271. Al-Shabaab spokesman Mukhtar Robow responded that the designation was a "badge of honor." T. Bryden II 10-11.

## The Defendants' Fundraising Conspiracy

Amina Ali and Hawo Hassan, with the assistance of several other ethnic Somali women from around the United States and Canada, raised funds from the Somali diaspora and provided the funds through various money remitting businesses to designated Foreign Terrorist Organization al-Shabaab.

The defendants raised funds through two primary means – teleconferences and door to door solicitation. In an October 8, 2008 intercepted telephone call, Ali and Hassan discussed how they would raise funds through teleconferences for "the mujahedin." The two agreed that they should dedicate a teleconferencing line to fundraising for the mujahedin under the guise that they were fundraising for the poor, because the mujahedin "would not fail to share with the wounded and the poor civilian alike." Gov't Ex. 8 at 8. In an October 13, 2008 call, Ali and Hassan agreed to back al-Shabaab, with Hassan noting "al-Shabaab are [sic] better. The Courts become worthless."[2]

---

[2] "Courts" is a reference to the ICU.

4

Ali then hosted recurring teleconferences where hundreds of people dialed in and listened to speakers who exhorted the listeners to donate funds to support the mujahedin. At the conclusion of the teleconferences, Hawo Hassan assisted Ali in recording the listeners' pledges. Three noteworthy examples of these teleconferences are the October 26, 2008 teleconference, which featured Hawo Kiin Raage, ("Hawo Kiin") an emira (female leader in al-Shabaab)(Gov't Ex. 19), as well as the February 9, 2009 (Gov't Ex. 73) and April 19, 2009 (Gov't Ex. 122) teleconferences during which al-Shabaab speakers urged the listeners to provide financial support. In the October 26, 2008 teleconference, Hawo Kiin delivered fiery jihadist rhetoric spurring the listeners to support the jihad in Somalia. She stated:

> Helping the public is a matter that God had made obligatory on us, we need to help the poor and needy, but this is not the time. As a matter of fact, all of us need to understand that fact; the poor and needy are being humiliated.. . . .We are saying today is the day of Jihad. Don't be distracted. What good can come out from simply feeding a person, if the person turns into an infidel? . . . .*The most valuable person is the person who sacrifices his life for God. The most valuable person is the Mujahid. The person who provides supplies, the person who is going to Jihad and the one who takes care of his children is like someone who went to Jihad. So dear sisters, let us help the Mujahid. Let us stand up for giving the Mujahid something. Let us stand up and feed the Mujahid. Let us stand up and take care of their wounds. Let us stand up for the Mujahid. . . .If we don't donate our money for the sake of God we will regret it. The trivial stuff we are busy with giving something to our sister who just had a baby, giving to our sisters who are widowed is all fine, but this is not the time. This is the time to protect the religion.*

Gov't Ex. 19 at 2-3 (emphasis added). At the conclusion of Hawo Kiin's lecture, Ali and Hassan recorded pledges from about twenty listeners totaling approximately $2,100. <u>Id.</u>

In the February 9, 2009 teleconference, the al-Shabaab speaker stressed that jihad was obligatory, appealed for financial assistance to the Jihadists to assist their widows, orphans and poor in Somalia, and defended al-Shabaab against media attacks. Gov't Ex. 73. While the speakers feigned to be objective observers of the political situation in Somalia, Ali, Hassan, and the rest of the listeners understood them to be al-Shabaab speakers. Id. Hassan later gave her assessment of how well the teleconference went, stating that the listeners enjoyed the al-Shabaab speakers. Gov't Ex. 75.

Another al-Shabaab member, Mahad Karate, a/k/a Moalin Burhan,[3] spoke during the April 19, 2009 teleconference. Significantly, Ali cautioned Burhan not to identify himself as an al-Shabaab member, telling him "you are not going to state that you belong to the *Youth*." Gov't Ex. 122. While Burhan complied, his explicit references to al-Shabaab, identified him to all listening as an al-Shabaab member.

Burhan made this financial appeal: "The jihad that is currently underway is waged verbally; it is waged through physical means; it is waged financially. Today, what is needed from you is financial help. You are asked to financially sponsor the Muslim people, who are hungry, the orphans of the martyrs and the widows of the martyr." Id.

