UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                )
                                )
  United States of America,     )   File No. CR-10-187
                                )          (MJD/FLN)
          Plaintiff,            )
                                )
  vs.                           )   Minneapolis, Minnesota
                                )   May 16, 2013
  (1) Amina Farah Ali,          )   11:25 a.m.
                                )
          Defendant.            )
                                )
                                )
------------------------------------------------------------




BEFORE THE HONORABLE MICHAEL J. DAVIS
UNITED STATES DISTRICT COURT JUDGE


**(SENTENCING HEARING)**









Proceedings recorded by mechanical stenography;
transcript produced by computer.

1    APPEARANCES

2      For the Plaintiff:          U.S. Attorney's Office
                                   JEFFREY S. PAULSEN, AUSA
3                                  600 U.S. Courthouse
                                   300 South Fourth Street
4                                  Minneapolis, Minnesota 55415

5                                  U.S. Department of Justice
                                   National Security Division
6                                  STEVEN WARD, ESQ.
                                   950 Pennsylvania Avenue NW
7                                  Washington, D.C. 20530

8      For Defendant Amina         Kelley, Wolter & Scott
       Farah Ali:                  DANIEL M. SCOTT, ESQ.
9                                  Suite 2530
                                   431 South Seventh Street
10                                 Minneapolis, Minnesota 55415

11     Court Reporter:             LORI A. SIMPSON, RMR-CRR
                                   1005 U.S. Courthouse
12                                 300 South Fourth Street
                                   Minneapolis, Minnesota 55415
13
       Interpreters:              Osman Abdulle
14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

1                 

2

3        THE COURT:  Let's call this matter.

4        THE CLERK:  The United States of America vs. Amina

5    Farah Ali, Criminal Case No. 10-CR-187.  Counsel, will you

6    please state your appearances for the record.

7        MR. PAULSEN:  Good morning, Your Honor.  Jeff

8    Paulsen on behalf of the United States.  With me is

9    co-counsel Steven Ward from the Department of Justice.  The

10   case agents, Mike Wilson and Kevin McGrane, are in the back.

11   Mr. Ward will be handling the Amina Ali sentencing and I

12   will handle the Hawo Hassan sentencing.

13       MR. SCOTT:  Your Honor, Dan Scott representing the

14   defendant, who is present in court.  I would ask to approach

15   the bench.

16       THE COURT:  You may.

17   **(At sidebar.)**

18       THE COURT:  Good morning.

19       MR. SCOTT:  Good morning, Your Honor.

20       THE COURT:  How are you?

21       MR. SCOTT:  Not good, Your Honor, right now.  Your

22   Honor, my client's family is here and it's an extended

23   family, so there's a lot of people, and they got here early

24   today.

25       And security measures were taken in this building

1    so that the people who were hoping to attend court were kept

2    outside of the building and the only people that were

3    allowed into the building were family members and close

4    relations for the first case.

5          And the family members for the second case and the

6    third were told that they could not come into the building

7    and could not attend the court proceedings because there

8    wasn't going to be enough room, so they had to wait, and

9    that the Court would clear out the courtroom from the first

10   sentencing and then when it was cleared out they would allow

11   the family members to come up for the second sentencing.

12   And that did not happen.

13         There may be a few of them that made it in, but

14   most of them did not make it in until the place was full

15   again.  They didn't clear out the courtroom of the people

16   who were there for the earlier one.

17         I understand it's a public courtroom with a public

18   proceeding, but if we had known that we, of course, would

19   have tried to get all of our family members in at 9:30

20   because most of them were here then for your 10:00 calendar.

21         I want to make sure --

22         THE COURT:  Are they downstairs?

23         MR. SCOTT:  They were downstairs.  In fact, I was

24   meeting with a number of them down in the Public Defender's

25   Office, which is outside of the court security envelope, and

1    then sent them around to the front so they could stand in

2    line so they could come in.  It's family members.  I want to

3    make sure that --

4         **(In open court.)**

5              THE COURT:  Sean.

6              THE CLERK:  Sean.

7         **(At sidebar.)**

8              MR. SCOTT:  The logistics gets complicated, Your

9    Honor.

10             THE COURT:  Yeah.  We can work that out.

11             MR. SCOTT:  I figured we would.  That's why I came

12   up on sidebar.

13             THE COURT:  Sean, there's members of the Ali

14   family that did not get into the courtroom --

15             DEPUTY MARSHAL:  Okay.

16             THE COURT:  -- because we didn't clear it out and

17   people stayed in.  Let's make room for them.

18             Do you know how many?

19             MR. SCOTT:  Well, about 15.  I was trying to keep

20   it down to eight.  So I guess there's probably 25 family

21   members that are here and they had set aside a row, but they

22   didn't get them all up until they were full.

23             THE CLERK:  Are there people in the row here

24   that --

25             MR. SCOTT:  There are people in that row who are

 1    family.

 2              THE CLERK:  Are there people that are not?

 3              MR. SCOTT:  That I can't tell you.  Most of the

 4    people in that row are family because they were only going

 5    to let the family in until the place is full and then

 6    anybody --

 7              DEPUTY MARSHAL:  A lot of people were cleared out.

 8    There were some people that stayed that were residual from

 9    the last one, but there was a bunch, a big group that left.

10              THE COURT:  Okay.  Who of her family --

11              MR. SCOTT:  I will ask her.  I won't recognize

12    them myself.

13              THE COURT:  Why don't you have her come up and the

14    interpreter.

15        (Defendant and interpreter join sidebar.)

16              THE COURT:  We need the interpreter sworn.

17              THE CLERK:  Please raise your right hand.

18        (Interpreter sworn.)

19              THE COURT:  Good morning.  My understanding is

20    that some of your family members aren't in the courtroom.

21              THE DEFENDANT:  Yes.

22              THE COURT:  How many of your family members are

23    not here?

24              THE DEFENDANT:  There are more, more people.

25              THE COURT:  How many?

1          THE DEFENDANT:  My husband is here as well as my

2     uncle.  My aunt, my husband, as well as my uncle.  The girls

3     are my cousins.  There's also another lawyer who is also a

4     clerical -- he is a member of the clergy here in town.

5          THE COURT:  Okay.  What I need you to do -- we'll

6     take a recess.  You will go down with Mr. Scott and point

7     out who your people are and we'll get them through security

8     and then we'll just make room.  I'll just make an

9     announcement that we are going to have to squeeze in because

10    her family members are going to get in.

11         DEPUTY MARSHAL:  I don't know how we are going to

12    squeeze -- like, say, if there's 10 or 15, are we going to

13    be able to squeeze them in or ask people to come out?  What

14    do you think?

15         THE COURT:  I'll ask for people to come out.

16         THE DEFENDANT:  How many people are allowed to --

17         THE COURT:  How many do you have?

18         THE DEFENDANT:  If I go outside, I will see a

19    number of people.  So can I bring at least 20, 20 people?

20         THE COURT:  We'll try to get 20 in.  It's going to

21    be tight.  We don't have another courtroom set up, do we?

22         THE CLERK:  No.

23         THE DEFENDANT:  They can sit tight together.  That

24    shouldn't be a problem.

25         THE COURT:  I'll make a request.

1              **(In open court.)**

2                   THE COURT:  This is a general announcement for

3         everyone that's in the courtroom.  Ms. Ali has informed me

4         that her husband and then a number of her close relatives

5         and family members have not been able to get in for this

6         proceeding.

7                   And I know that everyone wants to be here.  This

8         is the largest courtroom that we have.  I would like to

9         bring in 20 of her family members.  So those members of the

10        community that are not members of her community -- or of her

11        family, I would request that you do the honorable thing and

12        allow her family members to be present.  And you will

13        certainly hear about what the sentence is going to be, but I

14        know that you would want her family members to be present.

15                  So we're going to take a short recess so Ms. Ali

16        can go downstairs and find her family members, her husband

17        and family members, and have them brought up and then we

18        will request -- hopefully we can squeeze everyone in, but if

19        we can't, I'll come back out and request -- this is a public

20        courtroom and you can stay, I'm not asking you to leave, but

21        just as a courtesy for Ms. Ali that she would have her

22        family members here, that we make room for them.

23                  So let's take a 10-minute recess.

24             (Recess taken at 11:36 a.m.)

25                         *    *    *    *    *

1          (11:53 a.m.)

2                         **IN OPEN COURT**

3              THE COURT:  Let's call this matter.

4              THE CLERK:  The United States of America vs. Amina

5      Farah Ali, Criminal Case No. 10-CR-187.  Counsel, will you

6      please state your appearances for the record.

7              MR. PAULSEN:  Jeff Paulsen on behalf of the United

8      States with Steven Ward.  Case Agents Kevin McGrane and Mike

9      Wilson are at the back table.  Mr. Ward will be handling the

10     Amina Ali sentencing and I will be handling the Hawo Hassan

11     sentencing.

12             MR. SCOTT:  Your Honor, Dan Scott representing

13     Amina Ali.  She is present standing beside me.  Next to me

14     is the interpreter, who has already been sworn.  Christina

15     Bovaird is my paralegal and I brought her up here to make

16     more room in the back of the courtroom.

17             THE COURT:  All right.  Let's begin.  Counsel,

18     have you had an opportunity to read the presentence

19     investigation report in this matter?

20             MR. WARD:  We have, Your Honor.

21             MR. SCOTT:  We have as well, Your Honor.  My

22     client has had a chance to review both the interim

23     presentence investigation report and the final presentence

24     investigation report.

25             THE COURT:  I received information from the

 1       probation officer.  I would ask you to turn to paragraph 112

 2       and my understanding is there's a math error in the report.

 3       The maximum should be 2,340 months rather than the 1,872

 4       months.  Do you want to --

 5               MR. SCOTT:  We both noted the mathematical error,

 6       Your Honor.  I can't convert years to months standing here

 7       without a calculator, but it's 195 years.

 8               THE COURT:  Neither can I, but that's why I have a

 9       probation officer.  So both of you agree that it should be

10       2,340 months maximum?

11               MR. WARD:  That's correct, Your Honor.

12               THE COURT:  And so we'll make that correction.

13       Any other corrections or additions or objections to the

14       factual statements contained in the presentence

15       investigation report for the government?

16               MR. WARD:  None from the government, Your Honor.

17               THE COURT:  For the defense?

18               MR. SCOTT:  Your Honor, we listed in our filings a

19       number of additions to the report that we requested and some

20       rewriting of particular paragraphs to weave those additions

21       in.  I'm not going to go through them one at a time.

22               THE COURT:  The Court has reviewed the defense

23       position dealing with the factual statements contained in

24       the presentence investigation report.  The Court will adopt

25       the factual statements that have been prepared for the Court

1    by the Probation Office as its own; therefore, there will be

2    no further additions to the report.  Certainly the defense

3    will be able to argue those points.

4         Counsel, have you had an opportunity to review the

5    advisory guideline calculations that have been prepared for

6    the Court in this matter?

7         MR. WARD:  Yes, Your Honor, we have.  We believe

8    that they accurately compute the guideline sentencing range

9    for Ms. Ali.

10        THE COURT:  Mr. Scott, you have objections.  You

11   may be heard.

12        MR. SCOTT:  Your Honor, we made our objections in

13   writing.  I've been here for a number of the sentencings.  I

14   know the Court's rulings on similar objections that were

15   made.

16        THE COURT:  Because of the nature of this

17   sentencing I want a full argument, oral argument, dealing

18   with each of the defense objections so the record is

19   complete, so your client knows exactly what the arguments

20   are, so the government can respond, and so we can have a

21   full response to all arguments.  I don't care how long it

22   takes.

23        MR. SCOTT:  Yes, Your Honor.  Your Honor, as we

24   mentioned in our position pleadings, we made objections to

25   two of the guideline calculations that were made by the

1    Probation Office in the case.

2            The first was under Section 2M5.3(b)(1)(E) and

3    that is the two-level increase for whether the funds were

4    for the purpose of engaging in violent acts.  Our argument

5    is that the monies that were proven up in court in this case

6    were not intended for nor did the government show that they

7    were intended for violent acts; that the monies were

8    intended to go to help the wounded, to help the needy, and

9    to help those who were injured.  That's independent of

10   whether or not they may be in violation of statute.  We are

11   talking about the guideline.  So that's the first issue.

12           The second issue is the common issue that the

13   Court has heard.  The Probation Office recommended to the

14   Court that the Court adopt the 12-level enhancement found in

15   Guideline Section 3A1.4, which is for a federal crime of

16   terrorism.

17           We have made two interconnected arguments relating

18   to that, Your Honor.  One is in our objections and the other

19   is in our sentencing memorandum.  One goes to whether or not

20   it should be applied at all.  The sentencing memorandum goes

21   to whether or not the Court ought to depart downwards from

22   it.

23           First as to whether it should be applied at all,

24   it's been our contention -- it was our contention at trial

25   and it's been our contention since that the requirement

1   under -- for the definition of what a crime of terrorism is

2   includes, first, that my client was convicted of a violation

3   of 2339B, which she was, but second, that the assistance

4   that she provided was to influence the behavior of a foreign

5   government through violence or intimidation, which is the

6   second part of the definition under the statute.

7           We believe that the government -- that there was

8   no government, no recognized government of Somalia at the

9   time, that the Transitional Federal Government was not a

10  government, was not recognized by the United States.

11          It was not the de facto government because the

12  de facto government during this time period was, in fact,

13  al-Shabaab.  They controlled the southern half of the

14  country.

15          And the northern half of the country was

16  controlled by completely different third parties, the

17  semi-independent Puntland and the fully independent

18  Somaliland governments.

19          So that as a practical matter the enhancement

20  should not apply, that this is part of a civil war in a

21  civil conflict and that it doesn't qualify as a federal

22  crime of terrorism under this particular definition that's

23  supplied for the purposes of the increase in the guideline,

24  again, independent of whether or not it violates the

25  statute.

1           The statute is based upon a theory of whether or

2    not they were designated as a foreign terrorist

3    organization.  This is different than a foreign terrorist

4    organization.  It's whether it qualifies as a federal crime

5    of terrorism.

6           I have heard the Court say in the past that it's

7    not the job of -- you were citing, I think, a case out of

8    the Second Circuit -- that it's not the job of the district

9    court to decide who the government is and whether it's a

10   government or not.

11          And our contention is that if not you, then who?

12   And if the who is the State Department of the United States,

13   then if it's not your call, it's not the government because

14   the State Department of the United States has not -- had not

15   at that time recognized the Transitional Federal Government

16   as the government of Somalia.  So therefore if it's not your

17   call, then it's an easy call because there is no recognized

18   government and therefore this enhancement doesn't apply.

19          If it is your call, then the facts as you heard

20   them during the trial militate against a finding, that this

21   particular group of people who were never elected, who were

22   selected at the behest of a group of foreign countries, and

23   who in essence governed a few square miles of Somalia were

24   not the actual government.  So on the facts, if it is your

25   call to make, you should make it against applying the

1    enhancement.

2         I also understand that the government has argued,

3    although they really didn't argue in the briefing here, but

4    that the government has argued in their other briefing that

5    it's not -- it's irrelevant whether there's a government of

6    Somalia or not because there isn't any question under the

7    statutes -- I mean under the facts that were put forth in

8    the case that there was an intent to influence the actions

9    of the troops of foreign countries that were at that point

10   in Somalia and that therefore that was enough, whether those

11   countries were legally in Somalia or not, whether the armies

12   of those countries were legally there or not.  We oppose

13   that.

