```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA


  ------------------------------------------------------------
                                  )
                                  )
   United States of America,      )  File No. CR-10-187
                                  )          (MJD/FLN)
           Plaintiff,             )
                                  )
  vs.                             )  Minneapolis, Minnesota
                                  )  October 6, 2011
   (1) Amina Farah Ali and        )  9:05 a.m.
   (2) Hawo Mohamed Hassan,       )
                                  )
           Defendants.            )
                                  )
                                  )
  ------------------------------------------------------------
```

BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
UNITED STATES DISTRICT COURT JUDGE

**(TRIAL - VOLUME IV)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
 1      APPEARANCES

 2       For the Plaintiff:        U.S. Attorney's Office
                                   JEFFREY S. PAULSEN, AUSA
 3                                 600 U.S. Courthouse
                                   300 South Fourth Street
 4                                 Minneapolis, Minnesota 55415

 5                                 U.S. Department of Justice
                                   National Security Division
 6                                 STEVEN WARD, ESQ.
                                   950 Pennsylvania Avenue NW
 7                                 Washington, D.C. 20530

 8       For Defendant Amina       Kelley, Wolter & Scott
         Farah Ali:                DANIEL M. SCOTT, ESQ.
 9                                 Suite 2530
                                   431 South Seventh Street
10                                 Minneapolis, Minnesota 55415

11       For Defendant Hawo        Kelly & Jacobson
         Mohamed Hassan:           THOMAS M. KELLY, ESQ.
12                                 GRETCHEN L. GURSTELLE, ESQ.
                                   Suite 215
13                                 220 South Sixth Street
                                   Minneapolis, Minnesota 55402
14
         Court Reporter:           LORI A. SIMPSON, RMR-CRR
15                                 1005 U.S. Courthouse
                                   300 South Fourth Street
16                                 Minneapolis, Minnesota 55415

17       Interpreters:             Osman Abdulle
                                   Osman Omar
18                                 Hassan Hassan

19       Witness Interpreter:      Abdulaziz Ahmed Sheikh

20

21

22

23

24

25
```

1                                   **I N D E X**

                                                                            PAGE
2    MATTHEW BRYDEN
         Continued Direct Examination by Mr. Ward                            537
3        Cross Examination by Mr. Scott                                       571
         Cross Examination by Ms. Gurstelle                                  638
4        Redirect Examination by Mr. Ward                                    662
         Recross Examination by Mr. Scott                                    671
5
6    MICHAEL WILSON
         Direct Examination by Mr. Paulsen                                    674
7    OMAR DAHIR
         Direct Examination by Mr. Paulsen                                    709
8
9    MICHAEL WILSON
         Resumed Direct Examination by Mr. Paulsen                           717
10
11   GOVERNMENT EXHIBITS                                                     REC'D
         2                                                                    683
         3                                                                    683
12       9                                                                    698
         10                                                                   718
13       11                                                                   718
         20                                                                   700
14       23                                                                   700
         24                                                                   700
15       114                                                                  565
         122                                                                  555
16       130                                                                  549
         140                                                                  543
17       146                                                                  558
         161                                                                  689
18       162                                                                  707
         217                                                                  559
19       220                                                                  561
         221                                                                  539
20       223                                                                  546
         230                                                                  541
21       231                                                                  553
         232                                                                  540
22       272                                                                  547
         273                                                                  551
23

24

25

1              **P R O C E E D I N G S**

2                   **IN OPEN COURT**

3                   **(JURY PRESENT)**

4          THE COURT:  Let's continue.

5      (Witness previously sworn.)

6                   **(Matthew Bryden)**

7          **CONTINUED DIRECT EXAMINATION**

8    BY MR. WARD:

9    Q.  Good morning, Mr. Bryden.

10   A.  Good morning.

11   Q.  When we broke yesterday -- or before we broke you had

12   described the leadership of al-Shabaab as consisting of a

13   core and that there wasn't any one true leader.

14          So in addition to this gentleman who you

15   identified as the amir, Ahmed Abdi aw-Mohamed, can you tell

16   the jury during the time of the charges here who the leaders

17   were of al-Shabaab that were part of this core.

18   A.  The most -- the best known leaders and the most visible,

19   other than the amir, were Mukhtar Robow, also known as Abu

20   Mansur; Fuad Mohamed Khalaf, also known as Fuad Shangole;

21   until early 2008 Aden Hashi Ayrow.  There are a number of

22   other second tier leaders who have since become more

23   important, but those are the principal figures.

24   Q.  Okay.  And the amir, does he have a nickname, an Abu

25   name by which he is known?

1    A.  He actually adopted a pseudonym, a false name.  He

2    called himself Sheikh Mukhtar Abdirahman Abu Zubeyr.

3            MR. WARD:  And if I could have Government's

4    Exhibit 221, please.

5    BY MR. WARD:

6    Q.  Do you recognize the individual seated in the center of

7    the picture in Government's Exhibit 221?

8    A.  Yes, I do.  That's Abu Mansur.

9    Q.  When you say, "Abu Mansur," is that Mukhtar Robow?

10   A.  Yes, it is.

11           MR. WARD:  Your Honor, could I approach and ask

12   the witness to identify Robow on the original of the

13   exhibit?

14           THE COURT:  You may.  Sir, you can circle the

15   person you are talking about so everyone knows.

16           THE WITNESS:  (Indicating.)  It's not the best

17   color for that.

18   BY MR. WARD:

19   Q.  If you could, Mr. Bryden, go ahead and write "Mukhtar

20   Robow/Abu Mansur" on the bottom of Government's 221.

21   A.  (Indicating.)

22           MR. WARD:  If I haven't already done so, Your

23   Honor, I would offer 221.

24           MR. SCOTT:  No objection, Your Honor.

25           MS. GURSTELLE:  No objection, Your Honor.

```
1              THE COURT:  Be admitted.

2    BY MR. WARD:

3    Q.  And, Mr. Bryden, the weapons that the individuals in the

4    background are holding, can you identify those for the jury.

5    A.  Those are Kalashnikov-pattern assault rifles.

6    Q.  Are they also known as a --

7    A.  They are also known as AK-47s, but they could be any

8    variant made in any number of countries.

9    Q.  Okay.  And with respect to the flag that's hanging there

10   in the background behind those gentlemen, is there any

11   significance to that?

12   A.  That's one of the flags commonly carried by al-Shabaab.

13   Q.  And the devices that are sitting in front of the

14   gentleman to the left of Mukhtar Robow, can you explain to

15   the jury what those are.

16   A.  Those are recorders and microphones, suggesting that

17   this is a press conference.  And Abu Mansur was the

18   spokesman for al-Shabaab, so that would make sense.

19              MR. WARD:  If we could go to Exhibit 232, please.

20   BY MR. WARD:

21   Q.  And do you recognize the individual pictured in

22   Exhibit 232?

23   A.  I do.

24   Q.  And who is that?

25   A.  That is Fuad Mohamed Khalaf/Shangole.
```

```
1              MR. WARD:  I would offer 232, Your Honor.

2              MR. SCOTT:  No objection, Your Honor.

3              MS. GURSTELLE:  No objection, Your Honor.

4              THE COURT:  Be admitted.

5              MR. WARD:  Your Honor, may I approach with 232 to

6     have the witness mark the name of Fuad Shangole?

7              THE COURT:  You may.

8              THE WITNESS:  (Indicating.)

9     BY MR. WARD:

10    Q.  While you are doing that, Mr. Bryden, is Fuad Shangole

11    also known as Fuad Mohamed Khalaf, K-h-a-l-a-f?

12    A.  That's correct.

13    Q.  Can you write both of those names on the bottom of 232,

14    please.

15    A.  I will.  (Indicating.)

16    Q.  And for the benefit of the jury, is Fuad Mohamed Khalaf,

17    a/k/a Fuad Shangole, referred to in a call which is

18    identified as Government's Exhibit 7?

19    A.  Yes, he is.

20    Q.  Is he also referred to in -- strike the question.

21             MR. WARD:  May I have Government's Exhibit 230,

22    please.

23    BY MR. WARD:

24    Q.  Do you recognize the individual in Government's

25    Exhibit 230, Mr. Bryden?
```

```
 1     A.  I do.

 2     Q.  And who is that?

 3     A.  That is Hassan Mohamed Ali/Abu Ayman.

 4     Q.  And this is the individual that we talked about

 5     yesterday who was the administrative governor for

 6     al-Shabaab?

 7     A.  That's right.

 8     Q.  Is he also known as Hassan Afgoye?

 9     A.  Yes, he is.

10           MR. WARD:  I would move 230, Your Honor.

11           MR. SCOTT:  No objection.

12           MS. GURSTELLE:  No objection, Your Honor.

13           THE COURT:  Be admitted.

14           MR. WARD:  Again I would ask to approach to have

15     the witness mark on the bottom of the original.

16           THE COURT:  You may.  You don't have to ask to

17     approach.

18           THE WITNESS:  (Indicating.)

19     BY MR. WARD:

20     Q.  Now, Mr. Bryden, you referred to Godane or Ahmed Abdi

21     aw-Mohamed as the amir, but within al-Shabaab is there a

22     particular term that's used for a woman who is highly placed

23     within the female leadership?

24     A.  The equivalent of an amir, a female equivalent would be

25     an amira.
```

1    Q.  And is there an individual in the evidence in the

2    government's case to whom this term "amira" is applied?

3    A.  That term is used in one of the calls I reviewed, yes.

4    Q.  And if you recall, do you know the name of the

5    individual who that's applied to?

6    A.  Off the top of my head, no.

7    Q.  Does the name Hawo-Kiin Raage --

8    A.  Yes.

9    Q.  Now, with respect to Mr. Mukhtar Robow, who is also Abu

10   Mansur, did I ask you in preparing for your testimony today

11   to go through several calls, which will be played through

12   Special Agent Wilson, where the speakers referred to an

13   individual named Abu Mansur?

14   A.  Yes, you did.

15   Q.  And having listened to these calls in Exhibits 17, 21,

16   130, 134, and 140, did you reach a conclusion as to whether

17   or not the speakers were referring to Mukhtar Robow, the

18   spokesperson for al-Shabaab?

19   A.  Yes, I did, absolutely.

20   Q.  And was it the case that they were referring to Mukhtar

21   Robow?

22   A.  They were indeed.

23              MR. WARD:  If I could have Government's

24   Exhibit 140, please, and if we could go to page 3.

25              MR. SCOTT:  I don't think that's in evidence yet,

 1      Your Honor.

 2              MR. WARD:  I apologize.  Could we go back to

 3      page 1, please.  I would offer 140, Your Honor.

 4              MR. SCOTT:  Same foundation objections I've had,

 5      Your Honor, to linking it up.

 6              MS. GURSTELLE:  No objection.

 7              THE COURT:  Be admitted assuming it will be

 8      connected up and played later in the trial.  Continue.

 9      BY MR. WARD:

10      Q.  Mr. Bryden, is this a call dated June 7, 2009?

11      A.  Yes, it is.

12      Q.  And at the top is there also an indication that the

13      speakers are Amina Ali and Hawo Mohamed Hassan?

14      A.  Yes, there is.

15      Q.  And going to page 3, at the bottom, four lines from the

16      bottom, does Amina Ali say, ..."I recall about the cleric,

17      Abu --"

18          And then Halima says, "Who?"

19          And then the Defendant Amina Ali says, "-- I called him

20      one day; he normally does not answer the phone, but when he

21      saw my phone number he answered."

22          And then the Defendant Hawo Hassan says, "Who?"

23          And Amina says, "Abu, I mean Abu Mansur --"

24              Is this one of the references where you concluded

25      that they were referring to Mukhtar Robow?

1   A.  Yes, it is.

2   Q.  Now, with respect to Mr. Robow, did he respond to the

3   United States government's designation of al-Shabaab as a

4   foreign terrorist organization?

5   A.  He did.

6           MR. WARD:  And if I could have Government's

7   Exhibit 256, please.

8   BY MR. WARD:

9   Q.  Focusing on the date in February 2008 on page 2, do you

10  see the date February 26, 2008?

11  A.  Yes.

12  Q.  Is that the date that the U.S. designated al-Shabaab as

13  a foreign terrorist organization?

14  A.  I believe it is.

15  Q.  And the jury has seen as Exhibit 271 the formal

16  announcement of the designation, but directing your

17  attention to a time period in March of 2008, how did

18  al-Shabaab respond to the publication of the notice of its

19  designation as a foreign terrorist organization under U.S.

20  law?

21  A.  Mukhtar Robow welcomed the designation essentially as a

22  badge of honor.

23  Q.  And how did he -- how did that come to light, that he

24  had responded welcoming it as a badge of honor?

25  A.  He made a public statement, a press statement.

1   Q.  And was that carried out over the Internet?

2   A.  That was carried by local radio and over the Internet.

3                MR. WARD:  Now if we could go to --

4   BY MR. WARD:

5   Q.  Well, let me ask you:  Are you familiar with an

6   individual named Hassan Dahir Aweys?  We talked a little bit

7   about him yesterday.

8   A.  I am.

9   Q.  Can you explain to the jury a little bit more about who

10  he is.

11  A.  Hassan Dahir Aweys was the vice chairman and military

12  commander of the first Somali jihadist movement known as

13  al-Ittihad al-Islam or AIAI, which is also a designated

14  organization.

15               And following the dismantling of AIAI, in the mid

16  1990s he re-emerged as the key figure behind the Islamic

17  Courts.  He has acted as a mentor for a number of the key

18  leaders in al-Shabaab and he is currently aligned with

19  al-Shabaab.

20               MR. WARD:  Now if I could have Government's

21  Exhibit 223.

22  BY MR. WARD:

23  Q.  And do you recognize the individual in that picture?

24  A.  I do.

25  Q.  And how is it you recognize Hassan Dahir Aweys?

```
 1    A.  I know him because he is a public figure, very visible,

 2    and also because I have met him in the past.

 3                MR. WARD:  I would offer 223.

 4                MR. SCOTT:  No objection, Your Honor.

 5                MS. GURSTELLE:  No objection, Your Honor.

 6                THE COURT:  Be admitted.

 7                MR. WARD:  And if we can go to Government's

 8    Exhibit 272, please.

 9    BY MR. WARD:

10    Q.  You indicated that the organization that he started out

11    with that's abbreviated AIAI, that that was designated?

12    A.  That's correct.

13    Q.  But when you say "designated," is it designated under a

14    different set of sanctions other than as a foreign terrorist

15    organization?

16    A.  It's also designated by the United Nations under

17    Resolution 1267 as an al-Qaeda affiliate.

18    Q.  All right.  And how about, are you familiar with the

19    designations -- the alternative designations under U.S. law?

20    A.  I know it as a foreign terrorist organization and Hassan

21    Dahir Aweys as a specially designated global terrorist.

22    Q.  And when you use the term "specially designated global

23    terrorist," is that under United States law?

24    A.  Yes, it is.

25    Q.  And does that involve financial sanctions against the
```

1     individual?

2     A.  Yes, it does.

3     Q.  And can you identify Exhibit 272, Mr. Bryden.

4     A.  Yes.

5     Q.  Is that a copy of the Federal Register notice

6     designating Hassan Dahir Aweys as a specially designated

7     global terrorist, on page 2?

8     A.  Yes, it is.

9              MR. WARD:  I would offer 272, Your Honor.

10             MR. SCOTT:  We object, Your Honor, based upon the

11    same objections we made prior to trial.

12             MS. GURSTELLE:  Join that objection as well.

13             THE COURT:  Overruled.  Be admitted.

14    BY MR. WARD:

15    Q.  And in the third column, a little bit below the center,

16    is the name Sheikh Hassan Dahir Aweys?

17    A.  Yes, it is.

18    Q.  Okay.  And what's the date of the designation?

19    A.  I don't see a date.

20             MR. WARD:  If we could go back to page 1.

21             THE WITNESS:  March 19, 2002.

22    BY MR. WARD:

23    Q.  Now, outside of court and in preparation for your

24    testimony today, Mr. Bryden, did you listen to calls where

25    the speakers referred to an individual who was called Sheikh

1   Hassan Dahir?

2   A.  Yes, I did.

3   Q.  And did I ask you to listen to those and make a judgment

4   as to whether or not the speakers were referring to the

5   specially designated global terrorist Sheikh Hassan Dahir

6   Aweys?

7   A.  Yes, you did.

8   Q.  And do those exhibits, which will be played later during

9   the testimony of Special Agent Wilson, include Exhibits 49,

10  13, 130, 134, and 157?

11  A.  I don't recall all the designation -- all of the exhibit

12  numbers.

13  Q.  And is there anything that I could provide to you that

14  would help you refresh your recollection?

15  A.  I had a note in which I kept track of the calls.

16  Q.  Let me just provide that to you.  And when you and I

17  were preparing or discussing your testimony in advance, did

18  we sit down together and, you know --

19  A.  Yes.

20  Q.  -- a list?

21       And does that list include the exhibits that I

22  just read to you?

23  A.  Yes, it does.

24  Q.  Okay.  And with respect to each of those calls that I

25  read off, did you reach a conclusion as to whether the

1   references to "Hassan Dahir" were references to the

2   specially designated global terrorist Hassan Dahir Aweys?

3   A.  Yes, I did.

4   Q.  And what was that conclusion?

5   A.  That in all of those cases that the reference was to

6   Sheikh Hassan Dahir Aweys.

7   Q.  Now, Mr. Bryden --

8            MR. WARD:  If I could have Government's

9   Exhibit 130, and this exhibit is not in evidence.  It's a

10  May 21, 2009 call.  And I would offer it at this time.

11           MR. SCOTT:  Same foundation objection, Your Honor.

12           MS. GURSTELLE:  No objection, Your Honor.

13           THE COURT:  Be admitted.

14  BY MR. WARD:

15  Q.  Directing your attention, Mr. Bryden, to the "From" and

16  "To" lines, is this a conversation between Hassan Afgoye and

17  the Defendant Amina Ali?

18  A.  Yes, it is.

19  Q.  And continuing over to page 3, about the third time

20  Amina Ali speaks she says, "Oh, they will be startled.  I am

21  telling you, they will be startled.  They were saddened to

22  see the reports and hear about the recent unity meetings

23  that took place in Afgoye among the likes of Sheikh Hassan

24  Dahir"...

25           Is that one of the references that you looked at?

1    A.  Yes, it is.

2    Q.  And do you believe that reference to be to Sheikh -- the

3    specially designated global terrorist Sheikh Hassan Dahir

4    Aweys?

5    A.  Yes, I do.

6    Q.  And following down, I see the Abu name, "Abu Zubeyr."

7    Do you have an opinion as to who that's a reference to?

8    A.  Yes.  I believe that's a reference to Ahmed Abdi

9    aw-Mohamed Godane.

10   Q.  Is that the individual you have described as the amir --

11   A.  Yes.

12   Q.  -- of al-Shabaab?

13   A.  Yes, it is.

14   Q.  And continuing on, "Sheikh Hassan Turki," who does that

15   refer to?

16   A.  Hassan Turki was also a leading member of AIAI,

17   al-Ittihad al-Islam, and he was a leader of a group known as

18   the Ras Kamboni group, which was aligned initially -- it was

19   involved in the establishment of al-Shabaab.  And then parts

20   of his group broke away subsequently, but he remains aligned

21   with al-Shabaab.

22   Q.  And when you say "parts of his group," it's another

23   opposition militia, this Ras Kamboni Brigade?

24   A.  At that time it was an opposition militia.

25   Q.  Okay.  And is Sheikh Hassan al-Turki also a specially

1    designated global terrorist under Executive Order 13224?

2    A.  Yes, he is.

3    Q.  And finally, there's a reference to "Abu Mansur."  Is

4    this one of the other examples of where you concluded that

5    Abu Mansur was referring to Mukhtar Robow?

6    A.  Yes, it is.

7              MR. WARD:  If I could have Government's

8    Exhibit 273, please.

9    BY MR. WARD:

10   Q.  Now, we just talked about Hassan al-Turki, a specially

11   designated global terrorist.  Is this a copy of the Federal

12   Register notice --

13   A.  Yes, it is.

14   Q.  -- in which he was designated?

15   A.  Yes.

16             MR. WARD:  Offer 273, Your Honor.

17             MR. SCOTT:  We object, Your Honor, based on the

18   same grounds that we raised before trial.

19             MS. GURSTELLE:  We join that objection.

20             THE COURT:  Objection is overruled.  Be admitted.

21   BY MR. WARD:

22   Q.  If we could just focus directly on the center of the

23   page and can you just go ahead and read, Mr. Bryden,

24   starting after the -- starting below the bold.

25   A.  "Acting under the authority of section 1(b) of Executive

1    Order 13224 of September 23, 2001, as amended by Executive

2    Order 13286 of July 2, 2002 and Executive Order 13284 of

3    January 23, 2003, and in consultation with the Secretary of

4    the Treasury, the Attorney General, and the Secretary of

5    Homeland Security, I hereby determine that Hassan Abdullah

6    Hersi al-Turki, also known as Hassan al-Turki, has

7    committed, or poses a significant risk of committing, acts

8    of terrorism that threaten the security of U.S. nationals or

9    the national security, foreign policy, or economy of the

10   United States."

11   Q.  Thank you, Mr. Bryden.  Can you describe for the jury

12   what the general consequences are of someone being

13   designated a specially designated global terrorist under

14   this particular executive order.

15          MR. SCOTT:  I am going to object, Your Honor.

16   There's no qualification of him as an expert in U.S. law.

17          THE COURT:  Overruled.  He may testify.

18          THE WITNESS:  One of the principal consequences is

19   that it's prohibited for any U.S. entity or person to

20   transact business, to engage in financial dealings with a

21   designated global terrorist.

22   BY MR. WARD:

23   Q.  Okay.  So you can't send them money?

24   A.  Right.

25   Q.  And is this the same designation that applies to Sheikh

1    Hassan Dahir Aweys, who we just talked about?

2    A.  Yes, it is.

3              MR. WARD:  And could I have Government's

4    Exhibit 231, please.

5    BY MR. WARD:

6    Q.  I'd ask if you can identify the individual in that

7    picture.

8    A.  That is Sheikh Hassan Turki.

9    Q.  The individual we were just talking about, the specially

10   designated global terrorist?

11   A.  Yes.

12             MR. WARD:  I would offer 231.

13             MR. SCOTT:  No objection, Your Honor.

14             MS. GURSTELLE:  No objection, Your Honor.

15             THE COURT:  Be admitted.

16   BY MR. WARD:

17   Q.  Okay.  Now, you indicated that Hassan al-Turki, the

18   specially designated global terrorist, was the head of the

19   Ras Kamboni group.

20             In the course of your work with the monitoring

21   group, are you familiar with the name Isse Kamboni?

22   A.  Yes, I am.

23   Q.  What's the relationship between Isse Kamboni and Sheikh

24   Hassan al-Turki?

25   A.  Isse Kamboni was a leading member of the Ras Kamboni

1    group.  He was also someone who at times received funds from

2    various sources on behalf of the group and he was considered

3    to be part of the hard core of the group when other elements

4    split away.

5    Q.  Did he have any particular position within the

6    Ras Kamboni Brigades?

7    A.  I don't recall any specific title.  Just that he was a

8    known leader of the group.

9              MR. WARD:  So that the record is clear, I am

10   simply passing 231 to Mr. Bryden, which is the picture of

11   Hassan al-Turki, and I was going to ask him to write along

12   the bottom of it the name of the individual.

13             THE WITNESS:  (Indicating.)

14   BY MR. WARD:

15   Q.  And in the center of 231, Mr. Bryden, there's the words

16   "HornAfrik."  Can you tell the jury what HornAfrik is.

17   A.  HornAfrik is a local television and radio station and

18   media enterprise based in Mogadishu.

19   Q.  And from the looks of the picture, is Hassan al-Turki,

20   the specially designated global terrorist, giving a press

21   conference?

22   A.  That's correct.

23   Q.  And going back to his subordinate Isse Kamboni, did you

24   review -- are there calls in the government's case that will

25   be played through Agent Wilson in which Isse Kamboni is a

1    speaker?

2    A.  Yes, there are.

3    Q.  And do you recall the numbers of those exhibits?

4    A.  If I consult my notes, those would be Exhibits 18 and

5    26.

6             MR. WARD:  If I could have Government's

7    Exhibit 122, please.  Government's 122 is not in evidence

8    and I would offer it at this time.

9             MR. SCOTT:  Same objection on foundation, Your

10   Honor.

11            MS. GURSTELLE:  802 objection on the statements of

12   the individual that is not the defendant or co-defendant.

13            THE COURT:  Objection is overruled.  Be admitted.

14   BY MR. WARD:

15   Q.  Mr. Bryden, is this an April 19, 2009 telephone call

16   that involves a man named Mo'alin Burhan and the Defendant

17   Amina Ali?

18   A.  Yes, it is.

19   Q.  And do you know Mo'alin Burhan?

20   A.  I do.

21   Q.  Who is he?

22   A.  Mo'alin Burhan is a routine speaker on the Paltalk

23   online forums that we discussed yesterday.  He's believed --

24   that's believed to be a nickname for a known Shabaab leader

25   known as Mahad or Mahdi Karatey, but Mo'alin Burhan per se

```
 1    is someone whom we have monitored soliciting funds,

 2    mobilizing support over online chat forums.

 3    Q.  When you say you monitored him, did you listen to his

 4    presentations on the Paltalk discussion forum?

 5    A.  Yes.

 6    Q.  Are you familiar with his voice?

 7    A.  I am familiar with his voice.

 8    Q.  Did you listen to Government's Exhibit 122, the audio,

 9    yourself?

10    A.  Yes, I did.

11    Q.  Is that the voice of Mo'alin Burhan?

12    A.  I believe it is.

13    Q.  The man you also suspect is named Mahad Karatey?

14    A.  Yes.

15    Q.  And where is he in the al-Shabaab leadership?

16    A.  Mahad Karatey has operated principally in the Mogadishu

17    area.  He's one of the senior figures from the Hawiye clan

18    to emerge as an al-Shabaab leader, especially following the

19    death of Aden Hashi Ayrow.

20    Q.  And is Mr. Ayrow the individual that you indicated was

21    part of the core leadership up until May of 2008?

22    A.  That's correct.

23    Q.  What happened to him?

24    A.  He was killed by an air strike.

25    Q.  Are you familiar with the name of an individual named
```

```
1     Bashir Geelle Farah?

2     A.  Yes, I am.

3     Q.  And how is it that you have become familiar with him?

4     A.  Through the same medium, through monitoring online chat

5     forums, and he was identified in one forum we monitored as

6     someone who -- to whom contributors should direct their

7     funds and his telephone number and contact were given out

8     online.

