# United States Court of Appeals
## For the Eighth Circuit
_____

No. 13-2208
_____

United States of America

*Plaintiff - Appellee*

v.

Amina Farah Ali

*Defendant - Appellant*
_____

No. 13-2209
_____

United States of America

*Plaintiff - Appellee*

v.

Hawo Mohamed Hassan, also known as Halimo Hassan, also known as Halima Hassan

*Defendant - Appellant*
_____

Appeals from United States District Court
for the District of Minnesota - St. Paul
_____

Submitted: April 16, 2015
Filed: August 25, 2015
_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

In this consolidated appeal, we consider the criminal prosecutions that were brought against two women living in Minnesota in connection with funds sent to al Shabaab, an organization in Somalia that the United States Secretary of State had designated a foreign terrorist organization.  After a jury trial, Amina Farah Ali and Hawo Mohamed Hassan were convicted on all counts.  The district court[1] sentenced Ali to 240 months in prison and Hassan to 120 months in prison.  We affirm.

## I.    Background

Amina Farah Ali and Hawo Mohamed Hassan are naturalized citizens of the United States who live in Minnesota.  Both are from Somalia.  In the summer of 2008, the FBI learned that Ali had contacted members of al Shabaab, a foreign terrorist organization in Somalia.  Al Shabaab had been so designated by the Secretary of State in February 2008.  After a lengthy investigation, a federal grand jury returned an indictment charging (1) Ali and Hassan with one count of conspiring to provide material support to al Shabaab, *see* 18 U.S.C. § 2339B(a)(1); (2) Ali with twelve counts of providing material support to al Shabaab, *see id.*; and (3) Hassan with two counts of making a false statement, *see* 18 U.S.C. § 1001(a)(2).

_____

[1]The Honorable Michael J. Davis, then Chief Judge, United States District Court for the District of Minnesota.

Before trial, the Government informed Ali and Hassan that it intended to offer evidence obtained under the authority of the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801 *et seq*. Ali and Hassan requested disclosure of the FISA materials and suppression of all FISA-obtained evidence. In turn, the Government filed a declaration by the Attorney General of the United States averring that disclosure of the FISA materials or an adversary proceeding would harm the national security of the United States. Under FISA, this declaration prompted an *in camera*, *ex parte* review of the FISA materials by the district court. *Id.* §§ 1806(f), 1825(g). After conducting this review, the court denied Ali's and Hassan's motions for disclosure and suppression.

At the final status conference before trial, Ali remained seated when court was convened. After learning of Ali's failure to stand, the court issued an order requiring all parties to stand when court is called to order. Yet when court convened for the first day of trial, Ali remained seated. The court confirmed that Ali was aware of its order and revoked her pretrial release status. On the second day of trial, Ali again refused to stand.

While Ali was incarcerated, the court allowed "three learned clerics" to visit her. They informed Ali that she could stand for the court if she was "in a difficult situation, if [she was] fearful of [her] own life." When Ali returned to court, the court gave her a chance to speak, telling her that "your elders are even telling you that your interpretation [of the Hadith] is wrong." In response, Ali stated that "my understanding is that I have to follow what I think is the right way and that's what I've been doing." The court ultimately cited Ali for twenty instances of contempt. After two nights of incarceration, Ali informed the court that she would comply with its order. The court released Ali from custody, and Ali stood when court convened and recessed for the rest of the trial. Ali appealed the contempt citations, and we affirmed in part and vacated and remanded in part. *United States v. Ali*, 682 F.3d 705, 711 (8th Cir. 2012).

-3-

During the ten-day trial in October 2011, the jury learned about the history of Somalia as well as al Shabaab's role in the country.  The Government's expert witness, Matthew Bryden, explained that Somalia had not had an effective central government since 1991 but that the Transitional Federal Government ("TFG") had been in place since 2004.  With respect to al Shabaab, which is known as "the youth," Bryden explained that its goal is "to impose [its] version of Islamic law on Somalia." Bryden continued, explaining that al Shabaab seeks to "expel" and "dismantle" the TFG and "to replace it with [al Shabaab's] own rule by force."  Al Shabaab, Bryden explained, has used suicide bombs, roadside bombs, and assassinations.

The Government presented evidence that Ali and Hassan planned and participated in fundraising teleconferences in which a speaker, oftentimes a member of al Shabaab, would give a lecture.  After the lectures, listeners would pledge money. One of these teleconferences, the jury learned, had over one thousand listeners.  In another teleconference, listeners pledged $2,150, and Hassan kept track of the donors' phone numbers.  The FBI later found a ledger from this task in Hassan's home.  The jury listened to some of these teleconferences.  For example, in one teleconference, Ali asked an al Shabaab leader "[w]hy wage jihad against [the TFG]?  The goal was to adopt Islamic law and they adopted Islamic law."  The al Shabaab leader responded in part:

> The reason is:  Ugandan troops and Burundian troops are still in the country.  They are Christians.  They are carrying the cross.  They invaded our country.  They did not come here through our consent.  That means[] they are to be considered infidels, who are aggressors, and the action to be taken against infidel aggressors is war.

Ali frequently spoke with members of al Shabaab.  The jury listened to numerous recorded telephone calls between Ali and Hassan Afgoye, who at one time was responsible for al Shabaab's finances.  The Government's expert witness explained that Afgoye later became the senior al Shabaab figure for an area of

-4-

Somalia.  In fact, the jury learned that Ali and Afgoye actually discussed his new position.  In many of their conversations, Ali and Afgoye discussed money that she had arranged to be sent to him or his associates.  Through the testimony of an FBI agent, the Government meticulously connected Ali to each transfer of money charged in the indictment—for example, through documentation for the money transfers, telephone conversations in which Ali spoke with the sender of the money about where to send it, and telephone conversations in which Afgoye or his associates discussed with Ali whether they had received the money.  In one telephone call, Ali discussed with Afgoye how she sent money to al Shabaab as early as 2007, before it was designated a foreign terrorist organization.  Ali stated that she later learned that the "young men"—a reference to al Shabaab—"should be isolated" and that her family members had warned her about being arrested.

Ali and Afgoye also talked about al Shabaab's activities in Somalia.  For example, Afgoye told Ali about a recent battle, recounting that the enemy's leaders had been "captured alive and then slaughtered."  Ali responded:  "Were they killed?  Thanks God.  Yes."  The Government's expert provided context for this conversation, explaining that Afgoye was referring to a battle between al Shabaab and forces aligned with the TFG.  In another telephone call, Afgoye informed Ali about a recent al Shabaab suicide bombing.  The Government's expert witness explained that dozens of people died in this particular attack.  In yet another telephone call, Afgoye implored Ali to "send whatever you currently have in hand . . . [a]nd after that we will race to confront the enemy, God willing."  Ali responded, "By the grace of God, [m]ay God defeat[] them.  Around here, no one talks about the enemy; these people live in a different reality.  May God show these people the truth."

The Government also presented evidence that Hassan spoke with members of al Shabaab.  In a telephone conversation with Ali, Hassan stated that the al Shabaab "guys" had told her about their battle strategy.  Hassan stated that "[t]hey said [it] was [a] good idea.  And they are right if you really look at it."  In another telephone

-5-

conversation with Ali, Hassan described an al Shabaab suicide bombing where "they are still counting the dead," which she described as "[t]he best joy ever" and a "delightful event."  Ali twice chimed in that this news was "[w]onderful."  The Government's expert witness stated that this particular attack targeted a TFG minister at a hotel and that al Shabaab claimed credit for the attack.