The defendants also went door to door soliciting funds for al-Shabaab locally in Rochester, Minnesota, and in Minneapolis, Minnesota. To illustrate, in a November 7, 2008 call, Ali spoke with Hamdi Obede of Minneapolis and recounted her success with a three-week fund raising effort in the Rochester area. Ali stated that over the course of

---

[3] The government's expert witness identified Moalin Burhan as an alias for al-Shabaab leader Mahad Karate. T. Bryden II 21-22.

three weeks they had gone door to door every day and were able to send $7,000 to the fighters. Gov't Ex. 30. Ali also helped coordinate door to door fundraising efforts in other cities such as Columbus, Ohio; Portland, Maine; Nashville, Tennessee; and Canada.

Ali coordinated the delivery of funds through a prominent al-Shabaab leader, Hassan Afgoye, a/k/a Abu Ayman. Afgoye was a financial manager for al-Shabaab, Gov't Ex. 11 at 8, and later al-Shabaab's administrative governor for the Bay and Bakool regions of Somalia, T. Bryden 50-51.

The defendants deceived their donor base in order to maximize the fund raising for al-Shabaab, concealing that the funds would go to the fighters by telling donors the funds were for the needy. For example, in a July 2, 2009 call, Ali explained to Afgoye, "I tell the people to collect money in the name of the poor. Nobody is aware of the money I send to you. I give them the numbers; I give them the names. . . Once I am told needy people, well, they [al-Shabaab fighters] are needy. If a person specifies the orphans or specific people to me as a precondition, then I do not divert his. . . but if it is for the needy, I divert it that way." Gov't Ex. 146 at 7.

Ali directed the persons sending the funds to use false names to conceal the identity of the recipients, and to send the funds through the money remitters using a particular telephone number that would ensure that, despite the false recipient name, al-Shabaab would receive the funds. The evidence at trial showed that the conspirators used various telephone numbers controlled by one or more Afgoye subordinates, including, Warsame Maxud, Muriidi Haji Bakar, Madina Haji Ahmed, and Hawo Kiin.

During the course of their conspiracy, both defendants communicated with high-level leaders of the Islamist opposition to the TFG. Ali was in contact with Mukhtar Robow, a/k/a Abu Mansur, who was the spokesperson for al-Shabaab and a member of its Shura, or ruling council. T. Bryden 49-50; Gov't Ex. 140 at 3. In a June 7, 2009 call Hassan asked Ali to call the "clerics." Ali responded that because of security concerns, Robow "normally does not answer the phone, but when he saw my phone number he answered." Gov't Ex. 140 at 3.

Ali's financial contact with al-Shabaab, Hassan Afgoye, was another prominent leader. Afgoye became al-Shabaab's administrative governor for the Bay and Bakool regions of Somalia, assuming that position in February 2009, when Robow's power and influence within al-Shabaab was reduced as the result of an internal power struggle between Robow and al-Shabaab emir, Ahmed Abdi Aw-Mohamed, aka Abu Zubeyr. Gov't Ex. 105 at 2; T. Bryden 51-56; Gov't Ex. 244. Even after Afgoye assumed this position, Ali continued to direct her fund raising efforts through him.

Hassan was the primary contact with Hassan Dahir Aweys, a Specially Designated Global Terrorist under United States law. Gov't Ex. 272; T. Bryden 61-62. Once a prominent leader of the ICU, Aweys was, during the period of the indictment, the leader of Hizbul Islam, a coalition of Islamist militias other than al-Shabaab, which also sought the violent overthrow of the TFG. On more than one occasion Ali suggested or directed Hassan to contact Aweys. See, e.g., Gov't Ex. 113, 115; Hassan Ex. 3 at 14-15. In March 2009, for example, Ali wanted Aweys to speak on a teleconference. Hassan coordinated this and sent Aweys the funds to cover the telephone minutes he would use.