14        We understand that there is a case against us

15   relating to the Israeli incursion into Lebanon.  So we

16   understand that the only reported case is a case against us,

17   but we believe that unless they are legally in that country,

18   that they shouldn't be counted either.

19        The second argument which was made, and it's more

20   of a variance argument or departure argument, is that if you

21   analyze the statutes that were passed by Congress and then

22   you also analyze the creation of Section 3A1.4, that 3A1.4

23   was created by the United States Sentencing Commission in

24   response to a federal statute that Congress passed that told

25   the Sentencing Commission to set up a guideline for

1    terrorism and terrorist offenses.

2              And as part of the language when they told the

3    Sentencing Commission to set up the terrorism enhancement,

4    they said set it up for offenses to which there is not

5    already an enhancement for terrorism, when it's not already

6    included.

7              But the Sentencing Commission did not follow the

8    direction of Congress.  They applied it to numerous crimes

9    that were not specifically related to terrorism and said but

10   if this crime, such as assault on a federal officer or

11   something like that, involves terrorism, then apply the

12   enhancement.  But they also took and applied that same

13   enhancement to crimes such as the ones my client was

14   convicted of, which was providing material support to a

15   terrorist organization, that already had terrorism built

16   into the definition of the crime and that that was not

17   following the direction of Congress.

18             And I worked my way through some of the

19   complexities when Congress passed even more statutes, but

20   the Sentencing Commission never addressed that and Congress

21   never really backed away from that as they tinkered with

22   this.

23             So that the guidelines for -- the underlying crime

24   are the guidelines that ought to apply.  They take into

25   account terrorism.  The Court read the terrorism definitions

1    to the jury and told the jury that even if they found my

2    client didn't know that al-Shabaab was a designated foreign

3    terrorist organization, if she knew they engaged in

4    terrorism that was sufficient to convict.  So those

5    definitions were in front of the jury.  The jury was making

6    its findings based upon those definitions and the

7    definitions are included in the underlying guideline.

8            And as I noted to the Court in my argument, the

9    underlying guideline has very harsh penalties by itself.  A

10   first offender convicted of any violation of the statute,

11   which carries a maximum of 15 years, but a minimum of zero,

12   is going to face a sentence of approximately six to six and

13   a half years in prison as a first offender.  The lowest

14   sentence, recommended sentence, for the guidelines was

15   already one-third of the way up the maximum penalty.  So

16   that we're not talking that the Sentencing Commission had

17   not included an enhancement for the nature of the kind of

18   crime already within the guidelines.

19           So that is the secondary argument.  It doesn't say

20   that 3A1.4 doesn't apply on its face, but it says that the

21   Sentencing Commission did not follow the law in putting it

22   into -- putting this particular crime into the terrorism

23   enhancement.

24           I'm finished.

25           THE COURT:  For the government?

1          MR. WARD:  Yes, Your Honor.  Taking the arguments

2     in reverse order, the two-point -- or the two-level

3     adjustment for an act of violence, what we've briefed in our

4     papers and what the evidence at trial showed was that the

5     fund-raising that was the subject of the intercepted calls

6     was to go to al-Shabaab.

7          The designated foreign terrorist organization,

8     Mr. Bryden testified, was bent on toppling the provisional

9     Transitional Federal Government of Somalia by violence,

10    killing them if necessary, because in the views of the

11    defendants the Transitional Federal Government were

12    apostates, so they were traitors to Islam, and they were

13    backed by infidels, foreigners who were not even Muslims,

14    and the penalty for that, which we heard about, was death.

15    That was the doctrine of takfirism.

16         In addition to that, Your Honor, in Exhibit 81,

17    which we briefed in our papers, there was a discussion

18    between the Defendant Ali and Hassan Afgoye, the al-Shabaab

19    leader who was then the provisional governor of two of the

20    southern Somali regions, and they talked about a particular

21    amount of funds that had been sent.  It was only about $200.

22         But at the conclusion of the conversation, after

23    Ali explained some of the difficulties that she was having

24    in raising money in the United States, he said essentially

25    fine, fine, just send me whatever you have and I will race

1    to confront the enemy.

2              And I would note also for Your Honor in

3    Exhibit 259 -- that was the chart that Mr. Wilson prepared

4    of all the substantive counts of material support for which

5    Ms. Ali was convicted -- I would note that within nine days

6    of that call, I will race to confront the enemy, $2,000 were

7    sent in Counts 6 and 7 to al-Shabaab.

8              With respect to the applicability of the terrorism

9    enhancement, the testimony at trial, Your Honor, was that

10   the Transitional Federal Government was a member of the

11   international community in that it was recognized by the

12   United Nations, the African group called the

13   Intergovernmental Agency on Development, and the African

14   Union, which actually sponsored and sent troops to Somalia

15   in early 2009 after the Ethiopians withdrew.

16             If we decided that any insurgent group that enjoys

17   some modicum of success in their military engagement against

18   the lawful government or actually the government itself,

19   there would never be a terrorism case.

20             And the United States definitely supported,

21   definitely supported the Transitional Federal Government.

22   As Mr. Bryden testified, his whole job was to implement and

23   inspect compliance with United Nations Security Council

24   resolutions and there was a Security Council resolution

25   which backed the emplacement of the foreign troops into

1       Somalia to try and stabilize the situation and bring some

2       peace and order to the country.  The United States is on the

3       Security Council, Your Honor, and because it has veto power,

4       that resolution would have never been passed.

5               And with respect to the argument -- essentially

6       Mr. Scott is trying to say that if you apply the terrorism

7       enhancement to a 2339B charge, a material support charge,

8       you're double counting.

9               But the law is pretty clear that if -- I'm sorry.

10      The law is pretty clear that not every 2339B also warrants

11      the application of the terrorism enhancement 3A1.4 because

12      in order for the enhancement to apply you do have to prove

13      that the defendant's actions, of which they stand convicted,

14      were calculated to influence the conduct of a government or

15      to retaliate against that government for such conduct.  And

16      that's what the proof set out in this case.

17              al-Shabaab, as I said at the outset, was bent on

18      toppling the government, the Transitional Federal

19      Government, by violence.  And in the PSR there's a

20      discussion of Exhibit 3 where Hassan Afgoye reports to Amina

21      Ali that we actually shelled the house of a guy named Aden

22      Madobe.  Aden Madobe, according to Mr. Bryden, was a member

23      of the Somali provisional parliament.

24              There's another call outlined in our papers,

25      Exhibit 70, where the Defendants Ali and Hassan are talking

1    about the fact that the new president of Somalia, Sheikh

2    Sharif Ahmed, and his motorcade have been attacked as they

3    try and install the new government in the presidential

4    palace via Somalia in Mogadishu.

5              And it's clear from having listened to the earlier

6    calls that precede that time in February of 2009 that the

7    defendants, including Ms. Ali, had determined that they

8    would continue to back Shabaab because al-Shabaab had vowed

9    that they would fight this new government.

10             And it goes on, Your Honor.  We recall in June of

11   2009 the best joy ever call.  That's that ghoulish call

12   where the evidence at trial demonstrated that hundreds of

13   people lost their lives when an al-Shabaab suicide bomber

14   went into a hotel aiming to take out the Somali defense

15   minister and the ex-Ethiopian ambassador to -- the ex-Somali

16   ambassador to Ethiopia.  Of course, the collateral damage

17   were all the other clansmen who were members of the defense

18   minister's clan, which according to the call were in the

19   hundreds, who were also killed.

20             And the case that we cited in our brief, Your

21   Honor -- and actually there are two that specifically

22   addressed whether or not there's a double counting issue and

23   they both rejected that position.

24             MR. SCOTT:  Your Honor, might I just make one

25   short reply?

1              THE COURT:  You may.

2              MR. SCOTT:  The first is, of course, the cases

3      they cite are the generic thing that double counting in and

4      of itself is allowed.  The question is was it intended and

5      did Congress tell the Sentencing Commission to double count

6      or not, and they didn't follow the direction of Congress.

7              The second is that the definition of a foreign

8      terrorist organization makes it impossible, I mean,

9      literally impossible for the Court to make any other finding

10     than that they were engaged in terrorism.  You cannot look

11     behind that designation.

12             So to some extent I think if we looked into the

13     future we would see some other attorney for the Department

14     of Justice having to sort of eat Mr. Ward's words that they

15     are different.  They are not different.  Once that finding

16     is made, then the terrorism enhancement applies under the

17     definition that the government is offering now.

18             THE COURT:  The Court will deny the defense

19     motions.  Section 2M5.3(b)(1)(E) dealing with the two-level

20     enhancement will be invoked by the Court.

21             Section 3A1.4(a) and (b).  Section 3A1.4(a)

22     provides for a 12-level enhancement for crimes that involved

23     or were intended to promote a federal crime of terrorism.

24     Subdivision (b) provides that where subdivision (a) applies,

25     the applicable criminal history category is VI.  Defendant

1     objects to the application of this section as none of her

2     actions were intended to promote a federal crime of

3     terrorism.

4          A federal crime of terrorism is defined as conduct

5     that is calculated to influence or affect the conduct of

6     government by intimidation or coercion or to retaliate

7     against government conduct and is a crime enumerated in

8     Title 18, United States Code, Section 2332b(g)(5), which

9     list includes Title 18, United States Code, Section

10    2339B(a)(1).  Section 3A1.4, Application Note 1.

11         There's no dispute that the crimes for which the

12    defendant was convicted are specified in Section

13    2332b(g)(5).  The next inquiry is whether the crimes of

14    conviction were calculated to influence, affect, or

15    retaliate against a government.

16         Many courts interpret "calculated" as nearly

17    synonymous with "intentional."  Thus, if a defendant's

18    purpose in committing an offense is to influence or affect

19    the conduct of government by intimidation or coercion or to

20    retaliate against government conduct, application of the

21    terrorism enhancement is warranted.

22         LAW CLERK:  You're reading the wrong one.

23         THE COURT:  I'm sorry.  I'm reading the wrong

24    sheet here.

25         Based on the evidence in the record, the Court

1    finds that the terrorism enhancement clearly applies in this

2    case.

3              At trial, expert testimony demonstrated that the

4    TFG was the recognized government of Somalia at all relevant

5    times.  Evidence was also presented to show defendant's main

6    contact within al-Shabaab, Hassan Afgoye, also known as Abu

7    Ayman, A-y-m-a-n, publicly stated that members of the TFG

8    parliament should be killed.

9              There was also ample evidence that the defendant

10   was aware of al-Shabaab's goals and endorsed them.  For

11   example, when Afgoye told her about his forces killing enemy

12   soldiers, defendant gave thanks to God.

13             Moreover, defendant's teleconferences in which she

14   raised money to be sent to al-Shabaab were fully -- were

15   full of rhetoric extolling the virtues of violent jihad

16   against infidels and apostates.

17             Evidence at trial also demonstrated that the money

18   raised by the defendant and others is al-Shabaab's

19   lifeblood.

20             These facts sufficiently support a finding that

21   the crimes of conviction in this case were calculated to

22   influence or affect the conduct of government by

23   intimidation or coercion or to retaliate against government

24   conduct.

25             Any other objections to the advisory guideline

1    calculations by the defense?

2              MR. SCOTT:  No, Your Honor.

3              THE COURT:  For the government?

4              MR. WARD:  None, Your Honor.

5              THE COURT:  The total offense level is 40,

6    criminal history category of VI, custody 360 months to life,

7    supervised release two years to life, fine range of 25,000

8    to 250,000 dollars, a special assessment of $1,300.

9              All right.  You wish to be heard?

10             MR. SCOTT:  Yes, Your Honor.

11             THE COURT:  Would you have your client move so I

12   can see her and so I know that she's listening to you.

13             MR. SCOTT:  Your Honor, the Court's finding as to

14   what the suggested guideline range under law is only the

15   start of its consideration as to what a proper sentence

16   should be.

17             The statute directs the Court to impose the lowest

18   sentence possible to accomplish all of the goals of

19   sentencing under Section 3553(a) and the Supreme Court of

20   the United States has said that the guidelines themselves

21   are just one factor and that they do not control the court's

22   thinking and that the court has to make an independent

23   decision as to what the proper sentence is for each case,

24   that is, the underlying crime and each person that the court

25   has before it.

1          And that can result in widely different sentences

2     for the same underlying guidelines.  The sentences earlier

3     this week show that.  The guidelines were roughly the same

4     for everyone.  Some were 30 to life and others were just

5     life.  But the sentences reflected the Court's analysis of

6     all of the facts, all of the circumstances, and what the

7     appropriate result should be.

8          And I know the Court has done the same thing in

9     analyzing what the appropriate sentence should be for

10    Mrs. Ali and what I have to say here is I hope a small

11    measure, if the Court is leaning the direction that I want,

12    to keep the Court leaning in that direction and if you're

13    leaning in a different direction to have some headwind into

14    that.

15          We submitted I think a long sentencing memorandum,

16    but most of that memorandum was my client's life history,

17    Mrs. Ali's life history, because the question that comes to

18    the Court and that we have heard the Court say is how did

19    you get here, what happened in your life that caused you to

20    be here.

21          And we wanted the Court to have as many facts as

22    it could, so a big portion of what we added were basically

23    more facts about Ms. Ali than are in the presentence

24    investigation report and more analysis of the bare words in

25    that report.

1          THE COURT:  You may take this time, if you wish,

2      to supplement the record.  You've done it by written

3      memorandum.  The vast majority of the community will never

4      see that written memorandum.

5          MR. SCOTT:  That's true, Your Honor.

6          THE COURT:  And this is your opportunity and I

7      would ask of you to -- if there's something that you wish to

8      say, please say it so it's part of the record.

9          MR. SCOTT:  Thank you, Your Honor.  And I'm going

10     to tell the Court that we filed the memorandum in open court

11     and published it, that is, because it's public record, so

12     it's available to everyone.

13          And I will tell you that my client was not happy

14     with having her personal life laid out to everyone.  She is

15     a private woman and she believes that her life should be

16     kept private.

17          But this is a public prosecution and I think it's

18     imperative that everyone have that ability to know who she

19     is, so we did not ask to file the brief under seal and we

20     put the good facts and some of the embarrassing facts into

21     evidence or at least into the record.

22          Because when you look at it from the surface,

23     here's a middle-aged woman in her 30s, married for at this

24     point ten years or so, eight years, two young children,

25     invalid mother to take care of, living in Rochester in an

1   apartment, limited education, who accomplished extraordinary

2   things.  You can say whether they're good or bad, legal or

3   illegal, but they are extraordinary.

4        She had no training, she had no experience in

5   this, and she put together a nationwide program to gather

6   clothing all over the United States, package it, ship it,

7   work her way through a complicated system to get that

8   clothing to Somalia.  She learned the hard way about having

9   to pay bribes to get it there.  She learned the hard way

10  about sending money and then having people not follow

11  through.  This came from an idea that she had, and no one

12  has done it before and no one has done it since and probably

13  no one will.