9     Q.  Okay.  Now, Mr. Bashir Geelle Farah, is he someone that

10    you heard speaking on this discussion forum Paltalk?

11    A.  Yes, we did.

12    Q.  And where does Mr. Farah live?

13    A.  I'm not certain of where he lives, but I believe the

14    coordinates given in the call, one of the calls with the

15    forums we monitored, was the United Arab Emirates.

16    Q.  And if you know, sir, is he involved in the shipping of

17    clothes that are part of the evidence in the case?

18    A.  According to the calls that I have reviewed, yes.

19    Q.  I actually failed to ask you this, Mr. Bryden.  I know

20    you are aware of Mr. Farah, but is he in al-Shabaab?

21    A.  I don't know if he is al-Shabaab or not.  I know that

22    he's served that function, as a fund-raiser, for al-Shabaab.

23            MR. WARD:  And going to Government's Exhibit 146,

24    which is not in evidence, it is a July 2, 2009 call.  I

25    would offer it.
```

1          MR. SCOTT:  Objection, foundation, Your Honor.

2          MS. GURSTELLE:  No objection, Your Honor.

3          THE COURT:  Be admitted.

4    BY MR. WARD:

5    Q.  And, Mr. Bryden, at the top of the page does it indicate

6    that this is a telephone conference between Hassan Afgoye,

7    a/k/a Abu Ayman, and the Defendant Amina Ali?

8    A.  Yes, it does.

9    Q.  And proceeding to page 6, the very last block where

10   Amina Ali is speaking, do you see where she says, "They hold

11   a *fundraising* event in one of the mosques every year and

12   they keep the *raised funds* for themselves"?

13   A.  Yes, I do.

14   Q.  And so she continues on to identify an individual.

15   "This is what happened -- I am not sure whether it was in

16   *2007* -- the first time Hawo-Kiin informed me and I contacted

17   Abdullahi Timo-Jili'.  We had collected 11,000 from our area

18   and had handed it to him.  Hawo-Kiin informed that the men

19   were in very bad shape.  I obtained Abdillahi Timo-Jili's

20   number and he told me their situation was bad.  I called the

21   girls to another meeting and told them about the situation

22   and I said to them that we will not send anything to

23   Minneapolis anymore."

24          Now, do you know who Abdulahi Timo Jili' is?

25   A.  Yes, I do.

1    Q.  Can you tell the jury.

2    A.  Abdulahi Timo Jili' is another known Shabaab leader,

3    reportedly from the Murursade sub-clan of the Hawiye.  He is

4    considered to be a part of the faction within al-Shabaab

5    most closely aligned with the amir, Ahmed Abdi Godane.  He

6    was until his death I believe last year.

7    Q.  Okay.  So in 2007 he was still alive?

8    A.  Yes.

9    Q.  When Amina Ali refers to "Hawo-Kiin," is that this

10   woman, the amira, Hawo-Kiin Raage, that we talked about

11   earlier?

12   A.  Yes, it is.

13           MR. WARD:  If I could have Government's

14   Exhibit 217, please.

15   BY MR. WARD:

16   Q.  Do you have that in front of you, Mr. Bryden?

17   A.  Yes, I do.

18   Q.  And is it a picture of a man with some kind of a weapon?

19   A.  Yes, it is.

20           MR. WARD:  I would offer 217, Your Honor.

21           MR. SCOTT:  I'm not going to object, Your Honor.

22           MS. GURSTELLE:  Objection, 402 and 403.

23           THE COURT:  Overruled.  Be admitted.

24   BY MR. WARD:

25   Q.  Mr. Bryden, on the face of the picture there's a man

1   with a rocket launcher or something.  Can you describe what

2   that weapon is to the jury.

3   A.  That's a recoilless rifle.  It's used as an anti-tank or

4   anti-vehicle weapon.  I'm not expert enough and the picture

5   is not clear enough to say which kind it is, but a variant

6   of probably the Carl Gustav style recoilless rifle.

7   Q.  And are these the types of weapons that you come across

8   in your job?

9   A.  Yes, they are.  And this type of weapon is actually a

10  fairly recent addition to the al-Shabaab arsenal.

11  Q.  Okay.  And the notation on the picture itself,

12  "Kataiib.net," what's the significance of that?

13  A.  Kataiib.net was at one time considered to be the

14  official Internet site of al-Shabaab.  It's where they

15  published most of their communiqués and information that

16  they wanted their public to know about.

17  Q.  And you say "at one time."  I take it by that that the

18  official website of al-Shabaab changes from time to time?

19  A.  It does.

20  Q.  Do you recall any other websites that served as the

21  official website of al-Shabaab?

22  A.  There was Kataaib.net, Kataaib.info, al-Mujahid I

23  believe dot-net, al-Qimmah, which remains one of the most

24  important, Somali Memo.  Yes, it's changed over time.

25  Q.  Okay.  When you said -- did you say, "al-Mujahid"?

```
1    A.  Yes.

2              MR. WARD:  If I could have Government's

3    Exhibit 220, please.

4    BY MR. WARD:

5    Q.  Is that another picture of people with weapons?

6    A.  Yes, it is.

7              MR. WARD:  And I would offer Government's

8    Exhibit 220.

9              MR. SCOTT:  Foundation and relevance, Your Honor.

10             MS. GURSTELLE:  402 and foundation.

11             THE COURT:  Foundation, lay some foundation.

12             MR. WARD:  Your Honor, with respect to this photo,

13   there would be testimony from Special Agent Wilson as to

14   where the picture came from.

15             THE COURT:  All right.  It will be admitted, but

16   make sure you shore up the foundation with Special Agent

17   Wilson.

18             MR. WARD:  Yes, Your Honor.

19   BY MR. WARD:

20   Q.  Now, Mr. Bryden, on this picture, 220, the individuals

21   there are carrying various weapons.  The guy in the

22   foreground, what type of weapon is he carrying?

23   A.  I believe that's a PKM light machine gun.

24   Q.  And the individual right behind him?

25   A.  That's a rocket-propelled grenade launcher.
```

1    Q.  Does it have a particular name?

2    A.  It looks to me like an RPG-7.

3    Q.  I apologize for the clarity of the picture.

4            The distinctive head dress that each -- of the

5    three people that I can see, what's that called?

6    A.  That's an immamad.

7    Q.  And is that something that's characteristic of the

8    al-Shabaab fighters?

9    A.  It is.

10   Q.  Can you explain to the jury why the individuals have

11   their faces covered.

12   A.  This is also a characteristic of al-Shabaab fighters.

13   Ever since they first appeared, many of them have favored

14   covering their faces.  And as a guerilla movement this has

15   allowed them to operate freely even when Ethiopian or AMISOM

16   or TFG forces were in control of a given area, because their

17   identities were often unknown.

18   Q.  All right.  Mr. Bryden, is there a location affiliated

19   with al-Shabaab that's known as the Salahudin Center?

20   A.  Yes, there is.

21   Q.  Can you tell the ladies and gentlemen of the jury what

22   the Salahudin Center is.

23   A.  The Salahudin Center was established in late 2004, early

24   2005 by the al-Shabaab leader Aden Hashi Ayrow.  Ayrow was a

25   former fighter with AIAI, who had then subsequently traveled

1      and trained in Afghanistan.

2              He, upon his return to Somalia, became the militia

3      commander of a court, one of the Islamic courts in

4      Mogadishu, one of the first, which was headed by Hassan

5      Dahir Aweys.  The court was known as Ifka Halane.

6              Ayrow was closely associated with, in fact, his

7      militia protected some members of the al-Qaeda East African

8      Network and in late 2004, August 2004, Ayrow's house was

9      attacked by other militia leaders who were trying to

10     apprehend one of these al-Qaeda figures, Abu Taha al-Sudan.

11             Ayrow apparently then felt insecure and so he

12     relocated his base to a former Italian cemetery, a colonial

13     era cemetery dating from the pre-independence days.  His

14     fighters disinterred the remains in the cemetery and

15     established a mosque and a training center on the site and

16     it became known as the Salahudin Center.

17     Q.  And is it located in Mogadishu?

18     A.  Yes, it is located in north Mogadishu.

19     Q.  Okay.  As you were explaining the background of this,

20     you referred to some al-Qaeda members that were under the

21     protection of Aden Ayrow's militia.

22             Is there any other relationship that you are aware

23     of between al-Shabaab and al-Qaeda, specifically directing

24     your attention to the time frame March 2009?

25     A.  There were multiple linkages between members of

1     al-Shabaab and individuals in the al-Qaeda East African

2     Network, not only Ayrow, but these were pre-existing

3     linkages from the early 1990s.  From 1998 --

4     Q.  Let me just -- I wanted to try and focus on one

5     particular linkage in the time frame March 2009.  Was there

6     a communication between the al-Qaeda leadership --

7     A.  Yeah.

8     Q.  -- and al-Shabaab?

9          Can you tell the ladies and gentlemen of the jury

10    about that.

11    A.  In that specific period there was a statement from Osama

12    bin Laden, I believe it was entitled Fight on Lions of

13    Somalia, encouraging al-Shabaab to continue their struggle

14    even though Ethiopian forces had withdrawn from Somalia.

15    Al-Shabaab welcomed and responded to this statement and then

16    for about six months engaged in a media campaign called

17    Labaik Ya Osama or At Your Service Osama, including videos

18    and communiqués.

19    Q.  And when you say, "Labaik Ya Osama," is that in Arabic?

20    A.  Yes, it is.

21          MR. WARD:  And if we could go to Exhibit 114.

22    BY MR. WARD:

23    Q.  That's another transcript and audio.  And, Mr. Bryden,

24    is that an April 3, 2009 telephone call?

25    A.  Yes, it is.

```
1    Q.  Is it between Hassan Afgoye, also known as Abu Ayman,

2    and the Defendant Amina Ali?

3    A.  Yes, it is.

4           MR. WARD:  I would offer 114, Your Honor, and ask

5    that we be allowed to play the call.

6           MR. SCOTT:  Same foundation objection, Your Honor.

7           MS. GURSTELLE:  No objection, Your Honor.

8           THE COURT:  Be admitted.  Play the call.

9        (Audio recording played.)

10   BY MR. WARD:

11   Q.  Mr. Bryden, back on the first page when

12   Hassan Afgoye/Abu Ayman says that they had a lecture

13   at a place called Salahudin, is that a reference to the

14   Salahudin Center that you told us about?

15   A.  I believe it is.

16   Q.  And the next time that he speaks he says, "A center that

17   belongs to us -- a *center* located in Mogadishu"...

18           Who is he referring to, what group is he referring

19   to when he says "us"?

20   A.  To al-Shabaab.

21   Q.  And continuing down where he says, "-- the title of the

22   lecture was, '*Here We Are At Your Service*,'" that's in

23   italics.  That means it was in Arabic.  So is that the

24   Labaik Ya Osama campaign that you were talking about?

25   A.  That is the campaign.
```

1    Q.  And continuing down again, where it says -- well,

2    Defendant Amina Ali says, "Why would you say, '*Here We Are*

3    *At Your Service*, Osama'?  Why didn't you say, '*Here We Are*

4    *At Your Service, God*'?"

5         He responds, "No, we simply accepted his calling; the

6    sheikh had issued a decree."

7              Who is he referring to when he says "the sheikh"?

8    A.  He is referring to Osama bin Laden.

9    Q.  And what he is referring to when he had issued a decree?

10   A.  He is referring I believe to the statement by bin Laden,

11   "Fight on Lions of Somalia."

12   Q.  And continuing further down, as Hassan Afgoye continues

13   to talk to the Defendant Amina Ali he says, "We were letting

14   him know that we responded to his decree."

15             Who is he referring to, what organization is he

16   referring to when he says "we"?

17   A.  To al-Shabaab.

18   Q.  And does Amina Ali go on to give him an earful and say

19   that you shouldn't have said we are giving an answer to

20   Osama?

21   A.  Yes, she does.

22   Q.  And continuing over to the next page, does she express

23   her concern that all it is going to do is stir up

24   animosities and reinforce the suspicions because he doesn't

25   provide financial support?

```
 1    A.  Yes, she does.

 2              MR. WARD:  If I could have Government's

 3    Exhibit 256, please.

 4    BY MR. WARD:

 5    Q.  Mr. Bryden, if you could focus your attention on page 2

 6    of the exhibit, October 29, 2008, the al-Shabaab suicide

 7    bombing of Hargeisa and Bosaso.

 8    A.  Yes.

 9    Q.  Did such a suicide bombing take place in those two

10    cities?

11    A.  Yes, it did.

12    Q.  Where are they located?

13    A.  They are both located in northern Somalia.  One is the

14    capitol -- Hargeisa is the capitol of Somaliland.  Bosaso is

15    on the coast of the Gulf of Aden.  It is the commercial

16    capitol of Puntland.

17    Q.  Can you describe for the jury the activities or the

18    locations that were suicide bombed.

19    A.  In Hargeisa there were three targets.  One was an

20    Ethiopian office known as a trade mission there.  It's a

21    diplomatic outpost.  One was the presidency of the

22    Somaliland administration.  And the third was the offices of

23    the United Nations Development Programme.  In Puntland the

24    two targets were offices of the Puntland Intelligence

25    Service.
```

1    Q.  How many total suicide bombers were involved in this

2    activity?

3    A.  At least five.

4    Q.  And were these essentially simultaneous suicide

5    bombings?

6    A.  These were essentially simultaneous, five simultaneous

7    bombings.

8    Q.  And was one of the kids a Minneapolis resident?

9    A.  Yes, he was.

10   Q.  And what was his name?

11   A.  Shirwa -- I don't recall off the top of my head.  Shirwa

12   Ahmed, I believe.

13   Q.  And do you know who was responsible for the suicide

14   bombings in Hargeisa and Bosaso?

15   A.  All the indications of this was an al-Shabaab operation.

16   There's no other organization in Somalia with that

17   capability.

18   Q.  Can you describe that any further, what the basis is for

19   your conclusion that it was al-Shabaab?

20   A.  Well, there are a number of elements.

21        First, that al-Shabaab had already conducted

22   operations in Somaliland since 2003 and '04 killing a number

23   of aide workers and in I believe 2005, during Somaliland's

24   parliamentary elections, an al-Shabaab team had been

25   captured with weapons and explosives and had a plan to

```
 1    disrupt the elections with a bombing campaign, simultaneous
 2    bombings during the elections.  So there was a prior history
 3    of al-Shabaab activity in the region.
 4          Again, as I said, there is no other organization
 5    with the capability to conduct simultaneous suicide bombings
 6    in Somalia.
 7          The fact that they attacked both Puntland and
 8    Somaliland suggests that it's not internal opposition to
 9    either of those areas.  They were attacked both
10    simultaneously.
11          And the involvement of bombers who had been
12    recruited from the United States -- a bomber from the United
13    States who had been recruited and traveled through the
14    channels used by al-Shabaab I think makes the point fairly
15    clearly.
16    Q.  And in the United States in the criminal prosecutions
17    that related to the events that Shirwa Ahmed participated
18    in, did those individuals talk about what their role was
19    with al-Shabaab?
20    A.  I'm sorry.  I didn't --
21          MR. SCOTT:  Your Honor, I object.  That's about as
22    hearsay as you can get if something is happening in the
23    United States.  This witness is not a United States expert
24    and is being asked to, I think, talk about hearsay now more
25    so than normal.
```

```
 1              MS. GURSTELLE:  We also object on hearsay, 802.

 2              THE COURT:  Sustained.

 3    BY MR. WARD:

 4    Q.  Is there any evidence that you've considered in forming

 5    your opinion as to who was responsible for the Hargeisa and

 6    Bosaso bombings that relates to the individual who traveled

 7    from the United States?

 8    A.  In our investigations of the bombings in Hargeisa and

 9    Bosaso, we formed the opinion that it was an al-Shabaab

10    operation and that the individual named was involved.

11    Q.  When you say "the individual named" --

12    A.  Shirwa Ahmed.

13    Q.  Now, we'll hear some more about this later, but did

14    al-Shabaab ever claim responsibility for those suicide

15    bombings?

16    A.  Not that I'm aware of.

17              MR. WARD:  Your Honor, I simply wanted to ask the

18    witness to mark the one picture that's in evidence, 223, and

19    consult with co-counsel.

20         (Discussion off the record between

21          Mr. Ward and Mr. Paulsen.)

22    BY MR. WARD:

23    Q.  Mr. Bryden, if you could just write the name of the

24    individual on the bottom of 223.

25    A.  (Indicating.)
```

1          MR. WARD:  And I have no further questions.

2                      **CROSS EXAMINATION**

3     BY MR. SCOTT:

4     Q.  Mr. Bryden, you went to McGill University?

5     A.  That's correct.

6     Q.  And so would I be correct in guessing that you are

7     Canadian born and raised?

8     A.  I am British born and Canadian raised.

9     Q.  So you are a citizen of what country?

10    A.  Both the U.K. and Canada.

11    Q.  Do you carry passports, then, from both countries?

12    A.  Yes, I do.

13    Q.  And do you carry passports from any other countries?

14    A.  I have been given passports that I don't use from other

15    countries, including Somalia, and I have been given a

16    Somaliland passport.

17    Q.  So you have passports from Somalia, Somaliland, the

18    United Kingdom, and Canada?

19    A.  That's correct.

20    Q.  And you said that you came to Somalia in about 1990?

21    A.  That's correct.

22    Q.  And did you come there as a civilian visitor or did you

23    have a -- were you involved in the military at that time?

24    A.  I was a civilian.

25    Q.  Okay.  And prior to coming there as a civilian -- just

```
 1    let me go backwards for a moment.  You do have -- you were

 2    in the Canadian military?

 3    A.  That's correct.

 4    Q.  And what time period?

 5    A.  In 1985 until 1989.

 6    Q.  And then sometime after that, in 1990, you came to

 7    Somalia.  What part of Somalia did you come to first in

 8    1990?

 9    A.  I traveled to Mogadishu and almost immediately to Luuq

10    in the southwest.

11    Q.  Now, in 1990 when you arrived in Somalia, was Somalia at

12    peace internally?

13    A.  No.

14    Q.  And there was fighting going on in what parts of the

15    country when you arrived in 1990?

16    A.  There was fighting going on in the northwest, in the

17    central regions sporadically, and some guerrilla activity in

18    the area where I was located, in Luuq.

19             MR. SCOTT:  How do I get to the document camera?

20    All I see is auxiliary PC right now.  Oh, main page.

21    BY MR. SCOTT:

22    Q.  Let me throw a map up, because it is far easier to talk

23    when we've got a map.

24             So you said when you arrived there was fighting in

25    the northeast.  That would be Somaliland?
```

1    A.  The northwest.

2    Q.  Excuse me.  Fighting in the Puntland area when you

3    started?

4    A.  No, not in the Puntland area.

5    Q.  In the northwest, which eventually became Somaliland?

6    A.  There and two other regions.

7    Q.  Okay.  What two other regions are there?

8    A.  In the central regions, here (indicating).  And guerilla

9    activity where I was posted, here (indicating).

10   Q.  Now, when you came -- you said something just now, that

11   you were posted.  So you came as part of your employment?

12   A.  Yes.

13   Q.  And who were you working for when you first came?

14   A.  I was contracted by CARE International and I was

15   working -- I was seconded to the United Nations High

16   Commissioner For Refugees.

17   Q.  The fighting in the northwest part of Somalia, that

18   fighting, you were familiar with, had been going on for some

19   time period; is that right?

20   A.  It had been going on at a low level since 1983 and

21   full-scale war since 1988.

22   Q.  And the fight from -- when we are talking about the

23   full-scale war since 1988, can you tell the jurors who was

24   fighting with who.

25   A.  The fighting was a movement.  It was called the Somali

574

```
 1    National Movement.  It was anchored in the Isaaq sub-clan.

 2    Q.  Stop for a moment because you give out all these clans

 3    and everything so fast I can't even write it down.  There

 4    was a clan in Somalia, the Isaaq, I-s-a --

 5    A.  -- a-a-q.

 6    Q.  And they were fighting with the government of?

 7    A.  Mohamed Siad Barre.

 8    Q.  Mohamed Barre.  And when you say this was more intense,

 9    what kind of casualties are we talking about that are taking

10    place back and forth during this time period?

11    A.  Well, the conventional estimates are that in the first

12    few months of that fighting somewhere between 50 and 60

13    thousand people were killed and somewhere in the region of

14    half a million moved to Ethiopia as refugees.

15    Q.  So nearly half a million people, then, are driven out of

16    northwestern Somalia and into, I take it, this area in here

17    (indicating)?

18    A.  A little further west or near Jijiga.

19    Q.  Right there (indicating)?

20    A.  Yeah.

21    Q.  And then stuck in refugee camps, in makeshift housing,

22    whatever they can find, right?

23    A.  Correct.

24    Q.  And maybe this is the time to be talking about that for

25    the moment.  All of the fighting that you have been talking
```

1    about that went -- was going back and forth from 1988

2    through the present has resulted in a large number of people

3    being displaced; is that right?

4    A.  Absolutely.

5    Q.  Fleeing for their lives?

6    A.  Yes.

7    Q.  And sometimes a number of them not making it because

8    either they were killed -- the reason they were fleeing was

9    because people were being killed or they're dying on the way

10   as they flee?

11   A.  Yes.

12   Q.  The breakdown of civil society?

13   A.  Yes.

14   Q.  And when they get to the camps, these camps are being --

15   let's say in Jijiga, the camps aren't waiting for them, they

16   arrive and then the camps sort of build out of the fact that

17   there's all these refugees there; would that be a fair

18   statement?

19   A.  That's a fair statement.  And then agencies come to

20   assist them, organize the camps.

21   Q.  Because the camps, until they're organized, are about as

22   lawless as you can possibly get, right?

23   A.  No, I wouldn't describe them as lawless.  Chaotic, yes.

24   Q.  And in the camps there's no real economic activity, it's

25   all humanitarian aid that's coming in, at least when they

1    first start?

2    A.  Initially, but those camps were very busy economic hubs

3    for --

4    Q.  As time went along?

5    A.  As time went along.

6    Q.  Now, are there camps -- now, you talked about that camp

7    in Ethiopia.  Were there other camps that developed in

8    Ethiopia as well during the fighting?

9    A.  Well, there were several camps in the Jijiga area, one

10   further east in the Kebre Beyah area and one near Luuq in

11   the southwest.  Let's see if I can -- just to the left of

12   that arrow in the Dolo Ado area.

13   Q.  And then there were a number of camps that were also

14   developed during the fighting over these years in Kenya?

15   A.  Yes.

16   Q.  Do you remember some of the names of those camps in

17   Kenya?

18   A.  Well, the biggest is known as Dadaab and --

19   Q.  Dadaab?

20   A.  Dadaab, D-a --

21   Q.  D-u-d-a-b would be good enough?

22   A.  D-a-d-a-a-b.

23   Q.  Okay.  And is there one that has like three letters in

24   the name, Ifo or some name like that?

25   A.  Within the Dadaab refugee complex there are several

1    camps, Ifo, Dagahaley, Hagadera.

2    Q.  Now, you said in the late '80s half a million people

3    were displaced out of their homes in Somaliland as a result

4    of the fighting?

5    A.  Probably more if you count those who were internally

6    displaced, yes.

7    Q.  And let's get to the internal displacement for the

8    moment, then, as long as we're talking about this.

9    People -- besides the people that are driven clear out of

10   their country, there are people that are being driven away

11   from their homes and they're settling in other areas within

12   the confines of Somalia?

13   A.  Yes.

14   Q.  And there are refugee camps, then, within Somalia

15   itself?

16   A.  Yes.

17   Q.  I think you were testifying on direct examination about

18   one that's just outside of or just on the edge of Mogadishu

19   itself?

20   A.  Yes.  I mentioned Elasha Biyaha, which is one of the IDP

21   camps.

22   Q.  And that camp has been around now long enough that it's

23   basically a city, then, isn't it, in and of itself?

24   A.  It is.

25   Q.  It's been around for nearly a generation now?

1    A.  No.  It's been around since the Ethiopian occupation, so

2    since the beginning of January 2007.

3    Q.  So that's a recent one.  There are camps literally in

4    Somalia that -- or there are towns that developed out of

5    these refugee camps; isn't that right?

6    A.  There are some.  There are some small towns that have

7    been formed that way, yes.

8    Q.  And internally significant percentages of the population

9    have been displaced, that is, kicked out of their homes for

10   at least -- and had their homes destroyed for at least some

11   period of time?

12   A.  Yes.  There's been constant movement, displacement,

13   relocation, migration over the last 20 years.

14   Q.  And let's talk some more about that displacement and

15   migration.  There are people who were not just displaced

16   from their homes, but there were people who came in and took

17   over their homes or took over their farms permanently?

18   A.  Yes, that's true.

19   Q.  Seized them?

20   A.  Yes.

21   Q.  Not always connected with any government or anything

22   else, just literally as a result of the lack of any

23   governmental control that was left?

24   A.  That and civil war, yes.

25   Q.  I mean, there's civil war, there's banditry, there's

```
 1     just straight up expropriation by people taking over other

 2     people's areas?

 3     A.  That's correct.

 4     Q.  Now, the heaviest fighting, then, when you came and the

 5     most vicious fighting with this kind of casualties, 40 and

 6     50 thousand people casualties, was taking place in what used

 7     to be British Somaliland?

 8     A.  That's correct.

 9     Q.  And in 1990 -- you were explaining in 1991 officially

10     they declared their independence?

11     A.  That's correct.

12     Q.  And they have remained an independent, separate country

13     of Somaliland ever since?

14     A.  Well, they have declared independence, but they are not

15     a separate country.  They are not recognized.

16     Q.  Okay.  Well, they think they're a separate country?

17     A.  That's correct.

18     Q.  You're a UN member.  You can't acknowledge that today?

19     A.  That's right.  They are not.  They --

20     Q.  But you have written in the past about them --

21     A.  Yes, I have.

22     Q.  -- declaring their independence and maintaining their

23     independence as an independent country?