The jury also heard about al Shabaab's connections to groups both inside and outside of Somalia.  For example, Ali and Hassan once discussed having Hassan Dahir Aweys speak during a fundraising teleconference.  Aweys, the jury learned, was a specially designated global terrorist, *see generally* 31 C.F.R. § 594.310, and was in charge of another militia in Somalia.  Aweys eventually spoke during a teleconference, and Ali told Afgoye that she sent him the money that was donated.  The jury also heard about Ali's contact with Isse Kamboni, who was associated with another militia in Somalia that was led by another specially designated global terrorist.  The Government also demonstrated that al Shabaab had connections to al Qaeda.  For the most part, this evidence helped to explain the context of a telephone call between Ali and Afgoye, in which they discussed al Shabaab's response to a message from Osama bin Laden entitled "Fight on Lions of Somalia."

In connection with the two false-statement counts against Hassan, the Government presented evidence that Hassan met with FBI agents in late 2009.  On September 2, 2009, Hassan told an FBI agent that she did not know anyone who sent money to al Shabaab, the mujahidin, the young men, or the fighters.  Hassan also told an FBI agent that Ali had never asked her to send money to Somalia or elsewhere through a "hawala," which is a service for sending money overseas.  Hassan made three further statements about Ali to an FBI agent—specifically that "Ali provides [Hassan] a list and [she] collects the money and gives it to Amina Ali," that certain money was "provided to Ms. Ali," and that "Amina Ali spoke about jihad."

-6-

In their closing arguments, Ali and Hassan defended their actions primarily on the basis that they intended to provide humanitarian relief in Somalia. However, the jury returned a guilty verdict on all counts. For Ali, the district court calculated an advisory sentencing guidelines range of 360 months to life in prison. The court decided to vary downward to a sentence of 240 months' imprisonment. For Hassan, the court calculated an advisory sentencing guidelines range of 360 to 372 months in prison. The district court opted to vary downward from Hassan's advisory guidelines range, imposing a sentence of 120 months' imprisonment. Ali and Hassan appeal.

## II.   Discussion

### A.   Recusal

Ali and Hassan contend that the trial judge should have recused himself from this case. This contention is being raised for the first time on appeal, meaning that our review is for plain error. *See United States v. Burnette*, 518 F.3d 942, 945 (8th Cir. 2008).

A judge shall recuse from a case if "his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(a), (b)(1). "A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir. 2003) (quoting *Pope v. Fed. Express Corp.*, 974 F.2d 982, 985 (8th Cir. 1992)). The Supreme Court has explained that:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would

-7-

make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky v. United States*, 510 U.S. 540, 555 (1994).  We have emphasized that "[r]ules against 'bias' and 'partiality' can never mean to require the total absence of preconception, predispositions and other mental habits."  *Burnette*, 518 F.3d at 945 (quoting *United States v. Bernstein*, 533 F.2d 775, 785 (2d Cir. 1976)).

Ali and Hassan assert that, taken together, the court's statements "suggest a world view equating fundamentalist Islam with terrorism, therefore deserving of punitive measures in order to preserve the illusory concept of 'national security.'"  As evidence, Ali and Hassan direct us to the court's statements during jury selection, which they believe show the court prejudicially "group[ing] together" all persons of Muslim faith.  This assertion is baseless.  Ali and Hassan rely on various questions that the court asked potential jurors, such as whether "you or anyone that is close friends or relatives ever had any kind of experience with people from Somalia, the Horn of Africa, the Middle East, with Muslims, Persians, Iraqis, or Afghanistans" as well as whether anyone had "specialized knowledge or expertise in the issue[] of terrorism" or familiarity with "[t]he Middle East, Iraq, Iran, Afghanistan, Egypt, Somalia, Kenya, Tunisia, Morocco, and Egypt."  As the Government points out, these questions are functionally identical to questions that Ali's counsel requested that the trial judge ask on Ali's behalf.  Consequently, the court's questions evince a willingness to work with Ali's counsel to secure an impartial jury and thus the absence of bias and partiality.

As further support for the need for *sua sponte* recusal, Ali and Hassan direct us to a discussion between Ali and the court about Ali's refusal to stand.  In this

-8-

exchange, the court provided Ali with an opportunity to share her reasons for disobeying the court's order. The court stated that, while Ali was incarcerated, three clerics had spoken with her and that "your elders are even telling you that your interpretation of [the Hadith] is wrong." In response, Ali emphasized that her religious beliefs compelled disobedience of the court's order. The court then reiterated its intent to hold Ali in contempt but emphasized that, while she was incarcerated, the court would ensure that her "religious beliefs will be honored" and that her "modesty will be protected." Viewed in context, this exchange does not portray "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. Rather, this discussion merely shows the nature of the disagreement between the court and Ali. The proper recourse in this situation is an appeal, which Ali took to this court, not a bias or partiality motion to the district court that, as it turns out, was never made. *See id.*

Ali and Hassan next claim that the court's statements during sentencing were sufficient to necessitate *sua sponte* recusal. They specifically direct us to the following questions posed by the court during Ali's sentencing hearing: (1) "What does jihad mean to you?"; (2) "Did you know about al Shabaab describing itself as waging jihad against enemies of Islam?"; (3) "Would you agree that al Shabaab is an Islamist organization that follows a very conservative and strict interpretation of Islam?"; and (4) "[A]re you telling me that you don't want to talk to me about that or you have no knowledge of [al Shabaab's] strict beliefs?" Plucked from context, some of these questions may appear unconventional. However, rather than showing bias or partiality, when viewed in context, these questions demonstrate that the court sought to comprehend Ali's understanding of al Shabaab's goals and actions, a legitimate topic for a sentencing court to explore in a prosecution for conspiring to provide and providing material support to al Shabaab. *See* 18 U.S.C. § 3553(a)(1)-(2).

Finally, Ali and Hassan argue that the court's statements in similar cases show that the court was predisposed to rule against them. They primarily rely on the court's

statement in another matter that "[t]he community at large and the Somali community should know that the United States . . . has done an admirable job at investigating and prosecuting all the individuals that were involved in these terrorism activities." However, the Supreme Court has made clear that "opinions formed by the judge on the basis of facts introduced or events occurring in the course . . . of *prior proceedings*[] do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555 (emphasis added). The court's above-quoted statement shows neither extreme favoritism nor antagonism. It merely reflects the court's view of cases over which it presided. *See id.* at 551 ("If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." (quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943))). We thus discern no plain error.

## B.    Foreign Terrorist Organization Designation

Ali and Hassan raise two constitutional challenges to the procedure by which al Shabaab was designated a foreign terrorist organization. We review these issues *de novo*. *McDermott v. Royal*, 613 F.3d 1192, 1193 (8th Cir. 2010) (per curiam).

Ali and Hassan first claim that their material-support convictions violate the Due Process Clause of the Fifth Amendment. As relevant here, the material-support statute forbids "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so."  18 U.S.C. § 2339B(a)(1). The phrase "foreign terrorist organization" is a term of art that is defined in 8 U.S.C. § 1189(a)(1). Under this provision, the Secretary of State may designate an organization a foreign terrorist organization if the Secretary finds that (1) the organization is a "foreign organization"; (2) the organization engages in "terrorist activity" or "terrorism" or "retains the capability and intent to engage in terrorist activity or terrorism"; and (3) "the terrorist activity or terrorism of the organization

-10-

threatens the security of United States nationals or the national security of the United States." *Id.* Section 1189 also provides a mechanism by which an organization can seek judicial review of its designation as a foreign terrorist organization in the United States Court of Appeals for the District of Columbia Circuit. *Id.* § 1189(c)(1). However, this ability to challenge a designation belongs to the organization, not a defendant in a criminal proceeding. *Id.* § 1189(a)(8).