8

Gov't Ex. 113, 197. Immediately prior to the teleconference, Ali was concerned about news of a potential reconciliation between Aweys's group and the TFG. She directed Hassan to call Aweys and tell him that he should not speak if he had entered a peace agreement with the TFG. Gov't Ex. 115.[4]

Additionally, Hassan was in direct contact with al-Shabaab members who shared their long-term strategy with her. In a July 11, 2009 call, Hassan told Ali of a recent phone call she had with "al-Shabaab guys from Kismayo," who told her that they would not attack the Presidential Palace at that time, but rather would "capture the rest of the republic first, and the so-called government can stay [sic] the damn Palace." Def. Ex. 3 at 16. Hassan concluded that this strategy was "right, if you really think about it." Id.

## ARGUMENT

### I. THE COURT SHOULD IMPOSE A TWO-LEVEL ENHANCEMENT FOR INTENT TO COMMIT OR ASSIST IN THE COMMISSION OF A VIOLENT ACT

Guideline section 2M5.3(b)(1) is a specific offense characteristic that applies in material support cases such as this one. It provides that:

> If the offense involved the provision of . . . funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act, increase by **2** levels.

This enhancement is fully supported by the trial record. The evidence shows that Ali knew full well that al-Shabaab was engaged in violent acts, and that her material

---

[4] The government was unable to record that teleconference. However, the teleconference took place and the funds were forwarded to al-Shabaab. Gov't Ex. 146 at 8.

9

support of al-Shabaab would further those violent acts. For example, on February 16, 2009, Ali had a telephone conversation with al-Shabaab leader Hassan Afgoye in which Afgoye told Ali about an upcoming battle between Afgoye's forces and the "enemy" forces of the Traditional Federal Government (TFG). Gov't Ex. 81 at 1-2. Referring to the "enemy," Ali told Afgoye, "[m]ay God destroy them and help us capture their weapons." Id. at 2. Afgoye then implored Ali to "send whatever you currently have in hand . . . ." Id. at 4. He added, "[a]nd after that we will race to confront the enemy, God willing." Id. The evidence at trial showed that Ali caused $200 to be sent to Afgoye immediately following this call. Id. at 3; Gov't Ex. 196 (hawala record re $200 transfer).

In an intercepted call a few weeks later, Afgoye informed Ali that his forces had just been engaged in a major battle in which his forces killed 16 enemy soldiers, including two who were "captured alive and then slaughtered." Gov't Ex. 105 at 3. Ali responded, "I thank God. God has killed them all." Id. at 4.

In an intercepted call on February 7, 2009, Ali and co-defendant Hawo Hassan discussed the bombing of the presidential palace in Somalia, which was an apparent attempt to kill the new Somali president Sheikh Sharif Sheikh Ahmed. Gov't Ex. 70 at 1-2. Ali thought the news was "wonderful." Id. at 1. Al-Shabaab claimed credit for the bombing of the presidential palace. T. Bryden 61.

Ali was well aware that al-Shabaab engaged in suicide bombings as well. In an intercepted call on February 25, 2009, Hassan Afgoye informed Ali of a suicide bombing attack on the Burundians -- soldiers fighting on behalf of the TFG. He told her how a man with a suicide belt "went inside their church while they were praying," and then "[a]

10

vehicle was also used on those who escaped and came outside ...." Gov't Ex. 91 at 3. Al-Shabaab claimed credit for this attack as well. T. Bryden 63-64.

Similarly, in an intercepted call on June 18, 2009, Ali and co-defendant Hawo Hassan discussed what Hassan described as "the best joy ever." Gov't Ex. 141 at 1. They were referring to an al-Shabaab suicide bomber who blew himself up inside a hotel in Somalia, killing the TFG minister of national security, Omar Hashi, as well as many others. Id. at 1-2; see also T. Bryden 67-68.

## II.   THE 12-LEVEL TERRORISM ENHANCEMENT APPLIES TO ALI'S CONDUCT

The probation officer has correctly recommended a 12-level terrorism enhancement pursuant to guideline section 3A1.4. That section provides as follows:

> (a) If the offense is a felony that involved, or is intended to promote, a federal crime of terrorism, increased by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
>
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be category VI.

Application note 1 to section 3A1.4 states that the term "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5).

Section 2332b(g)(5) in turn defines "federal crime of terrorism" as (1) an "offense that . . . is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and (2) violates one of the statutes listed in section 2332b(g)(5). The list of statutes in section 2332b(g)(5) includes 18

U.S.C. section 2339B - - providing material support to terrorist organizations - - of which Ali stands convicted.