14        So how did we get there?  Well, to start with,

15  Ms. Ali was not a baby when she left Somalia.  She was a

16  teenaged woman when the government of Somalia collapsed.

17        THE COURT:  Excuse me for one second.  Would the

18  government sit.  You can take your notes while you're

19  sitting.

20        MR. WARD:  Thank you, Your Honor.

21        THE COURT:  Let the defense give their argument.

22        MR. SCOTT:  She grew up in Mogadishu.  Her father

23  had been involved in the military and the police, although

24  at the time of the fall he was not, he was a storekeeper.

25        So she was in the position of being in the clan

1    and the family that was tied to the government of Siad Barre

2    and the Court heard at trial, of course, and has heard

3    elsewhere that the collapse of the government was a disaster

4    for the people in Mogadishu and the people in Somalia, but

5    especially the people in Mogadishu because they were

6    urbanized.

7          They had no place to go.  They all became

8    refugees.  Many of them were murdered.  Many of the women

9    were raped.  Relatives of hers were killed.  She was forced

10   to flee as a young teenaged woman, a high school student,

11   with her mother and some of her brothers.  They went

12   through, in one way or another, the same kind of hell that

13   hundreds of thousands of refugees went through in those

14   years in 1991 and '92.

15         She ended up in Ethiopia in a town out in the

16   middle of the desert, Shilavo.  I've Googled it, looked

17   down, and it is in the middle of the desert.  It's not much

18   of a town anymore.  It wasn't except during this time period

19   when all of these refugees came.

20         As she mentioned, and we summarized, is they made

21   it there because of the help of other good people and some

22   not so good who just wanted to make some money, but good

23   people.

24         And they were somewhat protected compared to the

25   really bad conditions in the Kenyan camps, but it was still

1    relatively lawless and they lived in a lean-to, not even a

2    shack, her brothers and her mother and her sister, for some

3    time period.

4            This hit her at probably physically the most

5    emotional time in a person's life, in puberty when their

6    emotions overcome their intellect -- it's just part of how

7    we come together -- when people are emotionally more

8    sensitive than in any other time of their lives, and that's

9    when she went through this.

10           It forced her to be strong.  That's been her

11   undoing here, but it was her survival instinct then.  It

12   forced her to rely on her inner strength as against the

13   outside forces, which truly were dangerous and lethal.

14           She went to Yemen for a while and learned what

15   true discrimination is.  The Yemenis treated the Somali

16   refugees as trash, as free labor.  It was an eye-opening

17   experience for her.  She learned more than anyone how

18   untrustworthy people can be.

19           And I think in addition to her strength, her inner

20   strength, which may have come to the point I think

21   occasionally and we've seen occasionally to the point of

22   rigidity, she also, I think, more embraced her religion.  It

23   was the one anchor she could hang on to, because she

24   couldn't hang on to people.  People were for the most part

25   not good.  And she grew stronger and stronger in her

1    religion.

2          Luckily for her, as almost every Somali who is

3    here can say, is that there was someone in the United States

4    who was able to help.  It wasn't a refugee organization.  It

5    was a relative who had gotten here through a refugee

6    organization and was then able to help bring her family in.

7          And in her case it was her brother Adan, who

8    helped by sending money to the family, once he re-located

9    the ones he could find, and eventually made arrangements so

10   they could come to the United States.

11         And like many of the people who come here, this

12   was not something where they were a refugee for a few months

13   and this was a nightmare that they could outlive.  They were

14   refugees for years, three, four, five, eight, nine years.

15   There are family members here today who made it to the

16   United States in like 1999.

17         Ms. Ali came to the United States, for which she

18   was eternally gainfully.  It was a new start.  They located

19   first in Atlanta and she went out and looked for work.  She

20   went to school to learn English as a second language.  Her

21   future was bright.

22         Her mother at that point, who was the person who

23   was there -- her stepfather disappeared.  No one has ever

24   seen him since the collapse.  So her mother was the strength

25   and Amina as the oldest daughter was the strength in the

1    family.  Her mother's strength ebbed and disappeared.  Her

2    mother became an invalid right then.  No one could figure

3    out exactly why.  It might have been diabetes undiagnosed.

4    They weren't sure.

5            And that ended my client's chance to become fluent

6    in English.  She now took over the role, as the oldest

7    daughter, of taking care of the family, taking care of her

8    brothers and sisters and her half-brothers and sisters.

9    It's a big family.  They go from older to quite a bit

10   younger.

11           She managed to find out, as she said, about Mayo

12   Clinic and the big Somali community in Minnesota and she

13   literally helped move the family up here, along with Adan,

14   her older brother, who had his own family here.  Moved here

15   in hopes that her mother could go to Mayo Clinic and get

16   diagnosed as to what was wrong and what was making her an

17   invalid.  So she moved to Minnesota with hope.

18           And her mother stabilized for quite a while.  As

19   this Court knows from the presentence investigation report,

20   her mother just passed away after the trial last -- about

21   ten months ago, nine months ago now.

22           So her mother and her and the family lived in the

23   Rochester area, the greater Rochester area from the late

24   1990s until today.

25           THE COURT:  You left out an important part, that

1    her brother is a medical doctor.

2              MR. SCOTT:  Her brother is.  He became a medical

3    doctor, that's right.  He didn't come here.  He had his own

4    practice.  In fact, the first time I talked to him he was in

5    the midst of moving down to Florida.  He had finished -- I

6    think he had finished his final residency and was moving

7    down there.  I'm not positive, so don't quote me on that.

8              And he wasn't -- I don't want to say he wasn't

9    close, but he was not living in the same town, in the same

10   area, so their connection was as a brother and a big family

11   living in another town.

12             But he had provided tremendous help in getting

13   them here.  I mean, he literally supported them when they

14   lived in Ethiopia until the United States processed their

15   papers and allowed them to come.  And I think it was in the

16   report, when I wrote it, that at first they turned mother

17   down because of her health, so they couldn't leave yet.

18             She went to work here as soon as she could.  She

19   came to Minnesota.  She was working for Manpower, temp jobs,

20   temp jobs over at IBM, wherever she could find work, and she

21   went to work immediately.  This is what she was good at,

22   which is keeping herself extremely busy.

23             She got married, married Faysal, who is here -- I

24   am going to ask the Court to allow him to address the

25   Court -- in fact, in the year I think 2000.  And they had a

1    tough time having children because of issues having to do

2    with female circumcision in Africa that they finally were

3    able to reverse, but she basically, instead of having the

4    big family, had a small family because of it.

5           And she became active in the community.  Now,

6    that's when I want to bring back in those things she learned

7    as a refugee.  She had immersed herself in her religion,

8    Islam, and in the community, then, among the women in the

9    community, she was -- what on our side we would call Bible

10   studies.  She was engaged in Quran studies with her fellow

11   women refugees from Somalia and on a regular basis, just

12   like we would -- like the Christians who do it with a Bible,

13   these are groups.

14          She's not an imam, she's not anything else, but

15   she had immersed herself so much that she was more familiar

16   with the Quran than many of the women that she was with and

17   she picked up in high school and also living in Yemen a

18   better understanding of the Arabic language as well, which

19   is important for the Quran.

20          The good parts of that as well are Islam teaches

21   people to be giving.  Giving alms is one of the fundamental

22   bases of Islam.  Another fundamental basis of Islam is to be

23   kind to your neighbors.  If someone comes to your house, you

24   welcome them.  If someone comes to your neighborhood, you

25   welcome them.  If someone comes into your community, you

1    welcome them, you help them.

2         Those letters that you received, and there were a

3    lot of them, probably a third of them were people who met

4    Ms. Ali when they came up to Rochester and didn't know

5    anyone in the community and Mrs. Ali would show up.

6         If they needed a ride somewhere -- she had a

7    tremendous advantage over many of the women, she had a

8    driver's license -- she would take them where they needed to

9    go.  She would help them integrate themselves into the

10   community.  Many of them had no funds at all and she would

11   help them find neighbors who could help them with that.

12        It's simple goodness.  And I don't even want to

13   think about how many of those letters talks about her

14   goodness here in America to the people who have come, the

15   giving of herself.

16        You know, not too much good was happening in

17   Somalia during all this time period.  The new refugees would

18   let the old ones know what was happening.  The civil war

19   maybe percolated more so than raged, as it had in the early

20   '90s, but things were not --

21        THE COURT:  The civil war was not between

22   Christians and Muslims, it was Muslims against Muslims.

23        MR. SCOTT:  Clan against clan, interclan,

24   intraclan.

25        I've had a terrible time even getting a handle on

1    this, Your Honor, and I don't have more than that.  Clan

2    thinking -- my understanding from talking to numerous people

3    here who are Somalis, clan thinking is inherent in the

4    psyche of the Somalis.  Somali people identify themselves in

5    their clan, their sub-clan, their sub-sub-clan.

6         And it's historical and it's only been in the last

7    30 or 40 years that it was not a survival technique.  You

8    don't -- if there's someone from another clan or even

9    another sub-clan within your clan who is coming over to

10   where you are, the reason is not going to be good.  There's

11   an inherent suspicion that is historically based.

12        And in the old days, that is, before the mid 20th

13   century, people lived in the same place.  They may have been

14   nomads, but they went in the same place if they were raising

15   their cattle and they moved through the same grounds for

16   hundreds and hundreds of years.  And the people in the

17   cities, they lived with the same people.  So that it was, in

18   fact, probably a survival technique.

19        And you can have relative peace.  Even when they

20   were under the control of European powers, European powers

21   were able to be above the clan system, so they were sort of

22   equally well hated and equally well tolerated so long as

23   they didn't favor one clan over another, which to a large

24   extent enabled the Italians and the British to govern

25   Somalia with a relatively small number of people, because

1    they could stand outside the system and because the people

2    were still dealing within their system.

3           That changed in the latter half of the 20th

4    century with urbanization, with independence, with

5    disruption.  The society disrupted.  It's not unusual for

6    Somalia.  It happens.  It's happened in many, many

7    traditional countries that have been forced by circumstances

8    into the latter half of the 20th century, and Somalia took

9    it worse than most.

10          And Siad Barre, the dictator, the military

11   dictator who ran the country, he loaded up his people from

12   his clan and cut out the other clans.  So it's not a

13   surprise that it was the other clans who began rebelling

14   against him.

15          First the -- I will get the name wrong, but it

16   starts with an "I."  Whatever the one is that is now

17   Somaliland, they were first.  The Hawiye, they were the ones

18   in the center part of the country that were left out.  And

19   there's always an argument over which is the biggest, the

20   Darods or the Hawiye.

21          But they finished it and drove him out of power

22   and then, as one would expect back then, they had

23   retribution against those who had taken the power away and

24   then the retribution went back and forth.

25          But people got moved all over.  It was no

 1    longer -- other than maybe Somaliland where one clan has

 2    probably 90 percent of the people who live there, which is

 3    why they have been able to stay independent, outside of

 4    there people got all mixed up.  All of the things that

 5    caused that suspicion to be a survival technique became the

 6    exact opposite.

 7          But it's a thinking of them and us that's

 8    particularly heightened in people who were born and raised

 9    Somali that has not entirely disappeared here.  I understand

10    from speaking with people that there are still those kind of

11    clan arguments that go on in Minneapolis and Rochester in

12    the community and depending on which clan you're from may

13    have been which way you thought about the Islamic Courts

14    Union and the TFG and all of those things.

15          It's made the ability to put a government into

16    Somalia almost impossible because everybody is jockeying for

17    position and everybody is suspicious of everybody else.  And

18    even if they reach a compromise, nobody believes it.

19          How does that now play forward?  In 2006 the

20    Ethiopians occupied -- I won't use the word "invaded"

21    because they were invited in, same way Quisling invited in

22    the Nazis in Norway.  They were invited in by a person who

23    had been a strongman in Puntland and was put as the head of

24    the TFG, Yusuf, and who had as his first act, after becoming

25    named the head, was to invite them in.  And it took several

 1     years before the Ethiopians came in.

 2             There was then reported here -- accurately or

 3     inaccurately, it was reported in the United States at length

 4     that this was not going well for the Somalis, that there

 5     were now foreigners and that the foreigners were committing

 6     atrocities.

 7             And what the truth is I don't know, whether it was

 8     worse or better than what the rumors were and what was

 9     coming back from the country.  Usually it's not as bad and

10     it grows in the telling.

11             So now we're sitting here.  We have a housewife.

12     She has five- and six-year-old children.  Her world now is,

13     you know, within five miles of downtown Rochester, her whole

14     world, but it's also her religion and her religious groups.

15             So they are talking about what terrible things are

16     happening and they raise some money, they raise some money,

17     not a lot of money, a couple thousand dollars, and they send

18     it up to one of the groups up here in the Twin Cities to

19     have it sent to the people who were suffering from the

20     fighting.

21             And she learned -- and you heard the tape at the

22     trial when she repeated it -- she learned that not a dime of

23     it was going to Somalia.  Expenses.  That's where the

24     stubbornness and the hardheadedness now kicks in.  And

25     you've heard her talk about it with her own voice.  She

1    said, well, if they're not going to do anything, if all of

2    the help that we want to give is going to be eaten up by

3    these men, then we're -- I'm going to do something.

4            And she said we're throwing away clothing.  These

5    people are unclothed, they're naked.  And she remembers

6    that.  She remembers living in rags.  And so she says we're

7    going to get this clothing together and we're going to send

8    it over there and the heck with these other people.  They're

9    just going to eat up all the money.

10           I'm going to tell you that that is a combination

11   of her, I think, inner goodness and that stubborn

12   hardheadedness that we have seen in the courtroom.  And she

13   didn't know she couldn't do it and so she did it.

14           Now, how could she do it to start with?  First

15   because of all of the people who already knew that she was a

16   good woman, they became her helpers, they became her

17   organizers.  They talked to their friends in other parts of

18   the country.  And she literally learned step by step how to

19   do it.

20           The Court has seen it in some of the letters.  I

21   think the person who had the machine in there that they used

22   to compress the clothes wrote a letter as to how they got

23   that machine -- it was in his garage -- so they could get

24   the clothing in, they could wash it, they could fold it,

25   they could compress it so they could get more clothing into

1     the shipping containers.

2          She got those people to send 40 bucks along with

3     the clothing, not just send clothing, but send $40 to help

4     pay -- to raise the money to pay to send it.  It took

5     $17,000, it took $17,000 to send that first shipping

6     container to Somalia, 12,000 for the second.  She learned a

7     lot between the first and the second of who she could trust

8     and who she couldn't.  She got people to donate trucking.

9     You know, if she hadn't chosen the wrong horse, it would be

10    a miracle.  But she chose the wrong horse, so she's here.

11         And you heard also in the trial this wasn't just

12    one thing.  Other stuff developed out of this at the same

13    time.  The government put in evidence a list, I think I've

14    heard 350, I never counted it, but of families in Somalia

15    who were widows, orphans, injured, crippled who needed money

16    on a regular basis, $50 a month, $70 a month, and she put

17    together people then who agreed to send the money directly

18    to them, hundreds of families.  Whether it's 350, maybe I'm

19    wrong.

20         And then one of the reasons she kept track of it

21    was so that if one family couldn't do it anymore, their

22    husband got laid off, they weren't working, she could

23    substitute another family in, try to recruit someone else to

24    do that.  It's not terrorism.