24     A.  Yes.

25     Q.  And, in fact, some of your writings in the past have
```

1    been about what to do and whether Somaliland should remain

2    an independent country away from the rest of Somalia?

3    A.  I have written extensively on the issue.

4    Q.  And, in fact, you've written extensively on what would

5    happen if Somalia ever got back together and decided that

6    they wanted to take Somaliland back, that there would be,

7    you predicted, further violence?

8    A.  Yes, I did.

9    Q.  Now, Somaliland then sort of withdrew, then, from the

10   rest of the troubles in Somalia?

11   A.  Yes.

12   Q.  Or at least they tried to?

13   A.  Correct.

14   Q.  They had their own problems, even after they declared

15   independence things have been up and down in terms of the

16   formation and continuation of the country, there has been

17   violence, and at least when it started some question whether

18   they would make it, right?

19   A.  That's correct.

20   Q.  But since then they've had how many elections?

21   A.  Four.

22   Q.  Four elections.  And this is elections in which the

23   people are allowed to vote?

24   A.  Yes.

25   Q.  All of them?  Women too?

1    A.  Women too.

2    Q.  And a central government has been set up?

3    A.  That's correct.

4    Q.  What type of a system is it?  Is it --

5    A.  It's a bicameral legislature, two houses of parliament,

6    executive presidential system.

7    Q.  Closer to Britain or closer to the United States?

8    A.  I would say closer to the United States.

9    Q.  A more powerful president --

10   A.  Yes.

11   Q.  -- rather than a figurehead?

12          And these elections, at least some of the more

13   recent ones, have actually been internationally monitored as

14   well for fairness?

15   A.  That's correct.

16   Q.  Now, let's compare that for a moment with the rest of

17   Somalia since the fall of the Barre government.

18          You said on direct examination that the

19   northeastern portion of Somalia has declared itself to be at

20   least an autonomous region?

21   A.  Correct.

22   Q.  And the autonomous region of Puntland?

23   A.  Yes.

24   Q.  And Puntland and Somaliland have a little overlap that

25   has never been decided?

```
 1    A.  Correct.

 2    Q.  And there's been some tension between the group that was

 3    running Puntland and the people in Somaliland?

 4    A.  Yes.

 5    Q.  And this fellow Yusuf, he at one point or another was

 6    actually the leader of Puntland; is that right?

 7    A.  Abdullahi Yusuf, yes.

 8    Q.  I guess I am going to call him Yusuf because there are

 9    so many names I've got to pick one of them.

10            When did that northwestern area declare itself to

11    be an autonomous region of Puntland?

12    A.  The northeastern.

13    Q.  Northeastern, yes.

14    A.  That was in 1998.

15    Q.  Okay.  And have there been elections in which the people

16    have all voted in Puntland?

17    A.  No.

18    Q.  And so Puntland, although it's declared itself to be

19    independent, is really a thiefdom, or was when it started, a

20    thiefdom of a particular warlord, Mr. Yusuf?

21    A.  I wouldn't characterize it that way.

22    Q.  He characterized himself as a warlord, though, didn't

23    he?

24    A.  He may have.  I don't think he used the term, but he

25    was --
```

1     Q.  It might be in some of your writings, that he said I'm

2     just a warlord?

3     A.  He certainly had that tendency, but the Puntland

4     administration emerged from a popular process.  It just

5     never got to the point of elections.

6     Q.  And so it's been in existence now for about 13 years and

7     hasn't had any elections?

8     A.  That's correct.

9     Q.  And it is not recognized?

10    A.  No, and it doesn't seek recognition.

11    Q.  So as far as the government of Somalia is concerned,

12    Somaliland is a breakaway province?

13    A.  I think that's fair to say, yes.

14    Q.  And they've never managed to get your organization, the

15    United Nations, or any other significant national

16    organizations to recognize themselves as something separate?

17    A.  That's correct.

18    Q.  They don't acknowledge the supremacy of the Transitional

19    National Government or the Transitional Federal Government,

20    those --

21    A.  No, they don't, but they're hardly alone in that

22    position.

23    Q.  That's right.  Now -- and I am going to jump ahead and I

24    am going to go backwards, but as long as I'm here right now,

25    the first group to declare themselves the government of

```
1     Somalia was the Transitional National Government?

2     A.  Actually, no.  There was a first attempt in 1991 to

3     declare a government.

4     Q.  And that was General Aidid?

5     A.  No.  That was Ali Mahdi Mohamed, who was a hotelier.

6     Q.  A guy who ran a hotel declared himself to be the

7     government?

8     A.  Well, yes, and actually achieved a degree of

9     recognition.

10    Q.  Okay.  It would be like Conrad Hilton declaring himself

11    to be the United States?

12    A.  I'm not sure about the parallel, but it could be.

13    Q.  At least if he had a militia to go along with him?

14    A.  That would be closer to the truth.

15    Q.  And this hotelier that you're talking about, he actually

16    did have a militia; isn't that right?

17    A.  He had part of a militia, yes, he did, a big one,

18    well-armed.

19    Q.  So the Transitional National -- and I get the TN and TF

20    mixed up all the time, but the Transitional National

21    Government was one in that series of 18 or 19 that you're

22    talking about?

23    A.  That's right.

24    Q.  Have they -- did they ever have an election in Somalia

25    with the Somali people --
```

```
 1    A.  No.

 2    Q.  -- the Transitional Federal Government?

 3    A.  No.

 4    Q.  Now, let's go back to the time -- the real time of

 5    troubles.  Somalia declared their independence in 1991, but

 6    by this point the fighting in the south was getting

 7    significant enough, the opposition groups, that I think your

 8    testimony on direct was that they drove Mohamed Siad Barre

 9    out of Mogadishu?

10    A.  That's right.

11    Q.  And you were there at the time?

12    A.  That's correct.

13    Q.  So you're living and watching what's happening?

14    A.  Yes.

15    Q.  Can you tell me and describe to the jurors the type

16    of -- what's happening, the type of chaos, what is happening

17    in 1991 in southern areas of Somalia, especially near the

18    centers of populations.

19    A.  Well, in January of 1991 the fighting reached the

20    capitol and there was a combination of first an uprising of

21    Ali Mahdi's militia in the north and then in late January

22    General Aidid's militia, which was nominally the same group,

23    entered the city.

24         And there was an extremely violent period during

25    which Aidid's militia, who were mainly from the Hawiye and
```

 1    Habar Gidir sub-clan, persecuted members of other clans,

 2    notably from the Darod, who then fled towards the south.

 3             There was then a period of fighting in two

 4    directions between, to simplify it, Darod militias and

 5    Hawiye militias, in one direction towards Kismayo up and

 6    down the coast and also between the east and the west

 7    between the Kenya border and Mogadishu.  And it was that

 8    back and forth that I mentioned in direct was in large part

 9    responsible for the emergence of a terrible famine in 1992

10    and '93.

11    Q.  So you've got General Aidid and his group sweeping in.

12    They're fighting against General Barre.  And they're more

13    than one group anyway?

14    A.  There are all kinds of subgroups and splinter groups.

15    Q.  And you've got a general uprising taking place at the

16    same time?

17    A.  No.  At that point the uprising is over.  Barre is gone.

18    It's now just clan militias fighting each other.

19    Q.  And they're -- I mean, I'll use a terrible word.  I'm

20    pulling up 267, just for the record.  And the Hawiye clan

21    that you are talking about, their color is -- on 267, their

22    color on 267 is -- are they the sort of darker blue that's

23    here (indicating)?

24    A.  Yes, they are.

25    Q.  Okay.  And they're fighting -- and they are taking it

1    out on another clan, then, the Darod clan, in essence?

2    A.   That was a large part of the fighting, yes.

3    Q.   And Darod is the other color gray, this color gray here

4    (indicating)?

5    A.   That's correct.

6    Q.   And these are -- these two clans are the two biggest

7    clans in Somalia in terms of population, in terms of the

8    amount of people?

9    A.   I think that's the conventional wisdom, but, as I said,

10   there's never been a census.

11   Q.   So what started as a popular uprising has now developed

12   into clan warfare?

13   A.   That's fair, yes.

14   Q.   And everybody in Somalia belongs to a clan?

15   A.   Yes.

16   Q.   So it's like total war in a lot of ways, there's no --

17   you're not safe basically anywhere you are where there's

18   fighting?

19   A.   For about the first two years that was true.

20   Q.   So one side would sweep in, butcher their enemies, and

21   the other side would sweep in and butcher the other people

22   going back?

23   A.   As I said, the first two years, yes, that was the case.

24   Q.   And places like -- and give me just a rough percentage.

25   How many people in the area that we're talking about near

```
1    Mogadishu all the way down to Kismayo where the big cities

2    are and the agricultural areas are, what percentage of those

3    people do you think got displaced over this two years?

4    A.  Over those two years I couldn't say, but a ballpark

5    figure, I mean, probably at least half at one time or

6    another, maybe more.

7    Q.  Okay.  And what protection did these people, the regular

8    people, have during this time period?

9    A.  If they had -- if they were from a clan with a powerful

10   militia, that was about the only guarantee of security they

11   had.

12   Q.  And this went on for about two years?

13   A.  That type of fighting went on for two years.

14   Q.  And as a result of all of these people being displaced,

15   the production of food and I would guess the production of

16   almost everything else basically came to a halt?

17   A.  That's correct.  And there was also looting of food

18   surpluses.

19   Q.  And so when you say "the famine," the famine was induced

20   by the fighting, that is, there's no food, there's no money,

21   there's no food coming in, it's all been taken, people are

22   now starving literally as a result of war?

23   A.  Yes.

24   Q.  And that's when the United Nations came in and the

25   United States came in to try to do something about that?
```

```
1     A.  That's right.

2     Q.  And when they originally came in, they set themselves up

3     in Mogadishu for the purpose of providing humanitarian aid?

4     A.  That's right.

5     Q.  And you were living through all of this at the time?

6     A.  Yes.

7     Q.  And, in fact, when this was happening in '92 and '93,

8     you were still working for --

9     A.  I was an adviser to the Canadian ambassador.

10    Q.  By this point that's when the Canadians had said we know

11    who you are and you managed to be able to be there and

12    earning a living watching this?

13    A.  That's correct.

14    Q.  How old were you then in that time period?

15    A.  24, 25.

16    Q.  Would you say it was horrifying?

17    A.  Yes, I would.

18    Q.  And we talked about Black Hawk Down for a moment.  That

19    was a skirmish where the United States had gone outside to

20    try to -- outside the containment area to try to accomplish

21    something and they failed?  I think they were chasing after

22    General Aidid.

23    A.  They were chasing Aidid, yes.

24    Q.  And they failed and a number of them were killed; is

25    that right?
```

1    A.  18 were killed.

2    Q.  So General Aidid was still a power figure there?

3    A.  Yes, he was.

4    Q.  And had he come out of -- now, he called himself General

5    Aidid.  Had he been a general in the armies of Mohamed Barre

6    or is this self-appointed?

7    A.  I'm not sure.  I know he made the rank of colonel.  I'm

8    not sure if he actually was a general under Siad Barre.

9    Q.  So he is in a lot of ways an opportunist who when the

10   boss is out decides to take over?

11   A.  He was I believe acting as ambassador.  He was called

12   back by his group to lead their fighters.

13   Q.  And eventually even the United Nations pulled out?

14   A.  The forces pulled out.  The UN remained.  The aid

15   agencies remained.

16   Q.  And what protection did the aid agencies then get from

17   this chaos that surrounded them?

18   A.  Generally they either engaged their own guards and

19   eventually they had something they called the blue shirts,

20   who were their own local security.

21   Q.  So they hired their own militia, in essence?

22   A.  They did hire their own militia.

23   Q.  Tell me how there is some sort of status quo started to

24   be reached where -- because you can't fight forever because

25   eventually everybody is dead.  Some sort of status quo

1    started to be reached.  Tell the jury sort of what was

2    happening in the southern areas of Somalia to bring some

3    order to this process.

4    A.  Well, after the withdrawal of UN forces in 1995 there

5    was a period of, as you say, a sort of status quo that set

6    in until 2000.  And by that time clan warfare had

7    diminished.  It was much less dangerous for people to move

8    through the country.

9              Warlords emerged who -- basically if you could

10   control a port or an airport or a piece of road, anything

11   you could tax, you could set yourself up as a warlord with a

12   clan militia and you used that money to sustain your

13   militia.

14             And through that period there were a series of

15   conferences called by different governments and different

16   authorities trying to set up a new administration and a new

17   government for Somalia.  So basically you held your

18   territory, taxed your people, set up a militia, and that was

19   your ticket to a peace conference.

20             And that went on for a number of years without

21   anything emerging except the establishment of Puntland in

22   1998.  That was the main development in that period.

23   Q.  Okay.  So in the south, then, what you're talking about

24   is local strongmen often connected to this clan leadership?

25   A.  Yes.

1   Q.  Local strongmen connected to the clan leadership would

2   pull together fighters to protect literally their

3   neighborhoods to start with?

4   A.  In Mogadishu, yes.

5   Q.  And outside of that, to protect farming areas or

6   whatever the small towns were and they had to pull together

7   their own protection, their own fighters to be able to hold

8   off the other strongmen and the remnants of all of these

9   groups sweeping back and forth?

10  A.  I'm not sure protection was the driving motivation for

11  most of them, but that's close enough.

12  Q.  It would be for the people who were underneath them,

13  though, wouldn't it?

14  A.  Well, these were --

15  Q.  You would accept the warlord not just because he had

16  guns, but because he provided some protection?

17  A.  He provided protection and also extortion.  You had to

18  take one with the other.

19  Q.  Like the mafia?

20  A.  Yeah.

21  Q.  You take the good with the bad?

22  A.  Right.

23          THE COURT:  All right.  Let's stop here.  Let's

24  take our morning break.  We'll take a 15-minute break.  All

25  rise for the jury.

```
 1        (Recess taken at 10:32 a.m.)

 2                        *    *    *    *    *

 3        (10:57 a.m.)

 4                          IN OPEN COURT

 5                         (JURY PRESENT)

 6            THE COURT:  You may continue.

 7   BY MR. SCOTT:

 8   Q.  Let me just go backwards just a little bit.  We were

 9   talking about the strongmen, but I want to talk just a

10   little bit more about the clans.

11            You said on direct that in essence Somalia for

12   almost all of its existence has never been a unified

13   country?

14   A.  It didn't have a single state until the colonial period.

15   Q.  And so -- and I have got the map, which is just for the

16   record 267, Government's 267.  I have got the map of the

17   Somali clans.  Did they all -- I want to get this figured

18   out.  Do people identify themselves as Darod sub-clan

19   sub-clan or Hawiye sub-clan sub-clan or did the word

20   "Somali" ever come out at the top?  In other words, I am

21   trying to figure out whether these people just identify

22   themselves with their individual clans or whether there was

23   this thought that we are all Somalis.

24   A.  Both at once.  Somali nationalism has been very powerful

25   at times in the past.
```

1          THE COURT:  I'm sorry.  I didn't hear you.

2          THE WITNESS:  Somali nationalism has been very

3     powerful at times and identity is a matter of context and

4     where you are, what the issue is, but nationalism among

5     Somalis, even Somalis who live in other countries, Ethiopia,

6     Kenya, Djibouti, the sense of being Somali is very powerful.

7     BY MR. SCOTT:

8     Q.  Okay.  So that -- and this is not anything new in and of

9     itself?

10    A.  No.

11    Q.  So the people who are up in Somaliland that are

12    primarily the Isaaq clan, they've always considered

13    themselves Somalis of the Isaaq clan?

14    A.  Somalis and Isaaq, yes.

15    Q.  And we can see from the map that --

16         THE COURT:  Excuse me, Mr. Scott.

17         Help me a little bit.  It's never been a unified

18    country.  Where did the term "Somalia" come from and how did

19    these clans in some sense feel connected?

20         THE WITNESS:  I think many -- there may be

21    disagreement, but I think principally during the colonial

22    period, the early 20th century, there were -- we saw the

23    real early flames of Somali nationalism and particularly the

24    Somali Youth League, which was a group, a party really, from

25    all parts of Somalia, who lobbied for the unification of all

1    Somalis under a single flag.  So this sense of Somali

2    nationalism is maybe not a century old, but certainly since

3    the early 20th century.

4    BY MR. SCOTT:

5    Q.  And we can see from the map that the present lines of

6    Somalia are just, you know, maybe half of the area in which

7    people who claim to be Somali live, correct?

8    A.  Correct.

9    Q.  And if you had gone back 150 years ago before the West

10   moved in and drew the lines, the people out in the Ogaden

11   Desert considered themselves Somalis and they really didn't

12   know where there were any lines of --

13   A.  Correct.

14   Q.  -- countries?

15        A big chunk, then, of Somalia is in the herdsmen

16   business, the livestock business?

17   A.  Yes.

18   Q.  Camels, cattle?

19   A.  Yes.

20   Q.  Goats?

21   A.  Yes.

22   Q.  And that's because the land is too dry to farm?

23   A.  Most of it, yes.

24   Q.  And it's semi desert to almost desert to real desert?

25   A.  Yes.

1    Q.  And so you've got cattle, which you are feeding them

2    during the rainy season and then you're moving them off that

3    land maybe 30, 40, 50 miles or a hundred miles away for a

4    different season where they can be fed?

5    A.  Yes.

6    Q.  And that's why the national boundaries didn't mean much,

7    because the people who were handling livestock had to move

8    over vast areas just to keep their cattle fed so they could

9    later market them?

10   A.  Correct.

11   Q.  And that's a big chunk of the export business

12   traditionally of Somalia, is livestock, right?

13   A.  Yes.

14   Q.  And it is to this day in Somaliland a big chunk of their

15   business, right?

16   A.  Somaliland and much of Somalia.

17   Q.  Now, after -- and I am stepping ahead just a little bit

18   in terms of the clan stuff.  One of the problems with

19   drawing these lines is that the line between Ethiopia and

20   Somalia didn't fit with the lines where the herdsmen were

21   going back and forth with their herds?

22   A.  Correct.

23   Q.  And there had been some tension relating to that ever

24   since they started drawing country lines, right?

25   A.  I would say more than tension, yes.

1    Q.  Now let's go back and talk about the economy, the rest

2    of the economy.  That is, what happened to the economy of

3    southern Somalia as a result of all of this chaos?  Did

4    the -- the economy, I take it, pretty much collapsed?

5    A.  Well, that's the interesting thing.  Actually, it

6    didn't.  That's what one would have expected.

7    Q.  Okay.

8    A.  In a paradoxical way the chaos of the civil war, the

9    violence, the displacement co-existed with a fairly

10   unbridled economic growth in some sectors.  All of a sudden

11   economic activity that had been controlled by the state,

12   monopolized by the state under Siad Barre became completely

13   free enterprise and so telecommunications went private,

14   money remittance companies, unregulated export, airlines.

15   So some sectors of the economy boomed.  It's a striking

16   contrast.

17   Q.  So Siad Barre was, I think you had said -- when you were

18   talking about the clans, how important they were, you said

19   except for a certain time during the time Barre was there.

20   He was not clan oriented, I take it?

21   A.  He was.  That was one of the reasons his government

22   collapsed.  He started off with a message of nationalism

23   that was very popular, but increasingly centralized control

24   among his relatives and other parts of the Somali population

25   disengaged and eventually started to fight.

1    Q.  So he tried to control all of the business?

2    A.  It was a scientific socialist government.  Much of the

3    business was a state monopoly, state controlled.

4    Q.  Semi-Marxist, in other words?

5    A.  Yes.

6    Q.  So now after the worst of the civil wars had died down,

7    what you are talking about, as you said, is strongmen who

8    control areas, control populations, and they have militias?

9    A.  Yes.

10   Q.  And they're occasionally fighting with each other, but

11   most of the time they're just trying to control their areas?

12   A.  Trying to control their areas, trying to prevent rivals

13   from emerging within their own groups, aligning,

14   re-aligning, constant shifting of alliances.

15   Q.  Sounds like the five families in New York, Lucchese,

16   Gambino --

17   A.  I am not familiar with them.

18   Q.  They're re-aligning, but they are jostling, trying not

19   to jostle too hard because then they're fighting with

20   somebody and somebody else could fight with them on the

21   other side?

22   A.  That's true.

23   Q.  So there's just -- it's a low-level conflict --

24   A.  Yes.

25   Q.  -- would that be the best way of saying it?

1    A.  Low intensity conflict, yes.

2    Q.  But still no government?

3    A.  Correct.

4    Q.  Now, you identified on direct the TNG, the Transitional

5    National Government, and that was formed around the year

6    2000?

7    A.  Yes.

8    Q.  About nine years after the collapse of the government in

9    the south?

10   A.  Yes.

11   Q.  And the Transitional National Government was a

12   negotiating process before 2000 in which various of these

13   warlords or these, we'll call them, stakeholders were

14   brought together to try to see if some sort of negotiation

15   could be put together to put together a government?

16   A.  Actually that process, which was called for by the

17   Djibouti government, they were invited to Djibouti to

18   talk --

19   Q.  Right.

20   A.  -- essentially excluded the warlords.  It tried to bring

21   together civil society, traditional elders.  Some people

22   considered warlords sneaked in, but it was intended to

23   exclude them.

24   Q.  So it was a government of people who basically had no

25   power?

1    A.  That was part of the problem.

2    Q.  It was -- it got together the professors and the

3    professors all worked out the way they thought things ought

4    to be and then they turned around and realized that all they

5    had were professors?

6    A.  Well, they went back to Mogadishu and many of the

7    warlords who had been excluded moved against them and had

8    Ethiopian support to do so.

9    Q.  And so for all intents -- now, that group, as you said

10   earlier, that group set itself up outside of -- originally

11   outside of Somalia itself, right?

12   A.  Yes.

13   Q.  And it was in essence we should be able to try to put

14   some sort of government together here, let's take this and

15   move it in?

16   A.  Yes.

17   Q.  Did they have -- when they moved into Mogadishu, did

18   this group, the Transitional National Government, did they

19   have security forces to protect them?

20   A.  Yes, they did.

21   Q.  And those security forces came from?

22   A.  Mainly from powerful businessmen and members of the

23   principal -- well, the clans of the principal leaders of the

24   government.

25   Q.  And when you say "powerful businessmen" -- you know, I

1    would guess that whoever controls the port of Mogadishu has

2    to do it with his own army and makes his money as the port

3    authority.  That would be a powerful businessman, right?

4    A.  That's true.

5    Q.  And I'm sure there was such a person, wasn't there?

6    A.  There have been several, yes.

7    Q.  And Kismayo being one of the other big ports naturally

8    would have evolved into someone who controlled the port, had

9    his own militia to keep the other people that might want to

10   control the port there?

11   A.  Yeah, family businesses.

12   Q.  So some sort of civilized, but not the government?

13   A.  Yeah.

14   Q.  Did they ever, that group, the Transitional National

15   Government, did they ever control significant portions of

16   Somalia?

17   A.  No.

18   Q.  And I think your testimony was that eventually, then,

19   they went back to the drawing table and started to draw up a

20   more inclusive government in some ways?

21   A.  In fact, essentially Ethiopia got its own way and tried

22   to displace that group, which it didn't like.  And although

23   it was billed as a more inclusive process, it was actually

24   an attempt to bring together people acceptable to Ethiopia

25   and to displace the Transitional National Government.

```
 1    Q.  Okay.  I guess now is the time to talk about Ethiopia,

 2    then.  Ethiopia throughout this process since 1991 has been

 3    meddling in the affairs of Somalia?

 4    A.  Yes.

 5    Q.  And for their own national self-interest?

 6    A.  Yes.

 7    Q.  And they have fought --

 8              THE COURT:  What is their self-interest?

 9              MR. SCOTT:  Whatever it might be.  Whatever they

10    think their self-interest is.

11              THE WITNESS:  Yes, the general -- I think the

12    general view is that Ethiopia does not wish to see a strong,

13    united Somalia re-emerge and especially not one that might

14    align with its geopolitical rivals, such as Egypt.

15    BY MR. SCOTT:

16    Q.  And on top of that, one of the other problems is land

17    mass, we are not talking about people, but in land mass the

18    Somali people occupy a big area of the desert part of

19    Ethiopia?

20    A.  Of eastern Ethiopia, yes.

21    Q.  And there have been troubles with that, you've already

22    said?