Ali and Hassan argue that prohibiting them from challenging the Secretary of State's designation of al Shabaab as a foreign terrorist organization offends due process. Our sister circuits have rejected this argument. *United States v. Hammoud*, 381 F.3d 316, 331 (4th Cir. 2004) (en banc), *vacated on other grounds by* 543 U.S. 1097 (2005), *reinstated in all relevant parts*, 405 F.3d 1034 (4th Cir. 2005) (order); *United States v. Afshari*, 426 F.3d 1150, 1155-59 (9th Cir. 2005). For purposes of the Due Process Clause, the Supreme Court has stated that "in determining what facts must be proved beyond a reasonable doubt the . . . legislature's definition of the elements of the offense is usually dispositive." *McMillan v. Pennsylvania*, 477 U.S. 79, 85 (1986). Under 18 U.S.C. § 2339B, "Congress has provided that the *fact* of an organization's designation as [a foreign terrorist organization] is an element of [the crime], but the *validity* of the designation is not." *Hammoud*, 381 F.3d at 331. Thus, like our sister circuits, we hold that it comports with due process to prohibit a criminal defendant from challenging the validity of the Secretary of State's designation of a foreign terrorist organization. *See id.*; *Afshari*, 426 F.3d at 1155-59. In reaching this conclusion, we note that an organization's designation as a foreign terrorist organization is not wholly immune from challenge. The statute provides a method by which an organization, rather than a criminal defendant, can contest the Secretary of State's designation. 8 U.S.C. § 1189(c); *see Lewis v. United States*, 445 U.S. 55, 65-67 (1980).

Ali and Hassan next contend that allowing the Secretary of State to designate foreign terrorist organizations amounts to an unconstitutional delegation of legislative

-11-

power.  The longstanding rule is that "Congress may delegate its legislative power if it 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  *South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 795 (8th Cir. 2005) (alterations in original) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).  Congress has "wide latitude in meeting the intelligible principle requirement . . . [because] 'Congress simply cannot do its job absent an ability to delegate power under broad general directives.'"  *Id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).  "Congress fails to give sufficient guidance in its delegations only if it 'would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed.'"  *Id.* at 796 (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944)).

The statutory scheme governing the designation of foreign terrorist organizations provides an intelligible principle.  *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) (explaining that § 1189(a) "does not grant the Secretary unfettered discretion in designating the groups to which giving material support is prohibited").  As outlined above, the statute permits the Secretary to make a designation only after making three discrete findings.  *See* 8 U.S.C. § 1189(a)(1)(A)-(C).  As the Ninth Circuit has observed, "[t]he Secretary could not, under this standard, designate the International Red Cross or the International Olympic Committee as [foreign] terrorist organizations.  Rather, the Secretary must have reasonable grounds to believe that an organization has engaged in terrorist acts—assassinations, bombings, hostage-taking and the like—before she can place it on the list."  *Humanitarian Law Project*, 205 F.3d at 1137.  As such, two courts have upheld § 1189(a) against a non-delegation challenge.  *Hammoud*, 381 F.3d at 331; *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 172-73 (E.D.N.Y. 2008) ("Congress has established detailed procedures to designate organizations as [foreign terrorist organizations] and it retains the power to revoke such a designation when made.").

-12-

Ali and Hassan ask us to chart a different course primarily due to the requirement that the Secretary of State determine that an organization "threatens the security of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1)(C). The term "national security," Ali and Hassan argue, is "defined without meaning." But the statute defines "national security" to mean "the national defense, foreign relations, or economic interests of the United States." *Id.* § 1189(d)(2). That this definition is general and broad does not an unintelligible principle make. *See South Dakota*, 423 F.3d at 795. Moreover, "[t]he Supreme Court has repeatedly underscored that the intelligible principle standard is relaxed for delegations in fields in which the Executive traditionally has wielded its own power." *Hepting v. AT&T Corp.* (*In re Nat'l Sec. Agency Telecomms. Records Litig.*), 671 F.3d 881, 897-98 (9th Cir. 2011) (collecting cases); *see Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than it customarily wields in domestic areas."). For these reasons, we hold that granting the Secretary of State the ability to designate an organization a foreign terrorist organization does not constitute an unconstitutional delegation of legislative authority.

## C.   FISA

Ali and Hassan argue that FISA violates the Constitution. They alternatively urge that the FISA materials should have been disclosed to them and that the FISA-obtained evidence should have been suppressed.

To obtain approval for surveillance under FISA, there must be, among other things, probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power" and that "each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power." 50 U.S.C. § 1805(a)(2)(A)-(B). An essentially identical probable-cause standard must be met in order to conduct a

-13-

physical search under FISA. *Id.* § 1824(a)(2)(A)-(B). "This probable-cause showing differs in focus from the standard in a typical criminal case. 'Rather than focusing on probable cause to believe that a person has committed a crime, the FISA standard focuses on the status of the target as a foreign power or an agent of a foreign power.'" *United States v. Omar*, 786 F.3d 1104, 1111 (8th Cir. 2015) (alteration omitted) (quoting *United States v. El-Mezain*, 664 F.3d 467, 564 (5th Cir. 2011) (as revised)). A "foreign power" includes "a group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. §§ 1801(a)(4), 1821(1). And an "agent of a foreign power" includes any person who "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power." *Id.* §§ 1801(b)(2)(C), 1821(1). Moreover, "anyone who knowingly aids, abets, or conspires with an agent in furtherance of such activities is also deemed an agent of a foreign power." *Omar*, 786 F.3d at 1111 (quoting *United States v. Daoud*, 761 F.3d 678, 681 (7th Cir. 2014)); *see* 50 U.S.C. §§ 1801(b)(2)(E), 1821(1).

If the Government intends to offer FISA-obtained evidence in a criminal trial, FISA provides a procedure by which a district court can review a probable-cause determination without allowing the defendant to review the FISA materials. When the Attorney General certifies under oath that "disclosure [of the FISA materials] or an adversary hearing would harm the national security of the United States," a district court should "review in camera and ex parte the [FISA] application, order, and such other materials" as may be necessary to determine whether the surveillance or physical search was "lawfully authorized and conducted." *Id.* §§ 1806(f), 1825(g). The district court may order the Government to disclose the FISA materials to an aggrieved person "under appropriate security procedures and protective orders" but may do so "only where such disclosure is necessary to make an accurate determination of the legality" of the surveillance or physical search. *Id.* §§ 1806(f), 1825(g); *see also id.* §§ 1806(g), 1825(h). Under FISA, "disclosure and an adversary hearing are the

-14-

exception occurring *only* when necessary."   *Omar*, 786 F.3d at 1110 (alteration omitted) (quoting *United States v. Isa*, 923 F.2d 1300, 1306 (8th Cir. 1991)).

Ali and Hassan assert that FISA violates the Constitution in two ways.[2]  We review these arguments *de novo*.  *See McDermott*, 613 F.3d at 1193.  Ali and Hassan's primary argument is that FISA violates the Fourth Amendment by permitting a search without probable cause to believe that a crime has been committed.  This argument runs headlong into our precedent.  In *Isa*, we concluded that a defendant's Fourth Amendment rights are not violated by FISA surveillance so long as the probable-cause standard of FISA is met.  923 F.2d at 1304.  The Supreme Court has recognized that "[d]ifferent standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens."  *United States v. U.S. Dist. Court*, 407 U.S. 297, 322-23 (1972).  Consistent with our conclusion in *Isa*, we find that the probable-cause showing required by FISA is reasonable under the circumstances.  923 F.2d at 1304; *see United States v. Abu-Jihaad*, 630 F.3d 102, 121-23 (2d Cir. 2010); *United States v. Pelton*, 835 F.2d 1067, 1075 (4th Cir. 1987); *United States v. Cavanagh*, 807 F.2d 787, 789-91 (9th Cir. 1987).