Thus, the terrorism enhancement applies if Ali's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." E.g., United States v. El-Mezain, 664 F.3d 467, 570 (5th Cir. 2011); United States v. Jayyousi, 657 F.3d 1085, 1114 (11th Cir. 2011). The defendant's conduct in providing material support to the terrorist organization al-Shabaab easily meets this test. As the government's expert, Matthew Bryden, testified at trial, al-Shabaab's ultimate goal was to expel the TFG by force and replace it with its own rule. T. Bryden 38; T. Bryden II 128-29. Al-Shabaab used targeted assassinations to accomplish its goals. T. Bryden 47. Defendant Amina Ali's main contact within al-Shabaab - - Hassan Afgoye, a/k/a Abu Ayman - - publicly stated that members of the TFG parliament should be killed. Id. at 51-52.

There was ample evidence at trial that Amina Ali was aware of al-Shabaab's goals and endorsed them. When Afgoye told her about his forces killing enemy soldiers, Ali gave thanks to God. Gov't Ex. 105 at 3-4; see also Gov't Ex. 91 at 3. When she learned of al-Shabaab's shelling of the presidential palace in an apparent attempt to kill the new Somali president, Ali expressed satisfaction. Gov't Ex. 70 at 1-2. When she learned that an al-Shabaab suicide bomber entered a hotel and killed the TFG Minister of National Security, Ali was delighted. Gov't Ex. 141 at 1-2.

Moreover, Ali's teleconferences in which she raised money to be sent to al-Shabaab were full of rhetoric extolling the virtue of violent jihad against the infidels and

apostates - - namely, the government of Somalia and its supporters. E.g., Gov't Ex. 122 at 3-4.

In her letter to the probation officer, Ali argued that the terrorism enhancement should not apply because the TFG was not a government. This argument should be rejected. The government's expert testified at trial that the TFG constituted the government of Somalia at all relevant times. T. Bryden 29.

In United States v. Assi, 428 Fed. Appx. 570 (6th Cir. 2011), the Sixth Circuit rejected a similar argument that the terrorism enhancement should not apply to the defendant's conduct in providing material support to the foreign terrorist organization Hizballah, which engaged in terrorist attacks against Israeli soldiers. The defendant argued that Israel should not be considered a legitimate government because it allegedly had violated international law by invading Lebanon. The Sixth Circuit rejected this argument and held that Israel did qualify as a government for purposes of section 3A1.4. The Court noted that accepting the defendant's argument would place judges in the position of attempting to decide the legitimacy of any given government. Id. at *5. As the court held, "surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4." Id.

Even if the Court were to conclude that the TFG did not constitute a government at the relevant times, section 3A1.4 still would apply because al-Shabaab's coercion and retaliation extended to other governments as well, such as Ethiopia, Uganda, and

13

Burundi. These countries sent forces to Somalia to help the TFG defend itself against attacks from al-Shabaab. Al-Shabaab engaged in conventional and suicide bombing attacks against these forces in order to both influence the conduct of these governments and to retaliate against them for their support of the TFG. Ali approved of these attacks. E.g., Gov't Ex. 13 at 2 (Ali: "May all [the Ethiopians] die and vanish."); Gov't Ex. 20 at 2 (Ali: "May [the Ethiopians] be all wiped out, by God's order.")

While section 3A1.4 has a dramatic effect on the severity of the defendant's Guideline range, it is the result Congress and the Sentencing Commission intended. Section 3A1.4 reflects an understanding by both the Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and difficulty of deterring and rehabilitating the criminal, and thus, terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). In addition, "the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Id.

## CONCLUSION

In summary, the Probation Officer has correctly calculated the applicable guideline range. The defendant's expected objections to the two-level specific offense characteristic and 12-level terrorism enhancement should be overruled. The government

will carefully consider the defendant's motions for a downward departure and/or variance before making its final sentencing recommendation to the Court.

Dated: April 19, 2013

Respectfully submitted,

B. TODD JONES
United States Attorney

BY: JEFFREY S. PAULSEN
Assistant U.S. Attorney
Attorney ID No. 144332

for BY: STEVEN WARD
Trial Attorney
United States Department of Justice
National Security Division