25         The government even had a list which they put in,

1    I forget which exhibit it was, they had a list they put in

2    of what they called the 20 travelers.  And it's fairly clear

3    that that was money that she put together to send to pay to

4    treat the wounded.  Medicine is not free.  Now, those

5    wounded were wounded fighters, but she was sending money to

6    treat the wounded, who needed treating.  She's not Florence

7    Nightingale.  She's too hard to get along with, anyway, to

8    be Florence Nightingale.  I said she backed the wrong horse.

9        The evidence was that she was connecting with

10   various groups.  Her initial shipment was to go to Abshir

11   Ba'adle, and I'm sure I am mispronouncing his name, who was

12   a well-known and aged poet, Islamic poet.  And her

13   connection to him was that literally one of his wives at one

14   time or another actually lived in Rochester.  And he was to

15   help arrange to receive and hand out the clothing that was

16   in the first shipment.  She dealt with a person named

17   Abdirahman, who is I think a lady.  Neither of whom are

18   connected to al-Shabaab.

19       And she ended up with Hassan Afgoye, who we have

20   heard many a time, who was, in fact, a member of al-Shabaab,

21   apparently a financial member.  You know, every time I go

22   look something up on the websites or any of the lists of the

23   powers that be in al-Shabaab, his name was never there.  So

24   he was a low-level functionary, I guess, is what we would

25   call him.  And as she said then, he's a man she could trust.

1          These people were all people she could trust.

2     Now, that's important because she's Somali, but also

3     important for another reason.  The one thing that everyone

4     agrees on is that almost everything that has to do with

5     government in Somalia is corrupt.  The economy of Somalia

6     runs on money and goods coming in from the outside and

7     people make a profit on it.

8          It was the one thing that she didn't want to do.

9     She didn't want those clothes to go to anyone else.  She was

10    worried that people would be afraid that the clothes were

11    going to end up on the black market and not go to the poor

12    and the needy.  We heard her voice talking about that.

13          And al-Shabaab was the wrong horse, but it wasn't

14    the illegally wrong horse when she connected with them.

15    They had not yet been found to be a foreign terrorist

16    organization.  They were a fundamentalist splinter faction

17    fighting in a long-running civil war and they were the last

18    of the fighters that were left after the Ethiopians routed

19    the Islamic Courts Union and they were not part of the

20    corrupt government.

21          And I think that in both of the trials that you

22    heard, Matthew Bryden testified that he agreed that the

23    one thing you could say about the TFG was that it was

24    corrupt.

25          I read one article that the original one, the TNG,

1    had been literally set up because people wanted to give

2    money and somebody wanted to take it who could represent

3    that I'm taking the money for the government.  So let's set

4    up a government so we can get money from Saudi Arabia, from

5    outside people who wanted to help and then spend it not on

6    them.

7         I think the testimony and writings of Matthew

8    Bryden, who was watching over this, is that the TFG was not

9    engaged in anything during most of their time that had

10   anything to do with helping the Somali people.

11        Amina Ali sees things in black and white.  It's

12   her tradition and it's her stubbornness.  So she sees what

13   she wants to see in al-Shabaab.  They were trustworthy.

14   They weren't in it for the money.  They were believers in

15   Islam.  They professed not to be clan-based, which she

16   thought was something for the future.

17        And then she overlooked, I guess, the other

18   things.  And you say and will say how could she possibly

19   overlook this.  And the answer is name me a group that

20   wasn't engaged in killing and warfare and extortion and

21   piracy in Somalia.  This was not a choice between good and

22   evil.  This was a choice among evil.  So she chose to see

23   the good.

24        Now, the paper says -- excuse me.  The government

25   in their papers say, well, it was accidental.  I don't think

1     you saw me argue in the case, I don't think you saw me argue

2     in my papers or anyone else -- anywhere else that it was

3     accidental.  She knew.  You could tell she knew.  She

4     thought they were doing good work.  She was wrong on her

5     thinking, but she wasn't wrong on what she wanted to do,

6     which was to help.

7          The Court's job is to balance these things.  We

8     pretty well know in all of these cases that you've had, we

9     pretty well know that the people that you've sentenced are

10    not going to be in trouble again -- maybe some of the

11    youngsters because they're youngsters -- because they have

12    never been in trouble before and there's nothing in their

13    background that says they're going to be in trouble.  And

14    that's where Amina sits.

15         So this sentence is that balance.  It's not a

16    balance of what's going to happen in the future on that.

17    It's a balance of the punishment for the underlying offense,

18    balancing the good and the bad all in one sentence.

19         You know, when we talk about violent conflicts we

20    use names, wars, police actions, civil defense, civil war,

21    civil conflicts, insurgencies, terrorism, genocide.

22    Terrorism has incredible connotations to it.

23         When we think of terrorism we think of things such

24    as 2 million skulls in Cambodia, not genocide because they

25    were all the same people as those who lived and those who

1    died, but terror.  Terror bombings in World War II, Dresden,

2    Tokyo, London, aimed specifically at terrorizing a civilian

3    population.  Part of war.

4         My memory may be wrong, but I think General Curtis

5    LeMay, who is the person who put together the idea of terror

6    bombing of Germany, was heard to say that it's a good thing

7    that they won the war or he would have been executed as a

8    war criminal.

9         Violent conflicts are violent.  Peace is a

10   wonderful thing.  The problem with peace is that someone

11   always decides they can get more by using violence and then

12   you have to come back and stop their violence.

13        You know, in a regular war, you know, the laws of

14   war apply.  In an irregular war it doesn't, everything is on

15   the table.  Traditionally in Europe poison was a good way of

16   getting what you wanted.  The Bible has the rape of the

17   Sabine women.  Rome killed everybody in Carthage and then

18   salted the earth around it so no one would ever come back.

19   As I said in my papers, no one's hands are clean.

20        As a young adult we watched for seven, eight,

21   nine, ten years us backing one faction and the Russians

22   backing a different faction in Angola in which hundreds of

23   thousands of people were killed and, in fact, we backed the

24   insurgents, not the government.

25        Applying violence and supporting violence to

1    effect the operation of a government is politics.  Libya,

2    United States overtly and covertly supported a revolution

3    against a recognized government.  Syria today.  Nothing new.

4    We arranged in 1953 for the coup d'état to knock out the

5    democratic-elected government of Iran, and we paid the price

6    eventually and are still paying it today.  The Diem regime

7    when we were young men was a problem for the planners of

8    Vietnam.  So it was eliminated and replaced by a military

9    dictatorship, also engaged by the United States.

10          And we don't always have to deal -- get to deal

11   with people that we like.  Hamid Karzai was installed by us

12   as the head of the government of Afghanistan when we

13   eliminated the Taliban and, you know, he gives new meaning

14   to the word "corruption," but at least he's honest enough to

15   admit he gets his bags of cash from the Iranians, the

16   British, the United States, and that he wants to continue to

17   get them.  And if we want to continue to stay there, we have

18   to make economic arrangements to be able to do that.  I just

19   read that in the paper.  We live with it because the

20   alternative is worse.  It's not like we don't know.  We

21   know.  But what's the alternative?  The alternative is

22   Taliban.

23          Terrorism.  Terrorism has lost its meaning.  Look

24   at the definition we're talking about, the use of violence

25   to influence the actions of a government.

1          This Court well knows that domestic terrorism was

2     the threat that achieved the pleas in the protesters for the

3     Republican National Convention, that they would be

4     designated terrorists.  Now, they wouldn't get the 12 levels

5     because that only applies to international terrorism, but

6     they would have gotten much more serious guidelines because

7     they used violence.  That alone would make them a terrorist,

8     but it was not terrorism.

9          If we had gone back a few years, I was trying to

10     figure it out, but, you know, the Honeywell protests were

11     sort of an annual picnic that people would have to protest

12     the making of cluster bombs for the United States government

13     and they would climb up and try to knock down the fences.

14     That's violence.  Tony Bouza's wife, chief of police of

15     Minneapolis, one of those people who probably could have

16     been charged as a domestic terrorist under the definition.

17          So the word is being used for something that isn't

18     there and eventually "terrorism" won't be the right word

19     anymore and we'll have to find a new word because it will

20     lose its meaning.

21          THE COURT:  Be careful.  You forget or you may not

22     know that I was the judge that tried the first Honeywell

23     defendants, 30 or 40 defendants.

24          MR. SCOTT:  Well, I remember where you were

25     working back then, Your Honor.  Luckily for me they kept

 1     them in state court, so I didn't have to defend them myself.

 2              And, you know, the Supreme Court -- I mean, I'm

 3     not kidding in terms of what we're talking about.  The

 4     Supreme Court said under the statute, and they're right

 5     under the statute, the Supreme Court said under the statute

 6     that humanitarian aid violates the law, which is entitled,

 7     which is entitled Giving Material Support to a Foreign

 8     Terrorist Organization.  It is the law.  We know that.

 9     Doing good for people that have been designated by the

10     United States as bad is illegal even if it's doing good.

11     The Supreme Court had that case directly before them and

12     they directly said it.

13              So I'm not talking about here whether or not my

14     client violated the law.  I'm talking about where within

15     that vast area that qualifies she belongs.

16              You know, the government is going to come back and

17     say, as they did before, she took great -- actually not to

18     be mean to her co-defendant, but it was her co-defendant

19     that was doing the talking about the bombing of the defense

20     minister by a suicide bomber and the collateral damage was

21     hundreds of people or a hundred people.  I don't remember

22     how many died, but it was significant.  It was significant.

23     He was a military target.  He was the person in charge of

24     the opposition.  So in terms of terrorism, it was a

25     terrorism of war.

1          We have collateral damage.  We're better shots

2     than they are.  You know, it's different when it's somebody

3     in North Dakota who pushes the button on a computer screen

4     and a missile hits somebody and their family or their

5     friends.  It's not the same as when someone walks in and

6     pushes a button on themselves and blows themself up.  The

7     effect is the same.  And neither of them is good, but they

8     can be defended under the right circumstances.

9          You know, when the case ended and the government

10    came in with their search warrants after ten months of

11    listening to every phone call, they had enough clothing in

12    storage to send a third -- or close to enough to send a

13    third shipping container off to Somalia of clothing and they

14    were raising money for that as well.

15         I think that shows that her inner reasons for

16    doing this, which was to help, never changed.  I mean, I

17    wish for her sake that she could have had groups to send

18    that stuff to who were neutral or pro-Western who wouldn't

19    steal it.

20         THE COURT:  Excuse me.  Put up the picture.  Do

21    you know who that is?  Look on your screen.

22         MR. SCOTT:  Pardon?

23         THE COURT:  Look on your screen.  Do you know who

24    that is?

25         MR. SCOTT:  What my client told me is you have to

1    have power in Somalia to keep things from being stolen.

2    Amina Abdirahman, who is not part of al-Shabaab, had her own

3    security forces, which was good.  Abshir Ba'adle did not,

4    which is not so good.  And Hassan Afgoye did as well, so

5    that she knew that if he said something would happen, it

6    would happen, that he wouldn't be coming back saying it got

7    stolen from me.

8             Some of what happens is, in terms of your

9    sentencing as well, Your Honor, is how central these actions

10   are to the security of the United States of America.  And I

11   don't think there's any question about that that's important

12   and that the closer that you get to the armed forces of the

13   United States or the citizenry of the United States, the

14   more important it is to the United States, or areas where

15   the United States has a direct personal interest.

16             We are concerned with the insurgent movements in

17   southern Philippines, with FARC in Colombia, but we are more

18   concerned with Hizbullah and Hamas and more concerned with

19   al-Qaeda in Yemen.

20             I was looking through the website for the

21   Department of State recently and they had a 2010 briefing,

22   March of 2010, one of their assistant secretaries of the

23   Bureau of African Affairs, and they were talking about

24   Somalia in it.

25             And I read it first because there was a discussion

1      in it about the official position of the United States as it

2      related to the Somalis in Minnesota, and at that time their

3      official position in 2010 was that they had gone to fight

4      against the Ethiopians and not against the United States and

5      they went back for nationalist reasons.  But as I was

6      reading it, I saw some things that were more important for

7      what we're talking about here.

8              The first was when they were talking about

9      al-Shabaab and asking the government about al-Shabaab and

10     foreign terrorists and everything else, the ambassador said

11     that, "That's a misreading of Somali's history...and its

12     long period of internecine conflict inside the country, as

13     well as the region itself.  Somalia has been torn apart by

14     internal strife for more than two decades.  That two decades

15     supersedes many of the terrorist activities and events that

16     you would like to associate with Somalia.  Somalia's

17     problems are the result and absence of a central government,

18     constant tensions between various regions among the five

19     major clans and many sub-clans that exist.  Somalia's

20     problems are to be resolved by Somalis by recognizing the

21     reasons and causes of the conflict in their own country.

22     Somalia's people have to work together to bring peace to

23     their country."

24             I think that's the one thing that we saw that was

25     accurate, is that this is an internal conflict that we're

1     talking about here, not an external conflict.  We're not

2     fighting here instead, the shores of Florida.

3          There was another really interesting thing I found

4     in there as well.  This is 2010 and they had speaking also

5     the ambassador to the UN Mission in Rome for food and they

6     talked about whether there was being a diversion of the food

7     resources that were being shipped through the United Nations

8     into Somalia, diverted to other uses, and the ambassador

9     dodged that question, but what he did say was that, "...the

10    World Food Programme is not operating in the southern region

11    of Somalia, and our operational and food aid support to

12    Somalia is limited to the northern region of Somalia only."

13         You know, food is not a weapon that we endorse

14    being used for political purposes, but the lack of food

15    apparently is.  Of course they couldn't send any food to

16    southern Somalia because it was under the control of

17    al-Shabaab and it would be a federal crime to do so.

18         And the Court may recall in 2011, one year later,

19    when the famine worsened, of course the first things that

20    were said were it's al-Shabaab's fault.  And then finally

21    the federal government said, well, it's still illegal for

22    you to provide any food to these starving Somalis, but we

23    won't enforce the law if you want to do so.

24         Now, you can argue that there's nothing truly

25    right and truly wrong, there's only shades of gray.  And

1    when you get into truly right and truly wrong, you get

2    things such as the refusal to help the starving because you

3    don't like the government, until it reaches a point that

4    it's totally unreasonable, which happened in 2011.

5          My client violated the law, and I'm not even

6    saying that her motives were pure because she picked a side

7    in the fighting.  She probably shouldn't have.  But what she

8    wanted to do and what to a large extent she accomplished

9    doing was to provide aid and the kind of aid that is not war

10   aid.  It's food.  It's living expenses.  It's clothing.  And

11   I think that that balances in her favor as to what the Court

12   ought to do.

13         And I don't have a number really for you, Your

14   Honor.  Whichever one is probably wrong.  I mean, I'd like

15   to think the number you got from the government is

16   laughable, but I may be totally wrong in that in terms of

17   the way you see the case.

18         I don't see it that way.  I see the government's

19   argument for a truly punitive, punitive sentence as a

20   statement to the Somali community that there is only black

21   and white and you fall on the side of black and therefore

22   you deserve a terrorism sentence, you are a terrorist.