23    A.  There have been wars.

24    Q.  So Ethiopia has what it feels is a very big

25    self-interest in maybe even keeping Somalia the way it is
```

1   now?

2   A.  Possibly.

3   Q.  You know, if a failed state, then it's not a rival?

4   A.  It's possible.

5   Q.  So there have been how many wars from 1991 -- I

6   shouldn't say "wars."  That's the wrong word.  How many

7   times have there been significant Ethiopian clashes between

8   Ethiopia and Somali groups in the last 20 years now?

9   A.  Inside Somalia the principal clashes were in December

10  '96, January '97, and then again in 2006 an occasional

11  skirmishing at the border.

12  Q.  And then I think you testified on direct that there had

13  been a conflict between Siad Barre and Ethiopia that had not

14  gone well for Somalia back in the '80s?

15  A.  '77 and '78, the Ogaden War.

16  Q.  And there was a low-level resistance to Ethiopia going

17  on in the Ogaden Desert --

18  A.  Yes.

19  Q.  -- during this time period as well?

20  A.  That's correct.

21  Q.  And, in fact, that conflict was -- the leader of that

22  conflict was Mr. Aweys, wasn't it?

23  A.  No.

24  Q.  That was the II --

25  A.  That was the Western Somali Liberation Front and then

 1    the Ogaden National Liberation Front.

 2    Q.  I can't keep all of it straight myself.

 3            So in 2003 the outside parties that are around the

 4    edges of Somalia helped sponsor another negotiation to try

 5    to set up another transitional government?

 6    A.  2002, yes.

 7    Q.  2002.  And it took until 2004 before it came together?

 8    A.  Correct.

 9    Q.  And when I talk about outside, is there a word for that

10    group?

11    A.  Yes, IGAD.

12    Q.  I-G-A-D?

13    A.  I-G-A-D, the Intergovernmental Authority on Development.

14    Q.  And that's Kenya, Ethiopia --

15    A.  Ethiopia, Djibouti, Eritrea, although Eritrea suspended

16    participation, Sudan, and Somalia, but Somalia has -- was at

17    that time an absent member.

18    Q.  Okay.  So it's the group of the Horn of Africa?

19    A.  Correct.

20    Q.  The interested neighbors?

21    A.  Yes.

22            THE COURT:  Well, let me ask this question.  Just

23    historical -- you started in 1990, but dealing with Ethiopia

24    and Somalia, it goes back to the British occupation and

25    British giving the Ogaden region to Ethiopia and not to

1    Somalia?

2              THE WITNESS:  Your Honor, it goes back to even

3    earlier, to competition between the Ethiopian Empire in the

4    late 19th century and the Ottoman Empire, Turkey and Egypt

5    at that time, but the real trouble started with partition --

6    the colonial partition in I think 1884 in Berlin when the

7    borders were drawn.

8              THE COURT:  Okay.  Go ahead.

9              MR. SCOTT:  Thank you, Your Honor.

10   BY MR. SCOTT:

11   Q.  And in essence it goes back for a very, very long time

12   because Ethiopians are the -- I wouldn't call them the hill

13   people, but the mountain people, Abyssinia is the -- that's

14   the center of their civilization?

15   A.  You could say it goes back to I believe the 15th century

16   when the forces of Ahmed Gurey, an Islamic leader, invaded

17   Abyssinia.

18   Q.  So they haven't been friends?

19   A.  No.

20   Q.  And you said that the process when they were going to

21   form -- that eventually resulted in the Transitional Federal

22   Government was started, at least partially, to do something

23   to try to placate the Ethiopians and still put together a

24   government for Somalia?

25   A.  It was driven by the Ethiopians.

1    Q.  And would it be fair to say that when Yusuf, all of the

2    names, when Yusuf became the president of the Transitional

3    Federal Government, that Ethiopia got its way?

4    A.  Yes, that's correct.

5    Q.  And it was -- I think I am going to quote you when I say

6    it, but it was widely perceived at that point that he was in

7    league with Ethiopia?

8    A.  Yes.

9    Q.  And when I say "widely perceived," I mean by the other

10   stakeholders in Somalia.

11   A.  I think in Somalia and internationally, and I'm

12   certainly on record as having said it at the time.

13   Q.  Now, this group, the Transitional Federal Government,

14   the TFG, were they elected by the people of Somalia?

15   A.  No.

16   Q.  And have they held an election in Somalia since their

17   formation in 2004?

18   A.  No.

19   Q.  And, in fact, if I was reading some of your materials,

20   they just recently extended their mandate another three

21   years without any election?

22   A.  The parliament did.  The agreement now is one year,

23   until August next year, yes.

24   Q.  So this is a group that was basically put together by

25   powerbrokers?

1    A.  Yes.

2    Q.  Now, let me understand this.  When the Transitional

3    Federal Government set itself up, it set itself up

4    originally in Kenya, right?

5    A.  Correct.

6    Q.  So the government of Somalia, the professed government

7    of Somalia, is sitting in Kenya?

8    A.  Yes.

9    Q.  And one of the first things that the president of this

10   group said was give me 20,000 foreign troops because I need

11   them?

12   A.  Yes.

13   Q.  In essence to -- so I can invade my country, so I can go

14   in and take over my own country, right?

15   A.  Yes.  And I would add that he made the statement while

16   in Addis Ababa, so people could read between the lines.

17   Q.  He was actually in the capitol of Ethiopia when he

18   originally made the statement?

19   A.  Yes.

20   Q.  Oh, wow.

21             THE COURT:  Well --

22   BY MR. SCOTT:

23   Q.  And he wouldn't go back, in fact --

24             THE COURT:  Excuse me for a second.  I don't

25   mean -- just for historical purposes, Free France was

1    outside of France?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  And so it doesn't mean that -- and

4    certainly Britain and the United States during World War II

5    were supporting Free France against the Nazis?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  So just because a government is

8    outside or individuals are outside of their country does not

9    mean that they're not legitimate?

10             THE WITNESS:  Yes, Your Honor.

11   BY MR. SCOTT:

12   Q.  But he did call upon the Ethiopians to come in, did he

13   not?

14   A.  He did.

15   Q.  And, in fact, he engineered it so they did come in; is

16   that correct?

17   A.  Subsequently.  That's two years later.

18   Q.  Well, he kept asking the whole time.

19   A.  Yes, but I wouldn't say that he engineered it.  I think

20   he eventually got his way, but there were other factors

21   involved.

22   Q.  And the only time that he brought -- the first time that

23   he brought his government into the confines of Somalia was

24   basically after the Kenyans politely kicked him out?

25   A.  They told him he had to leave.

```
1    Q.  They had a ceremony, that they didn't ask for

2    permission, of him leaving and going back?

3    A.  Correct.

4    Q.  Leaving him in a spot where he didn't have much choice,

5    right?

6    A.  Correct.

7    Q.  So until then he wouldn't even go back into Somalia?

8    A.  That's right.

9    Q.  That Transitional National Government, that group that

10   called itself the government, until the Ethiopians came in,

11   what was the biggest section of Somalia that that group

12   governed over, had actual physical control over?

13   A.  I don't think it would be fair to say that it governed.

14   It was based in the town of Jowhar north of Mogadishu and

15   then part of it moved to Baidoa and stayed in Baidoa.  But

16   in terms of functional administration, very little, if

17   anything, took place.

18   Q.  You were observing all of this as it was happening?

19   A.  Yes, I was.

20   Q.  And at that point you didn't work for the United

21   Nations, 2004, 2005, 2006?

22   A.  Correct.

23   Q.  You worked for, I have to go back through it, but the

24   International Crisis Group either as an employee or as a

25   consultant during that time period?
```

1    A.  First as a consultant and then as director of the Horn

2    of Africa program.

3    Q.  And would it be fair to say that you said this is all

4    going to -- this is not going to work?

5    A.  That's correct.

6    Q.  This is going to go very badly?

7    A.  Yes.

8    Q.  And then you watched it go very badly?

9    A.  Yes.

10   Q.  So the people who actually at that point, if there could

11   be an organized group that was taking control, the people

12   who were actually taking control during the time that the

13   Transitional Federal Government was first claiming to have

14   the power were the Islamic Courts?

15   A.  I'm sorry.  I didn't understand the question.

16   Q.  2005 -- 2004 and '05 before the Ethiopians come in, the

17   group that's actually sort of, if there is a group in

18   control, coming into control is the Islamic Courts Union?

19   A.  The Islamic Courts came into control in the second half

20   of 2006.

21   Q.  Okay.  Who was in control, then, before that when he was

22   afraid to go back?

23   A.  There was no single authority in control.

24   Q.  Okay.  Now, you were talking on direct about the Islamic

25   Courts and that they had started to become noticeable in the

1    late '90s because they originally came in to provide sort of

2    judicial civil services?

3    A.  That's correct.

4    Q.  Because in essence there weren't any, so the best way to

5    do it was to bring in the clerics and have them decide the

6    disputes?

7    A.  That's correct.

8    Q.  And they became I don't want to use the word "popular,"

9    but they became accepted in areas of southern Somalia, so

10   that they were gone to to make decisions?

11   A.  They were accepted as one of multiple actors with their

12   own small jurisdictions, areas of control, yes.

13   Q.  And they grew in power, I guess is the best way to say

14   it, to the point where they became an actual political force

15   in 2005, 2006 in southern Somalia?

16   A.  Even earlier they tried to flex their muscles under the

17   Transitional National Government.  It failed.  But they

18   emerged as a force really in 2006.

19   Q.  And that group was, I guess you would say, a group

20   that had a big -- they had lots of different people that

21   were all within that union of various persuasions from right

22   to left, I guess you would say?

23   A.  Yes.

24   Q.  And they were able to take over most of or at least take

25   most of southern Somalia under their control in 2006?

1    A.  Yes.

2    Q.  And you said one of their tenets, of course, almost by

3    their name, is that they were going to impose sharia law?

4    A.  Yes.

5    Q.  And it varied from place to place, would that be fair to

6    say, how strict that sharia law was that they were

7    enforcing?

8    A.  Yes.

9    Q.  So in 2006 -- what number is that, your history?

10              MR. WARD:  256.

11              MR. SCOTT:  Thank you.

12   BY MR. SCOTT:

13   Q.  So in your timeline you've got "March through May of

14   2006 intense fighting breaks out between rival militias in

15   Mogadishu"?

16   A.  Yes.

17   Q.  Why don't you explain that for just a moment, as to who

18   it is that's fighting in March to May of 2006.

19   A.  Well, in fact, you could -- there was minor skirmishing

20   even before that, I think in February, which started between

21   the militias in the north of the city, a militia loyal to a

22   businessman named Abukar Omar Adaani, who was a financier of

23   the Islamic Courts --

24   Q.  Adaani, A-d --

25   A.  Adaani, A-d-a-a-n-i.

```
1    Q.  Okay.

2    A.  -- and Bashir Raghe, who was a businessman and militia

3    leader who was part of the American-backed Alliance for the

4    Restoration of Peace and Counterterrorism, which was in sort

5    of under-the-radar conflict with the Courts throughout 2005

6    and --

7    Q.  That was -- if you could describe that group that you

8    just -- what do they call that?

9    A.  ARPCT, the --

10   Q.  That alliance, that was one of those American fiascos?

11   A.  It was an American-backed alliance of faction leaders.

12   Q.  And it created and died in like four months?

13   A.  That's correct.

14   Q.  Okay.

15   A.  The fighting between Adaani and Bashir Raghe forced a

16   kind of polarization along the lines of those sympathetic to

17   the Courts and those sympathetic to the faction leaders.

18          And in February this alliance was declared.  The

19   Courts, I think, understood that this was a signal that the

20   anti-Courts faction leaders were going to ramp up their

21   efforts and launched an offensive.

22          And essentially the population in Mogadishu, I

23   think after fatigue of these warlords for many years, either

24   tolerated or supported the Islamic Courts and the fighting

25   continued between -- through March, April, May.  And in June
```

1    the Courts emerged in control of the city.

2    Q.  And the area -- in essence the area around --

3    A.  That took a little longer, but, yes, between June and

4    August they expanded across southern Somalia.

5    Q.  So when December of 2006 rolls around, at that point the

6    Islamic Courts control big chunks of southern Somalia?

7    A.  Correct.

8    Q.  And then the Ethiopian troops intervene at that point?

9    A.  Yes.

10   Q.  Now, I don't want to get into the exact lines here of

11   everything, but there were troops in -- foreign troops in

12   Somalia prior to December of 2006?

13   A.  Yes.

14   Q.  And they were there at the auspices of the UN?

15   A.  No.  They were there at the invitation of the

16   Transitional Federal Government.

17   Q.  Okay.  So the group that had been outside was asking

18   help from some of its backers that had created it?

19   A.  Correct.

20   Q.  When the Ethiopians came in, they came in in force?

21   A.  In December, yes.

22   Q.  Okay.  And they were able to sweep the Islamic Courts

23   Union out of how much of the area it controlled then in the

24   months thereafter?

25   A.  Almost all of it.

1    Q.  And what was the nature of their occupation?  Give me an

2    idea how many troops that Ethiopia had now in southern

3    Somalia.

4    A.  There are no exact figures, but I think my estimate at

5    the time was initially 20,000 and then they began to draw

6    down.

7    Q.  So they swept the Islamic Courts out of power?

8    A.  Yes.

9    Q.  But they didn't sweep at this point the opposition to

10   having Ethiopian troops occupying Somalia, there was

11   considerable opposition to that?

12   A.  Yes.

13   Q.  And now the opposition wasn't coalesced under the

14   Islamic Courts, it was more scattered or -- "scattered" is

15   not the word, "splintered," I think, is a better word for me

16   to use?

17   A.  Correct.

18   Q.  Okay.  And some of those groups were groups that had

19   been under the umbrella previously of the Islamic Courts?

20   A.  Yes.

21   Q.  And what grew to be named al-Shabaab was one of those

22   groups that had been under the umbrella of the Islamic

23   Courts?

24   A.  Yes.

25   Q.  And I think you said on direct that they were a fairly

1    disciplined fighting force when they were operating under

2    the umbrella of the Islamic Courts?

3    A.  Yes.

4    Q.  So they became then a dangerous opponent for the

5    occupying troops?

6    A.  Yes.

7    Q.  And over that next year or two, in 2008 especially,

8    al-Shabaab became to -- excuse me -- found some real success

9    in pushing the Ethiopians back?

10   A.  No.

11   Q.  No?

12   A.  They did some real damage, but the Ethiopians didn't

13   leave any areas because of al-Shabaab offensives, no.

14   Q.  Okay.  So when they pulled back, it was because --

15   A.  After two years I think the occupation -- the costs of

16   the occupation were paying their toll.  They felt that they

17   had achieved most of what they had come to do and they had

18   in a sense tried to leverage, by threatening their

19   withdrawal, leverage the African Union or the UN to send in

20   a more multinational force and they succeeded in having

21   Uganda deploy forces, who were then to replace the

22   Ethiopians.

23   Q.  So the Ethiopians started pulling back, but the vacuum

24   was filled by outside parties, wasn't it?

25   A.  Only --

```
1    Q.  Or I should say inside parties in this case, inside --
2    A.  Only in Mogadishu.  The Ugandans didn't fill the vacuum
3    in the rest of southern Somalia.  That was filled by
4    al-Shabaab.
5    Q.  So by the time the Ethiopians fully withdrew at the end
6    of January of 2009, al-Shabaab was in control of much of
7    southern Somalia?
8    A.  Al-Shabaab and parts of the Islamic Courts.  It was a
9    mixture.
10   Q.  And it's a mixture of groups and Hizbul Islam was one of
11   those groups?
12   A.  Not yet.  That was formed in 2009.
13   Q.  Okay.  The Ras Kamboni group?
14   A.  Ras Kamboni group.
15   Q.  And they had been connected to the Islamic Courts before
16   they broke up?
17   A.  They were aligned with al-Shabaab under the umbrella of
18   the Islamic Courts.
19   Q.  And since January or February of 2009 has al-Shabaab and
20   other of these militant groups basically kept their control
21   of southern Somalia?
22   A.  Yes.  Al-Shabaab has strengthened its control.
23   Q.  And so if we were to look at a map today of Somalia as
24   to who controlled what, if they were like a yellow color,
25   most of southern Somalia would be painted yellow?
```

```
1    A.  That's correct.

2    Q.  And the Transitional Federal Government still has some

3    areas that it controls now?

4    A.  It has the area of Mogadishu, but there are other groups

5    that have also taken back control of areas away from

6    al-Shabaab.

7    Q.  And that's been various places?

8    A.  Mainly the central regions.

9    Q.  The central region has been -- gone back and forth and

10   right now is actually in control of -- is it Jowhar?

11   A.  No, not Jowhar.  That's al-Shabaab.

12   Q.  What's the group that controls the central part now?

13   A.  There are three.  It is the Galmudug administration.

14   There's Ahlus Sunnah wal Jammah, which is based in clans,

15   that used to support al-Shabaab and the Islamic Courts and

16   then changed sides.  And there's not really a viable

17   administration, something calling itself Himan iyo Heeb,

18   which is another clan-based administration.

19   Q.  So the plans -- or maybe you'd call them the warlords

20   and the militias are back in control of a section of

21   central?

22   A.  These are less warlords than really more popular

23   clan-based administrations or forces.

24   Q.  So now let's go backwards.  When you're talking about --

25   you were talking on direct about government officials being
```

1    under some pressure from al-Shabaab.  These government

2    officials, you're really talking about -- they really aren't

3    members of the Transitional Federal Government, then, they

4    would be like local groups that have been in control, for

5    the most part?

6    A.  In Mogadishu?

7    Q.  Well, in Mogadishu, outside Mogadishu, in the rest of

8    the areas that are controlled by al-Shabaab.

9    A.  Well, in Mogadishu they would be the Transitional

10   Federal Government.  Outside Mogadishu they would be members

11   of these local administrations or Ahlus Sunnah.

12   Q.  My understanding of your testimony so far is that those

13   areas have really never been under control of either the TFC

14   or the TNG, whatever they are -- the TNG or the TFG, they

15   have actually never been governed by those particular

16   groups?

17   A.  That's right.

18   Q.  So they're just local people?

19   A.  Yes.  These are essentially, as I said, clan based.  The

20   clans of those areas choose to align themselves with one

21   group or the other.  Some of them used to be aligned with

22   al-Shabaab and have changed their -- changed sides.

23   Q.  Okay.  Now, I am thinking back to some of the stuff --

24   let me talk about the Islamic Courts for a moment and I am

25   going to move to al-Shabaab, but it is going to be in the

```
 1    same line.
 2              I remember some of the stuff you had written in
 3    the past and you said one of the reasons the Islamic Courts
 4    was able to exercise as much influence and take control of
 5    areas was because it provided some stability that was
 6    missing?
 7    A.  That's correct.
 8    Q.  And, you know, sharia law went along with it, but that's
 9    at least Islamic law, so that that stability was more
10    important than some of the issues about the harshness of
11    sharia law?
12    A.  That's correct.
13    Q.  Now, when al-Shabaab moved into a lot of these areas,
14    they also started putting in sharia law and governance; is
15    that right?
16    A.  A different version of sharia law, but yes.
17    Q.  A much harsher version?
18    A.  (Nodding.)
19    Q.  A more what you would call fundamentalist version?
20    A.  Yes.
21    Q.  But still sharia law?
22    A.  Yes.
23    Q.  So when you were talking on direct about some of the
24    punishments, the cutting off of hands or maybe feet of
25    someone who was caught in thievery --
```

```
 1    A.  Yes.

 2    Q.  -- that's part of sharia law?

 3    A.  That's part of their version, yes.

 4    Q.  And, in fact, it's not exclusive to Somalia?

 5    A.  No.

 6    Q.  It's one of the prescribed punishments in Saudi Arabia;

 7    is that right?

 8    A.  It is.

 9    Q.  And that's because it's drawn from penalties that are

10    allowed in classic Islamic law?

11    A.  Under some interpretations of Islamic law, yes.

12    Q.  I mean, the harshest of some of these punishments are

13    found -- what's the word in sharia law?  Hudud?

14    A.  Yes.

15    Q.  And those are the punishments that are literally drawn

16    from the Quran itself?

17    A.  Yes, but there are differing interpretations as under

18    what circumstances they can be applied.

19    Q.  That's right.  In other words, it's used very rarely in

20    most Islamic countries or maybe not at all?

21    A.  Yes.

22    Q.  In some countries the punishments that are in the Quran

23    itself are used far more often?

24    A.  Correct.

25    Q.  And that's because Islam has got -- it's got civil law,
```

1     a lot of which we would think of as criminal law?  I can't

2     remember the name.  I've got to look for it here.  Qisas or

3     something like that?

4     A.  Yes.

5     Q.  And that's sort of quasi civil and criminal?  Some

6     things we would think of, like murder, are civil law in

7     Islam?

8     A.  I wouldn't be in a position to speak to that.

9     Q.  Because you're not Muslim?

10    A.  I am Muslim.

11    Q.  You are Muslim?

12    A.  Yes.

13    Q.  So you know, then, if you are, you know that some of

14    these things we're talking about, the stoning of

15    adulteresses --

16    A.  Yes.

17    Q.  Or actually it's supposed to be adulterers, too, isn't

18    it, the men as well?

19    A.  Yes.

20    Q.  -- that stoning is something that you can find in the

21    Quran?

22    A.  Yes.

23    Q.  Rarely enforced, but it's in the Quran?

24    A.  Correct.

25    Q.  And that's because it was traditional in Middle Eastern

1    society, not just in Muhammad's society, that was a

2    traditional punishment?

3    A.  Yes.

4    Q.  You'll find it in the Bible?

5    A.  Correct.

6    Q.  And the death penalty for apostasy, that is, for denying

7    your Muslim faith, is in the Quran?

8    A.  Yes.

9    Q.  I mean, you can convert and become a Muslim, but you

10   can't convert from a Muslim to become another religion?

11   A.  That's correct.

12   Q.  That's apostasy.

13        Beheading is a punishment that is Middle Eastern,

14   is it not, in other words, one of the death penalties --

15   ways of doing a death penalty is beheading people?

16   A.  I'm not sure it's Middle Eastern.  I know it's practiced

17   in Saudi Arabia, but it was also practiced in France.

18   Q.  Yes, it certainly was, yes.  In fact, you can now save

19   my opening statement by telling me that Dr. Guillotine --

20   agreeing with me that Dr. Guillotine invented a machine that

21   lops off people's heads in France.

22   A.  Correct.

23   Q.  Good.  And that's just a more, quote, humane way of

24   beheading people?

25   A.  I'm not sure I would say either is humane.

1    Q.  And the problem that you've been talking about is that

2    al-Shabaab is more apt to use those extreme penalties when

3    in traditional Islam they slide towards the penalties

4    that we -- to the penalties that are not nearly as extreme

5    for violations of law like thieving or violations of

6    religion?

7    A.  I think I'd say that other than al-Shabaab, in Somali

8    society we haven't seen these types of punishments and they

9    are not practiced in other parts of Somalia.

10   Q.  But if you go to Saudi Arabia, it's a crime for a woman

11   to drive a car, right?

12   A.  I believe so.

13   Q.  There are restrictions that vary from light to heavy on

14   the conduct of women as it relates to men, that is,

15   appearing chaste, wearing chaste clothing, and being seen in

16   the company of men without a chaperone; those vary in Islam,

17   do they not?

18   A.  They do.

19   Q.  From very conservative, such as in Saudi Arabia, to, you

20   know, very light, which you would find in other countries in

21   the world, some other countries?

22   A.  Correct.

23   Q.  Even the wearing of a head -- the veil over the head, in

24   some Muslim areas that's no longer required?

25   A.  Correct.

1    Q.  And that's an evolution of beliefs?

2    A.  Yes.

3    Q.  If you go back, you will find that women in Catholicism

4    had to wear shawls over their heads whenever they were in

5    church?

6    A.  Yes.

7    Q.  That's recent, almost within your lifetime of seeing

8    that?

9    A.  Yes.

10   Q.  And you said that even the Transitional Federal

11   Government has adopted sharia law?

12   A.  Yes.  All Somali governments have adopted sharia law.

13   Q.  Let me talk a little bit about the fighting tactics that

14   you were mentioning on direct.  You were talking about

15   mortars.  Let's start with mortars.

16          You said one of the common things that you've seen

17   is that al-Shabaab would launch mortar attacks at the

18   foreign troops?

19   A.  Yes.

20   Q.  Or the centers that are controlled by the TNG -- excuse

21   me -- TFG?

22   A.  Correct.

23   Q.  And you thought one of the tactics -- or you observed

24   one of the tactics was they do that because then there would

25   be a counterattack of artillery?

1   A.  Yes.

2   Q.  And the counterattack of artillery would go right into

3   the civilian areas?

4   A.  Correct.

5   Q.  In other words, they could almost count on the TFG to

6   overreact?

7   A.  That's right.

8   Q.  And kill innocent people?

9   A.  Yes.

10  Q.  And al-Shabaab would have been long gone before they

11  ever did that?

12  A.  That's right.

13  Q.  So they could take advantage of the -- I don't want to

14  use the word "ruthlessness," but they could take advantage

15  of the fact that it appeared that the people firing from the

16  other side didn't care about the fallout?

17  A.  Yes.  I should correct the counterfire was usually from

18  Ugandan or Burundian troops since the TFG didn't have a lot

19  of artillery.

20  Q.  Right.

21  A.  And it was, I think, widely observed that the Ugandans

22  initially were also using indiscriminate fire.  That has

23  changed.  But there was blame on both sides.

24  Q.  So in this case it wasn't the al-Shabaab fighters that

25  were targeting civilians, it was the Burundians or the

1    Ugandans who were targeting civilians with their fire or

2    indiscriminately targeting civilians?

3    A.  Well, the Ugandans would have said they were targeting

4    al-Shabaab, but artillery is a blunt instrument.

5    Q.  Collateral damage?

6    A.  I expect they would have said that.

7    Q.  And you said that they were -- they would be involved in

8    targeted assassinations?

9    A.  Al-Shabaab, yes.

10   Q.  In other words, they would pick out their enemies, the

11   leaders of their enemies, and kill them?

12   A.  Yes, and not just leaders.

13   Q.  And they do that because they could, I mean, in other

14   words, they would go in and use whatever method they needed

15   to do to accomplish that, whether it was a suicide bomber or

16   just picking them off with a rifle or blowing up their car

17   as they were driving down the road?

18   A.  Yes.

19   Q.  Speaking of blowing up, improvised explosive devices,

20   they're mines, right?

21   A.  Some are mines.  Some are not.

22   Q.  You know, mining is not something invented by the

23   Somalis, is it?

24   A.  No.

25   Q.  Been around for -- as an instrument of war for certainly

```
 1    hundreds of years?

 2    A.  Correct.

 3    Q.  And it's been controlled to some extent, but not

 4    entirely, right?

 5    A.  Yes.

 6    Q.  There's an international treaty that covers mines?

 7    A.  Correct.

 8    Q.  We're not a signatory to it, the United States?

 9    A.  I realize that.

10    Q.  Yeah.  The only major country in the world that's not,

11    right?

12    A.  I believe so.

13    Q.  And then you talked about suicide bombings?

14    A.  Yes.

15    Q.  Okay.  Now, if someone puts a bomb in a building and

16    then blows it up and they're not there, that's not a suicide

17    bombing?

18    A.  Correct.

19    Q.  Suicide is they go in themselves to the same spot and

20    blow it up?