Ali and Hassan next assert that FISA's *in camera*, *ex parte* procedure violates their right to due process.  However, other courts uniformly have rejected this proposition.  *See El-Mezain*, 664 F.3d at 567-68; *Abu-Jihaad*, 630 F.3d at 129; *United States v. Damrah*, 412 F.3d 618, 624 (6th Cir. 2005); *United States v. Ott*, 827 F.2d 473, 476-77 (9th Cir. 1987); *United States v. Belfield*, 692 F.2d 141, 148-49 (D.C. Cir. 1982).  Ali and Hassan provide no persuasive reason for us to reject this wealth of

---

[2]Ali and Hassan also assert without elaboration that FISA's *in camera*, *ex parte* procedure "denies the right to the effective assistance of counsel" in violation of the Sixth Amendment.  We decline to consider this undeveloped claim.  *See United States v. Stanko*, 491 F.3d 408, 415 (8th Cir. 2007).

-15-

well-reasoned authority, and seeing no reason to do so, we likewise hold that FISA's *in camera*, *ex parte* procedure is consistent with due process.

Ali and Hassan also contest the district court's decision not to disclose the FISA materials to them under 50 U.S.C. § 1806(f). We review the district court's disclosure decision for abuse of discretion. *See Omar*, 786 F.3d at 1111. The FISA materials have been submitted to this panel, and we have undertaken a careful and comprehensive review of them to determine whether the district court acted within its discretion by concluding that disclosure was not "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f). Based upon this review, we conclude that the district court did not abuse its discretion by refusing to disclose the FISA materials to Ali and Hassan.

Ali and Hassan next assert that the district court should have suppressed any FISA-obtained evidence because FISA's probable-cause standard has not been met. In particular, Ali and Hassan direct us to FISA's requirement that "no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States." 50 U.S.C. § 1805(a)(2)(A). As we observed in our recent *Omar* decision, courts have reached different conclusions about the standard of review applicable to probable-cause determinations under FISA, with some courts undertaking a *de novo* review of the issue and others applying more deferential review. 786 F.3d at 1112. We think it best to leave the resolution of this issue for a case in which deciding it matters. It does not here. The probable-cause determination in this case is straightforward. After thoroughly reviewing the FISA materials, we have no problem concluding that probable cause under FISA existed under any standard of review.

-16-

### D.     Severance

Ali and Hassan offer four reasons why the district court should have severed their trials.  We will not reverse the denial of a motion to sever unless the movant demonstrates an abuse of discretion resulting in clear prejudice.  *United States v. Anderson*, 783 F.3d 727, 743 (8th Cir. 2015), *petitions for cert. filed*, --- U.S.L.W. --- (U.S. July 15, 2015) (Nos. 15-77, 15-81).

First, Hassan argues that severance was required so that Ali could testify on Hassan's behalf in a separate trial.  "The district court does not abuse its discretion in denying a motion to sever absent a 'firm representation' that a co-defendant would be willing to testify on the defendant's behalf."  *United States v. Crumley*, 528 F.3d 1053, 1063 (8th Cir. 2008) (quoting *United States v. Blaylock*, 421 F.3d 758, 767 (8th Cir. 2005)).  The defendant also must show that her co-defendant's testimony would be exculpatory.  *Id.* at 1064.  In Hassan's motion to sever, her counsel stated that it is "substantially likely" that Ali would be willing to testify on Hassan's behalf because the two were close friends.  Hassan's counsel did not further support this assertion. *Compare id.* at 1063 (explaining that defendant's pre-trial motion to sever "simply stated that he would call [the co-defendant] to testify" and offered "no proof to the district court that [the codefendant] agreed to testify on [the defendant's] behalf"), *with United States v. DeLuna*, 763 F.2d 897, 920 (8th Cir. 1985) (noting that co-defendant's counsel had stated that his client "had affirmatively represented that he would testify on behalf of [the defendant] if the trials were severed"), *overruled on other grounds by United States v. Inadi*, 475 U.S. 387 (1986).  Without more, the district court did not abuse its discretion by denying Hassan's motion to sever due to the lack of a firm representation that Ali would testify in a separate trial.  *See Crumley*, 528 F.3d at 1063-64.  Therefore, we need not reach the separate question of whether Hassan showed that Ali's testimony in a separate trial would be exculpatory.

-17-

Second, Hassan argues for severance based on Ali's refusal to stand at the beginning of the trial.  It has long been the rule that severance is warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  According to Hassan, this rule has been transgressed because Ali "acted in defiance of the law by refusing to stand for the judge, in plain view of the jurors."  However, "[s]everance is not required merely . . . because [a] co-defendant[] engage[s] in disrespectful behavior in court." *United States v. Delpit*, 94 F.3d 1134, 1143-44 (8th Cir. 1996).  The district court was in the best position to observe what effect, if any, Ali's initial failure to stand had on the jury.  In light of its superior vantage point, we cannot say that the court abused its discretion in allowing the joint trial to go forward after Ali temporarily refused to stand.

Third, Hassan argues that severance was necessary because the jury could not compartmentalize the separate evidence against her and Ali.  This argument faces an uphill battle, for "[r]arely, if ever, will it be improper for co-conspirators to be tried together." *United States v. Kime*, 99 F.3d 870, 880 (8th Cir. 1996) (quoting *United States v. Drew*, 894 F.2d 965, 968 (8th Cir. 1990)).  When assessing the jury's ability to compartmentalize evidence, "we consider the complexity of the case, whether any of the defendants were acquitted, and the adequacy of the jury instructions and admonitions to the jury." *United States v. Ghant*, 339 F.3d 660, 666 (8th Cir. 2003).

Hassan's compartmentalization argument centers on her contention that the Government's case against her was weaker than its case against Ali.  That may be, but a mere disparity in the weight of the evidence is not a valid basis for severance.  *See United States v. Dierling*, 131 F.3d 722, 734 (8th Cir. 1997).  Hassan also identifies allegedly prejudicial evidence that she believes would not have been admissible against her in a separate trial.  In particular, Hassan points to a telephone conversation between Ali and Afgoye in which they discussed a recent suicide bombing and money

-18-

that Ali had sent to Afgoye.  But "[a]cts committed in furtherance of a conspiracy are admissible as circumstantial evidence that the agreement existed, unless the evidence [is inadmissible] under Fed. R. Evid. 403."  *Id.* at 730 (internal citation omitted); *see United States v. Davis*, 154 F.3d 772, 781 (8th Cir. 1998).  Hassan does not dispute this rule but argues that this telephone call would not have been admissible in a separate trial against her under Rule 403.  This argument lacks merit.  By demonstrating that Hassan's co-conspirator spoke with an al Shabaab leader about sending him money during the charged conspiracy, this telephone conversation had substantial probative value.  The fact that Ali and Afgoye discussed a recent suicide bombing does not inject unfair prejudice, especially because Hassan once called Ali to discuss a suicide bombing, describing it as "[t]he best joy ever."

It is true that some evidence was admissible only against Ali.  For example, as discussed in detail below in Part II.E, there was evidence admitted against Ali but not Hassan under Federal Rule of Evidence 404(b).  But the district court instructed the jury about the limited use of this evidence.  For example, the court instructed the jury that "you may consider [this evidence] to help you to decide Defendant Ali's intent" and "you may consider the evidence of prior acts only on the issue of intent of Defendant Ali."  The court also told the jury that "if you were instructed that some evidence was received for a limited purpose only, you must follow that instruction." Hassan contends that these instructions were insufficient to eliminate spillover concerns because "it was not clearly stated that [the evidence] should not be considered in the case against Ms. Hassan." This argument meaninglessly splits hairs. The court's instructions plainly limited the jury's consideration of the Rule 404(b) evidence to the issue of Ali's intent.  *See United States v. Ford*, 726 F.3d 1028, 1033 (8th Cir. 2013) (stating that juries are presumed to be able to follow and understand the court's instructions), *cert. denied*, 574 U.S. ---, 135 S. Ct. 131 (2014).  Moreover, the court also limited spillover concerns by telling the jury that it must give "separate consideration to the evidence about each individual defendant" and that "[e]ach

-19-

defendant is entitled to be treated separately." *See Ghant*, 339 F.3d at 666 (relying on a similar instruction).