23         Before I finish, just a couple of I guess you

24   would call them procedural issues.  The first is where,

25   where she should go.  I would ask the Court to recommend

1    Waseca.  I don't know whether that will have any effect at

2    all on the Bureau of Prisons because the Bureau of Prisons

3    will do the same thing in looking at Mrs. Ali as Section

4    3A1.4 does, Criminal History Category VI.  That's the way

5    they think.

6              But if she doesn't go to Waseca, she'll go to

7    Carswell, Texas.  She'll be put in the high security unit --

8    I forget the initials there.  It's not SHU.  It's got a

9    different set of initials.  -- because she's a terrorist.

10   Not because she's a first offender, but because the Bureau

11   of Prisons thinks all terrorists have to be the same.

12   They're a bureaucracy.  They protect themselves.

13             To sort of give you an idea, Lynne Stewart is

14   there.  Lynne Stewart, of course, is our age and is a

15   lawyer, doesn't have any prior convictions, and is not a

16   security threat to run or anything else, but she's there

17   because she's a political prisoner and she is a terrorist.

18   And my client may well fall there.

19             THE COURT:  I take offense to that.  She was

20   convicted by a jury of her peers in the Southern District of

21   New York.  She's a criminal, not a political prisoner.

22             MR. SCOTT:  The federal prison system is divided

23   on people -- on how dangerous they are within the prison

24   system and how likely they are to be an escape risk.

25             THE COURT:  She violated all the ethical rules

1      that a lawyer would have in dealing with the Sheikh.

2              MR. SCOTT:  And maybe I'm cynical about it, Your

3      Honor, because I represented Mohamed Warsame, who while he

4      was presumed to be innocent was placed in the most secure

5      part of the most -- finally became the second most secure

6      institution in the United States, the hole in Oak Park

7      Heights, where he was kept in solitary confinement for six

8      years while he was presumed to be innocent with orders that

9      he was unable to communicate mostly with the outside world

10     and which, as it turned out, of course, his lawyer was being

11     recorded in any conversation that he had with his client.

12     And my cynicism, of course, based on that is because I had

13     it in writing they wouldn't do it, so of course I

14     immediately knew they would and that's the cynicism.

15             But I think that that's a likely result if this

16     Court does not recommend Waseca and I think it is a less

17     likely result if the Court recommends Waseca.

18             Waseca will allow her to receive visits.  If she

19     goes to Carswell, it will cost roughly a thousand dollars

20     for a person to see them just in the cost of the flight,

21     renting the car to go down to Carswell, staying overnight.

22     That will cut down the visits.

23             And I think the Court knows probably as well as

24     anyone that the visits of women in prison are minuscule.

25     And when you add thousands of miles onto it, the odds go

1    down further.

2         The second thing is this, Your Honor, and this is

3    true of both defendants here.  At the conclusion of the

4    trial the Court took my client into custody and initially

5    revoked co-defendant's bond, but then released her at the

6    same time and both of them to community confinement.

7         My client was released to community confinement

8    after about six months, in April of last year.  So she

9    served 13 months, almost even, under house arrest at a

10   halfway house.  She was not allowed to leave the halfway

11   house except for medical purposes, which really have been

12   none, and for me to take her to court, which is now the

13   second time today.  Because it's a condition of her release

14   that she remain there, she will not receive credit on a

15   prison sentence for that, but it is the equivalent of

16   imprisonment.

17        She had one tremendous advantage, to which we

18   thank the Court for, and the tremendous advantage that she

19   had was that she could wear her traditional clothing, which

20   is really important to her.

21        So I'm not going to say that for her it's the same

22   as jail because jail has a psychological factor that's

23   different, tremendously different.  We were so happy when

24   the Court allowed it.  My client had lost a considerable

25   amount of weight, there was less of her each time that I saw

1    her at the jail.  And she's been able to maintain her health

2    since then and I think a lot of that is psychological.

3            There is a way under the guidelines -- or not

4    under the guidelines, but under sentencing for the Court to

5    take that into consideration and that's for the Court to say

6    I think that the sentence that you deserve to have is X

7    number of months.  In putting the final sentence together I

8    have subtracted that time, so it's X minus 13 months.  And I

9    am posing as a sentence to take into consideration that you

10   have effectively incarcerated her during that time period.

11           As the Court well knows, there are many people who

12   are in the same institution under the same or even less

13   security that are officially serving a sentence, even a

14   felon sentence, because release to the halfway house is part

15   of the official federal sentence.  They could even be at

16   home on house arrest on a bracelet and be officially in

17   prison.

18           So that the difference is the difference of

19   semantics rather than a difference of type, and I would ask

20   the Court to take that into consideration when you reach the

21   final number that you think is fair under the statute.

22           I have nothing further.

23           THE COURT:  Thank you.  Do you wish to call her

24   husband?

25           MR. SCOTT:  Yes, if I could.  Faysal.

1              THE COURT:  Good afternoon, sir.

2              FAYSAL MOHAMED:  (In English)  Good afternoon,

3     sir.

4              THE COURT:  I need you to speak into the

5     microphone so everyone can hear you.  Do you need to have it

6     translated for you or do you wish to speak in English?

7              FAYSAL MOHAMED:  (Through interpreter)  Yes, okay,

8     translator.

9              THE COURT:  Would you state your name for the

10    record, please.

11             FAYSAL MOHAMED:  (Through interpreter)  My name is

12    Faysal Farah Mohamed.

13             THE COURT:  Please speak to me.

14             FAYSAL MOHAMED:  (Through interpreter)  It's

15    really difficult for me to present my feelings and my

16    emotional state at this point.

17             I'm a father of two small children.  I'm also the

18    husband of Amina Farah Ali.  The things that I would like to

19    talk about today are things that have changed my life

20    tremendously during this whole experience.  During this

21    whole case I have experienced a really difficult and dark

22    chapter of my life.

23             Initially I was caring for my mother-in-law as

24    well as my daughters.  One was nine and one was ten.  My

25    mother-in-law had been ailing.  Eventually she became

1    bedridden for 12 years.

2          We were dealing with stress to begin with and then

3    this issue came about.  All of a sudden I was dealing with

4    my two daughters, one was nine and one was ten, and my

5    mother-in-law, who at that point become bedridden.  On top

6    of that I had been working.

7          You can imagine how difficult the situation was

8    for me as a father working outside of the household dealing

9    with two small children as well as an ailing mother-in-law.

10   In addition to the daily care for my daughters, they were

11   daughters and females and they need additional care because

12   of their gender.

13          THE COURT:  My understanding that Adan's, Amina

14   Ali's brother, wife stayed with you and was taking care of

15   the children.

16          FAYSAL MOHAMED:  (Through interpreter)  No one had

17   offered any help except God.  The situation is difficult for

18   us at this time.  We are going through this dark chapter of

19   our life and it's something that we have been dealing with.

20          THE COURT:  Thank you.

21          Amina, you have an absolute right to talk to me.

22   You have an absolute right to tell me anything that you want

23   to tell me about yourself, about this offense, or anything

24   else that you think I should know before I sentence you.

25   Please talk to me.

1              THE DEFENDANT:  Thank you.  I thank you for the

2      opportunity you gave me today to talk to you.

3              Everything that I was accused of doing, everything

4      that I had done I had done because I was trying to do good.

5      I have never intended to do anything that's bad.  My

6      intention was to alleviate the suffering of people and I was

7      trying to make their lives a bit easier.

8              Because that was something that I had experienced

9      in the past.  I had experienced suffering.  I had

10     experienced people who did not have nothing to eat or

11     nothing to wear.  So based on that earlier experience, it's

12     something that I experienced personally.

13             THE COURT:  Do you know who -- excuse me.  Take a

14     look at the monitor.  Do you know who that is?

15             THE DEFENDANT:  Yes.  Actually her name is Hawa

16     Abdi and we actually had provided some assistance to one of

17     the camps that she had ran.

18             THE COURT:  And how would you describe her and her

19     fight for helping people in Somalia?

20             THE DEFENDANT:  From what I heard, she's a nice

21     person who had been helping those needy people.  That's what

22     I have learned.  I have heard about her because we have

23     offered some help to one of the camps that she actually had

24     ran.

25             THE COURT:  Have you heard of her being called

```
1    Mother Teresa and Rambo at the same time?

2              THE DEFENDANT:  What?  Will you elaborate?

3              THE COURT:  Do you know who Mother Teresa is?

4              THE DEFENDANT:  Yes, I have heard about her and

5    it's somebody that I actually tried to emulate.

6              THE COURT:  And do you understand that Somali

7    people have called Ms. Abdi the Mother Teresa of Somali

8    people?

9              THE DEFENDANT:  I have heard through a lady that I

10   was making contacts with that she has this camp and some of

11   our help that we have send actually found their way to her

12   camp.  That's what I heard, you know, because she had been

13   running camps as well.  That's how I heard her name, because

14   that name Hawa Abdi came up.

15             THE COURT:  So you never heard of her being called

16   the Mother Teresa of Somalia?

17             THE DEFENDANT:  No, I did not hear that, but I

18   have heard that she was running this camp and we actually

19   had provided some clothings to this camp.  Because she was

20   running this camp, that was enough for me to recognize her

21   good work.  But I can see her name right now on the screen.

22             THE COURT:  And have you heard that she repelled

23   and she is against any Islamists, including the al-Shabaab

24   and any splinter group dealing with al-Shabaab, and that she

25   fought off a group of thugs from taking over her hospital?
```

1          THE DEFENDANT:  No, I did not.  The ladies that I

2     have been making contacts with, they did not mention that to

3     me because the time that I spoke to them was very brief most

4     of the time, so they did not mention that to me.

5          THE COURT:  Do you know that she's been involved

6     in her activities for over 20 years in Somalia and you're

7     telling me that you've never heard of her?

8          THE DEFENDANT:  I was not really aware of what was

9     going on in Somalia internally up until 2007 or '08.  That's

10    when we had received the reports of the sufferings and the

11    people that had been displaced, and that's when I really

12    began to find out about what was going on.

13         THE COURT:  Now, you lived in Ethiopia; isn't that

14    correct?

15         THE DEFENDANT:  What?  Could you repeat that?

16         THE COURT:  You lived in Ethiopia; isn't that

17    correct?

18         THE DEFENDANT:  Yes.

19         THE COURT:  How many years did you live in

20    Ethiopia?

21         THE DEFENDANT:  I lived there one year in '91 and

22    then another year in '95.

23         THE COURT:  Were you placed in prison and beaten

24    by the Ethiopian troops?

25         THE DEFENDANT:  No.  Not at that time, no.

1           THE COURT:  At any time?

2           THE DEFENDANT:  They have never imprison me.

3           THE COURT:  Were you able to work while you were

4    in Ethiopia?

5           THE DEFENDANT:  No, at that time we don't really

6    venture out.  Mostly we stayed indoors because we were

7    afraid if we go out there, that we may get hurt.

8           THE COURT:  Now, you said that you went to Yemen;

9    is that correct?

10          THE DEFENDANT:  Yes.

11          THE COURT:  And so you were treated better in

12   Yemen than you were in Ethiopia?

13          THE DEFENDANT:  In Yemen -- I actually went to

14   Yemen because I was in search of work and in Yemen, you

15   know, some people may mistreat you, but there are others who

16   would help you out.  And in general they would -- because of

17   the color of our skin, they would discriminate us.  That was

18   something that I experienced.  So I was there mainly to find

19   work.

20          THE COURT:  I'll ask you the question again.  You

21   were treated better in Yemen than you were in Ethiopia;

22   would that be accurate?

23          THE DEFENDANT:  I felt better when I was in Yemen

24   because when I was in Ethiopia I was under tremendous fear,

25   but when I was in Yemen there was no such fear.  Because the

1    Ethiopians usually get angry when they see us.

2              THE COURT:  And so you left Yemen to go back to

3    Ethiopia; is that accurate?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Continue.  Tell me whatever you want

6    to tell me.

7              THE DEFENDANT:  Okay.  When I have heard the

8    sufferings -- and whatever I had been doing, I was trying to

9    do good.  That was my whole motivation.  When I have heard

10   the sufferings of the people and how they are in need of

11   clothings and other items, that's when the idea occurred to

12   me that the clothing that people throw out in this country

13   could be used and could be used by those needy people and

14   that's when I presented the idea to the community members to

15   see if we could do something, that we could collect clothing

16   articles and maybe send them to those people.

17             THE COURT:  Well, how could you -- you had contact

18   with officials in the al-Shabaab brigade, did you not?

19             THE DEFENDANT:  I have been contacting with a

20   number of people, including a lady who would submit to me a

21   name of -- the names of orphans who needed help.  The lady's

22   name was Hawo Ahmed Farah.  She was not a member of

23   al-Shabaab.  So was Abshir Ba'adle, because we trusted him

24   initially to distribute the items that we were sending.  The

25   only person that I made contact as far as the al-Shabaab was

1    concerned was a gentleman by the name of Hassan Afgoye.

2    There was also another lady by the name of Amina Abdirahman.

3    She's not a member of the organization.

4         THE COURT:  And you had the cell phone number of

5    Hassan Afgoye?

6         THE DEFENDANT:  Yes.

7         THE COURT:  And you would agree that he's a high

8    official in the organization of al-Shabaab?

9         THE DEFENDANT:  Yes, but my aim was to find people

10   who are trustworthy.  I was given his number and the reason

11   I targeted him was because I was told that he was someone

12   that could be trusted.

13        THE COURT:  And let's talk about al-Shabaab.

14   Would you agree that al-Shabaab is an Islamist organization

15   that follows a very conservative and strict interpretation

16   of Islam?

17        THE DEFENDANT:  I do know that they were Islamists

18   in their orientation.  Most Somalis are of Islamic faith.

19   As far as their interpretation and how extreme they are, I

20   really cannot get into that.

21        THE COURT:  Well, are you telling me that you

22   don't want to talk to me about that or you have no knowledge

23   of their strict beliefs?

24        THE DEFENDANT:  I did not ask them to explain to

25   me their beliefs and, you know, their interpretation of

1    Islam.  My target and my whole aim was to find people who

2    are trustworthy and, you know, I was told that those were

3    people who could be trusted and that's what motivated me.

4              THE COURT:  And aside from that, you knew

5    nothing -- are you telling the Court that you knew nothing

6    more about al-Shabaab than this one person was trustworthy?

7              THE DEFENDANT:  That's the information that I had

8    about them.  They would tell me the good things that they

9    do, but people generally do not talk about the bad things

10   that they do.  They would only tell me the good things that

11   they had done and that's where they would send me to.

12             THE COURT:  All right.  And the good things that

13   they may have mentioned to you, did they tell you that they

14   believed in suicide bombers?

15             THE DEFENDANT:  Okay.  I did not ask them about

16   that.  Every person will be asked their deeds.  They will

17   have to account at some point.  So I was worried about my

18   own actions and deeds.  And whatever they do, that's

19   something that's entirely up to them.

20             THE COURT:  Well, then you knew that they believed

21   in suicide bombers?

22             THE DEFENDANT:  I cannot say one way or the other

23   whether they believed in that or did not believe in that,

24   because that's not my main aim.  My main aim was to help

25   those people that needed help.

1          THE COURT:  If that is your position, would that

2     be your same position for al-Qaeda?

3          THE DEFENDANT:  I do not know al-Qaeda.  I am not

4     acquainted with them.  I have not been explained to me them

5     and I was not ready to learn about them.