21    A.  Yes.

22    Q.  So it's a targeted explosive?

23    A.  In theory.

24    Q.  The only problem is the person who is bringing it into

25    the target is going to sacrifice themselves --
```

1    A.  It's not the only --

2    Q.  -- purposefully or unpurposefully?

3    A.  It's not the only problem, but it is one of them.

4    Q.  But in terms of its effect and what it does, it isn't

5    any different than firing an artillery shell into the same

6    place or firing something bigger, such as a missile?

7    A.  It's one way of delivering an explosive.

8    Q.  And the same is true with the vehicles?

9    A.  Yes.

10   Q.  Because blowing up vehicles is a common way of causing

11   damage with or without somebody driving them, right?

12   A.  Yes.

13   Q.  Now, you were working your way through some of the calls

14   and I would like to look at Exhibit 70 first.  Now, 70 was a

15   call on February 7, 2009 between my client, Amina Ali, and

16   her co-defendant.

17        And I am going to bring your attention to the same

18   thing that the government did, which is on page 3.  I have

19   it up here on the screen for you.  When you were testifying

20   you identified the word "Sharif" on there, "Sharif's men"?

21   A.  Yes.

22   Q.  You identified that Sharif as whom?

23   A.  Sharif Sheikh Ahmed.

24   Q.  Sharif Sheikh Ahmed.  I can't say the (making sound)

25   part.  And he at that point in 2009 was the president of the

1    Transitional Federal Government?

2    A.  Correct.

3    Q.  Okay.  And he had been -- before he was made the head of

4    the Transitional Federal Government, he had been one of the

5    leaders of the Islamic Courts Union?

6    A.  He had been the chairman of the Islamic Courts Union.

7    Q.  So he was the leader?

8    A.  Officially, yes.

9    Q.  And so he was allied with al-Shabaab?

10   A.  Correct.

11   Q.  In fact, in essence they worked for him; is that right?

12   A.  Yes.

13   Q.  So that's who they're talking about here?

14   A.  I believe so.

15   Q.  Okay.  And they said -- and Amina Ali said, "They saw

16   the lifestyle the men, who are allied with this man."  Do

17   you see that?

18   A.  Yes, I do.

19   Q.  "The food they eat and the cars they drive, you cannot

20   imagine," that's what she's saying?

21   A.  Yes.

22   Q.  And Halima says, "Are you talking about Sharif's men?"

23   They agree, yes.  And then Halima says, "Well yes; that is

24   the way it is going to be.  They get money."  Amina says,

25   "Well sister, it is clear that these people are after

1    wealth."

2    A.  Yes.

3    Q.  So in that conversation we're talking there is they must

4    have just seen them coming in in -- somebody must have just

5    seen them coming in in cars, well-dressed, looking unlike

6    the mostly impoverished people of Somalia?

7    A.  Could you remind me of the date?

8    Q.  The date is February 7th of 2009.

9    A.  That would be the day, I believe, that they returned to

10   Mogadishu.

11   Q.  That's a correct statement.

12   A.  So I would imagine that this is talking about the

13   lifestyle that they enjoyed while in Djibouti outside

14   Somalia, yes.

15   Q.  And it's what they look like when they're coming in?

16   A.  Yes.

17   Q.  Okay.  So they're saying to each other that, you know,

18   these people are in it for the money, right?

19   A.  Yes.

20   Q.  Let's go to Exhibit 91 here, which is a phone call about

21   three weeks later on February 25, 2009.  And this is between

22   Amina Ali and Hassan Afgoye?

23   A.  Yes.

24   Q.  Now, you identified on direct examination the

25   conversation about the battle?

1     A.  Yes.

2     Q.  I'm going to flip over to page 2 here.  The conversation

3     that Amina was having before Hassan talked about the battle

4     was allocating the money she was sending for orphans and how

5     to do it, right?

6     A.  Yes.

7     Q.  And then he starts talking about the big fight, correct?

8     A.  Yes.

9     Q.  Now flip over to page 3.  When he's done talking about

10    the fight, they start talking about the orphans again; isn't

11    that right?

12    A.  He introduces the topic of orphans, yes.

13    Q.  She had introduced it a page before --

14    A.  Yes.

15    Q.  -- she's talking about the orphans?

16          They finally got back to the phone call, which is

17    what do we do about allocating money for the orphans?

18    A.  Yes.

19    Q.  Because she wants to make sure that money for orphans

20    goes to the orphans?

21    A.  Yes.

22    Q.  And he's telling her to talk to Madina about setting

23    that up?

24    A.  Correct.

25    Q.  So it would be fair to say that she calls about orphans,

1    Hassan Afgoye is the one who wants to talk about battles?

2    A.  It looks that way.

3    Q.  I want you to look next to 105, Exhibit 105.  And this

4    is another call that you were talking about in direct

5    examination?

6    A.  Yes.

7    Q.  That call took place on March 18, 2009?

8    A.  Yes.

9    Q.  And that's the call when you identified near the bottom

10   of page 2 that Amina Ali asked Hassan Afgoye (As read), "Are

11   you Abu Ayman?"

12   A.  Yes.

13   Q.  And that's the person that you named was the head -- had

14   been named the head of the Bay and Bakool region about a

15   month before?

16   A.  Correct.

17   Q.  So it's in March of 2009 that she asks him if he is that

18   person?

19   A.  Yes.

20   Q.  The battle that's being talked about in that particular

21   call, the battle in El Buur, I want to work my way through

22   and make sure that I understand what you were saying on

23   direct.

24          There was a fight with militia and the militia

25   there were Somali nationals or Somali people?

1    A.  There was, but that's not the battle in El Buur.

2    Q.  The battle they're talking about here -- because I'm

3    looking at my notes and I am trying to figure it out.  I

4    want to make sure I have it right.

5            Okay.  Hassan says at the bottom of page 2, "Today

6    we were involved in a battle"?

7    A.  Yes.

8    Q.  And then on page 3, about halfway down the page, they're

9    trying to identify who it is and Amina says, "Are they the

10   Ethiopians or the so called Somalis"?

11   A.  Yes.

12   Q.  And Hassan says, "They are the left over's from the

13   apostates"?

14   A.  Yes.

15   Q.  And your interpretation at this point was that this

16   particular group where this battle took place were actually

17   people of Somali ethnic heritage, they were Somalis?

18   A.  Yes, and they were a specific group of Somalis.

19   Q.  And you were familiar with the battle, so you knew the

20   specific group of Somalis?

21   A.  Yes, and they refer to it in the call.

22   Q.  Okay.  And did you tell us on direct examination that

23   this group of Somalis had been trained by Ethiopia or

24   Ethiopians?

25   A.  Certainly Ethiopian supported.  Some of them would have

1   been trained by Ethiopia.

2   Q.  And had some of them even -- may possibly even traveled

3   for their training to Ethiopia?

4   A.  Quite possibly.

5   Q.  And this was known by you independent of what we're

6   reading here?

7   A.  Yes.

8   Q.  And so presumably would have been known by Mr. Hassan as

9   well?

10  A.  Yes.

11  Q.  So when they are talking about apostates, in this case

12  at least the language that's being used is referring to

13  people that were allied with the Ethiopians?

14  A.  Had been allied with them; probably still were.

15  Q.  Let's go to 146.  146 is a call on July 2nd between

16  Hassan Afgoye and Amina Ali.  If my notes are correct, I

17  have the right call.  There's talk in the call -- I can't

18  find it.  Let me look at my notes for a moment.  I am

19  looking for the Timo Jili' --

20          MR. PAULSEN:  Bottom of 6.

21          MR. SCOTT:  Bottom of 6.  Thank you.

22  BY MR. SCOTT:

23  Q.  At the bottom of 6 --

24  A.  Yes.

25  Q.  -- you identified on direct examination that she had

1    sent $11,000 in 2007 to Abdulahi Timo Jili'?

2    A.  Abdulahi Timo Jili', yes.

3    Q.  Thank you.  I will butcher it the next time too.  I

4    can't seem to learn this stuff.

5            Am I right when I am reading it he pocketed the

6    funds; is that what she's saying?

7    A.  I didn't read it that way, no.  I believe she's saying

8    that other imams who had been collecting for -- to send

9    money to Somalia have pocketed the funds and therefore she

10   has contacted Abdulahi Timo Jili' directly.

11   Q.  Well, then I did get it wrong when I was listening to

12   you on direct.

13           And then finally let's look at 114.  And this is a

14   short clip that was taken out of a fairly long phone call,

15   but this is the one that talks about "We are at your

16   service, Osama."

17           I think what the prosecutor said to you, and you

18   agreed with him, is that Amina Ali gave him a

19   tongue-lashing?

20   A.  Yes.

21   Q.  And what she said was, "Yes."  And I am at the bottom of

22   page 1.  "But you should only point out the truth in your

23   lecture.  Why was it necessary to say, 'We are giving an

24   answer to Osama -- we are responding to Osama?'  Osama is

25   not with you, you know?  He cannot help you in any way.  The

```
 1    only effect he can have is: stir up animosities and

 2    reinforce the suspicion those sick people have about your

 3    relationship with these men."  That's the tongue-lashing

 4    we're talking about here?

 5    A.  Yes.

 6              MR. SCOTT:  I have no further questions.

 7              THE COURT:  Let's stop here and we'll start up at

 8    1:30, at 1:30.  All rise for the jury.

 9         (Jury excused.)

10                        IN OPEN COURT

11                      (JURY NOT PRESENT)

12              THE COURT:  Anything that we need to talk about

13    before 1:30?

14              MR. PAULSEN:  The government does not have

15    anything.

16              MR. SCOTT:  No, Your Honor.

17              MS. GURSTELLE:  No, Your Honor.

18              THE COURT:  I will see you at 1:30.

19         (Lunch recess taken at 12:11 p.m.)

20                        *    *    *    *    *

21         (1:36 p.m.)

22                        IN OPEN COURT

23                      (JURY PRESENT)

24              THE COURT:  You may inquire.

25
```

Bryden - Cross

1                          **CROSS EXAMINATION**

2       BY MS. GURSTELLE:

3       Q.  Good afternoon, Mr. Bryden.

4       A.  Good afternoon.

5       Q.  My name is Gretchen Gurstelle.  I represent Defendant

6       Hassan.  I would like to ask you a few questions.  I will

7       try not to go over anything that was covered by Mr. Ward or

8       Mr. Scott.

9       A.  Thank you.

10      Q.  Now, you told us that you had first gone to Somalia in

11      1990?

12      A.  That's correct.

13      Q.  So you were in Somalia in 1991 when the Barre government

14      fell in Mogadishu?

15      A.  Yes, I was.

16      Q.  And I believe the revolutionary forces came into the

17      city on December 31, 1991?

18      A.  There was an uprising on the 30th and the forces outside

19      the city actually entered about three weeks later.

20              MR. KELLY:  Can I ask you to drop your microphone

21      a little bit.  I am having a little problem hearing.

22      BY MS. GURSTELLE:

23      Q.  Now, after those forces came into the city, can you tell

24      me a bit about what happened in the city.

25      A.  Well, I left the city at that point, like most of the

1    foreigners, but the forces of the United Somali Congress

2    captured the city.  There was -- they were simultaneously

3    fighting against pro government forces and they were

4    targeting members of clans whom they considered to be

5    aligned with the government.  There was a combination of

6    fighting, looting, summary executions.

7            And then the fighting moved for a while further

8    down to the south until the United Somali Congress, the

9    forces that took over the capitol, divided amongst

10   themselves and started fighting amongst themselves.

11   Q.  Now, before the forces came into Mogadishu, can you tell

12   us a bit about how the city functioned.  I'm wondering if

13   there were things like any public transportation or

14   electricity --

15   A.  Yes.

16   Q.  -- basic public services that were available before

17   that.

18   A.  Yes, before the collapse Mogadishu was a beautiful and

19   very functional city for the northeast part of Africa.  It

20   wasn't a rich country, but there was public transportation,

21   there were many buses that will take you around town.

22   Electricity was becoming problematic by the end of -- well,

23   by '89 and '90.  Water was still available.  All of those

24   services stopped functioning in 1991.

25   Q.  And how quickly after the Barre government fled

1    Mogadishu did those services get disrupted?

2    A.  Almost immediately.  The pumping station at Elasha

3    Biyaha outside the city was captured, fell into disrepair.

4    There was a spasm of looting.  Anything that was public

5    property, government property was considered fair game,

6    including the electrical wires under the streets.  It was

7    all removed by militia leaders, looters, marauders.  The

8    city was pretty much torn apart in a matter of months, or at

9    least that public infrastructure was.

10   Q.  Now, I have on the document camera the map that we've

11   been showing.  It's Exhibit 267.

12         Now, I have to apologize both to you and the

13   defendants and any other Somali speaker in the courtroom

14   that I will probably do a pretty horrible job at trying to

15   pronounce these words.

16         But this clan that is the blue clan here, I

17   believe that's the Hawiye --

18   A.  Ha-wee-ah [phonetic].

19   Q.  -- Hawiye clan, that's the clan that traditionally had

20   the most population around Mogadishu?

21   A.  That's correct.

22   Q.  Was that true in the city also?

23   A.  The city was a very mixed city, all Somalis could live

24   there, but perhaps there's been a historical attachment by

25   members of the Hawiye and particularly from the Abgal clan.

1   Q.  So after the Barre government fled, was it the Hawiye

2   clan that had most control over the city?

3   A.  That's right.

4   Q.  So if you were a resident in Mogadishu at the time and

5   you were not able to flee immediately and you were from a

6   different clan, would that have put you in danger?

7   A.  It could.  It depended which clan.  Some clans were

8   associated with the former government and they were

9   therefore considered targets.  Other clans were not

10  considered to have in a sense offended the Hawiye.  Smaller

11  clans, minority clans from the north might not have been

12  considered targets.  But if you came from a clan that didn't

13  have a militia in Mogadishu, in any event you could be a

14  victim of robbery, theft, murder.  There was both war and

15  lawlessness.

16  Q.  So if you were a woman living in Mogadishu when this was

17  occurring, where would you look for protection?

18  A.  Well, you would move, if you could, into areas where you

19  still had elements of your clan who could protect you.  If

20  you didn't, you really had very few choices.  You would have

21  tried to flee the city or look for even in-laws or relations

22  in some form who might have been able to extend some

23  protection to you.

24  Q.  Now, for women who were living in the city while this

25  was going on, they would be vulnerable to kidnapping, being