In addition, this case was not so complicated that concerns about the jury's ability to follow these instructions arise. *See id.* Although the trial lasted ten days, it focused on the Government's straightforward theory that Ali and Hassan took part in a scheme to funnel money to al Shabaab. "Despite the different degree of involvement on the part of each of the defendants, we believe that the jury would have been able to compartmentalize the evidence against [Hassan]." *See id.* We therefore find no abuse of discretion in the court's denial of Hassan's motion for severance due to compartmentalization concerns.

Fourth, Ali argues that severance was required under *Bruton v. United States*, 391 U.S. 123 (1968). "We review de novo the issue of whether a *Bruton* violation occurred." *United States v. High Elk*, 442 F.3d 622, 625 (8th Cir. 2006). In *Bruton*, the Supreme Court held that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201-02 (1987). "*Bruton* does not apply at all when a codefendant's statements do not incriminate the defendant either on their face or when considered with other evidence." *United States v. Melina*, 101 F.3d 567, 570 (8th Cir. 1996), *overruled on other grounds by Jones v. United States*, 529 U.S. 848 (2000). Moreover, "Supreme Court cases have held that *Bruton* is not violated if the non-testifying defendant's statement only inculpates a codefendant inferentially—through linkage to other evidence." *United States v. Coleman*, 349 F.3d 1077, 1085 (8th Cir. 2003) (discussing redacted statement of non-testifying defendant).

Ali asserts that the admission of three of Hassan's statements during her FBI interviews violated *Bruton*: (1) "Amina Ali provides [Hassan] a list and [she] collects

-20-

the money and gives it to Amina Ali"; and (2) certain money was "provided to Ms. Ali"; and (3) "Amina Ali spoke about jihad."  The Government's brief does not mention the third statement but argues that the first two statements do not violate *Bruton* because "Hassan did not tell the FBI that the money went to al Shabaab." However, Hassan's statements linked Ali to some of the money that formed the basis of the Government's material-support case.   Thus, these statements arguably inculpated Ali when considered alongside other evidence presented at trial.  *Cf. Melina*, 101 F.3d at 570 (finding no *Bruton* error where a codefendant's statements that mentioned the defendant at most inculpated the defendant when considered with other evidence and the district court's limiting instruction cured any risk of harm to the defendant).  Even so, we need not resolve whether the statements listed above violated *Bruton*.

"It is well-established that a *Bruton* error is subject to harmless-error analysis." *Coleman*, 349 F.3d at 1086.  Assuming that *Bruton* was violated, we must determine whether the error was harmless beyond a reasonable doubt.   *United States v. Chapman*, 345 F.3d 630, 635 (8th Cir. 2003).  A *Bruton* error can be harmless beyond a reasonable doubt if "[t]he testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury." *Brown v. United States*, 411 U.S. 223, 231 (1973); *see Coleman*, 349 F.3d at 1086. As described above in Part I, the Government's case meticulously connected Ali to the money sent to al Shabaab—through telephone calls and documentation for the money transfers.  As a result, Hassan's statements connecting Ali to some of this money merely served as cumulative evidence of a fact that the Government overwhelmingly proved.   Indeed, during Ali's closing argument, her counsel acknowledged as much, stating that "[Ali] was raising money for the jihad.  She was raising money for the fighters. . . . She was raising money for the families that were left over for the martyred fighters.  It's all over.  She wasn't hiding it because these were public calls." The admission of Hassan's statement that Ali spoke about jihad also was harmless beyond a reasonable doubt.  The Government admitted recorded

-21-

conversations in which Ali specifically mentioned jihad, and Ali's counsel asserted in closing argument that Ali "did not hide that the duty is jihad." Consequently, even if Ali's Confrontation Clause rights were violated, any error was harmless beyond a reasonable doubt. *See Brown*, 411 U.S. at 231.

## E.    Evidentiary Issues

Ali and Hassan appeal several of the district court's evidentiary rulings. They meaningfully challenge the admission of three categories of evidence: (1) evidence that Ali supported al Shabaab before its designation as a foreign terrorist organization; (2) evidence that Ali and Hassan spoke with and supported non-al Shabaab persons who were specially designated global terrorists or were associated with specially designated global terrorists; and (3) expert testimony about the connections between al Shabaab and al Qaeda.[3] We review these issues for clear abuse of discretion and will reverse "only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." *Omar*, 786 F.3d at 1112 (quoting *Anderson*, 783 F.3d at 745).

We begin with the contention that evidence of Ali's support of al Shabaab before it was designated a foreign terrorist organization constitutes inadmissible propensity evidence under Rule 404(b). This rule provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to

---

[3]Ali and Hassan mention other pieces of evidence that they say should have been excluded, but they fail to take the necessary step of explaining *why* this evidence was inadmissible. This is insufficient to raise an argument for our consideration. *See* Fed. R. App. P. 28(a)(8)(A) (stating that an appellant's brief should contain "appellant's contentions *and the reasons for them*, with citations to the authorities and parts of the record on which the appellant relies" (emphasis added)); *Stanko*, 491 F.3d at 415 (noting that claims not meaningful argued in the appellant's opening brief are waived).

-22-

show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).  However, evidence may be admitted for another purpose, such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "Rule 404(b) is a rule of inclusion, prohibiting only evidence that tends solely to prove the defendant's criminal disposition."  *United States v. Shoffner*, 71 F.3d 1429, 1432 (8th Cir. 1995).

The Government argues that evidence of Ali's pre-designation support of al Shabaab is not subject to Rule 404(b) because it is intrinsic evidence of the charged conspiracy.  "Rule 404(b) applies only to extrinsic, not intrinsic, evidence."  *United States v. Young*, 753 F.3d 757, 770 (8th Cir. 2014), *cert. denied*, 574 U.S. ---, 135 S. Ct. 986 (2015).  "Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred."  *Id.* (quoting *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006)). Put differently, intrinsic evidence "completes the story or provides a total picture of the charged crime."  *Id.* (internal quotation marks omitted) (quoting *Johnson*, 463 F.3d at 808).  We agree that the evidence of Ali's pre-designation support of al Shabaab qualifies as intrinsic evidence.  In a telephone call, Ali told Afgoye that, in 2007, she contacted an al Shabaab leader, and "[w]e immediately collected money in a quick manner and sent it to them" and "have been collecting for them ever since."  Ali stated that she later learned that the "young men"—a reference to al Shabaab—"should be isolated."  The Government contends that being "isolated" refers to al Shabaab's designation as a foreign terrorist organization, an assertion that is corroborated by Ali's statement to Afgoye that her family members tried to convince her to avoid arrest.  This telephone call qualifies as intrinsic evidence of the charged conspiracy. Ali's conversation with Afgoye shows how she began raising money for al Shabaab and arguably illustrates how she reacted to the news that it was illegal to send money to al Shabaab, thereby providing context to the charged crime.  *See United States v. Roberts*, 253 F.3d 1131, 1134 (8th Cir. 2001) ("[I]t is fair to say that [the defendant's]

-23-

prior bank robberies . . . helped to explain both the genesis and the execution of [the defendants'] bank robbery offense.").