6          THE COURT:  Would it be your feeling that the vast

7     majority of the Somalis living in Minneapolis and Minnesota

8     would support al-Shabaab?

9          THE DEFENDANT:  I did not do any kind of surveys

10    on that issue, about whether the majority of the people

11    believe in them or not, because my aim was to get help for

12    those needy people.  And even to the extent that I was

13    making contacts with people, I was asking people if they

14    could sponsor a family or if they could offer any help.  So

15    I was not really keen on knowing the political views of

16    people.  That was not my main area.

17         THE COURT:  You were giving money to al-Shabaab;

18    is that not correct?

19         THE DEFENDANT:  I did not give money to

20    al-Shabaab, but -- and there's no record of that, but what I

21    have said was that, you know, get that money to the needy

22    and get the money to the most needy of the people that they

23    were providing the assistance to.

24         THE COURT:  Did you give clothing to al-Shabaab?

25         THE DEFENDANT:  We did not give clothings to

1    al-Shabaab and they did not receive the clothings.  We have

2    made some tapes of that clothing being distributed, going to

3    the needy.  The clothings was distributed among the needy

4    people.

5         THE COURT:  Did you -- then are you saying that

6    you had no contact with al-Shabaab?

7         THE DEFENDANT:  When you say a relationship, I

8    have made contacts with a number of people and this

9    individual was one of those people that I have contacted --

10        THE COURT:  My question was, and I can read it to

11   you, it said, "Did you -- then are you saying that you had

12   no contact with al-Shabaab?"

13        THE DEFENDANT:  Like I said earlier, I was given

14   this guy's information because I was looking for someone who

15   was trustworthy.  I was trying to get in touch with the

16   orphans who were in Afgoye.  I was told -- because I was

17   looking for someone who was trustworthy, I was given his

18   information and that is how I made contacts with him.

19        THE COURT:  Did you have contacts with the TFG?

20        THE DEFENDANT:  No, because my main point was to

21   get people who can get the help to the needy and I did not

22   hear that they were offering help to the needy.

23        THE COURT:  Did you hear that they were the

24   provisional government of Somalia, the TFG?

25        THE DEFENDANT:  Yes, I have heard about that, but

1      this government, from what I could tell, was not a

2      government that would address the needs of the people.  They

3      were not a government that was responsive to the need of the

4      people, from what I have heard.

5              When I was younger when I was in Somalia, the

6      government at the time was responsive and helpful to the

7      people who needed help.  Similarly, the United States

8      government is responsive and helpful to its people, even

9      were able to help us out.  But this government, still I did

10     not hear any help that it was offering to anyone.

11             THE COURT:  Did you give any aid to Ras Kamboni

12     brigades?  When I say "aid," is that money or clothing?

13             THE DEFENDANT:  We couldn't get clothings to the

14     area that those people were in, but there were people --

15     most of our friends who were displaced came to Mogadishu.

16     There was camps for the orphans and those camps were the

17     place that we were trying to get help with.  And we were

18     also trying to help the people who were displaced in the

19     city who were in the outskirts of town.  There was camps

20     outside of the city.  Those were the people that needed help

21     immediately because they were out there exposed to the heat

22     and sun and everything else.  But the people who were

23     outside of the city of Mogadishu did not need as much help,

24     they were not suffering as much as the people who were

25     displaced.

1              THE COURT:  Do you know some Arabic?

2              THE DEFENDANT:  What?

3              THE COURT:  Do you know -- can you speak a little

4      Arabic?

5              THE DEFENDANT:  I do have limited understanding of

6      Arabic because the script is in Arabic, but it's not my

7      primary language.

8              THE COURT:  Can you translate "al-Shabaab" for me?

9              THE DEFENDANT:  The youth, youth.

10             THE COURT:  What does jihad mean to you?

11             THE DEFENDANT:  Jihad is actually in the script in

12     the Quran and God had set that down.  Jihad to me is a

13     method to use when you are trying to alleviate the

14     sufferings of people who were either enslaved or mistreated

15     or disrespected.  Jihad is one method to use to remove that

16     suffering.

17             THE COURT:  Do you know why the al-Shabaab left

18     and split off from the Court -- Islamic Courts Union?

19             THE DEFENDANT:  I do not know anything about that

20     because that was not really something that I was privy to.

21     I was not involved.  That's something between those two

22     factions.  But my aim was to help out.

23             THE COURT:  Did you know about al-Shabaab

24     describing itself as waging jihad against enemies of Islam?

25             THE DEFENDANT:  Maybe they -- they may be able to

1    answer that question, but, you know, each person can come up

2    with what they consider an enemy, but that question may be

3    better answered by those people.

4         THE COURT:  When you were doing your humanitarian

5    aid to raise funds amongst other Somalis, you had to tell

6    them who you were raising money for; is that accurate?

7         INTERPRETER:  Your Honor, could you repeat that

8    question, please, for me?

9         THE COURT:  When -- did you raise money for your

10   aid to Somalia through the Somali population in Minneapolis?

11        THE DEFENDANT:  We did collect money.  However,

12   most of that money went to the shipping expenses because it

13   was very difficult for us to get that going.  And whatever

14   money that's left, that money that was raised would go to

15   the needy people, who we were receiving reports about their

16   needs, so we would send the money to -- whatever left of the

17   money we would send to those people.

18        THE COURT:  Did you ever tell the people that you

19   were asking money from that you were collecting money for

20   al-Shabaab?

21        THE DEFENDANT:  No, I did not because the money

22   was not intended and I was not sending the money to

23   al-Shabaab.  al-Shabaab was the vehicle used to send -- to

24   get the money to the needy.  They did not -- they were not

25   using that money for their own purposes.  But the other

1    contacts that I've made were more numerous than the contact

2    that I have made with this organization to get the money to

3    the needy.

4              THE COURT:  When you were in Ethiopia, did you

5    hate the Ethiopians?

6              THE DEFENDANT:  We were fearful of them, but

7    before we fled to their country, you know, we did not like

8    them.  But when we got there some of them wanted to harm us,

9    others were trying to help us.  But we have had historical

10   problems with Ethiopia.

11        (Pause.)

12             THE COURT:  If you were to guess, would you say

13   that the population of Somalis in Minneapolis support

14   al-Shabaab?

15             THE DEFENDANT:  I don't know whether they will

16   support them or not.  There are lots of people who are

17   involved in the political process, but that was not one of

18   my strong areas.  I can only answer things that are

19   pertaining to the script.  That's the only thing that I can

20   answer with some authority.

21             THE COURT:  Would you guess that the Somali

22   community supports al-Qaeda?

23             THE DEFENDANT:  What did they support?  Who did

24   they support?

25             THE COURT:  Did you know that al-Shabaab was

1    killing TFG soldiers?

2              THE DEFENDANT:  There has been killings in

3    Somalia.  You know, there has been killings and each group

4    was killing the other group.  So it wasn't really important

5    to me to ask about killings.  That was not what was of

6    concern to me.

7              THE COURT:  I don't know how to take that answer.

8    My question was:  Did you know that al-Shabaab was killing

9    the transitional troops?

10             THE DEFENDANT:  I have heard through the radio

11   reports that there were killings, you know, among various

12   factions.  That's what I have heard.

13             THE COURT:  Did you know that there was a

14   Minneapolis young man that was a suicide bomber for

15   al-Shabaab?

16             THE DEFENDANT:  I did not know him personally, but

17   I have heard that through others, other people.

18        (Pause.)

19             THE COURT:  Go ahead.  You have this opportunity

20   to tell me anything else that you want to tell me about

21   yourself, about this offense, or anything else that you

22   think I should know before I sentence you.

23             THE DEFENDANT:  First, I just wanted to say that

24   in our country there's corruption, corruption is endemic.

25   People who usually have power and influence usually, you

```
 1     know, take away whatever they want to take.  There's no

 2     system to protect the needy and the helpless.

 3            To get help to the needy is very difficult.  Even

 4     when the UN brings food aid to the country, the people with

 5     power and guns usually take the food away and never get --

 6     the food never gets to the needy and the people it was

 7     intended to go to.

 8            THE COURT:  Did you know that was the same thing

 9     with al-Shabaab?

10            THE DEFENDANT:  Of course.  Some of the members of

11     this organization, their names were given to us, but we did

12     not trust them, we were afraid of them, so we didn't deal

13     with them even though they claim that they were not doing

14     the same thing that the others were doing.

15            Because once we obtain somebody's information, we

16     don't just trust that person blindly.  We inquire further

17     about that person's character and then we learn more about

18     that person's integrity.

19            I was always looking for someone who was

20     trustworthy and someone that I could trust and that's how I

21     obtained this guy's information and that's how I made

22     contacts with him.  And with the help of Allah I was able to

23     get the help to the needy and they never embezzle anything,

24     take away anything that I have sent, everything get to the

25     needy.
```

1          Even to make sure that the money gets to the

2     needy, when I send the money to someone, I would also inform

3     a few other individuals that the money was sent and the

4     money was intended for that purpose.  So not only that

5     person, the person who receive the money knows about the

6     money, but there were others who knew about the money and

7     what it was intended for.

8          THE COURT:  And you sent the money in your name?

9          THE DEFENDANT:  At times, yes, but at times I

10    had -- you know, there were others that did send the money

11    under their names, because it wasn't my own money.  It was

12    money collected from the community and I didn't want me only

13    to get the credit, so I had others who send the money under

14    their own names.

15         Also people who donated the money knew -- would

16    trust me more if they knew that someone else had sent the

17    money and the money went to the needy.  Because if I were to

18    receive the money, even if I were to send the money, they

19    wouldn't know that the money was sent, they wouldn't know if

20    I used the money for my own personal purposes.

21         THE COURT:  Continue.

22         THE DEFENDANT:  If you were to go to one of those

23    camps in Mogadishu, people would know my name and they knew

24    that I had gotten help to those needy people.  They knew

25    that there were families here that I put in touch with

1    orphan families in Somalia and the family here would sponsor

2    one family and they would send a certain amount of money

3    each month to that family.  I've put in touch the needy

4    family as well as the family that would sponsor them in this

5    country as well as in Canada.  So the people knew what I had

6    been doing, which was to do a good deed.

7            There were others who were not getting regular

8    monthly remittances.  Those were people -- mostly elderly

9    people who were blind or in some other capacity were

10   disabled.  So we would try to help them out as much as we

11   could, send them whatever help we could send to them on a

12   regular basis.

13           THE COURT:  So if I understand you correctly,

14   culturally the Somalis in Minneapolis, if they went to a

15   hawala to send money, they would use a fictitious name to

16   send the money?

17           THE DEFENDANT:  From what I understand, people

18   will use their own names to send the money, they would send

19   the money under their own names.

20           THE COURT:  Continue.

21           THE DEFENDANT:  One other help that we had tried

22   to offer was we tried to get help to this orphanage camp in

23   Afgoye and in that camp there were about 400 orphans,

24   children who were orphans in that camp.  So we tried to help

25   them out.

1              But we tried to make themself self-sufficient by

2      sending them -- by trying to make a bakery for them as well

3      as a water well.  So by making a bakery as well as water

4      wells available to them, we were trying to make them

5      self-reliant.  And that's one thing that they had requested

6      from us to do for them, so they can do things for

7      themselves.

8              They have made this request to us that they needed

9      this bakery because they needed to use some of the pastries

10     that were made in the bakery for themself and then whatever

11     left of what they make they will sell it to generate cash.

12             They also talked about the wells.  They needed

13     water wells so they can use that for themself and then sell

14     the water if there's any additional water available.  They

15     also talked about donkey carts and they say they needed that

16     for transportation.

17             So they requested and they had submitted their

18     request to us and we try to address that and help them out.

19             INTERPRETER:  Your Honor, I didn't quite get that.

20     I'm sorry.

21             THE DEFENDANT:  And we were trying to help out the

22     orphans in this camp.  They would submit their request to us

23     and one time they wanted us to buy some clothing items for

24     them, shoes for those young orphans, and we did that because

25     they were complaining about not having enough shoes or

1    clothings to wear.

2         There's also another orphan camp that we tried to

3    help as well and this one they wanted some -- in the camp

4    they wanted shacks for the camp so they can use those shacks

5    as shelters.  So we send them a couple thousand dollars for

6    that purpose, to make those shelters for those orphans who

7    were in the camp.

8         THE COURT:  Who did you send the money to?

9         THE DEFENDANT:  We send the money to the orphans.

10   This had nothing to do with al-Shabaab.  There was this

11   well-known man who was running the camp and we send the

12   money to him.

13        And sometimes when the displaced people are in the

14   camp, they make those makeshift shelters and then, you know,

15   if they have to move again, they do that, they move their

16   tarps or whatever else they were using as a shelter and then

17   establish another camp.

18        THE COURT:  Did you send the money in your name or

19   some fictitious name?

20        THE DEFENDANT:  When the money is sent -- you

21   know, for example, if the money is sent from Ohio, whoever

22   is sending the money from Ohio would use his or her own

23   name.  And if there's someone, for example, in Minneapolis

24   sending the money, that person would use his or her own

25   name.  So depending on the person who is sending, that's how

1      the money was sent.

2              THE COURT:  If you were sending the money, if she

3      was sending the money, would she send it in her own name or

4      a fictitious name?

5              THE DEFENDANT:  I would send under my own name.

6              Those orphans and their camps are still in

7      operation and if someone wants to find out, they are still

8      on the outskirts of town and they are still there.

9              THE COURT:  Please continue to tell me anything

10     else that you want to tell me.

11             THE DEFENDANT:  I have offered help, much more

12     than what I have said.  If you want me to continue, I would,

13     but --

14             THE COURT:  I want you to feel free to tell me

15     anything that you want to tell me.

16             THE DEFENDANT:  I would also, for example, provide

17     sermons to the other ladies and I would give them eight

18     hours of my time each week dedicated to that task, religious

19     task.  I was doing all of those things to do good, but I've

20     never intended those things to cause me trouble or to cause

21     trouble to someone else.

22             For example, I have taken away from my family, my

23     children, as well as my mother, who had been ailing at that

24     point.  My mother has passed away while I was in custody.  I

25     was not there when she was dying.  I was not there when she

1    passed away, did not attend her funeral.

2             I'll give you an example.  I have heard of this

3    mother who has eight children who was not able to look after

4    those children.  So the children were divided among

5    relatives in the city and she eventually ended up not having

6    any of her children because she was unable to provide for

7    them.

8             So because I knew the bond between mother and

9    children, I made contacts with people and I've told these

10   people to collect those children from their relatives and

11   bring back to the mother and I took upon myself to send $100

12   to this lady every month so that family can be intact and be

13   together.

14            But it never occurred to me that I would be the

15   one that would be taken away from my own children at that

16   point.  Because of my limited language skills and because of

17   my circumstances, I never knew this would happen to me.  And

18   because of the good things I have been doing, I've never

19   thought that would cause me to lose my own family.

20            Because of my limited language, I was confined to

21   asking assistance from the members of the community.  If I

22   knew English and if I were able to communicate with the

23   larger communities that I lived in, I would have probably

24   gone and knocked on doors and asked for assistance.