```
 1   killed, rape, any type of crime?
 2   A.  With the exception of kidnapping, which wasn't as common
 3   in the early '90s, yes.
 4   Q.  Were other types of physical assaults common?
 5   A.  Yes.
 6   Q.  So if you were a woman from a clan that was not in
 7   control of the city or the neighborhood that you were in,
 8   you might look for someone who is in that clan, in the
 9   Hawiye clan, to protect you?
10   A.  Yes, you might, through some kind of relationship.
11   Q.  And if you didn't have that type of relationship, would
12   they be self-reliant to try to protect themselves?
13   A.  Then you would have probably sought safety in numbers,
14   small clusters of internally displaced people settling in
15   somebody's property and sometimes paying, seeking the
16   protection of whoever owned that property, negotiating some
17   kind of relationship with whichever militia group was in
18   charge.
19   Q.  At the beginning when the government left, before the
20   clans established neighborhoods that they would be in
21   control of, would women be able to leave their homes?
22   A.  I'm sorry.  Before?
23   Q.  During --
24   A.  Could you repeat the question?
25   Q.  As this was happening, as the forces were coming into
```

1   the city and the Barre government was leaving, right away,

2   that quick period, the first couple weeks, were women safe

3   to leave their homes?

4   A.  Yes.  In the first couple of weeks I witnessed -- well,

5   in the first few days before I left I certainly saw women

6   leaving their homes, carrying their goods, leaving the

7   center of town, yes.

8   Q.  Did it come to a point where they could no longer leave

9   their homes?

10  A.  It came to the point where anybody, male or female,

11  leaving their homes was at risk of being stopped at a

12  checkpoint and having to face the consequences.

13  Q.  So if you were in a minority clan, how would you get

14  food during this period?

15  A.  Again, you would look for someone with whom you had a

16  relationship, either a family relationship or Somalis, like

17  anybody, have relationships with school mates, with friends,

18  and you would look for someone else who had more protection

19  than you to try and assist you in fulfilling your needs.

20  Q.  If someone from a minority clan wanted to then leave the

21  city, to get out of the city to get to a refugee camp, what

22  would they do?

23  A.  There were -- initially people walked to the outskirts

24  and some walked as far as Kenya.  For others the safest way

25  out of the city was convoys and for a period in 1991 there

1    were large, almost spontaneously organized convoys.  People

2    traveled in groups because you were more secure passing

3    through the checkpoints, militia checkpoints, outside the

4    city if you were in numbers, whether or not you were armed,

5    and if there were members of your convoy who might be

6    related to the militia groups and could provide protection.

7    Otherwise you paid.  You tried to buy your fare on a taxi or

8    a four-wheel drive vehicle, anything.  And some people took

9    dhows down the coast to mainly Kenya.

10   Q.  Now, you've been discussing over the last 20 years these

11   various political movements, al-Shabaab, Hizbul Islam, AIAI,

12   Ras Kamboni, and within these groups there are conflicts

13   based on clan politics even within these specific groups?

14   A.  That's correct.

15   Q.  And within these groups, depending on the region of the

16   country that that portion of the group is operating from,

17   they might have disagreements with other regions of the same

18   movement?

19   A.  Yes.  There's almost, as I said, infinite division,

20   subdivision, re-alignment going on all the time.

21   Q.  I would like to ask you some questions about the news in

22   Somalia.  Starting from when the Barre government fell in

23   1991, what is the sources of news that people have access to

24   in Somalia?

25   A.  Well, in the early '90s there wasn't much.  There

1    were -- well, there was rumor, of course, word of mouth.

2    Somali society is an oral society and news travels amazingly

3    fast by word of mouth, by people traveling from one region

4    to the next.

5           The next development throughout the '90s was

6    taars.  It was a system of radios and partly because the

7    United Nations and the NGOs, who had been the

8    nongovernmental organizations that had been operating in the

9    country, many of them had offices with high-frequency radios

10   and these, of course, fell into the hands of different

11   groups and there was an incredibly sophisticated network of

12   high-frequency radio operators speaking to each other all

13   the time between various regions inside and outside Somalia.

14   That was for a long time the main form of inter-regional

15   communication.

16          And then subsequently mobile phones were

17   introduced, the Internet was introduced, and Somalis became

18   what I think many analysts believe is one of the most active

19   online communities on the planet.  There are hundreds of

20   Somali websites.  And all of the news that's published and

21   shared is also picked up and shared by people over the phone

22   calling one another.  It's an information society.

23   Q.  Now, you talked about rumor and people calling and

24   posting about events that they've heard about.  So it sounds

25   like this information network, there's a bit of telephone

1    going on, that I hear something, I would pass it on to the

2    next person, it's not all coming from a direct news source?

3    A.  There's plenty of that, but there are also -- over time

4    you come to know which sources are reliable, which are not.

5    Many of the websites and news sources are aligned with

6    certain groups.

7            So when you know what the source of the

8    information is, you have to make a determination as to what

9    the political interest or angle of that website or news

10   source or radio might be, who it's aligned with and its

11   track record over time.  That's part of the open source

12   analysis I referred to yesterday.

13   Q.  So some of these groups that are aligned with specific

14   organizations, or these news sources, you would have to

15   determine whether you were getting information or

16   propaganda?

17   A.  Yes, you would.  Over time you would generally be able

18   to figure it out.

19   Q.  Is it common for these groups to rely on using and

20   distributing propaganda?

21   A.  Which groups?

22   Q.  Any of the political organizations that have been --

23   A.  Well, most of the political organizations do engage in

24   some form of propaganda and so it's important not to rely on

25   them and to rely on many of the other independent sources.

1    Q.  I want to touch on something that you mentioned during

2    your testimony earlier.  You said the Somali Youth League?

3    A.  Yes.

4    Q.  That that was an old organization?

5    A.  That's right.

6    Q.  Can you tell me a bit about that.

7    A.  Well, my memory of that period of Somali history is a

8    bit vague, but the Somali Youth League was really the first

9    Pan-Somali political organization and it was particularly

10   active in the years leading up to independence, I think the

11   '50s, formed in the '50s, and then through until 1960 and

12   remained an important -- it's remained an important

13   political point of reference for Somalis up to the present

14   day.

15        The Somali Youth League believed in the

16   unification of Somalis under a single flag.  And if you look

17   at the Somali flag, it's a blue field with a white or silver

18   five-pointed star and that star represents the five parts of

19   the Somali community.  It was at that time British

20   Somaliland, Italian Somalia, northeastern Kenya, the eastern

21   part of Ethiopia or Ogaden, and the Somali part of the

22   French Somali coast or Djibouti.  And the aim was to unify

23   all of those five Somali territories under a single

24   authority.

25   Q.  So what would the Somali Youth League be called in

 1    Somali?

 2    A.  You know, I've only ever seen it referred to in English,

 3    so I can only guess at what its -- what it would have been

 4    called in Somali.  But if you are referring to the term

 5    "youth," I am guessing it would have been "dhallinyarada."

 6    Q.  I would like to ask you some questions about the

 7    Transitional Federal Government.  Now, Mr. Scott covered a

 8    lot of the history of the government, but I would like to

 9    ask you some questions about how it's operated since 2007

10    and I know that you've done a lot of work with the UN and

11    the monitoring group to look into those -- that

12    organization.

13           Now, is it fair to say that in 2007, when the

14    Transitional Federal Government came back into the country,

15    that many Somalis opposed both the Ethiopian troops coming

16    in and the Transitional Federal Government?

17    A.  In 2007, yes, that is absolutely true.

18    Q.  And when the Ethiopian troops were backing the

19    Transitional Federal Government, it was regarded poorly by a

20    lot of the Somali public?

21    A.  That's correct.

22    Q.  Now, when the Transitional Federal Government attempted

23    to regain control of Mogadishu in 2007, they failed to

24    stabilize Mogadishu?

25    A.  Correct.

1    Q.  They weren't able to provide a stable government for the

2    city?

3    A.  That's right.

4    Q.  So is it right that they failed to restore any of the

5    public services?

6    A.  Yes, that's right.

7    Q.  What about the economy?

8    A.  The economy independent -- operated independently of

9    government.  Much of the economy and particularly the big

10   markets of Bakaara and Suk Ba'ad in the north of the city,

11   these markets were functioning normally except when they

12   were targeted by usually government soldiers, but both

13   sides, or they were shelled.

14           But economic activity continued.  The only

15   qualification would be that much of the business from

16   Bakaara, the main market, actually moved outside the city

17   towards the town of Afgoye to get away from the violence.

18   Q.  You said the markets were sometimes targeted by the

19   government soldiers?

20   A.  Well, Bakaara was considered a center of al-Shabaab

21   activity and so government forces would enter it from time

22   to time in strength.  Suk Ba'ad in the north less so.  But

23   still as centers of economic activity, either military

24   operations and sometimes just looting and pillage would take

25   place.

1    Q.  Now, in your 2011 report that you provided to the United

2    Nations you said that the principal impediment to security

3    and stabilization in southern Somalia are the Transitional

4    Federal Government's leadership's lack of vision or

5    cohesion, its endemic corruption, and its failure to advance

6    the political process?

7    A.  That sounds right to me.

8    Q.  Can you expand on what you were referring to by "endemic

9    corruption."

10   A.  Over the years the Transitional Government has either

11   received revenues from, say, the port of Mogadishu and

12   perhaps to a much lesser extent taxation and also donor

13   funds, whether from Western donors or from donors in the

14   Arab world, and these funds have disappeared.

15        To a certain extent we have some knowledge of

16   which individuals may have taken those funds or where they

17   have gone, but essentially it's an open secret that the

18   government has been extremely corrupt.

19   Q.  I think you also mentioned that the forces, the military

20   forces, the Transitional Federal Government uses are

21   irregular and clan based?

22   A.  There are about 2,000 that were trained with European

23   Union funds in Uganda that form a kind of -- well, a

24   relatively disciplined cohesive core.  Around them there are

25   militias I would say affiliated with the TFG that are clan

1   based, some of them headed by militia leaders from the

2   pre-TFG period, that are -- they may or may not be

3   uniformed, but they are essentially irregulars.

4   Q.  So you brought up the foreign investment into the

5   Transitional Federal Government and let's talk about that

6   for a moment.

7           Before we can get into that, can you remind us a

8   bit about what the arms embargo is and how long the UN has

9   been monitoring that.

10  A.  The arms embargo was established in 1992 and for ten

11  years, until 2002, it was unmonitored.  It's the

12  responsibility of member states of the United Nations to

13  ensure that their territories are not used for the export of

14  arms to Somali.

15          By 2002 I think it was manifestly clear to

16  everybody that the arms embargo was not being respected.

17  Arms had entered the country and fueled the civil war for a

18  decade.

19          So in 2002 the UN's Secretary General and Security

20  Council set up the first what was then known as a panel of

21  experts to monitor the embargo and report on violations.

22  The panel of experts later became known as a monitoring

23  group, in 2004 I believe.

24          So from 2002 to 2008 there was a team which

25  changed every six months, was reappointed every six months

1    to monitor the arms embargo and report on violations.  In

2    2008 the mandate was changed.

3            The Security Council did two things.  One is that

4    it expanded the mandate of the group beyond the arms embargo

5    to report on threats to peace and security.  Threats to

6    peace and security, specifically the Security Council added

7    acts that threatened the transitional federal institutions,

8    African Union forces on the ground, or the political process

9    and specifically the 2006-'07 Djibouti Agreement by force,

10   and it added the obstruction and diversion of humanitarian

11   assistance.

12           The second major change in 2008 was that the

13   Security Council introduced targeted sanctions.  So anyone

14   found violating the sanctions regime would be subject to an

15   assets freeze, a travel ban, and what's known as a targeted

16   arms embargo.  It would be illegal to transact military

17   business with an individual or an entity.

18           The mandate has since evolved, I think as I said

19   yesterday, with the last resolution, 2002, of July this year

20   to include corruption within the TFIs, the transitional

21   federal institutions, or other acts that impede the

22   transitional political process.  It includes certain human

23   rights violations, including gender-based violence,

24   recruitment of child soldiers, or forced migration.

25           And it includes any nonlocal trade with ports

1    controlled by al-Shabaab, which is to say that trade that's

2    for the people living in al-Shabaab-controlled areas is

3    fine, it's authorized, but a lot of that trade was destined

4    as contraband for neighboring countries or charcoal export

5    to the Gulf states and that trade is effectively prohibited

6    by the Security Council.

7    Q.  Now, there's been a number of foreign countries that

8    have provided investment into the Transitional Federal

9    Government.  We've talked about Burundi and Uganda and some

10   of the other African countries and the UN.  Can you tell us

11   some of the other countries that have invested.

12   A.  Directly in the Transitional Federal Government?

13   Q.  (Nodding.)

14   A.  There have been donations from some Arab states, at

15   various times from Saudi Arabia, from the United Arab

16   Emirates, from Qatar, which has also had a relationship with

17   opposition groups.  There has been investment, mainly

18   humanitarian, from South Africa and through the United

19   Nations.  The largest donor until a couple of years ago I

20   think was the United States, but also most -- the European

21   Union would have been a close second and then the Nordic

22   countries.  Japan has also contributed, I believe.

23   Q.  Now, some of this international investment is

24   responsible for introducing new weapons to Somalia and has

25   been in the past?

1   A.  Yes, but through the African Union forces on the ground.

2   Q.  So has there been foreign investment providing arms and

3   ammunition to the Transitional Federal Government that the

4   monitoring group has considered to be violations of the arm

5   embargo?

6   A.  Yes.  There have been both direct and indirect.

7           The direct violations include, for example,

8   Ethiopia providing arms and ammunition to proxy militias,

9   including Ahlus Sunnah wal Jammah and some warlord-based

10  militias in the border areas.

11          There have been direct violations by the

12  government of Kenya supporting, arming, and equipping

13  militias on its territory to fight al-Shabaab in the Jubba

14  Valley.  We have reported on these violations.

15          The indirect violations include contributions of

16  arms and ammunition to the Transitional -- to the African

17  Union forces and the African Union has passed on some of

18  this ammunition and these weapons to allied militias

19  considered to be aligned with the transitional government.

20  These militias then also sell this ammunition into the

21  market.  Most of that ends up in the hands of al-Shabaab.

22          So we have these two categories of violation.

23  Q.  So I believe one of the things that you mentioned and

24  you've also written about in your monitoring reports is that

25  the Transitional Federal Government, once it receives

1    weapons frequently loses control of those weapons?

2    A.   The Transitional Federal Government, yes, but probably

3    even more so the militias that are aligned with it.

4    Q.   I believe in your 2008 report you wrote about that it

5    was common for soldiers to defect or desert positions in the

6    Transitional Federal Government and then these weapons go

7    with the soldiers?

8    A.   That's correct.

9    Q.   And it's also true that the Transitional Federal

10   Government soldiers have been known to sell weapons to these

11   other militia groups, including al-Shabaab?

12   A.   That's correct.

13   Q.   And you've touched on in your earlier testimony some of

14   the tactics used by these different groups, but the

15   Transitional Federal Government's police forces have also

16   been known to use machine guns and rocket-propelled grenades

17   in urban zones?

18   A.   Yes, they have.

19   Q.   Where there would be civilians present?

20   A.   That's correct.

21   Q.   Now, I would like to ask you just a couple questions

22   about the Transitional Federal Government's efforts to

23   establish a controlled, stable government in Somalia and

24   Mogadishu.

25            You noted in your 2010 report that in your opinion

1    the instability in Somalia was due to the Transitional

2    Federal Government's weakness and not to the strength of the

3    opposition; is that correct?

4    A.  Yes.  I would suggest what we meant by that is not that

5    the weakness itself created instability, but that it left

6    Somalia essentially ungoverned so that other groups could

7    expand.

8              Our assessment of al-Shabaab and other opposition

9    groups was that they were not necessarily stronger or more

10   popular than the Transitional Federal Government, but in the

11   absence of an effective political authority they had free

12   reign of southern Somali territory.

13   Q.  You also noted that despite the foreign assistance and

14   support that the Transitional Federal Government has

15   received, that it remained ineffective, disorganized, and

16   corrupt?

17   A.  That sounds right.

18   Q.  Now I would like to ask you some questions about

19   al-Shabaab.  Now, like the other organizations and militias

20   in Somalia, it would be fair to say that al-Shabaab is not

21   unified on all of the political goals?

22   A.  Correct.

23   Q.  And there's significant internal disagreement regarding

24   the use of tactics that we've discussed here, the use of

25   suicide bombers, foreign fighters, that they are -- there's

1    disagreement within al-Shabaab about using those tactics?

2    A.   There's some indications of that.  Again, as I say, it's

3    a secretive organization.  It's hard to know, but, yes, I

4    think there are some indications of that.

5    Q.   And in your 2010 report you noted that you believed

6    that the -- excuse me -- not you specifically, but that the

7    UN monitoring group believed that there were some elements

8    of al-Shabaab that appeared to be pragmatic and eligible for

9    political engagement?

10   A.   That's correct.

11   Q.   Now, one of the individuals that you talked about

12   yesterday was Hassan Dahir Aweys, and possibly this morning

13   as well.  And I believe you said on your direct that he was

14   affiliated with al-Shabaab, so I wanted to ask you some

15   questions about that.

16        Now, Hassan Dahir Aweys I believe -- and you can

17   correct me -- in 2007 became the leader of Hizbul Islam?

18   A.   2009.

19   Q.   Oh, it was 2009.  And before that he was working with

20   which organization?

21   A.   The Islamic Courts.  Well, before that with the ARS

22   based in Eritrea and before that with the Islamic Courts and

23   before that with al-Ittihad al-Islam.

24   Q.   But he left the country when the Islamic Courts

25   disintegrated?

1    A.  That's correct.

2    Q.  And he returned under the organization Hizbul Islam?

3    A.  Correct.

4    Q.  And Hizbul Islam is a separate organization from

5    al-Shabaab?

6    A.  Yes, it is.

7    Q.  And they may have cooperated at times, but they do not

8    pursue the same political and ideological agenda?

9    A.  There was a degree of overlap, but they were distinct.

10   Q.  So Hassan Dahir Aweys is not a member of al-Shabaab?

11   A.  Well, since Hizbul Islam disintegrated, he has merged

12   with al-Shabaab.

13   Q.  And when was that?

14   A.  That was in 2010, I believe.  I'm not sure of the exact

15   date.  It may have been earlier this year.

16   Q.  I'd also like to touch on the humanitarian assistance

17   efforts.  Somalia is considered one of the most, if not the

18   most, difficult places on the globe to provide humanitarian

19   assistance; is that true?

20   A.  That's correct.

21   Q.  Because of the instability, it's not uncommon for aid

22   agencies to pay off local authorities for protection to

23   distribute aid?

24   A.  That's true.  It varies a great deal and it has become

25   less common since the U.S. government and the UN imposed

1    restrictions that would involve some legal liability if

2    those agencies provided resources directly to al-Shabaab.

3    Q.  Because the conditions there are changing so frequently,

4    let's focus on the time period that's covered under the

5    indictment in this case, which would be September 17, 2008

6    through July 19, 2009.

7    A.  Yes.

8    Q.  So at that point this was a common practice?

9    A.  Well, the most common practice would have been for

10   agencies to hire their own security.  Those security would

11   obviously be from a local clan aligned probably with the

12   most influential authorities in that area in order to ensure

13   some goodwill.  It would be rare for agencies to pay off a

14   factional militia for support.  It may have happened

15   indirectly, but it would have been much less common.

16   Q.  But aid agencies that operate in combat areas frequently

17   lose a portion of their aid to the group controlling that

18   area?

19   A.  Yes.

20   Q.  And you described that practice in your 2010 report as

21   the cost of doing business in Somalia?

22   A.  I think that's in inverted commas, but, yes, we used

23   that term.  Also I would say that assessment is based on our

24   research.  In a combat zone it would be quite normal for up

25   to 10 to 15 percent of relief assistance to be diverted, and

 1    agencies tend to accept that.  We were attributing that more

 2    to the common view of the aid community rather than to a

 3    monitoring group assessment.  Aid agencies would normally

 4    accept losses of 10 to 15 percent as the cost of doing

 5    business.

 6    Q.  And those losses that were diverted, whether they were

 7    provided for protection or as a bribe or they were taken

 8    from the agencies, those would go to the militia that was in

 9    charge of the area?

10    A.  Yes.

11    Q.  One of the aid agencies you discussed in that report was

12    the World Food Programme?

13    A.  Yes.

14    Q.  And I understand that they've left Somalia at this

15    point; is that --

16    A.  No, they're back in Somalia.  They suspended contracts

17    to three individuals that we named in that report as either

18    involved in the diversion of food or maintaining large

19    militias thanks to their contracts with the World Food

20    Programme.

21    Q.  And these individuals that you're identifying in your

22    report, you are referencing the monitoring group's discovery

23    that the World Food Programme was known to provide some

24    financial support to some of these armed groups in their

25    efforts to provide aid?

1    A.  It was based on the fact that they had contracted three

2    individuals for well over a decade and at least at that time

3    we only made allegations about two of the individuals, one

4    of them we had no case against; that two of the individuals,

5    one had been allegedly involved in diversion of food aid on

6    a large scale and one was a major financier of first the

7    Islamic Courts and then al-Shabaab.

8    Q.  I believe you estimated in that report, like you

9    mentioned with many groups, that 5 to 10 percent of the aid

10   would be diverted to armed groups in control of that area?

11   A.  I think we actually had a higher estimate in that

12   report.

13   Q.  And at the time of the 2010 report, al-Shabaab

14   controlled 95 percent of the areas in which the World Food

15   Programme operated?

16   A.  That's probably correct.

17   Q.  And the World Food Programme is a well-respected

18   international aid agency?

19   A.  It's a UN agency.

20   Q.  So it would be fair to say that even well-respected aid

21   agencies have difficulty providing aid in areas where

22   al-Shabaab is operating without some of those funds being --

23   aid being diverted to al-Shabaab?

24   A.  That's correct.  The humanitarian community, of course,

25   adheres to the principle of humanitarian neutrality, which

1    is it doesn't matter who is in control, if there are

2    civilians in need, then they try to provide assistance and

3    they accept that it's never perfect, especially areas that

4    they cannot control.

5            Al-Shabaab established a system, which is, in

6    fact, referred to in one of the calls.  It's known as the

7    Office for the Supervision of -- I can't remember exactly

8    the term, but basically of aid agencies that increasingly

9    hindered access for NGOs and the UN to areas under their

10   control, which meant that the proportion of assistance that

11   was being diverted or that couldn't be verified as having

12   reached the beneficiaries increased.  And that's one of the

13   reasons that since that time international agencies have

14   done less and less business in those areas, because they

15   just can't confirm where the aid is going.

16   Q.  Thank you, Mr. Bryden.  I don't have any more questions.

17   A.  Thank you.

18                    **REDIRECT EXAMINATION**

19   BY MR. WARD:

20   Q.  Mr. Bryden, I just want to work backwards and talk about

21   some of the questions you were asked on cross examination by

22   Ms. Gurstelle, particularly with respect to humanitarian

23   assistance efforts.

24           In your view, is al-Shabaab part of the solution

25   of delivering humanitarian assistance or are they part of

1     the problem?

2     A.  Well, our most recent report concludes that al-Shabaab

3     actively obstructs humanitarian access to areas under its

4     control.

5     Q.  And, sir, if you recall, you were asked on cross

6     examination about a group called Hizbul Islam led by Sheikh

7     Hassan Dahir Aweys, the specially designated global

8     terrorist?

9     A.  Yes.

10    Q.  And you were asked some questions in relationship to

11    al-Shabaab about that group.  But do the two -- when Hizbul

12    Islam existed, did the two groups, al-Shabaab and Hizbul

13    Islam, share the goal of overthrowing the Transitional

14    Federal Government?

15    A.  Yes, they did.

16    Q.  And was that going to be by peaceful means or --

17    A.  No, that was a coordinated military effort.

18    Q.  You were asked a question on cross examination about a

19    particular group or possibly even a police group that used

20    some tactics similar to al-Shabaab.  Do you recall that

21    question?

22    A.  Yes, although I think it was phrased somewhat

23    differently, that they also used rocket-propelled grenades

24    and violence against civilians.

25    Q.  Thank you for reminding me.  Is there any other group in

1    Somalia operating on either side of the conflict that

2    engages in suicide bombing?

3    A.  No.

4    Q.  Sir, moving backward to Mr. Scott's cross examination,

5    do you remember talking with him about the tongue-lashing

6    that Defendant Amina Ali gave to Hassan Afgoye talking about

7    the "Here we are, you know, we're at your service, Osama"

8    campaign?

9    A.  Yes, I do.

10              MR. WARD:  If I could have 114, please.

11   BY MR. WARD:

12   Q.  114 is that same conversation that both you and -- or

13   both I and Mr. Scott asked you about, but on the second page

14   at the top, this is where Amina is giving Hassan Afgoye a

15   piece of her mind and she's saying that the only thing that

16   Osama bin Laden can do is "stir up animosities and reinforce

17   the suspicion those sick people have about your relationship

18   with these men."  Do you see that there?

19   A.  Yes, I do.

20   Q.  And my question to you, sir, is:  We're talking about in

21   March of 2009 some communications or a response to a

22   communication from Osama bin Laden.  Prior to March of 2009

23   had there been other communications or other indications of

24   a relationship between the foreign terrorist organization

25   al-Shabaab and leaders of al-Qaeda?

1    A.  Yes, there had been.  There was a long-standing

2    relationship.

3    Q.  Can you give me an example of two or three of those.

4    A.  Well, first of all, Hassan Dahir Aweys himself had had a

5    relationship with al-Qaeda East Africa dating from the early

6    1990s, as had Hassan Turki.

7           Then several of the prominent al-Shabaab figures,

8    especially I would say someone I haven't mentioned, Ibrahim

9    Haji Jama Mee'aad/al-Afghani, who was one of the first

10   al-Shabaab to engage in jihad back in the late 1980s, also

11   had a prior relationship with al-Qaeda.  He had been trained

12   in Afghanistan and he and Aden Hashi Ayrow provided some of

13   the militias and support, the liaison for the three

14   principal members of al-Qaeda East Africa who moved to

15   Mogadishu.

16          After the 1998 embassy bombing in Nairobi, the

17   presumed head of the al-Qaeda East Africa cell, Fazul

18   Abdullah Mohammed, moved to Somalia together with others.

19          After the 2002 bombing of the Paradise Hotel in

20   Kikambala near Mombasa and the attempted shooting down of an

21   Israeli airliner near Mombasa, other members of the al-Qaeda

22   East African Network moved to Somalia.

23          Saleh Ali Saleh Nabhan, Abu Talha al-Sudani, and

24   these groups -- these individuals were known to be protected

25   by the militias of Aden Hashi Ayrow.  Ibrahim Haji Jama was

1    associated with them at that time, as were some other

2    members of what later became known as al-Shabaab.

3    Q.  Now, have there been other communications where

4    prominent leaders of al-Qaeda had encouraged al-Shabaab to

5    continue its violent jihad against the Transitional Federal

6    Government?

7    A.  Yes.  And I don't remember the dates, but there were

8    statements from Ayman al-Zawahiri, bin Laden's number two,

9    and also communications with al-Libbi, another senior

10   al-Qaeda figure.

11   Q.  Now, Mr. Scott also asked you about the form of sharia

12   that al-Shabaab would like to implement by force and I think

13   you indicated in response to his question that all of the

14   charters or constitutions of the various attempts at

15   government in Somalia have contained the requirement that

16   they be conducted in accordance with sharia; is that

17   correct?

18   A.  That's correct.

19   Q.  Is it true, though, that none of them has ever adopted

20   al-Shabaab's peculiar interpretation of sharia for the

21   Somali people?

22   A.  That's true except once in 1994 one Islamic court in

23   northern Mogadishu implemented cross amputations.  It was a

24   court run by a sheikh known as Ali Dhere.  The clan in that

25   part of Mogadishu was so offended and responded so

1    aggressively, that the amputations were suspended and

2    discontinued until al-Shabaab arrived.

3    Q.  And when you refer to the courts, you are talking about

4    that group that held power in parts of -- in Mogadishu and

5    other parts?

6    A.  This was a precursor to all of that.  It was one of the

7    earliest declared Islamic courts in Somalia.  It didn't last

8    very long.

9    Q.  Now, when Mr. Scott and you were discussing various

10   types of tactics, do you recall a line of questioning about

11   targeted killings?

12   A.  Yes, I do.

13   Q.  Do you recall that he asked you whether or not suicide

14   bombing was -- he asked you to analogize it to artillery

15   fire; is that correct?

16   A.  Yes.

17   Q.  Would you agree with me, though, Mr. Bryden, that there

18   are a lot of differences between the use of indirect fire,

19   artillery, and a suicide bomber?

20   A.  Yes, I would.

21   Q.  In fact -- I forget.  In your military experience were

22   you an artillery officer?

23   A.  No.  I was an infantry officer, but I did direct

24   artillery.

25   Q.  And in directing artillery, do you realize -- you

1    realize, then, that a lot of times you can't even actually

2    see the target that you are firing at?

3    A.   That's correct.  That's why it's indirect fire.

4    Q.   And in your experience, certainly there are cases in

5    which artillery fire goes off course?

6    A.   That's correct.

7    Q.   Now, let's contrast the situation, then, of a suicide

8    bomber.  With a suicide bomber, the chance of actually

9    hitting your target really is pretty much dependent upon

10   whether or not you have somebody willing to kill themselves;

11   is that correct?

12   A.   That and whether or not they can actually get past

13   whatever protection exists to the site, yes.

14   Q.   And that was the question I was going to have to have

15   you answer.

16          MR. WARD:  Exhibit 141, if we could have that,

17   please.

18   BY MR. WARD:

19   Q.   This is the call that on cross examination Mr. Scott

20   didn't want to ask you about.  This is the call that we

21   talked about on direct about the Beledweyne hotel's suicide

22   bombing that killed the security minister and a bunch of

23   other people on June 18, 2009.  And if you have that in

24   front of you, this is the one that the Defendant Hawo Hassan

25   describes as "The best joy ever"?

```
 1      A.  Yes.

 2      Q.  She then goes on to describe how -- "Omar Hashi is

 3      gone."

 4           And Amina says, "Did he die?"

 5           Hawo Hassan then goes on to say, "He is dead."

 6           And Amina says, "May God protect the people from him.

 7      Go on."

 8           So the Defendant Hawo Hassan goes on and says (As read),

 9      "The hotel he was staying in, with hundreds of others...I

10      think Ethiopians were there also...and all the Hawadle clan

11      leaders, and Laqanyo, the other" -- he calls him the

12      other -- she calls him "the other days foul mouthed one, who

13      was the former Somali Ambassador to Ethiopia, all the

14      officials; they are still counting the dead."

15      A.  Yes.

16      Q.  On the following page the Defendant Amina Ali responds,

17      "Wonderful!"

18                And would you read, please, the response that Hawo

19      Hassan had to that.

20      A.  "His maternal cousin -- his own maternal cousin, who is

21      a member of Al Shabab, was the guy who went inside with it."

22      Q.  In your opinion, would that have been a good way to

23      acquire a target as a suicide bomber?

24      A.  Yes, it would.

25      Q.  With respect to -- there was some cross examination
```

1    about the current president of the Transitional Federal

2    Government, Sheikh Sharif Sheikh Ahmed, and do you remember

3    Mr. Scott saying that he used to be one of them?

4    A.  Yes.

5    Q.  And by that I understood him to mean that when

6    al-Shabaab was underneath the Islamic Courts Union, as a

7    technical matter Sheikh Sharif Sheikh Ahmed was actually in

8    charge of it because he was with the Courts; is that

9    correct?

10   A.  That's correct.  He had to -- the Courts were, as we

11   discussed earlier, a very broad umbrella.  Al-Shabaab was

12   one of the elements under that umbrella and part of Sheikh

13   Sharif's responsibility as a leader was to try to maintain

14   some form of cohesion between all of these elements.  That's

15   correct.

16   Q.  Now, of course, since the date of the Courts Sheikh

17   Sharif Sheikh Ahmed has become the head of the latest

18   attempt at central government and he's left al-Shabaab; is

19   that correct?

20   A.  He was never a member of al-Shabaab, but in other

21   respects that's correct.

22   Q.  Okay.  And how has al-Shabaab reacted to the fact that

23   he's now the head of the government?

24   A.  They've declared him and his government apostates and

25   waged war against them.

1    Q.  And as an apostate, what is the remedy or the punishment

2    under al-Shabaab's view?

3    A.  That's equivalent to a death sentence.

4    Q.  And actually isn't that what al-Shabaab wants to do to

5    anyone who attempts to leave the organization?

6    A.  I think they've shown --

7            MS. GURSTELLE:  Objection, improper redirect,

8    leading.

9            MR. WARD:  I will withdraw the question, Your

10   Honor.

11           THE COURT:  Anything further?

12           MR. WARD:  No, nothing further, Your Honor.

13           THE COURT:  Mr. Scott?

14           MR. SCOTT:  Thank you, Your Honor.

15                      **RECROSS EXAMINATION**

16   BY MR. SCOTT:

17   Q.  I think on redirect examination you were talking about

18   al-Qaeda ties to al-Shabaab?

19   A.  Yes.

20   Q.  And the first two names you mentioned in terms of people

21   who had ties to al-Qaeda were Hassan Aweys and Hassan Turki?

22   A.  That's why they were initially designated.

23   Q.  Okay.  But they were not at that time -- or at least

24   Hassan Turki has never been a member of al-Shabaab?

25   A.  Correct.

1    Q.  And Hassan Aweys had never been a member until maybe

2    this year or the end of last year?

3    A.  No, they were both what I would call mentors of

4    al-Shabaab rather than members.

5    Q.  And Hassan Aweys, speaking as a mentor, he was one of

6    the central figures in the Islamic Courts as well, was he

7    not?

8    A.  He was indeed.

9    Q.  And this fellow Gaty [phonetic] -- you said late '80s

10   somebody named Geety [phonetic]?

11   A.  Ibrahim Haji Jama Mee'aad/al-Afghani.

12   Q.  Okay.  Al-Afghani.  That was in the late '80s.

13   Al-Shabaab was not a recognized organization in the late

14   '80s?

15   A.  No.  Ibrahim Haji Jama traveled to Afghanistan in the

16   late '80s and returned to Somalia in 1990 as one of the

17   founders of al-Ittihad al-Islam and then went on to become

18   one of the founders of al-Shabaab.

19   Q.  And in 1998 he was what connection to al-Shabaab?

20   A.  In 1998 --

21   Q.  Excuse me.  2008, what we're talking about here.

22   A.  Well, we know that in 2006 he was -- prior to the

23   dispersal of al-Shabaab his last known position was as

24   secretary of the standing committee to the Shura of the

25   Islamic Courts as a member of al-Shabaab.

1              After the dispersal he reappeared in Kismayo.  He

2     adopted the name Abubakar al-Seyli'i, not his real name, and

3     he became briefly the mayor of Kismayo and then withdrew to

4     a behind-the-scenes role.

5              He is still known to be very active and is

6     described as often the deputy to Ahmed Abdi Godane, although

7     I would say he's probably more influential than Godane

8     himself.

9     Q.  And I don't want to spend a lot of time on this targeted

10    killing stuff, but I think what the prosecutor was asking

11    you is when you launch an artillery attack, you know there's

12    going to be the possibility of collateral damage because

13    artillery is just not that accurate?

14    A.  I believe that was part of the solution, but if I may --

15    Q.  I mean, that doesn't forgive --

16    A.  In terms of asking about the differences between the

17    two, at approximately the time that we're discussing a

18    suicide bomber walked into a medical student's graduation

19    and blew himself up.  That was the target.  That's not

20    collateral damage.

21    Q.  Right.  Okay.  I was trying to figure that out.

22              MR. SCOTT:  I have nothing further.

23              MS. GURSTELLE:  No further questions, Your Honor.

24              THE COURT:  Sir, you may step down.

25              THE WITNESS:  Thank you, Your Honor.

```
 1              THE COURT:  Let's take a 15-minute break.  Let's
 2      take a 15-minute break.
 3          (Recess taken at 2:34 p.m.)
 4                          *    *    *    *    *
 5          (2:42 p.m.)
 6                          IN OPEN COURT
 7                          (JURY PRESENT)
 8              THE COURT:  Call your next witness, please.
 9              MR. PAULSEN:  The United States calls Special
10      Agent Mike Wilson.
11          (Witness sworn.)
12              THE COURT:  Sir, would you state your true and
13      correct name for the record, please.
14              THE WITNESS:  Michael R. Wilson.
15              THE COURT:  Spell Michael.
16              THE WITNESS:  M-i-c-h-a-e-l.
17              THE COURT:  Wilson.
18              THE WITNESS:  W-i-l-s-o-n.
19              THE COURT:  You may inquire.
20                          (Michael Wilson)
21                          DIRECT EXAMINATION
22      BY MR. PAULSEN:
23      Q.  Special Agent Wilson, by whom are you employed?
24      A.  With the FBI.
25      Q.  How long have you been an FBI agent?
```

1    A.  Almost 20 years.

2    Q.  Where did you do the first part of your career with the

3    FBI?

4    A.  The primary first part was in North Dakota.

5    Q.  And that was from about, what, 1992 to 2002?

6    A.  Yeah, approximately.

7    Q.  What types of cases did you work on up in North Dakota?

8    A.  While I was out there, the major investigation was

9    crimes on the federal Indian reservations.

10   Q.  And that's all type of different crimes, including

11   violent crimes?

12   A.  Primarily violent crime.

13   Q.  Then after your stint in North Dakota you went to the

14   Rochester field office here in Minnesota?

15   A.  Correct.

16   Q.  And what types of cases have you worked on for the last

17   ten years down in Rochester?

18   A.  Out there general criminal investigations as well as

19   some foreign counter-intelligence and foreign

20   counter-terrorism investigations.

21   Q.  Which is the type of investigation this case involves,

22   right?

23   A.  Correct.

24   Q.  About how many prior counter-terrorism investigations

25   have you worked on?

```
 1    A.  We've worked on quite a few.  It's hard to say.  To put

 2    a number on it, I would say at least 40.

 3    Q.  And when did this particular investigation begin?

 4    A.  Approximately summer of 2008.

 5    Q.  And was there something that triggered you and Special

 6    Agent McGrane to open an investigation down in Rochester?

 7    A.  Yes.  We had received information that Ms. Ali had been

 8    in contact with a prohibited group.

 9    Q.  And did that lead come from headquarters?

10    A.  Yes, it did.

11    Q.  So you opened an investigation here in Minnesota?

12    A.  Correct.

13    Q.  And what was the nature of the investigation you opened?

14    A.  We initiated a foreign counter-intelligence -- or

15    foreign counter-terrorism investigation.

16    Q.  And what organization was Ms. Ali at that time suspected

17    of being involved with --

18    A.  Al-Shabaab.

19    Q.  -- prohibited contact?

20    A.  Al-Shabaab.

21    Q.  And the document has been introduced, but you're aware

22    that al-Shabaab was designated by the Department of State as

23    a foreign terrorist organization on February 26, 2008?

24    A.  Correct.

25    Q.  As a result of that, it became illegal as of then to
```

```
1    provide material support to al-Shabaab?

2    A.  Yes.

3    Q.  And people that are covered by that law include United

4    States citizens?

5    A.  Correct.

6    Q.  Is Amina Ali a United States citizen?

7    A.  Yes, she is.

8    Q.  Is she originally from another country, to your

9    knowledge?

10   A.  Yes, she is, from Somalia.

11   Q.  And she became a naturalized citizen here at some point?

12   A.  Yes.

13   Q.  And is Defendant Hawo Hassan also a naturalized citizen

14   of the United States?

15   A.  She is.

16   Q.  And did she come from another country at some point?

17   A.  Somalia as well.

18   Q.  Was there kind of a parallel investigation going on

19   involving al-Shabaab being run out of the Minneapolis

20   office?