Ali and Hassan next assert that Rule 404(b) prohibits the admission of evidence about their contact with and support of non-al Shabaab individuals who were specially designated global terrorists or were associated with specially designated global terrorists. One such individual was Hassan Dahir Aweys, who led a militia in Somalia and "has acted as a mentor for a number of the key leaders in al Shabaab and . . . is currently aligned with al Shabaab." The Government's evidence about Aweys included a telephone call between Ali and Hassan in which they discussed having Aweys speak during a teleconference. After Aweys eventually spoke, Ali told Afgoye that "[n]o one donated anything[, b]ut I sent you the small amount that was donated." This telephone call thus connected Aweys to the conspiracy to provide material support to al Shabaab. Consequently, the evidence about Aweys likewise was intrinsic to the charged conspiracy. *See Young*, 753 F.3d at 770 (stating that intrinsic evidence is "inextricably intertwined as an integral part of the immediate context of the crime charged" (quoting *United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998)); *Moore v. United States*, 178 F.3d 994, 1000 (8th Cir. 1999).

Ali and Hassan next object to the admission under Rule 404(b) of evidence about Isse Kamboni. The jury learned that Kamboni was associated with another militia aligned with al Shabaab and that this militia was led by Hassan al-Turki, who was a specially designated global terrorist. The Government admitted a telephone call between Ali and Kamboni in which Kamboni described a joint operation between his militia and al Shabaab. Ali then mentioned sending Kamboni money. In another telephone call, Ali told Kamboni that "we will try to send $1,000, God willing. . . . We will send it under someone's name, God willing." The district court did not abuse its discretion by admitting this evidence because it helped to establish Ali's intent for the charged crimes. *See* Fed. R. Evid. 404(b)(2). For example, in order to convict Ali of conspiring to provide material support to al Shabaab, the Government had to show,

-24-

among other things, that she "knew that al Shabaab was a designated terrorist organization, knew that al Shabaab has engaged or engages in terrorist activity, or knew that al Shabaab has engaged or engages in terrorism." *Omar*, 786 F.3d at 1113 (citing 18 U.S.C. § 2339B(a)(1)). That Ali spoke with and supported another militia aligned with al Shabaab undermined her defense that she merely intended to provide humanitarian relief and instead showed that she knew the true nature of al Shabaab's activities.

Ali and Hassan argue that this evidence is nonetheless inadmissible because it is unfairly prejudicial. *See United States v. Cook*, 454 F.3d 938, 941 (8th Cir. 2006) (listing requirements for admitting evidence under Rule 404(b), including that its probative value is not substantially outweighed by the danger of unfair prejudice under Rule 403). As explained just above, by rebutting one of Ali's defenses and proving the mens rea element under 18 U.S.C. § 2339B, the evidence about Ali's communication with and support of Kamboni had meaningful probative value. Furthermore, the district court gave limiting instructions to the jury about this evidence that diminished any danger of unfair prejudice. *See United States v. Franklin*, 250 F.3d 653, 659 (8th Cir. 2001). For these reasons, the district court did not abuse its discretion by admitting Rule 404(b) evidence about Ali's communication with and support of Kamboni and his militia.

Finally, Ali and Hassan contend that the district court abused its discretion by allowing Matthew Bryden, the Government's expert witness, to testify about the connections between al Shabaab and al Qaeda. This testimony, they argue, should have been excluded as unfairly prejudicial under Rule 403. This argument mirrors an argument that we rejected in *Omar*. There, we considered testimony by the *same* expert witness about "al Shabaab's connections to al Qaeda, Osama bin Laden, and global jihad." *Omar*, 786 F.3d at 1112. In *Omar*, we found that Bryden's testimony about al Shabaab's connections to al Qaeda was "dry and academic" and "devoid of vivid imagery that might excite the jury." *Id.* at 1113 (quoting *United States v.*

-25-

*Ibrahim*, 529 F. App'x 59, 63 (2d Cir. 2013) (summary order)).  Bryden's matter-of-fact testimony here was no different.  Moreover, Bryden's description of al Shabaab's connections to al Qaeda was only a small part of his lengthy testimony, and the trial court was careful not to allow Bryden's testimony about this topic to become a point of emphasis during trial, sustaining Ali's objection when another witness was asked to repeat Bryden's testimony.  *See id.*

Bryden's testimony also had substantial probative value.  As we explained in *Omar*, a description of the connections between al Shabaab and al Qaeda "helped to establish the open and notorious nature of al Shabaab's activities," a fact that is relevant for establishing the mens rea necessary for a material-support conviction under 18 U.S.C. § 2339B.  786 F.3d at 1112-13.  Moreover, much of Bryden's testimony about al Qaeda related to an exchange of statements between Osama bin Laden and al Shabaab.  This testimony was probative because the Government admitted a telephone call between Ali and Afgoye in which the two discussed al Shabaab's response to Osama bin Laden's message.  Bryden's testimony therefore added helpful context for the trier of fact.  For these reasons, we find no abuse of discretion in permitting Bryden's limited testimony about the ties between al Shabaab and al Qaeda.

## F.    Closing Argument

Ali and Hassan contend that the Government made improper and prejudicial remarks during the rebuttal portion of its closing argument.  "To be successful, [a defendant] must show that the [Government's] remarks were improper and that his right to a fair trial was prejudiced."  *United States v. Collins*, 642 F.3d 654, 657 (8th Cir. 2011).  However, because no objection was made during the rebuttal argument, our review is for plain error.  *See id.* ("Unobjected-to closing statements are grounds for reversal only in exceptional circumstances.").

-26-

First, Ali and Hassan claim the prosecutor improperly "vouched" for al Shabaab's designation as a foreign terrorist organization. *Cf. United States v. Benitez-Meraz*, 161 F.3d 1163, 1167-68 (8th Cir. 1998) (discussing improper vouching). In particular, Ali and Hassan point to the prosecutor's remark that "it's not your decision whether al Shabaab should be designated as a foreign terrorist organization. That decision has been made at the highest levels of the United States government." But this was a correct statement of the law on which the jury was instructed, *see* 8 U.S.C. § 1189(a)(1), (a)(8), and we have rejected a prosecutorial-misconduct argument where, as here, "the prosecutor did little more than paraphrase the court's [jury] instruction." *United States v. Johnson*, 639 F.3d 433, 442 (8th Cir. 2011).

Second, Ali and Hassan object to the prosecutor's comments during rebuttal argument about the propriety of al Shabaab's designation as a foreign terrorist organization—for example, by saying that there are "good reasons" for this designation. But Ali's and Hassan's closing arguments about al Shabaab "invited a response by the prosecutor and the prosecutor has a right to reply to an argument raised by the defense." *See Wycoff v. Nix*, 869 F.2d 1111, 1114 (8th Cir. 1989); *see Collins*, 642 F.3d at 658 ("An advocate is permitted considerable latitude in responding to his opponent's arguments.") (quoting *United States v. Beaman*, 361 F.3d 1061, 1065 (8th Cir. 2004)). In their closing arguments, Ali and Hassan attempted to portray al Shabaab in a positive light, saying that al Shabaab was "knock[ing] the foreign invader out" and was seen as a "popular movement," a "movement of the Somalian people," and a group of "freedom fighters." Because the prosecutor's comments were a fair reply to these assertions, no plain error was committed. *See Wycoff*, 869 F.2d at 1114-15.

Third, Ali and Hassan object to the prosecutor's reference to Zacarias Moussaoui during rebuttal argument. The prosecutor described Moussaoui as the "20th hijacker" who was captured before the September 11th terrorist attacks and stated:

-27-

> [S]uppose the FBI had gone to him and said, Mr. Moussaoui, we have heard you might have some information about something that's going to happen and he lied and said I don't know anything about it . . . I don't have any contact with those people, I don't know anybody who is about to go do something against the United States.  Would anybody here just say, well, it wouldn't be fair to convict him?