25            In any event, I never thought that this would

1    cause me trouble because I thought America was always a

2    country that help out the people who were needy and needed

3    help.  Because I was the one actually who was helped by this

4    country, so I thought that if I were to help out someone

5    else, that would never get me into trouble.

6              But I would like to be taken into account the

7    fact -- the reasons behind what I was doing, not how I did

8    it, but why I was doing what I was doing.  I may have made a

9    mistake in how I went about doing this, what I was doing,

10   but I think my motivation and what I intended to do and what

11   I was doing should not outweigh the way I handled this and

12   the way I went about doing what I was doing.

13             THE COURT:  What would you do differently now?

14             THE DEFENDANT:  I would never do anything else --

15   I would not do something that I would not know -- I would

16   not do something if I didn't know all the implications of

17   what I was doing.  I would be much more careful.

18             THE COURT:  Anything else that you wish to tell

19   me?

20             THE DEFENDANT:  I would also like to talk about my

21   own family and I would like to say that I have been taken

22   away from my family now for 19 months and I would like to go

23   back to my family and I would like the time that I was away

24   from my family be the time that I have been away from them

25   so far and not additional time.  That's what I would like.

1    God willing, that's what I would like to see happen.

2          THE COURT:   Thank you.   Why don't you have a seat.

3    The government is going to give us their position.

4          MR. WARD:   Thank you, Your Honor.   As I have sat

5    and listened to this, I feel compelled to remind everybody

6    that the offense conduct for which the defendant was

7    convicted by a jury of her peers didn't have anything to do

8    with clothing.   She was convicted for sending money to a

9    deadly designated terrorist organization, al-Shabaab.   Was

10   there some clothing that was mentioned at trial?   There sure

11   was.   But even that was not humanitarian aid.   I'll get to

12   that in a minute.   But I want to talk about what the actual

13   purpose of the fund-raising was.

14         The Court will recall that early on in the

15   conspiracy the Defendant Ali was speaking with Defendant

16   Hassan and they were talking all about how they could raise

17   money using one of Amina Ali's teleconferencing lines.   And

18   the exhibit was Exhibit 8.   It's a call dated October 9th.

19   And what's clear about it is that the defendants knew there

20   was only so much money to go around and there was a lot of

21   need.

22         And as the two talked, the Defendant Ali starts

23   out, "I am telling you specifically --", addressing

24   Defendant Hassan.

25         Hassan goes, "Hum."

1          Amina goes, "-- to ready yourself and stand up for the

2     mujahidin, because you have slacked off when it comes to the

3     mujahidin."

4          Hassan:  "Sister, I swear to God, I have not slacked

5     off."

6          Amina:  "Yes."

7          Hassan:  "I swear to God these men do not allow it in

8     their *line*," referring to the other teleconferencing line.

9     "Don't let them deceive you, sweetie."

10          "I want to tell you" -- says Amina, "I want to tell you

11     to speak up; speak up in the *line*.  You should speak up,

12     Halima," using the Defendant Hassan's other name.

13          And Hassan goes back, "I am ready to do it in your

14     *line*."

15          And as they go down the page, Amina Ali says, "So let us

16     stand up for the people.  The people, who are dying, are all

17     our own; but who has the priority?"

18          Hassan goes, "The Muslim [OV] I will speak up; but give

19     me a *line*.  Give me a *line*."

20          Amina repeats.  "Who has the priority?  Let the

21     civilians die.  Sister, let the civilians die.  The

22     mujahidin should be supported.  If the mujahidin are

23     supported..."

24          And then Halima asks down at the bottom, "What should we

25     do then?"

 1                At the conclusion of that call they determine what

 2        they're going to do is reserve the Defendant Ali's

 3        teleconferences line for fund-raising for the mujahidin, and

 4        I believe that's on page 6.

 5           It's the Defendant Ali saying to Hassan, "This *line*

 6        should be left for --"

 7           Hassan goes, "Go on."

 8           "-- the mujahidin.  What do you think about that?  Or

 9        should we give up?"

10           Hassan goes, "Well, first of all, you cannot give up on

11        the mujahidin.  Everywhere..."

12                And within a matter of days, the evidence at trial

13        showed -- this was an October 13th call -- that it wasn't

14        just any mujahidin group that they were backing, it was

15        al-Shabaab.

16                Because as the politics of the TFG had developed,

17        they were engaged in talks with that wing called the Islamic

18        Courts, the insurgent wing called the Islamic Courts, and

19        the Islamic Courts -- it had already been announced there

20        was going to be some kind of deal brokered to revise and

21        revamp the TFG and that the former head of the Islamic

22        Courts Union, Sheikh Sharif Ahmed, would become the new head

23        of the Transitional Federal Government.  And of course

24        al-Shabaab was not part of that.

25                And so in that call the defendants decided that

1    the Islamic Courts are worthless.  Of course they're

2    worthless because they're now going to become the

3    government.

4            But they know that al-Shabaab has said that they

5    will fight.  And that's exactly what they agree to do.  They

6    agree to back al-Shabaab because it's going to continue to

7    fight the Transitional Federal Government.

8            And it isn't long until the end of that month

9    where Amina Ali puts on her teleconferencing line -- it's

10   October 26th -- she invites onto her teleconferencing line a

11   woman from Somalia who is an al-Shabaab member named

12   Hawo-Kiin Raage.  Mr. Bryden when he testified described

13   Hawo-Kiin as an amira, which is the female equivalent of

14   amir, a prominent leader within al-Shabaab.

15           And Hawo-Kiin gets on the teleconferencing line

16   with the Defendant Hassan and the Defendant Ali and hundreds

17   of people listening and she tells everybody exactly what the

18   fund-raising is all about.  There is that platform of Islam

19   that talks about zakat, but the fund-raising and the giving

20   in this case wasn't going to be to support the poor and

21   needy.

22           And what Hawo-Kiin said was, "Helping the people

23   is a matter that God has made obligatory for us, we need to

24   help the poor and the needy, but this is not the time.  As a

25   matter of fact, all of us need to understand that the poor

1    and needy are being humiliated, their religion is being

2    humiliated.  Support their religion.  The first thing to do

3    is to assist them in their religion; help them safeguard

4    their religion."

5              And how are they going to do that?  "It's not

6    possible to earn the paradise of God easily.  God will give

7    it to us in his own ways and his power, but we need to

8    strive... we are saying that today is the day of the jihad.

9    Don't be distracted.  Devote yourselves to protecting the

10   religion for the people, my dear sisters.  What good can

11   come out from simply feeding a person, if the person turns

12   into an infidel?  My dear sisters, who is the most important

13   person?  The prophet may peace be upon him and all the noble

14   men...said, 'The most valuable person is the person who

15   sacrifices his life for God.'  The most valuable person is

16   the Mujahid."

17             And she continues, "The person who provides

18   supplies, the person who is going to jihad and the one who

19   takes care of his children is like someone who went to

20   jihad.  So, dear sisters, let us help the Mujahid.  Let us

21   stand up for giving the Mujahid something.  Let us...feed

22   the Mujahid.  Let us stand up and take care of their wounds.

23   Let us stand up for the Mujahid."

24             And we know that the Defendant Ali and her cohorts

25   shared in this view because at the conclusion of that

1    teleconference they raised about $2,100 and sent it off

2    straight away to al-Shabaab using a money remitter business.

3           A thousand dollars of that was sent in a false

4    name.  They actually convinced the employee of the Tawakal

5    money remitter business in Rochester to send it under his

6    name, falsely representing to him that it was for orphans.

7           So for the defendant to sit here and tell the

8    Court that she was simply trying to alleviate the suffering

9    of Somalis, who were the casualties, the victims of violence

10   and strife in Somalia, is not supported by the evidence that

11   was introduced at trial.

12          Instead what she was doing was supporting further

13   violence, further famine, and further deprivation in the

14   name of al-Shabaab.  Because as we heard at trial,

15   Mr. Bryden testified about al-Shabaab being the biggest

16   obstacle to bona fide relief through the UN and other

17   nongovernmental organizations.

18          In that same call, Your Honor, the October 26th

19   call of Hawo-Kiin, later on, as the PSR describes it at

20   paragraph 37, another speaker who Amina invited to talk

21   says, Do not miss the opportunity for the jihad in Somalia.

22          And it's noteworthy that Hawo-Kiin equated people

23   were raising money to supply the mujahid with those people

24   who actually went and engaged in the fighting.  They were on

25   the same level as far as she was concerned and, I submit,

1    the defendants were concerned.

2          And what's particularly troubling about the

3    defendant's position here today is the fact that raising

4    money under the guise or the pretense that it was for the

5    poor and needy was a tactic that the conspirators developed

6    and used in order to bilk people out of money they actually

7    thought was going, they thought was going to help the poor

8    and needy.

9          If the Court remembers Government's Exhibit 81,

10   this is a conversation that occurred on roughly

11   February 16th of 2009.  It's a conversation between the

12   Defendant Ali and Hassan Afgoye.  He was at the time the

13   administrative governor on behalf of al-Shabaab for the two

14   provinces in Somalia known as Bay and Bakool.

15         And Afgoye asks Amina Ali on page 2 of that

16   exhibit, How are things going with you?  And what Amina Ali

17   told him is, "We spoke to the people the other day.  Even

18   though the people are not receptive - as you know, they do

19   not approve the mujahidin.  Eh...you know...we told them...

20   some of the girls are knocking on doors; so we asked

21   them...you know...to say, 'Poor people.'  We asked them not

22   to say, 'Orphans' only; but to say, 'Needy people.'  So, God

23   willing, we hope for the best."  Now, she doesn't explain to

24   Afgoye why that's helpful, but she does later.

25         And the conversation continued for about another

1     page of transcript, at which point Afgoye starts talking

2     about the enemy and he says to Amina Ali, "God willing, we

3     want to get closer - we will get closer to where the enemy

4     is.  I was thinking to...eh...if you feel that the enemy is

5     not going to cause any harm, then, since there is no way to

6     change this reality one way or the other, I was thinking to"

7     -- and it's unintelligible -- "ask you to send whatever you

8     currently have in hand, take it, and then leave.  And after

9     that we will race to confront the enemy, God willing."

10          So it's pretty clear from that conversation that

11    two things are going on.  When Ali and her cohorts are out

12    raising money door-to-door, they're telling people give it

13    to us because it's for the poor and it's for the needy; and

14    then on the other hand when she's talking to Afgoye, she

15    says the money is on the way.  It's there so he can race to

16    confront the enemy.

17          And in Exhibit 146 -- and there are several

18    exhibits that talk about this ruse of the poor and needy

19    being a mask or a guise under which they collected money

20    that could be sent to al-Shabaab for them to use for

21    military applications.

22          But in Exhibit 146, again, this is another phone

23    call between Hassan Afgoye and the Defendant Ali.  This is

24    in June of 2009.  He tells her -- Amina Ali tells Hassan

25    Afgoye, "In addition to that...I tell the people to collect

1    money in the name of the poor.  Nobody is aware of the money

2    I send to you.  I give them the numbers; I give them the

3    names; the gold they have donated -- it is not -- no one

4    told me -- eh... Once I am told, 'Needy people,' well,

5    they" -- and she is clearly referring to al-Shabaab --

6    "well, they are needy.  If a person specifies the orphans or

7    specific persons as a precondition, then I do not divert

8    his."

9          But -- and it continues on, But if it is said to

10   be for the needy, then I divert it that way, to Hassan

11   Afgoye's way, because she's collected it and it can be used

12   by al-Shabaab for whatever purpose they want to,

13   including --

14          THE COURT:  I hope you are not trying this case

15   again.

16          MR. WARD:  Yes, Your Honor.

17          And all among the 1,400 -- excuse me -- the 14,000

18   dollars that are mentioned in the presentence report, none

19   of that involves anything that has to do with clothing, none

20   of it involves anything that has to do with orphans, none of

21   it involves anything that has to do with the wounded.

22          And each of the substantive counts in the

23   indictment were carefully traced through a particular number

24   that was demonstrated to be an al-Shabaab number in the

25   call.

1          There were false names used for each of the

2     transactions except for one and that caused a bit of a

3     problem because the people in Somalia were upset about it

4     because they thought they might get caught and it all went

5     to al-Shabaab.

6          Now, with respect to the clothing, not even the

7     clothing had this benign and humanitarian purpose.  The

8     evidence was at trial that the purpose of sending the

9     clothing, which was acknowledged by the Defendant Amina Ali,

10    was to help al-Shabaab advance its program.

11         There was no doubt, Your Honor, that al-Shabaab

12    had a bit of a public relations problem because of its

13    extreme version of sharia with the amputations, the

14    stonings, the suicide bombers.  But as Hassan Afgoye's

15    subordinate pointed out, the common people tend to go with

16    the people who can provide for them; and that was one of the

17    exhibits at trial.

18         In another call that's in paragraph 43 of the PSR,

19    Amina Ali is talking about the first shipment of clothing to

20    Hassan Afgoye again.  She says, I want you to take this

21    stuff, distribute it, and win the hearts of the people.

22         And of course it's obvious that if al-Shabaab is

23    going to be capable of providing for Somali people within

24    their territory, the people are going to back them because

25    they can actually give them something.

1          And when that clothing arrived there, the first

2     shipment of clothing, there ultimately was a squabble

3     between Hassan Afgoye and Amina Ali about whether or not

4     al-Shabaab would participate in the distribution of the

5     clothing.

6          But the facts were that Amina Ali tried to

7     convince Afgoye to continue to participate in the

8     distribution of the clothing and ultimately when she pulled

9     out -- or when they pulled out, they still agreed to take

10    whatever it is they wanted so that they got first dibs.

11         On the second shipment of clothing, al-Shabaab

12    took control of the entire shipment so that they had the

13    ability not only to take whatever it is they wanted -- and

14    one of the calls demonstrated that that basically went to

15    their fighters in Baidoa, who Hassan Afgoye said they were

16    underclothed, so they really needed it -- or to ultimately

17    distribute it and win the hearts and minds of the people.

18         So that when -- so it's troubling to stand here

19    and have to listen that this was all about humanitarian aid

20    when the offense conduct proven in the indictment was even

21    the so-called humanitarian aid with the clothing was not

22    directed to helping the public at large, it was only

23    directed to helping al-Shabaab.

24         And to the extent those calls talked about

25    providing it to the mujahidin, the mujahidin orphans and the

1    mujahidin widows, there was another benefit to al-Shabaab

2    from that because it makes it a lot easier to find people

3    who are willing to become suicide bombers if they know that

4    their family is going to be provided for after they're gone.

5    That's what was happening and that's what was proven in the

6    calls that were introduced at trial.

7         One of the things that struck me during the

8    Court's questions directed to the defendant was the question

9    about whether or not Ms. Ali knew about the suicide bombing

10   that the young man from Minneapolis participated in and she

11   said she heard about it through other people.

12        One of the calls that was played at trial, Your

13   Honor, was Exhibit 20.  It was a call dated October 30th.

14   And that was the suicide bombing that occurred in northern

15   Somalia in Hargeisa and Bosaso where Shirwa Ahmed, the young

16   man from Minneapolis, was one of the persons who was a

17   suicide bomber.  In that call Amina Ali spoke to Hawo-Kiin

18   Raage, the amira of al-Shabaab over in Somalia, and said I

19   don't think you guys should claim responsibility for this.