21   A.  Yeah.  Around this time there was a concern with young

22   Somali men traveling --

23            MR. SCOTT:  I am going to object, Your Honor.

24   It's all hearsay.

25            THE COURT:  Sustained.
```

1    BY MR. PAULSEN:

2    Q.  What did you do at the start of your investigation, what

3    preliminary investigation did you do?

4    A.  Well, we conducted some surveillance.  We tried to

5    establish residence.  We tried to confirm telephone

6    information of Ms. Ali, and we did analysis of that

7    telephone information and discovered numerous international

8    calls which tended to corroborate some of the information we

9    had received from headquarters.

10   Q.  And so to be clear, were you able to locate where

11   Ms. Ali was residing at the time?

12   A.  Yes, we did, in Rochester.

13   Q.  And later on were you able to locate where Hawo Hassan

14   was residing at the time?

15   A.  Yes, we did.  She also lived in Rochester.

16   Q.  Did they live close to each other or far apart?

17   A.  I would say within five or so miles.

18   Q.  So based on the preliminary investigation, including the

19   analysis of phone records, did there come a time when a

20   wiretap was applied for in this case?

21   A.  Yes, there was.

22   Q.  And that is you make an application to a court and the

23   court reviews it and decides whether the court is going to

24   authorize you to tap someone's phone?

25   A.  Correct.

1    Q.  And that approval came through in this case?

2    A.  It did.

3    Q.  And the phones you were authorized to wiretap were whose

4    phones?

5    A.  It was Ms. Ali's landline telephone number and then

6    later Ms. Ali's cellular telephone number.

7    Q.  And when did the wiretap on Ms. Ali's two phones begin?

8    A.  Initiated in about mid September of 2008.

9    Q.  Describe generally how the wiretap operates.

10   A.  Well, once we get the court order authorizing the

11   wiretap, for the landline we conducted that in Rochester and

12   the information from the call is intercepted and then sent

13   out to Minneapolis where it's put on opti disks, the audio

14   is.

15         And then in this case, because it's a foreign

16   language, it was routed off to Washington, D.C. where we

17   have a language unit that will do translations for us.  And

18   then after they do the translation, it will be sent back to

19   us in a written format so we can understand the call.

20   Q.  And similarly with the cell phone, were recordings

21   collected and then sent off to Language Services for review?

22   A.  Correct.

23   Q.  And how would you be kept advised of the progress of the

24   wiretap investigation?

25   A.  Well, as soon as the linguists had prepared a summary of

1    the call, we would receive it electronically on our system.

2    Now, it's not real time.  It usually takes about three,

3    four, five days for them to translate it and then we would

4    receive it on our computer and review it.

5    Q.  And we haven't really talked about it, but on all these

6    transcripts at the top there's something called a session ID

7    number.  What's that?

8    A.  Well, each call is assigned an identification number.

9    It helps in the tracking of the call throughout the process.

10   Q.  Sometimes there's more than one session identification

11   number?

12   A.  Correct.  We might initially receive what's called a

13   summary of the call and that gets an identification number.

14   Later on if we request a verbatim translation, which is word

15   for word, from portions of that summary, then that would be

16   on occasion assigned another identification number.

17   Q.  But not always, sometimes it's just one number for each

18   call?

19   A.  Correct.

20   Q.  And how long did this wiretap on Ms. Ali's phones last?

21   A.  Approximately ten months.

22   Q.  And is that unusually long for this type of

23   investigation?

24   A.  Not really.  In fact, it would be -- with some it could

25   be considered on the shorter end.

```
 1    Q.  What's the goal of an investigation of this type?

 2    A.  Well, the goal is to find out, of course, what's

 3    happening and what is the extent of the activity locally,

 4    you know, who are the individual's associates, who are they

 5    dealing with.

 6             And then of course in this case you're dealing

 7    with international contacts in Somalia and in this case

 8    al-Shabaab members.  So even from an intelligence

 9    standpoint, information you can obtain concerning those

10    al-Shabaab members is very important.

11             So it's international aspect and then also

12    domestic aspect.

13    Q.  Now, in the course of the ten months were numerous

14    recorded calls generated?

15    A.  Yes, numerous.

16    Q.  And many of them were described as being pertinent to

17    the investigation?

18    A.  Correct.

19    Q.  That meant they had something to do with the matters

20    under investigation?

21    A.  Yes.

22    Q.  And after this case was indicted and lawyers were

23    appointed, what was done with respect to all of the

24    pertinent calls in the investigation?

25    A.  All the calls deemed pertinent were turned over to the
```

1    prosecutor's office and then to the defense counsel.

2    Q.  And that would be a lot more than we have in the binder

3    here, right?

4    A.  Considerably a lot more.

5    Q.  But both sides have had access to all the pertinent

6    calls?

7    A.  Yes.  And the call would be the entire audio of the

8    call, not just the snippets, but the entire audio session

9    would be provided.

10   Q.  All right.  I want to turn right to -- well, Count 1 of

11   the indictment is the conspiracy count charging Amina Ali

12   and Hawo Hassan with conspiracy to provide material support;

13   is that right?

14   A.  Yes.

15   Q.  And I'm going to turn -- and then there are Counts 2

16   through 13 that charge Amina Ali with specific transactions

17   of providing material support to al-Shabaab?

18   A.  Correct.

19   Q.  And I am going to turn right now to Count 2, one of

20   those transactions.  That transaction is alleged to have

21   involved material support to al-Shabaab on September 17,

22   2008 in the amount of $1,063.  There are some calls that

23   relate to that count?

24   A.  Yes, we have some calls.

25             MR. PAULSEN:  At this time I offer Counts -- or

1     Exhibits 2 and 3.

2                 MR. KELLY:  No objection.

3                 MR. SCOTT:  No objection, Your Honor.

4                 THE COURT:  Be admitted.

5     BY MR. PAULSEN:

6     Q.  Before we get into the call itself, can you tell us just

7     a little bit about what the investigation revealed with

8     respect to how funds were raised.

9     A.  In this case funds were raised by just going door to

10    door knocking on person's doors and asking for individuals

11    to donate money.

12                The second method was through teleconferences,

13    which you have heard a little bit about today or in previous

14    testimony, and you would have a guest speaker come on.

15    Amina -- I should back up.  Amina Ali had a teleconference

16    line and on occasion she would invite guest speakers to come

17    on that line.  Some of these speakers were al-Shabaab

18    members and they would make a plea, a pitch for funds and

19    individuals would then donate that money, who are listening

20    to the teleconference, to Ms. Ali.  And that was the second

21    method.

22    Q.  We've heard some talk about giving to orphans or not

23    giving to orphans.  Did Ms. Ali kind of have some rules or

24    guidelines in that regard when it came to fund-raising?

25    A.  She absolutely did.

1           MR. SCOTT:  Your Honor, I object to the summary

2     testimony.  If there are words and they were made --

3           THE COURT:  Sustained.

4     BY MR. PAULSEN:

5     Q.  Will there be some calls that we are going to get to on

6     that issue?

7     A.  Definitely to explain to that.

8     Q.  Let's start with Exhibit 2.  This is a call on

9     September 21, 2008 between Amina Ali and Hassan Afgoye.  And

10    just to set the stage here, the transaction is alleged to

11    have occurred on September 17, 2008.  Were you monitoring

12    Amina Ali's phones that early or not?

13    A.  That was right around the time we started the

14    monitoring, right at the beginning of it.  So I think we

15    actually went up on September 20th, approximately.  So this

16    would be like around the first day.

17    Q.  And this is a call at 18:11, which would be 6:11 p.m.,

18    but UTC.  Now, that's straighten that out right now.  What's

19    UTC?

20    A.  UTC is Coordinated Universal Time.  As you had heard in

21    prior testimony, it's similar to Greenwich Mean Time.

22    Q.  Can you tell what time it would have been in Minnesota

23    from this 6:11 p.m. UTC.  How many hours do you have to

24    subtract?

25    A.  At this time you would subtract approximately five

```
 1   hours.

 2   Q.  Does it vary whether we are in Daylight Savings Time or

 3   not?

 4   A.  If it's Daylight Savings, then you would subtract six

 5   hours.

 6   Q.  So on all of these calls the jury either subtracts five

 7   or six hours from the time that's listed?

 8   A.  Correct.

 9           MR. PAULSEN:  Play Exhibit 2, please.

10       (Audio recording played.)

11   BY MR. PAULSEN:

12   Q.  So on page 2, just past the halfway or at the halfway

13   point, she asks Hassan Afgoye if he had received a thousand?

14   A.  Correct.

15   Q.  And just so everybody recalls, Hassan Afgoye is also

16   known as Abu Ayman?

17   A.  Hassan Mohamed Ali is another alias.

18   Q.  And he was the al-Shabaab figure who later became the

19   governor of the Bay and Bakool regions?

20   A.  Correct.  At this time he was more in charge of the

21   finance issues.

22   Q.  He was a finance representative for who?

23   A.  Al-Shabaab.

24   Q.  Okay.  And again on the top of page 3 she asks him if he

25   had received a thousand dollars.  He says, "When was it
```

```
 1    sent?"  And apparently the call isn't real clear, so she
 2    says, "I will call you back."
 3    A.  Yes.
 4    Q.  All right.  Does she call him back the next day?  I
 5    believe it's the next day.
 6    A.  Yes, she does.  And in this call here, too, she makes
 7    mention that she sent the money under the name Nima Ali
 8    Mohamed.
 9    Q.  Have you researched that name?
10    A.  Yes.  That name, as we will see in a later exhibit,
11    is -- she'll say that that's a name that she had made up,
12    it's a fictitious name.
13    Q.  Okay.  So then we go to Exhibit 3, which is a call the
14    next day, September 22, 2008, at it would be 2:53 p.m. UTC
15    again between Amina Ali and Hassan Afgoye.
16          MR. PAULSEN:  If you can play Number 3, please.
17       (Audio recording played.)
18    BY MR. PAULSEN:
19    Q.  That's the end of the first excerpt that ends in the
20    middle of page 2.  At the top of page 2 Hassan Afgoye --
21    well, at the bottom of page 1 he is telling her about a
22    massacre and destruction by those men in Mogadishu and they
23    bombarded the city with artillery and a plane -- at the top
24    of page 2 he says a plane came to pick up Abdullahi Yusuf.
25    Has that name came up today in testimony?
```

1   A.  Yes.  As Mr. Bryden had testified earlier, he was the

2   Transitional Federal Government president from approximately

3   2004 to 2008.

4   Q.  And Hassan Afgoye tells Amina Ali that the plane came to

5   pick him up, but could not take him.  He goes on to say that

6   last night the Ugandans were attacked in their camp.  They

7   were surprised and massacred last night.

8          And the Ugandans were a part of what force at this

9   time?

10  A.  They were part of the Africa Mission in Somalia, a

11  peacekeeping force that was in the country at the time.

12          MR. PAULSEN:  And now we will go on to the second

13  excerpt beginning on the middle of page 2.

14      (Audio recording played.)

15  BY MR. PAULSEN:

16  Q.  This is where he -- Amina asks him again, "Did you

17  receive one thousand?"  And then she says, Did you receive

18  1,060?  "It was under the name of Nimo Ali Mohamed."  And

19  Hassan Afgoye informs her that, "1,063; yes --"  And then he

20  confirms that he received it, correct?

21  A.  Correct.

22          MR. PAULSEN:  Then we'll just quickly go to the

23  third excerpt.

24      (Audio recording played.)

25  BY MR. PAULSEN:

1    Q.  Here Hassan Afgoye is telling Amina Ali about, "The

2    house of Aden Madobe was attacked, in Baidoa."  Do you know

3    who that is?

4    A.  Yeah.  He was a member of the Transitional Federal

5    Government.

6    Q.  And he goes on to say that, "He had a *checkpoint* in

7    front of the house where four apostate were killed."  And

8    then he goes on to say, "We had one man who became a martyr"

9    and adds that "and his house was pounded with artillery and

10   was destroyed anyway.  That is what happened."

11   A.  Correct.  I think that is significant because that

12   associates Hassan Afgoye with that attack and Amina Ali is

13   aware that he is associating himself with the attack by

14   saying "we" in that case, we had one man martyred.

15            MR. KELLY:  Object to the conclusions of the

16   witness, Your Honor, lack of foundation, 602.

17            THE COURT:  Overruled.

18   BY MR. PAULSEN:

19   Q.  Now, getting back to Count 2, the transaction we just

20   heard about for $1,063, did you obtain some records to try

21   to confirm whether or not there was such a transaction

22   involving a money transfer company, also known as a hawala?

23   A.  Yes.  We went to the Kaah hawala and obtained a

24   financial record which supported that transaction.

25   Q.  And is that contained in Government Exhibit 161?

```
 1    A.  I believe so.

 2    Q.  I will approach so you can make sure.

 3    A.  Yep, that is the transaction.

 4              MR. PAULSEN:  Offer 161.

 5              MR. SCOTT:  No objection, Your Honor.

 6              MR. KELLY:  No objection.

 7              THE COURT:  Be admitted.

 8    BY MR. PAULSEN:

 9    Q.  Take us through this document.  It's the first time

10    we've seen one of these, so maybe you can explain what this

11    represents.

12    A.  Well, you've got, of course, in the Sender column the

13    name Basra Ali Warsame.  That is the name under which the

14    money was sent out, the person who sent the money.

15    Q.  Do you know who that person is?

16    A.  Yes.  Ms. Warsame is an associate of Ms. Ali's.

17              MR. SCOTT:  I am going to object, Your Honor, to

18    identifying those people right now.  There's no foundation

19    for this.

20              MR. PAULSEN:  I can lay some foundation.

21              THE COURT:  Go ahead.

22    BY MR. PAULSEN:

23    Q.  Before you tell the relationship, how do you know what

24    the relationship is?

25    A.  Well, we had interviewed Ms. Warsame.  We had conducted
```

1    a telephone analysis and obtained subscriber information for

2    telephone calls placed to Ms. Ali and associated that

3    telephone number that we see there, the 614 area code

4    number, with Ms. Warsame.

5    Q.  And are there going to be other calls later on in this

6    binder where Ms. Warsame and Ms. Ali are talking about

7    sending money?

8    A.  Yes.

9              THE COURT:  Go ahead.

10   BY MR. PAULSEN:

11   Q.  So where does Basra Warsame lives?

12   A.  She lives in the Columbus, Ohio, area.

13   Q.  And she is a real person?

14   A.  Correct.

15   Q.  So she was the actual sender of this?

16   A.  Correct.

17   Q.  And we learn from the calls that we heard that Amina Ali

18   had given the name of the recipient over the phone to Hassan

19   Afgoye and that name -- does that name appear on this

20   document?

21   A.  Yes, as the beneficiary, the Nimco Ali Mohamed.

22   Q.  And below the name Nimco Ali Mohamed is a telephone

23   number.  Do you see that?

24   A.  Correct.  That's the beneficiary number.  And those

25   numbers are significant because in this case we have -- it's

1    really the telephone number that's important.  The name

2    Nimco Ali Mohamed, as we have been told or as we'll see, is

3    a fictitious and made-up name.  The beneficiary telephone

4    number in this case is 2521-5332225.

5    Q.  And for our purposes we might want to keep in mind the

6    last four digits, 2225?

7    A.  Yes.

8    Q.  Does that number come up in future transactions as well?

9    A.  It will.

10   Q.  And who typically provides these telephone numbers to

11   Amina Ali?

12            MR. SCOTT:  I am going to object, Your Honor.  It

13   is going to call for hearsay.

14            THE COURT:  Overruled.

15            THE WITNESS:  Ms. Ali obtains these numbers

16   through her contacts with the al-Shabaab network she dealt

17   with in Mogadishu, which we will hear more about later.

18   BY MR. PAULSEN:

19   Q.  And so the amount was $1,063, just as Ali and Hassan

20   Afgoye discussed on Exhibit 3, correct?

21   A.  Correct.

22   Q.  And the issue date down here, what's that mean?

23   A.  That's the date that it appears that the money was paid

24   out or picked up.

25   Q.  There's an issue date here and then there's a date paid

```
 1    over here, it looks like.  So this one looks like it was

 2    paid on the same day?

 3    A.  It appears to be so.

 4           MR. PAULSEN:  At this time I would like to offer

 5    Government Exhibit 8.

 6           MR. KELLY:  No objection.

 7           MR. SCOTT:  I think 8 -- is 8 already in evidence?

 8           MR. PAULSEN:  It is in evidence.  It just hasn't

 9    been played yet, so we'll --

10           MR. SCOTT:  No objection, Your Honor.

11    BY MR. PAULSEN:

12    Q.  Turn to the transcript, Number 8, which is a call on

13    October 9, 2008 at 7:14 p.m. UTC between Hawo Hassan and

14    Amina Ali?

15    A.  Correct.

16           MR. PAULSEN:  Go ahead and play Number 8.

17        (Audio recording played.)

18    BY MR. PAULSEN:

19    Q.  I want to direct your attention to the top of -- or the

20    bottom of page 2, carrying over to the top of page 3, where

21    Amina Ali is telling Hawo Hassan that, "I am telling you

22    specifically to ready yourself and stand up for the

23    mujahidin, because you have slacked off when it comes to the

24    mujahidin."  To which Hawo Hassan protests with, "Sister, I

25    swear to God, I have not slacked off."
```

 1          And a couple exchanges later Amina Ali tells her,

 2    "Yes.  I want to tell you to speak up; speak up in the *line*.

 3    You should speak up, Halima --"  And Hawo Hassan says, "I am

 4    ready to do it in your *line*."

 5          From your review and your investigation, what is

 6    your understanding of what they were talking about when they

 7    say "your line"?

 8    A.  In this case it would be the teleconference line that

 9    Amina Ali made use of to provide religious lectures as well

10    as teleconferencing when she would have guest speakers on

11    her line and later for also fund-raising.

12    Q.  And later on will we see that Hawo Hassan does

13    participate in those teleconferences?

14    A.  Yes.

15    Q.  At the midpoint Amina Ali says to Hawo Hassan, "Who has

16    the priority?  Let the civilians die.  Sister, let the

17    civilians die.  The mujahidin should be supported.  If the

18    mujahidin are supported," and then the sentence kind of runs

19    out.

20          MR. PAULSEN:  Let's go to the second excerpt.

21        (Audio recording played.)

22    BY MR. PAULSEN:

23    Q.  At the top of page 4 Amina Ali is quoting someone as

24    saying, "The people said ... First they said to me, 'Convey

25    our regards to the young men.'"  And then later on, about

```
1    halfway down, a little past halfway down, she says, "But
2    they said that they have financial problem."  Do you see
3    that?
4    A.  Yes, I do.
5    Q.  In this context what's "the young men" refer to?
6    A.  The young men at --
7              MR. SCOTT:  I am going to object, it calls for a
8    conclusion of this witness, especially since he skipped the
9    next line that said -- where she explained it as the
10   Muslims.
11             THE COURT:  Overruled.  Continue.
12             THE WITNESS:  I think especially in consultation
13   with the linguist in this case and the context of the call,
14   that would mean al-Shabaab.
15             MR. SCOTT:  Your Honor, I would ask, then, that
16   the answer be stricken.  He asked for his opinion.  He is
17   giving someone else's opinion.
18             THE COURT:  Sustained.  It will be stricken.
19   BY MR. PAULSEN:
20   Q.  Over on page 5, about a third of the way down Amina says
21   (As read), "I said to him, 'We will present a lecture; I
22   will have you call into the line next week God willing.'"
23             And is there a teleconference that comes up within
24   a week or so of this?
25   A.  Yes.
```

```
 1    Q.  And do you recall who the speaker is?

 2    A.  The speaker on that would -- I believe it was --

 3               MR. SCOTT:  Objection, foundation, Your Honor --

 4               THE COURT:  Sustained.

 5               MR. SCOTT:  -- as to how he knows.

 6    BY MR. PAULSEN:

 7    Q.  Well, have you reviewed the call, the teleconference?

 8    A.  I have.

 9    Q.  How many times?

10    A.  Numerous times.

11    Q.  And is there a speaker at a teleconference not long

12    after this call?

13               MR. SCOTT:  Your Honor, he is referring to

14    documents and they are not in evidence, Your Honor.

15               THE COURT:  No, he can answer that question.

16               THE WITNESS:  Yes.  I believe you are referring to

17    the Hawo-Kiin Hassan Raage teleconference.

18    BY MR. PAULSEN:

19    Q.  And Hawo-Kiin Raage has been talked about already as

20    being who?

21    A.  She was in charge of women's affairs with the al-Shabaab

22    group associated with Hassan Afgoye.  She also handled the

23    wounded, orphans issues, and communications.

24               MR. PAULSEN:  And now if we could play excerpt 3.

25          (Audio recording played.)
```

```
 1    BY MR. PAULSEN:

 2    Q.  At the top of page 6 Amina Alia says, ..."whenever I see

 3    Somalis, who are hungry, no matter where they may be, my

 4    stomach churns."  But then she adds, "But I feel more

 5    sympathy for the mujahidin."  And Halima -- or Hawo Hassan

 6    responds how?

 7    A.  "I know that."

 8    Q.  On page 7, about seven lines up, Amina Ali says, "We

 9    will pressure the agency to get something to Abudwaq

10    immediately.  Sister, they have license; they hold

11    fundraising in mosques and everywhere."

12              Do some charitable organizations have a license?

13    A.  They do.

14    Q.  And is that the customary way of doing it?

15    A.  Yes, it is.

16    Q.  Does Amina Ali have a license?

17    A.  She does not.

18    Q.  Does she later explain why she won't go get a license?

19    A.  Yes.

20    Q.  What does she say?

21              MR. SCOTT:  Objection, Your Honor, one,

22    foundation; two, he's going to be reporting on a tape that's

23    not in evidence.

24              THE COURT:  Overruled.  You'll have to -- you'll

25    connect it.  And if you don't connect it, you know what will
```

1    happen.

2    BY MR. PAULSEN:

3    Q.  You have reviewed the calls where she explains to

4    various people why she won't get a license?

5    A.  Yes, I have.

6    Q.  And what's her explanation?

7    A.  She doesn't want to lie to God or be restricted on where

8    the things she collects goes because it goes -- some of it

9    goes to the men.

10   Q.  "The men" meaning?

11   A.  Al-Shabaab.

12            MR. SCOTT:  I am going to object.  It's not an

13   accurate statement of what will come up in the tape, the

14   last line, Your Honor.

15            THE COURT:  Overruled.  You will be able to

16   cross-examine.

17   BY MR. PAULSEN:

18   Q.  So on the top of page 8 Amina proposes that, "And this

19   *line* should be left for the mujahidin."  To which Hawo

20   Hassan responds, "Well, first of all, one cannot give up on

21   the mujahidin."

22            And in this context the line that's being referred

23   to, is it more than one line?

24   A.  In this case they are referring to Amina Ali's line.

25   Q.  And that's the one that will be reserved for collecting

1     for the Mujahidin?

2     A.  Correct.

3     Q.  And are there other lines besides this one?

4     A.  There are other lines, yes, but -- are you referencing

5     just Amina Ali or other individuals?

6     Q.  Other individuals.

7     A.  Yes, other individuals have lines.

8             MR. PAULSEN:  Next one is Exhibit 9.  I offer 9.

9         (Pause.)

10            MR. SCOTT:  I didn't hear what --

11            MR. PAULSEN:  Oh, I'm sorry.  I offered 9.

12            MR. SCOTT:  Oh, I didn't hear you.  I'm sorry.

13    I'm not going to object, Your Honor.

14            MR. KELLY:  Defendant Hawo Hassan objects on the

15    grounds of hearsay with respect to the unidentified female

16    voice on the other end of this conversation.

17            THE COURT:  Overruled.  You can play it.

18    BY MR. PAULSEN:

19    Q.  Exhibit 9 is a recorded call on October 10, 2008 at

20    about 7:00 p.m. UTC between Amina Ali and it does say

21    unknown female.  That phone number that's listed there, the

22    320 number, what's that area code?

23    A.  That would be St. Cloud.

24    Q.  Minnesota?

25    A.  Correct.

```
 1              MR. PAULSEN:  We can play Exhibit 9.

 2         (Audio recording played.)

 3    BY MR. PAULSEN:

 4    Q.  So in this call near the bottom of page 1 Amina Ali is

 5    telling this person in St. Cloud, who has some money, to

 6    "send it to the men," correct?

 7    A.  Correct.

 8    Q.  And then Amina Ali gives her a name.  She says, "Address

 9    it to Nurto Ahmed Hassan," right?

10    A.  Yes.

11    Q.  And then she says, "I made up this name, okay.  I make

12    up the names."  Right?

13    A.  Yes.

14    Q.  "But the number is correct."  Right?

15    A.  Yes.

16    Q.  And then the unknown female says, "Is everything normal

17    or there is a particular fear for it to be revealed."  And

18    Amina Ali says, "No, it's always good to take a precaution."

19              And then at the end of the call she gives this

20    person the phone number to whom -- to which the money should

21    be sent, correct?

22    A.  Correct.

23    Q.  And can you just read that phone number into the record.

24    A.  2521-5332225.

25    Q.  And this is the record from Count 2 that we just looked
```

1    at.  Is that the same number that was involved in Count 2?

2    A.  Yes, it is.

3    Q.  And that number comes -- is the account for whom?

4    A.  That number comes back to an individual known as

5    Warsame, who is an associate of Hassan Afgoye.

6    Q.  So when Amina Ali says at the bottom of page 1, "Send it

7    to the men," she's essentially saying what?

8    A.  Send it to Hassan Afgoye's group.

9    Q.  Which is al-Shabaab?

10   A.  Yes.

11   Q.  Now, to be clear, this particular transaction is not one

12   of our counts of the indictment, correct?

13   A.  Correct.

14   Q.  But our next count of the indictment is Count 3, alleged

15   to have occurred on October 30, 2008 for $1,000, correct?

16   A.  Yes.

17   Q.  And are there several calls that go with this count?

18   A.  There are.

19   Q.  And that would be --

20             MR. PAULSEN:  I would offer at this time

21   Exhibits 20, 23, and 24 for right now.

22             MR. SCOTT:  No objection, Your Honor.

23             MR. KELLY:  Relevance as to Defendant Hassan.

24             THE COURT:  Objection overruled.  Be admitted.

25   BY MR. PAULSEN:

1    Q.  If you turn to Exhibit 20, this is a call on October 30,

2    2008, the same day as the alleged transaction in Count 3,

3    from Amina Ali to Hawo-Kiin Hassan Raage.  And remind us who

4    she is.

5    A.  Hawo-Kiin Hassan Raage, again, is an associate of Hassan

6    Afgoye and she's probably in charge of women's related

7    issues, helping the wounded, the orphans, the mujahidin, and

8    lectures, teleconferences.

9    Q.  Now, this morning we heard from Mr. Bryden about some

10   bombings that occurred on October 29, 2008, one day before

11   this, in Bosaso and Hargeisa, I believe it was?

12   A.  Correct.

13   Q.  A very large-scale suicide bombing involving I think

14   five suicide bombers, he said?

15   A.  Yes.

16   Q.  And this call is the very next day, right?

17   A.  Yes.

18         MR. PAULSEN:  Let's play Number 20.

19   BY MR. PAULSEN:

20   Q.  So right at the beginning, the day after those bombings,

21   Amina Ali is telling Hawo-Kiin of al-Shabaab, "No claim of

22   responsibility should be made about the incidents that

23   happened in those two places."

24         Further on down past the midpoint Amina Ali

25   repeats, "Okay, the responsibility shouldn't be claimed."

1    To which Hawo-Kiin says, "We don't even know about it."  And

2    Amina says, "Exactly, that is the way."

3            Mr. Bryden testified this morning that al-Shabaab

4    was the only organization in Somalia capable of doing that

5    and yet for some reason they never claimed responsibility?

6    A.  Correct.

7    Q.  On the top of page 2 Hawo-Kiin advises Amina Ali that,

8    ..."the Ethiopians have suffered spectacularly and all of

9    their officers had been wiped out."  To which Amina responds

10   (As read), "May they all be wiped out, by God's order.  Let

11   them all be wiped out."

12           Over on the top of page 3 Amina, second time she

13   speaks, says -- refers to 500 and then she says, "Also, tell

14   Hassan that we will send one thousand -- we will send one

15   thousand through Tawakal."

16   A.  Yes.

17   Q.  Now, the 1,000, does that turn out to be what's charged

18   in Count 3?

19   A.  Yes, it is that amount.

20   Q.  What about the 500, is that a count or just other money

21   that's out there?

22   A.  That may be referencing other money that's out there.

23   Q.  But with respect to this money, including the 1,000 that

24   she's going to send through Tawakal, Amina says, "Which we

25   collected through a door-to-door fund raising"...

 1                And then later down at the halfway point Hawo-Kiin
 2     says, "To whom did you address it?  It's important to have
 3     the name of the guy that you address it to.  Amina says,
 4     (As read), "We did not send it to a guy's name.  We will
 5     create the name but we haven't sent it yet."
 6     A.  Yes.
 7     Q.  Over on the bottom of page 4 Amina, three lines, four
 8     lines up from the bottom, is talking about, (As read) "The
 9     enemy is all united.  Furthermore the men who live in the
10     Villa Somalia --"
11                What's the Villa Somalia?
12     A.  That was the presidential palace at the time for the
13     TFG.
14     Q.  She goes on to say that the people who live in the Villa
15     Somalia, the presidential palace, on the top of page 5,
16     ..."if they turn themselves in.  They should be welcomed to
17     let the enemy be weakened."
18     A.  Correct.
19     Q.  Now we go to Exhibit 23.  This is a call on October 30,
20     2008 at 10:14 p.m. UTC between Amina Ali and Abdirizak
21     Khalif Nur, also known as Omar Abdi Dahir.  Do you know that
22     person, Omar Abdi Dahir?
23     A.  Yes.  He is an individual who works at Tawakal Halal in
24     Rochester.
25                MR. PAULSEN:  If we can play Exhibit 23, please.