The Government defends this argument as a fair reply to Hassan's closing argument that asked the jury whether it would be "fair" to convict her of making false statements that did "not influence[] the Government one bit."   Though the prosecutor's rhetorical comparison to an individual associated with the September 11th terrorist attacks gives us some pause, the Government was not the first party to bring up these attacks.  Ali's counsel already had discussed the September 11 terrorist attacks during closing argument, comparing the attacks to "Japanese kamikaze pilots." "While the prosecutor's remark might well have been improper if unprovoked, 'where the prosecutor, his witnesses, or the work of government agents is attacked, the [prosecutor] is entitled to make a fair response and rebuttal.'"  *Beaman*, 361 F.3d at 1066 (alteration omitted) (quoting *United States v. Lee*, 743 F.2d 1240, 1253 (8th Cir. 1984)).  We discern no plain error.

## G.    Sentencing

We now turn to Ali's and Hassan's sentences.  Ali and Hassan first contend that the district court erred by imposing two sentencing guidelines enhancements.  In reviewing the district court's imposition of these enhancements, we review factual findings for clear error and the construction and application of the advisory sentencing guidelines *de novo*.  *See United States v. Stong*, 773 F.3d 920, 925 (8th Cir. 2014), *cert. denied*, 575 U.S. ---, 135 S. Ct. 1872 (2015).

We begin with the sentencing enhancements imposed under USSG § 3A1.4, which states that "[i]f the offense is a felony that involved, or was intended to

-28-

promote, a federal crime of terrorism, increase by 12 levels" and "the defendant's criminal history category . . . shall be Category VI."  Ali and Hassan assert that a conviction under 18 U.S.C. § 2339B for material support of a foreign terrorist organization cannot be a federal crime of terrorism for purposes of the § 3A1.4 enhancement.  However, under § 3A1.4, a federal crime of terrorism has the meaning given to that term in 18 U.S.C. § 2332b(g)(5).  USSG § 3A1.4 cmt. n.1.  Section 2332b(g)(5), in turn, provides that a federal crime of terrorism is an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and is a violation of certain enumerated provisions.  Among these identified provisions is 18 U.S.C. § 2339B, the provision under which Ali and Hassan were convicted.

Ali and Hassan respond that applying the § 3A1.4 enhancement to a conviction under 18 U.S.C. § 2339B is inconsistent with a congressional directive to the United States Sentencing Commission.  They note that, in 1994, Congress told the Sentencing Commission to "amend its sentencing guidelines to provide an appropriate enhancement for any felony . . . that involves or is intended to promote international terrorism, *unless such involvement or intent is itself an element of the crime*."  Violent Crime Control & Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022 (1994) (emphasis added).  Relying on the italicized language, Ali and Hassan assert that the § 3A1.4 enhancement cannot apply to their § 2339B convictions.  We need not weigh in on this legal issue because, in 1996, Congress ordered the Commission to "amend the sentencing guidelines so that the . . . adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code."  Antiterrorism & Effective Death Penalty Act of 1996, Pub. L. No. 104-32, § 730, 110 Stat. 1214, 1303 (1996).  "The Sentencing Commission did as instructed, adding the first application note to section 3A1.4 defining a 'federal crime of terrorism' as having the same 'meaning given that term in 18 U.S.C. § 2332b(g)(5).'"  *United States v. Jordi*, 418 F.3d 1212, 1216 n.2 (11th Cir. 2005) (quoting USSG 3A1.4(a) cmt. n.1).

-29-

Therefore, "it is clear that the [§ 3A1.4] terrorism enhancement may be imposed on a defendant who has been convicted of providing material support to a designated [foreign terrorist organization]." *Hammoud*, 381 F.3d at 355.

Ali and Hassan next challenge the § 3A1.4 enhancement as violating their Sixth Amendment right to a jury trial. We have rejected this argument before. *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014). It is settled that "the Sixth Amendment permits a district court to rely on facts beyond those found by the jury when the court calculates the applicable advisory sentencing guidelines range and selects a sentence within the statutorily-prescribed range." *United States v. Bennett*, 765 F.3d 887, 897 (8th Cir. 2014), *cert. denied*, 574 U.S. ---, 135 S. Ct. 1463 (2015). Therefore, the court's imposition of the § 3A1.4 enhancement did not violate the Sixth Amendment rights of Ali or Hassan. *See Mohamed*, 757 F.3d at 760.

Ali and Hassan also assert that imposing the § 3A1.4 enhancement violates their due-process rights because this sentencing enhancement is based solely on prejudice and fear. The Second Circuit, as Ali and Hassan acknowledge, roundly rejected a similar due-process challenge to the § 3A1.4 enhancement in *United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003). Applying rational basis review, the court concluded that Congress and the Sentencing Commission "had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *Id.* at 92. The court continued, "[E]ven terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Id*

Our court considered a due-process challenge to a sentencing enhancement in *United States v. Meirick*, 674 F.3d 802 (8th Cir. 2012). We began with the proposition that "[o]nce a person has been convicted of a crime in accordance with

-30-

constitutional guarantees, determining the severity of his punishment is, in the first instance, a legislative task." *Id.* at 805. "Those [legislative] decisions are not subject to substantive due process . . . review, absent line-drawing that is totally arbitrary or based upon an impermissible factor such as race." *Id.* As a result, "'rational basis' review of sentencing provisions under the Due Process Clause . . . must be highly deferential to legislative judgments about the most effective way to protect the public from convicted criminals." *Id.* However, in *Meirick*, we declined to apply rational basis review to the challenged sentencing enhancement because it "did not cause [the defendant's] sentencing injury" in light of the advisory nature of the sentencing guidelines. *Id.*

After *Meirick*, a strong argument could be made that we need not review the § 3A1.4 enhancement under rational basis review. *See id.* However, instead of addressing *Meirick*, Ali, Hassan, and the Government have argued the merits of this issue. For this reason, rather than consider *Meirick*'s applicability, we simply adopt the Second Circuit's well-reasoned conclusion in *Meskini* that the § 3A1.4 enhancement is "in no way irrational" and survives rational basis review. 319 F.3d at 92.

Ali and Hassan also urge that the § 3A1.4 enhancement was improperly applied because their offenses were not "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See* 18 U.S.C. § 2332b(g)(5)(A). We recently explained that this standard "does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object." *Mohamed*, 757 F.3d at 760 (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010)). "'Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance." *Id.* (quoting *Awan*, 607 F.3d at 317).

-31-

The district court did not err by concluding that Ali's and Hassan's offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct.[4]  The district court so concluded based upon Ali's and Hassan's contact with al Shabaab members, their vocal support of al Shabaab's efforts to expel the TFG by force, and their fundraising efforts in support of that cause.  As the district court noted, when Hassan learned of a suicide bombing that targeted a TFG minister, she described it as "[t]he best joy ever."  And when Ali learned that al Shabaab had "captured alive and then slaughtered" forces aligned with the TFG, Ali stated, "Were they killed? Thanks God. Yes."  These facts demonstrate that Ali's and Hassan's offenses were calculated to influence or affect the TFG by intimidation or coercion or to retaliate against that government.  *See Hammoud*, 381 F.3d at 356.

Ali and Hassan next challenge the imposition of a two-level enhancement under USSG § 2M5.3(b)(1)(E), which applies if an offense involves "the provision of . . . funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act."  They contend that their conduct does not warrant applying this enhancement.  Based upon the facts just described, there was no error by the district court in concluding otherwise.[5]

---

[4]Relying upon expert testimony from trial, the district court found that the TFG was the recognized government of Somalia at all relevant times.  Neither Hassan nor Ali meaningfully challenge this finding on appeal.  *See Mohamed*, 757 F.3d at 760 (affirming application of the § 3A1.4 enhancement where plea agreement stated that defendant "assisted men with traveling to Somalia, so that the men could fight against Ethiopian troops who were in Somalia assisting the internationally-recognized Transitional Federal Government") (ellipsis omitted).