20        So she may not have known that it was someone from

21   the Minneapolis area that went over there, but she knew all

22   about the suicide bombing, as she did about the other

23   suicide bombings that we talked about when we discussed the

24   terrorism enhancement.

25        I was also struck by the fact that she indicated

1   that when funds were sent, she either used her name or if it

2   was in another city those people used their names.  But the

3   evidence that was proven up at trial -- and one of them was

4   Exhibit 76 where she's talking with a co-conspirator in Ohio

5   named Basra Warsame and she's telling, Warsame is telling

6   her we've got to use a structured rotation, by which she

7   meant that the names of the senders and the names of the

8   recipients have got to be altered because otherwise they're

9   going to draw attention to themselves.

10          And that's exactly what happened in the

11  substantive counts that were proven up at trial and

12  contained in Exhibit 259 that Special Agent Wilson testified

13  about.  They did switch the names around.

14          And there were calls where Warsame and Ali talked

15  to each other and Amina Ali congratulated Basra Warsame

16  because, in the amount that she sent, she put it in somebody

17  else's name rather than using her own.

18          I don't mean to belabor the point, Your Honor, but

19  for the defendant at this point to insist that she never

20  sent any money to al-Shabaab and there's no record of it is

21  just baseless.

22          The Court heard the evidence.  Every transaction

23  with which she was charged substantively was backed up by a

24  record from a money remitter business, it was backed up by

25  multiple calls that discussed the purpose of the calls and

 1    whether or not the funds had been received.

 2            And the money either went to -- it went to one of

 3    three different telephone numbers, which we referred to at

 4    trial as the al-Shabaab account number.  All it was was a

 5    cell phone number of somebody who was going to be authorized

 6    to go pick up the money once it arrived in Somalia.

 7            But it changed frequently because this was a

 8    dangerous business and they didn't want to draw suspicion to

 9    themselves.  And Ms. Ali knew that because she complained

10    about it to one of the last people that she dealt with over

11    sending money and said that it's been compromised from

12    overuse.

13            And, again, to say that the only person from

14    al-Shabaab that she dealt with was Hassan Afgoye is just not

15    supported by the intercepted calls.

16            In Exhibit 140 she's having a conversation with

17    the Defendant Hassan and there's been a rumor circulating in

18    the Somali press that Hassan Dahir Aweys, who is associated

19    with the Defendant Hassan, that he's been wounded.  A

20    specially designated global terrorist, they are keeping

21    track on whether or not he's still healthy after a recent

22    battle.

23            Hassan suggests to Amina Ali to call Abu Mansur.

24    She is referring to Mukhtar Robow, who Mr. Bryden testified

25    was part of the Shura and he said he was the most

1    recognizable member of al-Shabaab to people in the West

2    because he was the spokesperson for the group.  And in that

3    call Amina Ali decides not to call him, but she says he

4    doesn't answer his phone calls, but if he sees it's my

5    number, he'll take it.

6            And I have already discussed Hawo-Kiin, who came

7    on the teleconference hosted by Ali at Ali's invitation, a

8    member of al-Shabaab.

9            I had just a few remarks on Ms. Ali's position and

10   the risk of recidivism here.  The Court sat through the

11   trial.  The Court listened to all of those calls.  But one

12   of the reasons that the guidelines have this Criminal

13   History Category VI for people who are subject to the

14   enhancement is because of the risk of recidivism and the

15   need to incapacitate such in defendants.

16           I would submit that this is particularly the case

17   here.  Ms. Ali consistently stated, even through the time

18   the verdict was returned, that she was undeterred and

19   unapologetic.

20           And as the Court heard in Exhibit 146 at trial,

21   Afgoye asked her, Hey, you know, is this causing you

22   problems with the family?  No.  They came to me and said I

23   shouldn't be sending money to these young men, referring to

24   al-Shabaab.  I don't care.  I was doing it this way when we

25   got together and if he doesn't like it, it's my way or the

1    highway.

2          She rejected the position of the imams at the

3    mosque in Minneapolis that were spoken about and instead

4    when the imams wouldn't send her money to al-Shabaab, she

5    called up Hawo-Kiin Raage, we know she's al-Shabaab, and

6    another guy named Abdulahi Timo Jili'.  Mr. Bryden testified

7    that he was another battlefield commander.  And that's when

8    she began sending money, according to the call in 2007, to

9    al-Shabaab.

10          And she went on and she said later, The people of

11    the mosque came to me and said these young boys, the

12    dhallinyarada, referring to al-Shabaab, they need to be

13    isolated, clearly indicating that she knew that they've been

14    designated as a terrorist.  People were out there trying to

15    dissuade her from this conduct and she was undeterred.

16          And throughout the other calls, some of which were

17    played at trial, it's pretty clear even before the search

18    warrants were executed that she had knowledge that she and

19    others who were part of her fund-raising network were being

20    looked at by the FBI and she said she would not stop.

21          And so when she stands here today and says that

22    she only dealt with Hassan Afgoye because he was the only

23    game in town, the only guy who was trustworthy, and that he

24    was the only guy who could help her alleviate the suffering

25    in Somalia, the Court should disregard that as part of a

1    plea for leniency because what she ended up doing in the

2    name of humanitarianism, she prolonged the very violence,

3    strife, and deprivation that she claimed to be trying to

4    alleviate and she did it while lying to people in the Somali

5    diaspora here in Minnesota that the money was actually going

6    to go to humanitarian aid.

7         And I recall her attitude when the verdict came

8    in, as does the Court, and if she were not given a

9    substantial sentence, she would be right back out there

10   doing the same thing.

11        THE COURT:  What's the government recommending for

12   a sentence?

13        MR. WARD:  Your Honor, if it were up to me

14   personally, I would ask for a lot more than what we put in

15   our papers, but there are a lot of people within the

16   Department of Justice and other parts of the United States

17   government who have gotten together on this and while we

18   understand that a variance may be warranted, we think that

19   the sentence should be no lower than 20 years.

20        And we think that that fits within the matrix of

21   cases that we discussed in our pleading and we think, if the

22   Court would like to hear any more on this, we think it fits

23   within the matrix of sentencings that have been handed down

24   here in Minneapolis this week.

25        But we think 20 fits, particularly because Ms. Ali

1   was an incredibly highly-placed person within this

2   organizational structure that raised money for al-Shabaab

3   outside of Somalia.

4          She had -- she used these teleconferences to

5   promote the al-Shabaab agenda and to promote fund-raising

6   and she brought in high-profile people to talk on them,

7   including this woman Hawo-Kiin, another al-Shabaab member

8   named Mahad Karatey, and she also, working with the

9   Defendant Hassan, was able to convince specially designated

10  global terrorist Hassan Dahir Aweys to come and speak on the

11  teleconferences and help raise money.

12         She's the person who deployed people door-to-door

13  with the instructions tell them a lie, tell them it's for

14  the poor and needy so we can give it to al-Shabaab.

15         She had this North American network scattered

16  throughout the United States and in a couple of cities in

17  Canada that were part of her fund-raising network to get

18  money to her contact Hassan Afgoye and his subordinates in

19  Somalia, and that ability to fund-raise give her access.

20         And unlike any of the other defendants whose

21  sentences I'm familiar with, Ms. Ali, she came here, she

22  came to the United States.  We actually gave her sanctuary

23  from her life in Somalia.  And how does she react to that?

24  She repudiated the United States.

25         There were at least four different calls that were

1    played at trial in which she condemned the U.S., calling

2    them the enemy.  And one of them she's talking to Hassan

3    Afgoye.  She's actually talking to him about a shipment of

4    clothing.  It's Exhibit 10.  Ali says, "Let me tell you one

5    thing, are you aware that America is the number one enemy.

6    It is your number one enemy.  And do you know that they are

7    watching any men that live in this country?"

8            And the reason that she repeatedly called the

9    United States her enemy is because they stood in her way of

10   fund-raising for al-Shabaab, a group that Mr. Bryden

11   testified not only wanted to topple the government in

12   Somalia, but had ambitions for global jihad.

13           And she went beyond that because in at least two

14   calls she actually repudiated her American citizenship.  In

15   Exhibit 17 and 78 she says we're Somalis, we're not

16   Americans.  And she repeated the same sentiment, "We are not

17   Americans," in Exhibit 78.

18           So I would submit that if you take a look at the

19   other financing cases, Your Honor, that were covered in our

20   memo, Nima Yusuf in San Diego, she sent $1,400 to three of

21   the individuals who traveled from Minneapolis over to

22   Somalia.  She pled guilty, she did not agree to cooperate,

23   and she received a sentence of eight years.

24           Mr. Yusuf, Mohamud Abdi Yusuf in St. Louis, was

25   part of this fund-raising network and he pled guilty.  His

1      guidelines were just like Amina Ali's.  They came out at 360

2      to life.  He got 140 months.  And I recognize that that was

3      on a motion, you know, a government motion, for a variance

4      based on substantial assistance.  But what he did, he

5      provided $5,000 to al-Shabaab and he agreed to cooperate and

6      he didn't -- he was nowhere as near plugged into the

7      fund-raising structure in the manner in which Amina Ali was.

8              So that the fact that she was the head of an

9      organization and a network here in North America, the fact

10     that she raised three times the amount of money than Yusuf,

11     and the fact that she raised, you know, ten times the amount

12     of Nima Yusuf in San Diego, we think that 20 years would be

13     a fitting sentence if for no other reason than to deter

14     other people who might be misguided enough to think that

15     fund-raising among the Somali diaspora in the United States

16     is a good way to fund a designated terrorist organization.

17             THE COURT:  Thank you.

18             Step forward.  On October 20, 2011 the jury

19     returned verdicts of guilty to all counts charged in a

20     16-count indictment in which the defendant was named.

21     Count 1, conspiracy to provide material support to foreign

22     terrorist organization, in violation of Title 18, United

23     States Code, Section 2339B(a)(1).  Counts 2 through 13,

24     material support to foreign terrorist organization, in

25     violation of Title 18, United States Code, Section

1   2339B(a)(1).  Counts 1 through 13 -- excuse me.  I'm sorry.

2   To these counts the defendant was found guilty by a jury and

3   is considered guilty of those offenses.

4       The Court has read the presentence investigation

5   report in this matter.  The Court has read all the

6   submissions of counsel in this matter.  The Court has read

7   all the pertinent terrorism cases that have been written in

8   our country regarding the specific provisions of the statute

9   that the defendant has been found guilty of.  The Court has

10  read the pertinent United States Supreme Court decisions

11  dealing with sentencing plus all the pertinent decisions

12  coming out of the Eighth Circuit Court of Appeals dealing

13  with sentencing.  Of course the Court has to follow the

14  factors under Title 18, Section 3553(a), in sentencing.

15      Amina Farah Ali, the Court sentences you to the

16  care and custody of the Bureau of Prisons for a term of 240

17  months.

18      There's no fine, no restitution.

19      You are sentenced to a term of life of supervised

20  release on each count -- can I do that?

21      PROBATION OFFICER:  Yes, Your Honor.

22      THE COURT:  -- to run concurrently.  The following

23  mandatory conditions are applicable:

24      The defendant must report to the United States

25  Probation and Pretrial Services Office in the district to

1    which the defendant is released within 72 hours of release

2    from the custody of the Bureau of Prisons.

3            The defendant shall not commit any crimes,

4    federal, state, or local.

5            Mandatory drug testing is suspended based on the

6    Court's determination that the defendant poses a low risk of

7    future substance abuse.

8            The defendant shall not possess a firearm,

9    ammunition, destructive device, or any other dangerous

10   weapon.

11           The defendant shall cooperate in the collection of

12   DNA as directed by the probation officer.

13           The defendant shall abide by the standard

14   conditions of supervised release that have been adopted by

15   the Court, including the following special conditions:

16           The defendant shall be prohibited from engaging in

17   any form of fund-raising activities unless preapproved by

18   the probation officer.

19           If not employed at a regular lawful occupation as

20   deemed appropriate by the probation officer, the defendant

21   may be required to perform up to 20 hours of community

22   service per week until employed.  The defendant may also

23   participate in training, counseling, daily job search, or

24   other employment activities as directed by the probation

25   officer.

1          The defendant shall submit her person, residence,

2     office, vehicle, or an area under the defendant's control to

3     a search conducted by a United States probation officer or

4     supervised designee at a reasonable time and in a reasonable

5     manner based upon reasonable suspicion of contraband or

6     evidence of a supervision violation.  The defendant shall

7     warn any other residents or third parties that the premises

8     and areas under the defendant's control may be subject to

9     searches pursuant to this condition.

10         There's a $1,300 special assessment payable to the

11    Crime Victims Fund, which is payable immediately.

12         The Court will recommend that she be housed in a

13    facility in Minnesota.  The only women's facility in

14    Minnesota is at Waseca.

15         The defendant has a right to appeal her trial and

16    her sentence to the Eighth Circuit Court of Appeals, which

17    sits in St. Louis, Missouri.  Mr. Scott will be her attorney

18    on that appeal.  If she does not wish to have Mr. Scott, she

19    can hire her own attorney or represent herself.  Mr. Scott

20    has been the attorney on this matter from the beginning.

21    The Court is not going to appoint another attorney to get up

22    to speed on this matter.

23         Anything further for defense?

24         MR. SCOTT:  Two items, Your Honor.  First, for the

25    record, Eighth Circuit law is loose enough that we want to

1    formally object to the Court's sentence that it doesn't meet

2    the grounds of reasonability, so that we haven't waived that

3    issue.

4            And second, Your Honor, the form of the Court's

5    sentence, I understand the intent, which is 20 years.  The

6    maximum penalty for any one of the counts is 15 and so the

7    form of the sentence itself has to be modified.

8            THE COURT:  Let's go back.  Madame Probation

9    Officer?

10           PROBATION OFFICER:  The maximum penalty is 180

11   months on each count.  So in order to get to the 240, we'll

12   need to structure that.

13           THE COURT:  On Count -- let's do it this way.  On

14   Count 1 it will be 180 months.  On Counts 2 through 13 it

15   will be 60 months consecutive.

16           MR. SCOTT:  Consecutive to Count 1, concurrent

17   with each other, Your Honor?

18           THE COURT:  Correct.  Counts 2 through 13 are

19   80 months, concurrent to each other --

20           MR. SCOTT:  60.

21           THE COURT:  -- 60, 60 months concurrent to each

22   other and consecutive to Count 1.  And the life

23   imprisonment -- life supervised release is on each count and

24   that's concurrent.

25           Any other corrections to the Court's sentence at

1    this time for the defense?

2              MR. SCOTT:  No, Your Honor.

3              THE COURT:  Anything further for the government?

4              MR. WARD:  Your Honor, it's a mandatory detention

5    case.  We would ask that --

6              THE COURT:  She will be remanded to the custody of

7    the United States Marshal.

8              Anything further?

9              MR. WARD:  Nothing further, Your Honor.

10             THE COURT:  All right.  We will recess.  The next

11   sentencing will be at 4:00.

12        (Court adjourned at 3:31 p.m.)

13                           *     *     *

14

15

16

17

18

19        I, Lori A. Simpson, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23             Certified by:  *s/ Lori A. Simpson*

24                            Lori A. Simpson, RMR-CRR

25