```
 1              (Audio recording played.)
 2      BY MR. PAULSEN:
 3      Q.  So this Abdirizak Khalif Nur, does this end up being the
 4      name of the sender on the record involving Count 3?
 5      A.  It does.
 6      Q.  And he's a real person?
 7      A.  Correct.
 8      Q.  And he actually works at Tawakal in Rochester?
 9      A.  Yes.
10      Q.  What is Tawakal?
11      A.  It's a market, a food market, but it's also a place --
12      it's a hawala where you can send money out, if you would
13      like to, to overseas locations.
14      Q.  And Amina Ali gives him a phone number that he should
15      use to send it to?
16      A.  Yes.
17      Q.  And it's that same phone number that we have seen before
18      ending in 2225?
19      A.  Yes.
20      Q.  Now we'll go to --
21              MR. PAULSEN:  If I haven't offered it, I will
22      offer Exhibit 24.  I guess I already did.
23      BY MR. PAULSEN:
24      Q.  24 is a call on November 1, 2008, just a day later, from
25      Amina Ali calling Hawo-Kiin Hassan Raage.  Again, she's with
```

1    al-Shabaab in Somalia?

2    A.  Yes.

3    Q.  And the call takes place at 3:35 a.m. UTC.

4         MR. PAULSEN:  We can play Number 24.

5       (Audio recording played.)

6    BY MR. PAULSEN:

7    Q.  All right.  So just to clear up one thing, the second

8    time Hawo-Kiin speaks --

9         THE COURT:  Before we do that, let's take a

10   stretch break.  Let's take a two-minute stretch break.

11      (Pause.)

12        THE COURT:  Let's continue.

13   BY MR. PAULSEN:

14   Q.  I wanted to direct your attention to page 1.  The second

15   time Hawo-Kiin speaks she refers to Amina Ali as Amina Aden?

16   A.  Yes.

17   Q.  Is that another name for Amina Ali?

18   A.  That is another name used, yes.

19   Q.  And there's still talk about that 500 from the previous

20   call.  It looks like that hasn't showed up yet?

21   A.  This might be in reference to the 500 in Count 4, which

22   comes next.

23   Q.  All right.  At any rate, with respect to the $1,000 in

24   Count 3, over on page 3, about a third of the way down,

25   Amina tells Hawo-Kiin that, "$1,000 have been sent to the

1    number and name you gave me."  She says, "I lost the name.

2    The name you gave me...I wrote it on a piece of paper and I

3    lost it.  When I couldn't find the paper, since I was at the

4    transfer office.  I made up a name.  And the name I made up

5    is Ibado Ali Warsame."  She goes on to say, "Yes, I made it

6    up.  But it's remitted by a male, it's sent by a male,

7    because my name cannot be used.  I asked a man to use his

8    name.  I beg people for their names, do you know?"

9         Hawo-Kiin says, "Right."

10        Amina says (As read), "So a man allowed his name to be

11    on the $1,000 and it's a man by the name of Abdirizaq Khalif

12    Nuur."

13    A.  Correct.

14    Q.  Did you then go and get the Tawakal record with respect

15    to this transaction?

16    A.  Yes, we did.

17    Q.  And is that Government Exhibit 162?

18    A.  Yes, it is.

19              MR. PAULSEN:  Offer 162.

20              MR. SCOTT:  No objection, Your Honor.

21              MR. KELLY:  Your Honor, again, Defendant Hassan

22    objects as to relevancy and we request a limiting

23    instruction --

24              MR. PAULSEN:  Well, Your Honor --

25              MR. KELLY:  -- at this point.

```
 1                    MR. PAULSEN:  If I may?

 2                    THE COURT:  You may.

 3                    MR. PAULSEN:  The next witness will tie it up and

 4       that will be -- with permission, I am going to ask to

 5       interrupt Mr. Wilson and bring the next witness momentarily.

 6                    THE COURT:  All right.  Overruled.

 7       BY MR. PAULSEN:

 8       Q.  So this is from the Tawakul Money Express and it says

 9       the sender is Abdirisaak Khalif Nur, right?

10       A.  Correct.

11       Q.  And the beneficiary is who?

12       A.  Cibaado Cali Warsame.

13       Q.  And we heard from the FBI linguist about this putting

14       "C" in front of vowels sometimes.  The "C" is silent?

15       A.  Yes.

16       Q.  So this here on the voucher is spelled differently than

17       the name was spelled in the transcript, but the "C" is

18       silent?

19       A.  Correct.

20       Q.  And it was sent to the telephone number that ends in

21       2225 that we talked about?

22       A.  Yes, which is associated with Warsame.

23       Q.  Who works for Afgoye?

24       A.  Correct.

25       Q.  And the date of the remittance was October 30, 2008?
```

```
 1    A.  Yes.

 2    Q.  And the amount of it was $1,000?

 3    A.  Yes.

 4              MR. PAULSEN:  At this time, Your Honor, I would

 5    like permission to interrupt Mr. Wilson's testimony to call

 6    Omar Dahir, also known as Abdirizak Khalif Nur.

 7              THE COURT:  All right.  Sir, you may step down.

 8              MR. PAULSEN:  He needs an interpreter, Your Honor.

 9              THE COURT:  Swear the interpreter in.

10              THE CLERK:  Please raise your right hand.

11       (Interpreter sworn.)

12              THE COURT:  If you want to pull up a chair, you

13    can.

14              INTERPRETER:  No, I'm okay.

15              THE COURT:  But you can't block the jury, so

16    that's the problem.

17       (Witness sworn.)

18              THE COURT:  All right.  Would you state your true

19    and correct name for the record, please.

20              THE WITNESS:  Omar Dahir.

21              THE COURT:  All right.  Sir, if you would pull the

22    microphone closer to you so the English translation can be

23    heard by the jury.

24              You may inquire.

25
```

```
1                        (Omar Dahir)

2                    DIRECT EXAMINATION

3    BY MR. PAULSEN:

4    Q.  You are Omar Dahir?

5              THE COURT:  Spell your name for the record, first

6    and last name for the record.

7              THE WITNESS:  O-m-a-r.  D-a-h-i-r.

8    BY MR. PAULSEN:

9    Q.  Are you also known as Abdirizak Khalif Nur?

10   A.  Yes, some people knows [sic] that name to me.

11   Q.  Can you explain why you are known by two names.

12   A.  The people in Africa use that name as a nickname, that I

13   know them in Africa.

14   Q.  Are you originally from Somalia?

15   A.  Yes.

16   Q.  What region?

17   A.  Mogadishu.

18   Q.  And how old are you?

19   A.  30 years.

20   Q.  Did there come a time when you left Somalia?

21              WITNESS INTERPRETER:  Will you repeat the

22   question, please?

23   BY MR. PAULSEN:

24   Q.  Did there come a time when you left Somalia?

25   A.  1991.
```

```
 1    Q.  And where did you go first?

 2    A.  Kenya.

 3    Q.  When did you come to the United States?

 4    A.  '91 -- I mean '99.

 5    Q.  And you currently live in the Rochester, Minnesota,

 6    area?

 7    A.  Yes.

 8    Q.  Do you have a family there?

 9    A.  Yes.

10    Q.  You're married.  Do you have any children?

11    A.  Yes, I have two kids.

12    Q.  Can you tell us what your education has been.

13    A.  Level five ESL classes.

14    Q.  When you were growing up in Somalia, did you go to

15    school at all in Somalia?

16    A.  No, not at that time.

17    Q.  How about when you were living in Kenya, did you go to

18    any formal schooling?

19    A.  Yeah, I went to private schools, not that much.

20    Q.  How many years of schooling?

21    A.  I would say between a year and two years.

22    Q.  And then in the United States you've just had ESL or

23    English as a second language courses?

24    A.  Two years of ESL.

25    Q.  Where do you presently work?
```

1    A.  Store.

2    Q.  What's the name of the store?

3    A.  Tawakal Halal.

4    Q.  And what kind of a store is that Tawakal store?

5    A.  Grocery store.  Also is halal meat.

6    Q.  And what does that mean?

7    A.  It is a store and we sell kosher meat.

8    Q.  In addition to selling groceries, is there a place in

9    the store where people can send money to Somalia?

10   A.  Yes, we do have hawala also.

11   Q.  You call it a hawala?

12   A.  Yes.

13   Q.  How long have you worked at this combination grocery

14   store/hawala?

15   A.  I would say around five years.

16   Q.  So were you working there on October 30th of 2008?

17   A.  Yes.

18   Q.  And you remember being involved in a transaction that

19   involved a thousand dollars?

20   A.  Yes.

21   Q.  Do you know someone named Hawo?

22   A.  Yes.

23   Q.  Do you see her in court today?

24   A.  Yes.

25   Q.  Could you point her out, please.

1    A.  I call Hawo that girl or that lady (indicating).

2    Q.  Well, I'll count off the people at the table and you

3    tell me which one it is.  Number 1, number 2, number 3,

4    number 4, or number 5.

5    A.  (In English) Number 3.

6              WITNESS INTERPRETER:  Sir, you have to wait until

7    I finish the question.

8              THE WITNESS:  Yes.

9              WITNESS INTERPRETER:  Go ahead, sir.

10             MR. PAULSEN:  May the record reflect he has

11   identified the Defendant Hawo Hassan?

12             THE COURT:  It may.

13   BY MR. PAULSEN:

14   Q.  Did you know Hawo prior to October 30, 2008?

15   A.  Yes.

16   Q.  How did you know her?

17   A.  She used to shop our store.

18   Q.  Now, about this time in late October did Hawo come into

19   the store with some money?

20   A.  Yes, yes.

21   Q.  And how much money did Hawo bring to the store?

22   A.  A thousand dollars.

23   Q.  And did she tell you what she wanted to have done with

24   the thousand dollars?

25   A.  Yes.

1    Q.  Did she want to send it someplace?

2    A.  She told me she raised this money for orphans, so she

3    can send to orphan people.

4    Q.  And to what country did she want the money to be sent

5    for the orphans?

6    A.  Mogadishu.

7    Q.  In Somalia?

8    A.  Yes, Somalia.

9    Q.  And did she at that point have a name or a phone number

10   for the recipient in Somalia to give to you?

11   A.  It was a long time ago.  I do believe she give me a

12   name, but I don't remember if she give me a number, phone

13   number.

14   Q.  And did there come a time when you had a conversation

15   with her about the name to be used as the sender on the

16   thousand dollar transfer?

17   A.  I remember that I send the money and I remember that she

18   told me this money is going to orphans.  That's all I

19   remember.

20   Q.  Well, you ended up -- your name ended up being used as

21   the sender.  It was not your money, was it?

22   A.  I send it, yes, I did.

23   Q.  What I am asking is:  How did it come to be that your

24   name was used as the sender rather than Hawo's name?

25   A.  Hawo ask me to send it, that money in my name, and that

1    money was going to orphans.

2    Q.  That's what she told you, right?

3    A.  That's what she told me.

4    Q.  And she also told you that she wanted to use your name

5    rather than her name?

6              MR. KELLY:  Objection, Your Honor, leading.

7              THE COURT:  Rephrase.

8    BY MR. PAULSEN:

9    Q.  Was it Hawo that asked you to send it under your name?

10   A.  Yes.

11   Q.  And did you agree to do that?

12   A.  Yes, because the good intention that money go to the

13   orphans, because of that, yes.

14   Q.  That's why you agreed to do it, because you thought it

15   was with good intentions?

16   A.  Yes, that's true.

17   Q.  Had you ever done this before, that is, had you ever

18   allowed your name to be used to -- on somebody else's money

19   transfer?

20   A.  No.  Because of the orphan, because of that.

21   Q.  And have you ever done it since?

22   A.  I never did after that.

23   Q.  So this is the only time you've ever allowed your name

24   to be used to send someone else's money?

25   A.  Yes.

```
1    Q.  Now, did there come a time when somebody else contacted

2    you to give you more information about where this money

3    should go?

4    A.  Yes.

5            MR. PAULSEN:  And because it's so short, Your

6    Honor --

7    BY MR. PAULSEN:

8    Q.  Well, who was the person that called you?

9    A.  Somebody bring me a tape that I listen and that voice

10   was -- looked like Amina.

11   Q.  You're talking about prior to trial we had you listen to

12   a particular phone call, recorded call, right?

13   A.  Yes.

14           MR. PAULSEN:  And with the Court's permission, I

15   would like him to be able to listen to it again here in

16   court.

17           THE COURT:  He may.

18           MR. PAULSEN:  It's Exhibit 23.  Play 23 again.

19       (Audio recording played.)

20   BY MR. PAULSEN:

21   Q.  Is that the call you listened to before trial?

22   A.  Yes.

23   Q.  And now listening to it again, do you recognize the

24   voice of the speaker who was talking to you?

25   A.  Yes.
```

```
 1    Q.  Who was it?

 2    A.  Amina.

 3    Q.  And do you know somebody named Amina Ali?

 4    A.  Yes, I do.

 5    Q.  How do you know Amina Ali?

 6    A.  She was my customer.  She was a good person that I know.

 7    Q.  Do you see her in the courtroom today?

 8    A.  Yes, I do.

 9    Q.  Would you point her out.

10    A.  She's the fourth sitting person.

11              MR. PAULSEN:  May the record reflect the

12    identification of Amina Ali?

13              THE COURT:  It may.

14    BY MR. PAULSEN:

15    Q.  You said the fourth person?

16    A.  Yes.

17              THE COURT:  It may.

18    BY MR. PAULSEN:

19    Q.  Would you have agreed to do this if you had thought the

20    money was going to al-Shabaab?

21    A.  No.

22    Q.  Why not?

23              MR. KELLY:  Objection, relevance.

24              THE COURT:  Overruled.

25              THE WITNESS:  I never supported any group in
```

```
1    Somalia who are fighting.

2    BY MR. PAULSEN:

3    Q.  You don't like fighting?

4    A.  No, I don't.  I don't like war.

5            MR. PAULSEN:  Nothing further.

6            MR. KELLY:  May we have a minute, Your Honor?

7            THE COURT:  You may.

8        (Discussion off the record between

9         Mr. Kelly and Mr. Scott.)

10           MR. KELLY:  I don't have any questions, Your

11   Honor.

12           MR. SCOTT:  He talked me out of it, Your Honor.

13           THE COURT:  Anything further with this witness?

14           MR. PAULSEN:  No, Your Honor.

15           THE COURT:  You may step down, sir.

16           MR. PAULSEN:  Re-call Mike Wilson.

17                    RESUMED DIRECT EXAMINATION

18   BY MR. PAULSEN:

19   Q.  Special Agent Wilson, now we are going to have to kind

20   of go back in time and pick up a couple of calls I skipped

21   over in the interest of accommodating that witness.  The

22   next call would be Number 10, Exhibit 10.

23           MR. PAULSEN:  I'll offer 10 and 11 at this point.

24   I guess they're already in.  They just haven't been played

25   yet.
```

```
 1              MR. SCOTT:  10 is in, Your Honor.  We don't object
 2       to 11.
 3              MR. KELLY:  Your Honor, again we object on
 4       relevancy to Exhibit 11.  Your Honor, these exhibits are
 5       offered in support of the government's proof of counts in
 6       which my client is not involved and we ask the Court for a
 7       limiting instruction.
 8              THE COURT:  Overruled.  You may play the tapes.
 9       BY MR. PAULSEN:
10       Q.  Special Agent Wilson, Count -- or Exhibit 10 is a call
11       on October 12, 2008 at 6:05 p.m. UTC from Hassan Afgoye,
12       also known as Abu Ayman, to Amina Ali.
13              There's going to be talk about clothing shipments
14       in this call or a clothing shipment in this call.  And was
15       Amina Ali involved in such shipment?
16       A.  Yes, she was.
17              MR. PAULSEN:  Let's play Exhibit 10.
18          (Audio recording played.)
19       BY MR. PAULSEN:
20       Q.  All right.  If we go back to page 1, Amina Ali, the
21       second time -- well, she says that the ship is carrying the
22       garments and it's on its way to Mogadishu.
23              The third time she speaks she says, "So, I told
24       the group that has an agency over there ...when it is taken
25       there; then the Mujahidin men should be given a part and the
```

1    other part belongs to the general public."

2            Is she referring to the clothing?

3    A.  Correct.

4    Q.  So first she calls them "the Mujahidin men," right?

5    A.  Yes.

6    Q.  And then on page 2, the third time she speaks, after

7    talking about "I do not know how the garments were packed,"

8    at the end of that paragraph she says, ..."but things like

9    jackets and shoes are for the men."  Right?

10   A.  Correct.

11   Q.  And she's talking to Hassan Afgoye, the al-Shabaab

12   finance representative?

13   A.  Yes.

14   Q.  And then on page 4, talking to Hassan Afgoye, the third

15   time she speaks she says, "*Naturally*, but you will be taking

16   a part of it --"  And then there's some talk at the bottom

17   about how -- Hassan says to her that, ..."we have a

18   communication department and our *Media* is working."  Can you

19   elaborate on that a little bit.

20   A.  Yeah.  It's important to Ms. Ali that the distribution

21   of the garments --

22           MR. SCOTT:  Your Honor, I am going to object to

23   what's important to her.  He --

24           THE COURT:  Sustained.

25   BY MR. PAULSEN:

1    Q.  In this and later calls are plans made to film the

2    distribution of the garments?

3    A.  Yes.

4    Q.  And Hassan's organization actually has a media

5    department that can do that?

6    A.  Correct.

7    Q.  At the top of page 5 Amina says, "Hold on, hold on."

8    And this is after he's talked about his media department.

9    She says, "Hold on, hold on.  Let me tell you one thing, are

10   you aware that America is the number one enemy.  It is your

11   number one enemy --"  And then she adds, "-- and do you know

12   that they are watching any men that live in this country?"

13   She says, "If you post it in Al-Mujahid -- when you post

14   it --"  And then he says, No, I didn't mean that.  We won't

15   do it that way.

16        Do you know what Al-Mujahid is?

17   A.  It's a jihadi website affiliated with al-Shabaab.

18   Q.  So does it appear that Amina did not want this to go on

19   the public website?

20   A.  Absolutely.

21   Q.  She goes on a few lines later to explain.  After he says

22   they won't do it she says, "Right, right.  Yes.  They will

23   come straight to Amina.  Do you know?  That is what they

24   want; that gives them a chance to look for me."  Right?

25   A.  Yes.

1    Q.  Then we go over to the bottom of page 6.  Talking again

2    about who is going to get these garments, the last time

3    Amina speaks she says, "Yes, God willing.  So I will tell

4    those people not to unpack the garments before that group

5    comes.  So you, the youth, take a share as a collective

6    group."

7            She's speaking to Hassan Afgoye and referring to

8    his group as "the youth," right?

9    A.  Correct.

10   Q.  And I believe that is one of the places where our

11   linguist indicated "youth" should be capitalized?

12   A.  Yes.

13   Q.  Because it's referring to the organization?

14   A.  Yes.

15   Q.  And then over on page 7, about a third of the way down,

16   Amina is asking Hassan Afgoye whether he received two

17   hundreds.  Would that be $200?

18   A.  Yes.

19   Q.  And a little farther down there's a reference to Amina

20   Said, S-a-i-d, and Amina Ali says, "This was sent to another

21   name, but the number is the same number that you know.  It

22   is Warsame's."

23   A.  Correct.

24   Q.  And you previously identified Warsame as an associate of

25   Afgoye?

```
 1    A.  Yes.

 2    Q.  And he is in charge of which one of these numbers?

 3    A.  He has the 2521-5332225 number.

 4    Q.  So he's got the one that we have seen that ends in 2225?

 5    A.  Correct.

 6    Q.  And several lines later Amina says, "It was sent to

 7    Nurta Ahmed Hassan," and she tells him to write that down.

 8    Will there be a later call that sheds light on whether that

 9    is a true name or a false name?

10    A.  There will be.

11    Q.  And what is it?

12    A.  It's a fictitious name.

13    Q.  Now, that particular $200 is not a count in our

14    indictment, it's just extra money out there?

15    A.  Yes.

16    Q.  Oh, and then just over at the top of page 8 Hassan

17    Afgoye says, "Yes, God willing.  Fortunately Warsame and I

18    will see each other at home, tonight."

19           So evidently they live nearby or close?

20    A.  Correct.

21    Q.  Next call would be Exhibit 11.  It's already in

22    evidence.  This is a call on October 13, 2008 from Amina Ali

23    to Bashir Gelle Farah.  I believe we heard about him from

24    Mr. Bryden this morning, didn't we?

25    A.  Yes, we did.
```

```
1    Q.  Remind us who Bashir Gelle Farah is.

2    A.  He is an individual who assists in fund-raising for

3    al-Shabaab.

4    Q.  And he's located where?

5    A.  He's in United Arab Emirates.

6    Q.  And this call again is going to relate to this clothing

7    that's on its way?

8    A.  Correct.

9    Q.  And does Mr. Bashir Gelle Farah have some responsibility

10   with respect to the clothing?

11   A.  Yes.  He is assisting in the shipment of the clothing

12   from U.S. to UAE, from UAE to Somalia.

13            MR. PAULSEN:  Play Number 11, please.

14       (Audio recording played.)

15   BY MR. PAULSEN:

16   Q.  So was this a large shipment of clothing?

17   A.  Yes, it was.

18   Q.  And if we go to page 5, about ten lines up from the

19   bottom on page 5 Amina says, "They... in other words... The

20   youth should come united as one group and take half."

21   A.  Correct.

22   Q.  Over on page 7, the midpoint of page 7, she repeats,

23   "Yes.  So they should come and -- eh -- this group -- eh --

24   the youth -- they should come and take whatever they want to

25   from it, because they have wives and children, you know?
```

1    They should be allowed to take whatever they want to.  They

2    should come and... I mean, they should be present even when

3    the garments are being divided and sorted."

4            And does Bashir agree to that?

5    A.  Yes, he does.

6    Q.  And then in the middle of page 8, just below the

7    midpoint, Amina says, "I spoke to Hassan Afgoye; he keeps in

8    touch with me by phone -- God bless him -- I told him -- the

9    man responsible for their finance."

10           And Bashir agrees, right, that Afgoye is the man

11   responsible for al-Shabaab's finances?

12   A.  Correct.

13           MR. PAULSEN:  That's all the questions I have on

14   that one, Your Honor.

15           THE COURT:  All right.  Let's stop here.  We'll

16   start up tomorrow at 9:30, at 9:30.  I have some other

17   motions starting at 8:00, so we'll start up at 9:30.  All

18   rise for the jury.  Enjoy this beautiful day.

19       (Jury excused.)

20                        **IN OPEN COURT**

21                      **(JURY NOT PRESENT)**

22           THE COURT:  Counsel, is there anything that we

23   need to discuss before tomorrow morning?

24           MR. PAULSEN:  Just so the record is clear, when

25   Mr. Kelly makes objections to the calls that he claims don't

1  apply to Hawo Hassan, you've overruled, but just so my

2  record is clear, I believe they do apply to Hawo Hassan with

3  equal force under the co-conspirator exception, which I

4  talked about at pretrial.

5         MR. KELLY:  Your Honor, as I understand, the

6  evidence coming in right now is directed perhaps solely to

7  Counts 2 through 13 in which Defendant Hassan is not a

8  defendant and we feel it would be proper for the Court to

9  instruct the jury that this evidence is being admitted

10 against only one of the defendants and not the other.

11        THE COURT:  Okay.  Your objection is overruled.

12        Anything else for Mrs. Ali, Mr. Scott?

13        MR. SCOTT:  No, Your Honor.  Mr. -- the prosecutor

14 is pushing Mr. Wilson's envelope pretty hard.  I'm trying

15 not to object all the time.  I wish he would slow that down.

16 It could slow down the trial if I start objecting.

17        THE COURT:  Okay.  We'll recess until tomorrow.

18 Have a good evening.

19     (Court adjourned at 5:05 p.m.)

20                    *     *     *

21

22

23

24

25

1

2

3          I, Lori A. Simpson, certify that the foregoing is a

4      correct transcript from the record of proceedings in the

5      above-entitled matter.

6

7                    Certified by:  *s/ Lori A. Simpson*

8                                   Lori A. Simpson, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25