[5]Ali and Hassan assert that the record does not indicate whether the district court considered granting a downward departure under USSG § 2M5.3 cmt. n.2, even though Ali raised this issue in her sentencing memorandum.  However, at Ali's sentencing hearing, she failed to raise this departure argument even after the court

-32-

This brings us to the individual challenges that Ali and Hassan raise with respect to their sentences. We begin with Ali's sentence of 240 months in prison. She first contends that the court procedurally erred by failing to consider the factors from 18 U.S.C. § 3553(a) and by failing to explain the reasons for her sentence. *See United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). "We do not require a mechanical recitation of the § 3553(a) factors at sentencing." *United States v. Diaz-Pellegaud*, 666 F.3d 492, 504 (8th Cir. 2012). Rather, "it simply must be clear from the record that the district court actually considered the § 3553(a) factors in determining the sentence." *Id.* (quoting *United States v. Walking Eagle*, 553 F.3d 654, 659 (8th Cir. 2009)).

Before sentencing Ali, the court conducted a lengthy sentencing hearing during which it asked many questions that related to the § 3553(a) factors. The court asked Ali questions about her background, her contact with members of al Shabaab, her understanding of al Shabaab's goals and activities, and the circumstances under which she had sent money to al Shabaab. Furthermore, in sentencing Ali, the court specifically stated that it had followed the § 3553(a) factors and had considered the presentence investigation report, counsels' arguments, and "all the pertinent terrorism cases." The district court's questions and its statement in imposing Ali's sentence satisfy us that the court "considered the parties' arguments and ha[d] a reasoned basis for exercising [its] own legal decisionmaking authority." *United States v. Roberson*, 517 F.3d 990, 994 (8th Cir. 2008) (second alteration in original) (quoting *Rita v.*

---

asked whether there were "[a]ny other objections to the advisory guideline calculations by the defense." This suggests waiver of this contention. *See United States v. White*, 447 F.3d 1029, 1031-32 (8th Cir. 2006) (finding waiver where the defendant filed written objections to the facts in the presentence investigation report but acknowledged at the sentencing hearing that those facts were correct). Even if we reviewed this argument for plain error, we would find that Ali and Hassan have not met their burden of "demonstrat[ing] a reasonable probability that, but for the error, the outcome would have been different." *United States v. Ault*, 598 F.3d 1039, 1042-43 (8th Cir. 2010); *see United States v. Bain*, 586 F.3d 634, 640-41 (8th Cir. 2009).

-33-

*United States*, 551 U.S. 338, 356 (2007)).  Furthermore, the district court later issued a written statement of reasons that expounded on its sentencing rationale.  *Cf. United States v. Townsend*, 617 F.3d 991, 994-95 (8th Cir. 2010) (per curiam).

Ali also argues that her 240-month sentence is substantively unreasonable.  We review this contention under a deferential abuse-of-discretion standard.  *Stong*, 773 F.3d at 926.  A district court abuses its discretion and imposes an unreasonable sentence "when it fails to consider a relevant and significant factor, gives significant weight to an irrelevant or improper factor, or considers the appropriate factors but commits a clear error of judgment in weighing those factors."  *Id.* (quoting *United States v. Robison*, 759 F.3d 947, 950-51 (8th Cir. 2014)).  However, when a district court varies downward from the advisory sentencing guidelines range, as the court did in fashioning Ali's sentence, "it is nearly inconceivable that the court abused its discretion in not varying downward still further."  *United States v. Zauner*, 688 F.3d 426, 429 (8th Cir. 2012) (quoting *United States v. Lazarski*, 560 F.3d 731, 733 (8th Cir. 2009)).

In urging that her below-guidelines sentence is substantively unreasonable, Ali advances two arguments.  First, she asserts that the court improperly weighed her religion and her refusal to disavow it.[6]  *Cf. United States v. Gunderson*, 211 F.3d 1088, 1089 (8th Cir. 2000) ("The sentencing guidelines direct that a defendant's religion is not relevant to the determination of a sentence.").  The portion of the sentencing transcript that Ali cites for this contention does not support her argument.  Rather, as detailed in Section II.A, the district court merely explored Ali's

---

[6]As we have done before, "[w]e recognize the existence of a second line of authority that categorizes a district court's consideration of an allegedly improper or irrelevant factor as a procedural error rather than a challenge to substantive reasonableness."  *United States v. O'Connor*, 567 F.3d 395, 397 n.3 (8th Cir. 2009).  Because we would reach the same result under either framework, we need not resolve this issue here.

-34-

understanding of al Shabaab's goals and actions—a permissible factor to consider in sentencing.  *See* 18 U.S.C. § 3553(a)(1)-(2).  Second, Ali contends that the court committed a clear error of judgment in weighing the § 3553(a) factors, including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Ali further urges that the court should have given greater weight to the fact that al Shabaab was not designated a foreign terrorist organization until shortly before she committed her crimes.  However, having reviewed the record and recognizing that the district court has substantial latitude in weighing the § 3553(a) factors, we conclude that Ali's below-guidelines sentence is not substantively unreasonable.  *See Stong*, 773 F.3d at 927.

Hassan also raises several challenges to her 120-month sentence, which is well below the advisory sentencing guidelines range.  Hassan claims that the district court procedurally erred by failing to consider the § 3553(a) factors and by failing to explain its sentencing rationale so as to permit meaningful appellate review.  *See Feemster*, 572 F.3d at 461.  In particular, Hassan asserts that the court failed to consider her mitigating evidence—specifically, her diagnosis of post-traumatic stress disorder and her life experiences.  However, Hassan's counsel made these specific mitigation arguments during the sentencing hearing, and "we presume the district court considers such matters as are presented to it," *Grimes*, 702 F.3d at 471.  Furthermore, the court conducted a lengthy sentencing hearing during which it asked several questions related to the § 3553(a) factors, including questions about Hassan's background, her knowledge of events in Somalia, and her understanding of al Shabaab's goals and activities.  And before sentencing Hassan, the court stated that it had considered the § 3553(a) factors, the "pertinent terrorism cases," the presentence investigation report, counsel's arguments, the evidence from trial, and the court's discussion with Hassan at the sentencing hearing.  We also note that the court later issued a written statement of reasons about Hassan's sentence.  We accordingly reject Hassan's claims of procedural error.  *See Roberson*, 517 F.3d at 994.

-35-

Hassan's substantive reasonableness argument likewise fails.  Her primary contention is that the court improperly weighed her religion and her refusal to disavow it.  *Cf. Gunderson*, 211 F.3d at 1089; *see also O'Connor*, 567 F.3d at 397 n.3.  Some of the court's questions during the sentencing hearing, such as querying Hassan about whether the Qu'ran permits suicide bombings, when she started wearing a hijab, and whether she knows about "the philosophy or religious viewpoint of al Shabaab," touch on the topic of religion.  However, as the recorded telephone calls admitted at trial make clear, "religion was a pervasive theme underlying the entire trial.  It is thus not surprising that religion might have been mentioned at sentencing."  *United States v. Hoffman*, 626 F.3d 993, 999 (8th Cir. 2010).  Viewing the district court's above-quoted comments in context and having reviewed the entire sentencing transcript, we can find no suggestion that the court based Hassan's sentence, which was twenty years below the bottom of her advisory guidelines range, on Hassan's religion or her refusal to disavow it.  *See id.*  Hassan further argues that her sentence is substantively unreasonable because of her limited role in the conspiracy.  However, according due deference to the court's weighing of the § 3553(a) factors, we conclude that Hassan's below-guidelines sentence is not substantively unreasonable.  *See Stong*, 773 F.3d at 927.

## III.   Conclusion

For the reasons described above, we affirm.

_____

-36-